—816—

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                         WACO DIVISION

 3   SVV TECHNOLOGY              *
       INNOVATIONS, INC.        *
 4                              *       September 26, 2024
     VS.                        *
 5                              * CIVIL ACTION NO. 6:22-CV-311
     ASUSTEK COMPUTER INC.      *
 6
                 BEFORE THE HONORABLE ALAN D ALBRIGHT
 7                    JURY TRIAL PROCEEDINGS
                         Volume 4 of 4
 8
     APPEARANCES:
 9
     For the Plaintiff:   Bradley W. Caldwell, Esq.
10                        Warren J. McCarty III, Esq.
                          Robert Seth Reich, Jr., Esq.
11                        Daniel R. Pearson, Esq.
                          Aisha Mahmood Haley, Esq.
12                        Bjorn A. Blomquist, Esq.
                          Caldwell Cassady Curry PC
13                        2121 N. Pearl St., Suite 1200
                          Dallas, TX 75201
14
                          Robert D. Katz, Esq.
15                        Katz PLLC
                          6060 N. Central Expressway, Ste 560
16                        Dallas, TX 75206

17   For the Defendant:   Eric A. Buresh, Esq.
                          Michelle L. Marriott, Esq.
18                        Chris R. Schmidt, Esq.
                          Nickolas R. Apel, Esq.
19                        Erise IP, PA
                          7015 College Boulevard
20                        Overland Park, KS 66211

21                        Mark Siegmund, Esq.
                          Cherry Johnson Siegmund James, PLLC
22                        The Roosevelt Tower
                          400 Austin Avenue, 9th Floor
23                        Waco, Texas 76701

24   Court Reporter:      Kristie M. Davis, CRR, RMR
                          PO Box 20994
25                        Waco, Texas 76702
                          (254) 666-0904
```

817

1              Proceedings recorded by mechanical stenography,

2    transcript produced by computer-aided transcription.

08:36    3

818

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | (Hearing begins.)                                        |
| 08:36 | 2  | THE COURT:  I understand there's an issue                |
| 08:36 | 3  | that you want to raise.                                   |
| 08:36 | 4  | MR. BURESH:  Yes.  Briefly, Your Honor.                  |
| 08:36 | 5  | THE COURT:  Whatever time you use raising                 |
| 08:36 | 6  | this is coming out of your time for closing.  So do       |
| 08:36 | 7  | whatever you feel best.                                   |
| 08:36 | 8  | MR. BURESH:  Okay.  Very briefly.                         |
| 08:36 | 9  | I don't want there to be any surprise                     |
| 08:36 | 10 | when the rebuttal witness comes up, and so just putting   |
| 08:36 | 11 | everyone on fair notice.  There's two paths this can      |
| 08:37 | 12 | take.  The question here is:  When was that picture       |
| 08:37 | 13 | that we saw yesterday taken?  And if it's taken here in   |
| 08:37 | 14 | court, that's the testimony, I'll simply cross-examine    |
| 08:37 | 15 | the witness, no big deal.                                 |
| 08:37 | 16 | If the testimony is that the picture was                  |
| 08:37 | 17 | taken somewhere outside of court, okay, with additional   |
| 08:37 | 18 | setup and preparation, then I'm going to be raising the   |
| 08:37 | 19 | issue in front of the jury that --                        |
| 08:37 | 20 | Can you give me the ELMO briefly?                         |
| 08:37 | 21 | -- that what we were reacting to                          |
| 08:37 | 22 | yesterday and what the witness was reacting to is the     |
| 08:37 | 23 | witness asked a question:  These micrographs were taken   |
| 08:37 | 24 | in court yesterday?                                       |
| 08:37 | 25 | And Mr. McCarty said:  Yes.                               |

08:37 1                    The witness said:  Sir, I don't believe

08:37 2    that was possible.

08:37 3                    THE COURT:  Did he do it here in court or

08:37 4    not?  I'm asking.

08:37 5                    MR. CALDWELL:  I don't know if he

08:37 6    snapped, if he pushed the --

08:38 7                    (Clarification by Reporter.)

08:38 8                    THE COURT:  I want to know what -- just

08:38 9    tell me what he did.

08:38 10                   MR. CALDWELL:  This was when he -- when

08:38 11   Mr. Credelle stepped down and gave the demonstration

08:38 12   and zoomed in on exactly that part, it's that image.

08:38 13   But I don't know if he pushed the capture there or the

08:38 14   capture's from another date.

08:38 15                   What he's going to testify to, what I

08:38 16   thought he was testifying to pursuant to literally what

08:38 17   you told us last night is, you said he's going to get

08:38 18   on the witness stand and say it is possible.

08:38 19                   Because remember they made this argument,

08:38 20   you can't do it with your microscope.  And you said

08:38 21   last night he's going to get on the witness stand and

08:38 22   say it is possible because I did it, and that's what

08:38 23   he's limited to tomorrow.  So that's literally what I

08:38 24   was going to ask him because that was your order.

08:38 25                   What I don't know is if that exact

820

08:38  1    capture is from that moment or in the breakout room or

08:38  2    whatever.  It's the same exact panel we've shown over

08:38  3    and over and over with the same exact microscope.

08:38  4              MR. BURESH:  And, Your Honor, I have

08:38  5    testimony from their witness that he could not even see

08:38  6    the image in court because he could hardly read the

08:38  7    model number.  And this is what I'm responding to,

08:38  8    Your Honor.

08:38  9              When I raised an objection, Mr. McCarty

08:39  10   said:  This is the picture we did in court yesterday

08:39  11   with Mr. Credelle who's sitting right there.  He

08:39  12   cross-examined Mr. Credelle on this picture.

08:39  13             I responded:  There was literally no

08:39  14   picture done in court yesterday.

08:39  15             And Mr. McCarty said:  Yes.  It is.

08:39  16             That picture was not taken in court.

08:39  17   Okay?  I don't -- there was no way to even see the

08:39  18   image in court.  You could not even read the model

08:39  19   number, much less see these tiny little microcosms that

08:39  20   they're pointing to with these -- the pictures they

08:39  21   showed yesterday look like wedding pictures, they were

08:39  22   so clear.  And I'm telling you they were not taken in

08:39  23   court.  That's what I was responding to yesterday.

08:39  24             I do not believe that Mr. McCarty was

08:39  25   forthcoming with the jury, with the witness, or with

08:39  1    this Court in response to my objection.  And I want to

08:39  2    point that out to the jury if they put this witness on

08:39  3    the stand.  And that's all I have.

08:39  4                    Do you need to see this further?

08:39  5                    THE COURT:  We'll bring them in.

08:39  6    Plaintiff can call him.  You can cross him and then

08:39  7    we'll finish.

08:39  8                    MR. BURESH:  Thank you, Your Honor.

08:40  9                    THE BAILIFF:  All rise.

08:40  10                   (Pause in proceedings.)

08:40  11                   THE BAILIFF:  All rise.

08:40  12                   THE COURT:  Please remain standing for

08:40  13   the jury.

08:40  14                   (Jury entered the courtroom.)

08:41  15                   THE COURT:  Thank you.  You may be

08:41  16   seated.

08:41  17                   Ladies and gentleman of the jury, we have

08:41  18   one more witness to take up, and I've given each side

08:41  19   about five minutes to examine or cross-examine that

08:41  20   witness.

08:41  21                   If you'd like to call him.

08:41  22                   MR. CALDWELL:  Actually, plaintiff rests,

08:41  23   Your Honor.

08:41  24                   THE COURT:  Okay.  Very good.

08:41  25                   Well, not very good because that means I

08:41    1    have to start reading, but very good.  And so...

08:41    2                    Yes.  Okay.  You all have this charge in

08:42    3    front of you?  Do y'all have a copy?

08:42    4                    JUROR:  I can't hear.

08:42    5                    (Off-the-record discussion.)

08:42    6                    THE COURT:  Okey-dokey.

08:42    7                    Members of the jury, it is my duty and

08:42    8    responsibility to instruct you on the law that you are

08:42    9    to apply in this case.  The law contained in these

08:43    10   instructions is the only law that you may follow.  That

08:43    11   is your duty, to follow what I instruct you the law is

08:43    12   regardless of any opinion you might have as to what the

08:43    13   law ought to be.

08:43    14                   Each of you has your own printed copy of

08:43    15   the final -- each of you has your own printed copy of

08:43    16   the final jury instructions.  There is no need for you

08:43    17   to take notes but, of course, if you want to, you can.

08:43    18                   If I have given you the impression during

08:43    19   the trial that I favor either party, you must disregard

08:43    20   that impression.  If I've given you the impression

08:43    21   during the trial that I have any opinion about the

08:43    22   facts in this case, disregard that impression because

08:43    23   you are the sole judges of the facts.  Other than these

08:43    24   instructions on the law, disregard anything I may have

08:43    25   said or done during the trial when you're arriving at

08:43  1    your verdict as judges.

08:43  2              You should consider all the instructions

08:43  3    about the law as a whole and regard each instruction in

08:44  4    light of the others without isolating a particular

08:44  5    statement or paragraph.  The testimony of the witnesses

08:44  6    and other exhibits introduced by the parties

08:44  7    constitutes all of the evidence.

08:44  8              The statements of counsel are not

08:44  9    evidence.  They are only arguments.  It is important

08:44  10   for you to distinguish between the arguments of counsel

08:44  11   and the evidence upon which the arguments rest, but

08:44  12   what the lawyers say or do is not evidence.  You may,

08:44  13   however, consider their arguments in light of the

08:44  14   evidence that's been admitted and you as judges

08:44  15   determine whether the evidence admitted in this trial

08:44  16   supports those arguments.

08:44  17             You must determine the facts from all the

08:44  18   testimony that you've heard and all of the evidence

08:44  19   admitted.  You are the judges of the facts, but in

08:44  20   finding those facts, you must apply this law that I

08:44  21   instruct you.

08:44  22             You're required by the law to decide this

08:44  23   case in a fair and impartial and unbiased manner based

08:44  24   entirely on the law and on the evidence presented to

08:44  25   you here in the courtroom.  You may not be influenced

08:44  1  by passion or prejudice or sympathy that you might have

08:45  2  for either party in arriving at your verdict.

08:45  3              After the remainder of these

08:45  4  instructions, you'll hear closing arguments from the

08:45  5  attorneys.  These are statements and arguments and I

08:45  6  remind you are not evidence and not instructions on the

08:45  7  law.  They're intended to assist you in understanding

08:45  8  the evidence and the parties' contentions.

08:45  9              A verdict form has been prepared for you.

08:45  10             This is incorrect.  At some point I will

08:45  11  fix this in the future.

08:45  12             The verdict form will be back in the jury

08:45  13  room for you.  Once you have reached a unanimous

08:45  14  decision or agreement as to the verdict, you will have

08:45  15  your foreperson fill in the blanks in verdict form,

08:45  16  date it, and sign it.

08:45  17             And also to give you a little notice in

08:45  18  advance, when we come back in and I render the verdict

08:45  19  that you've given me, I'm going to ask each of you to

08:45  20  stand up to reflect that you are in support unanimously

08:45  21  of the verdict.

08:45  22             Answer each question in the verdict form

08:45  23  from the facts as you find them to be.  Do not decide

08:45  24  who you think should win the case and answer the

08:45  25  questions to reach any result.  Your verdict must be

08:46  1    unanimous.

08:46  2                    Let's talk first about what is evidence.

08:46  3                    The evidence that you are to consider of

08:46  4    the testimony of the witnesses, the documents and other

08:46  5    exhibits admitted into evidence -- there was a

08:46  6    stipulation in this case which I read to you and which

08:46  7    the lawyers agreed to -- and any fair inference and

08:46  8    reasonable conclusions you draw from the facts and

08:46  9    circumstances that you as judges believe have been

08:46  10   proven.  Nothing else is evidence.

08:46  11                   Generally speaking, there are two types

08:46  12   of evidence.  One is direct, such as the testimony of

08:46  13   an eyewitness.  The other is indirect or

08:46  14   circumstantial, which is evidence that proves a fact

08:46  15   from which you can logically conclude a different fact

08:46  16   exists.

08:46  17                   As a general rule, the law makes no

08:46  18   distinction between direct and circumstantial evidence.

08:46  19   It simply requires you as the judges to determine from

08:46  20   the facts all the evidence that you hear in this case,

08:46  21   whether it's direct or circumstantial or a combination

08:46  22   of both.

08:46  23                   As I instructed you before the trial

08:47  24   began, in judging the facts, you must consider all the

08:47  25   evidence, both direct and circumstantial.  But that

08:47  1    does not mean you have to believe or accept all of the

08:47  2    evidence you heard.  That is why you're here as judges.

08:47  3            It is entirely up to you to give the

08:47  4    evidence you receive in the case the weight you

08:47  5    individually believe it deserves.  It's up to you each

08:47  6    to decide which witness to believe or not, the weight

08:47  7    you give any testimony you hear, and how much of any

08:47  8    witness' testimony you decide was -- you will accept or

08:47  9    reject.

08:47  10           Remember that during the course of trial,

08:47  11   there were objections, but those objections were not

08:47  12   evidence.  They may have objected -- the attorneys may

08:47  13   have objected if they thought documents or testimony

08:47  14   that were being offered into evidence were improper

08:47  15   under the rules of evidence.

08:47  16           I ruled on those, but my legal rulings as

08:47  17   to the objections are also not evidence.  If I made

08:47  18   questions -- if I made comments or asked questions,

08:47  19   those are not evidence.  Do not ever be influenced by

08:47  20   any ruling that I made on any objection.  If I

08:48  21   sustained one, then pretend the question was never

08:48  22   asked.  If there was an answer given, ignore it.

08:48  23           I often -- a couple of times I told you

08:48  24   to disregard it.  You must do that as well.

08:48  25           If I overruled an objection, act like the

08:48  1    objection was never made.  If I gave you instructions

08:48  2    that some type of evidence was received for a limited

08:48  3    purpose, follow that instruction.  If I gave any

08:48  4    limiting instruction during trial, follow it.  Any

08:48  5    testimony I tell you to exclude or disregard is not

08:48  6    evidence.  You may not consider it.

08:48  7            You are not going to conduct any

08:48  8    investigation at this point.  You're going to be

08:48  9    deliberating after this.  So I'll skip that.

08:48  10            You alone are to determine the questions

08:48  11    of credibility or truthfulness of the witnesses.  In

08:48  12    weighing the testimony of the witnesses, you may

08:48  13    consider the witness' manner and demeanor on the

08:48  14    witness stand, any feelings or interest in the case,

08:48  15    any prejudice or bias about the case that he or she may

08:48  16    have had, and the consistency or inconsistency of their

08:48  17    testimony considered in the light of all the

08:49  18    circumstances.

08:49  19            Was the witness contradicted by other

08:49  20    credible evidence?  Did he or she make statements at

08:49  21    other times in places contrary to those made here on a

08:49  22    witness stand?

08:49  23            You must give the testimony of each

08:49  24    witness the credibility that you as judges believe it

08:49  25    deserves.

08:49   1                In determining the weight to give the

08:49   2       testimony of a witness, consider there was evidence at

08:49   3       some other time the witness said or did something or

08:49   4       failed to say or do something that was different from

08:49   5       the testimony given by any of the witnesses at trial.

08:49   6                Even though a witness may be a party to

08:49   7       the action and, therefore, would be interested in its

08:49   8       outcome, you may still accept their evidence if it was

08:49   9       not contradicted by direct evidence or by a different

08:49   10      inference that could be drawn from the evidence so long

08:49   11      as you believed their testimony.

08:49   12               A simple mistake by a witness does not

08:49   13      necessarily mean that the witness did not tell the

08:49   14      truth as he or she remembered it.  Remember, we are all

08:49   15      people.  We forget things.  We remember things

08:49   16      inaccurately.

08:49   17               If a witness made a misstatement,

08:50   18      consider whether the misstatement was intentional or

08:50   19      just a mistake.  The significance of that may depend on

08:50   20      whether it has to do with an important fact or an

08:50   21      unimportant detail, but at all times it is exclusively

08:50   22      in your province as the judges to accept and believe

08:50   23      every word a witness said or disregard everything they

08:50   24      said or somewhere in between because you are the

08:50   25      exclusive judges of the facts in this case.

08:50 1            Remember this:  You are not to decide the

08:50 2    case by counting the number of witnesses who testified

08:50 3    for either side.  Witness testimony is weighed.

08:50 4    Witnesses are not counted.  The test is not the

08:50 5    relative number of witnesses but the relative

08:50 6    compelling or convincing force of their evidence.

08:50 7            Remember, the testimony of even a single

08:50 8    witness is sufficient to prove any fact even if a

08:50 9    greater number of witnesses testified to the contrary

08:50 10   if, after considering all the evidence, you believed

08:50 11   that evidence.

08:50 12           Certain testimony was presented to you in

08:50 13   the form of a deposition.  A deposition is the sworn

08:51 14   recorded answers to questions a witness was asked in

08:51 15   advance of trial.

08:51 16           There's circumstances where a witness

08:51 17   cannot be present to testify live from the witness

08:51 18   stand.  Therefore, that witness' testimony may be

08:51 19   presented under oath in the form of a deposition.  That

08:51 20   means that sometime before this trial, attorneys

08:51 21   representing the parties in this case questioned the

08:51 22   witness under oath.  There was a court reporter there

08:51 23   who was present and recorded the testimony.

08:51 24           The questions and answers were read or

08:51 25   shown to you.  The testimony -- the deposition

08:51  1    testimony is entitled to the same consideration and is

08:51  2    to be weighed and otherwise considered by you in the

08:51  3    same way as if the witness had been present and had

08:51  4    testified from the witness stand.

08:51  5              You heard testimony from a witness in

08:51  6    this case or -- who testified in the Chinese language

08:51  7    through an interpreter.  Witnesses who do not speak

08:51  8    English or who are more proficient in another language

08:51  9    testified through an official court interpreter.

08:52  10             Although some of you may know the Chinese

08:52  11   language, it is important that all jurors consider the

08:52  12   same evidence.  Therefore, you must accept the

08:52  13   interpreter's and check interpreter's translation of

08:52  14   the witness testimony.  Disregard any different

08:52  15   meaning.

08:52  16             You must not make any assumption about a

08:52  17   witness or party based solely on the use of an

08:52  18   interpreter to assist that witness during trial.

08:52  19             Let's talk about expert testimony, which

08:52  20   is testimony from a person who has a special skill or

08:52  21   knowledge in some science or profession or business

08:52  22   which is not common to the average person but has been

08:52  23   acquired by the expert through special study or

08:52  24   experience.

08:52  25             When you're weighing expert testimony,

08:52  1    consider their qualifications, the reasons for their

08:52  2    opinions, the reliability of the information that

08:52  3    supported those opinions, as well as all the factors

08:52  4    I've given you for weighing the testimony of any

08:53  5    witness.

08:53  6              Expert testimony receives whatever weight

08:53  7    and credit you as the judges think is appropriate given

08:53  8    all the evidence in the case.  You are not required to

08:53  9    accept the opinion of any expert.  Rather, you are free

08:53  10   to accept or reject the testimony of experts just as

08:53  11   with any other witness.

08:53  12             A stipulation is an agreement.  When

08:53  13   there's no dispute about certain facts, the parties may

08:53  14   agree or stipulate to facts.  If a fact is stipulated

08:53  15   to, you must accept the stipulated fact as evidence and

08:53  16   treat that fact as having been proven here in court.

08:53  17             Two stipulations were provided in this

08:53  18   case.  One is regarding representative products and has

08:53  19   been entered into the record as JTX-5.

08:53  20             The other is that the parties agree that

08:53  21   for the purpose of assessing the issue of infringement

08:53  22   in this case, you should treat ASUSTeK Computer Inc.

08:53  23   and it's wholly owned subsidiaries as one actor, that

08:53  24   is, an act of infringement by an ASUSTeK, a wholly

08:53  25   owned subsidiary, would constitute an act of

08:54  1  infringement by defendant ASUSTeK Computer Inc.  SVV,

08:54  2  the plaintiff, still has the burden to prove

08:54  3  infringement.

08:54  4          And to go off script just a bit, when we

08:54  5  finish, after the closing arguments and you go back, we

08:54  6  no longer have physical exhibits.  The exhibits will be

08:54  7  on a monitor.  And Jen will come back there and help

08:54  8  you show -- figure out how it is that you run through

08:54  9  the exhibits.

08:54  10         So with respect -- were there

08:54  11  interrogatories in this case that were read?  I don't

08:54  12  think so.

08:54  13         MR. CALDWELL:  I think an interrogatory

08:54  14  was referenced in a cross but not read aloud.

08:54  15         THE COURT:  Okay.  Well, let me go ahead

08:54  16  and say what it was.  Thank you.

08:54  17         Evidence has been presented to you in the

08:54  18  form of answers of one of the parties to a written

08:54  19  interrogatory submitted by the other side.  These

08:54  20  answers were given in writing and under oath for the

08:54  21  trial in response to questions that were submitted

08:54  22  under established court procedures.  You should

08:54  23  consider the answers, insofar as possible, in the same

08:54  24  way as if they were made from the witness stand.

08:55  25         The fact that one side or the other

08:55  1    brought this lawsuit and is in court seeking damages

08:55  2    creates no inference on their behalf that they're

08:55  3    entitled to judgment.

08:55  4           The act of making a claim in a lawsuit,

08:55  5    in this case claims of patent infringement, does not

08:55  6    tend to establish the claim is true or not true and

08:55  7    cannot be considered by you as evidence.  Also, the

08:55  8    fact that the defendant raised arguments against the

08:55  9    claims that they don't infringe creates no inference

08:55  10   that they are entitled to a judgment.

08:55  11          Both of these actions, the offensive

08:55  12   action of filing the suit and the defensive action of

08:55  13   defending a suit, are to be disregarded by you.  None

08:55  14   of those actions have anything to do with establishing

08:55  15   a judgment in either favor.

08:55  16          Certain exhibits were shown to you, such

08:55  17   as PowerPoint presentations, posters, models, and they

08:55  18   are illustrations of the evidence, but they are not

08:55  19   themselves evidence.  They are known as demonstrative

08:55  20   exhibits, which is a party's description, picture, or

08:55  21   model used to describe something involved in this

08:56  22   trial.  If your recollection of the evidence differs

08:56  23   from a demonstrative exhibit, rely on your

08:56  24   recollection.

08:56  25          I will tell you in advance, occasionally

08:56  1   we have -- jurors send a question saying we can't find

08:56  2   a certain exhibit.  If you have that problem, there's a

08:56  3   great likelihood it's because it was a demonstrative

08:56  4   exhibit and you don't have it back in the room with

08:56  5   you.  But you're still welcome to send any questions

08:56  6   you want.

08:56  7          Certain charts and summaries have been

08:56  8   shown to you solely to help explain or summarize the

08:56  9   facts disclosed by the books, records, and other

08:56  10  documents that are in evidence.  These charts and

08:56  11  summaries are not evidence or proof of any facts unless

08:56  12  I admit a chart or summary into evidence.

08:56  13         You should determine the facts from the

08:56  14  evidence.  Do not let bias, prejudice, or sympathy play

08:56  15  any role in your deliberations.  Whether you are

08:56  16  familiar with one party or the other should not play

08:56  17  any part in your deliberations.  Remember at all times

08:56  18  that a corporation and all persons are equal before the

08:57  19  law.  They must be treated as equals in a court of

08:57  20  justice.

08:57  21         We're about to turn to a burden of proof,

08:57  22  which is why you're here, is to determine whether or

08:57  23  not the parties have met their burden of proof.

08:57  24         In any legal action, facts must be proved

08:57  25  by a requirement of evidence known as the burden of

08:57  1  proof.  In this case there is only one burden of proof,

08:57  2  and it is on the plaintiff, and it is called a

08:57  3  preponderance of the evidence.

08:57  4          What does that mean?  That means that

08:57  5  plaintiff has the burden of proving patent infringement

08:57  6  and damages by a preponderance of the evidence, which

08:57  7  means evidence that persuades you that a claim is more

08:57  8  probably true than not true.  We can discuss this as

08:57  9  the greater weight and degree of credible testimony.

08:57  10  You may think of this preponderance of the evidence

08:57  11  standard as being slightly greater than 50 percent.

08:57  12          Let me read you the contentions in this

08:57  13  case.  I'm -- after I read the contentions, I'm going

08:58  14  to tell you what each party must do to prove or win on

08:58  15  its contentions.

08:58  16          The plaintiff is the owner of patents at

08:58  17  issue in this case, which are United States Patents

08:58  18  No. 9,880,342, 8,290,318, 10,439,089, and 10,627,562.

08:58  19          The plaintiff contends that defendant

08:58  20  infringes either directly or indirectly Claim 1 and 21

08:58  21  of the '342 patent; Claim 3 of the '318 patent; Claim

08:58  22  19 of the '089 patent; Claims 1 and 7 of the '562

08:58  23  patent.  These are all known as "the asserted claims."

08:58  24          The plaintiff alleges that defendant

08:58  25  infringes its patents through importing, making, using,

08:58    1    offering for sale, and/or selling the accused products.

08:58    2    They include laptops and computer monitors with

08:59    3    backlighting designs alleged to unlawfully practice the

08:59    4    inventions disclosed in the asserted patents.  They are

08:59    5    referred to as the "accused products."

08:59    6              Defendant alleges -- I'm sorry --

08:59    7    plaintiff alleges that it is entitled to damages and

08:59    8    that defendant's infringement has been willful.

08:59    9              Defendant denies that it has infringed

08:59    10   any of the asserted claims of the asserted patents.

08:59    11             And it is your job as the judges to

08:59    12   decide whether or not defendant has infringed any of

08:59    13   the asserted claims.

08:59    14             If you decide that any asserted claims

08:59    15   have been infringed, it is then up to you to decide any

08:59    16   money damages to be awarded to plaintiff to compensate

08:59    17   it for infringement.

08:59    18             If you decide that there was any

08:59    19   infringement of the asserted patents and that such

08:59    20   infringement is willful, your decision as to

08:59    21   willfulness should not affect any damages that you

08:59    22   might award.  It is up to me to take into account the

08:59    23   willfulness issue after the trial.

08:59    24             Before you can decide many of the issues

09:00    25   in this case, you need to understand the role of patent

837

09:00  1  claims.

09:00  2          Patent claims are the numbered sentences

09:00  3  at the end of each patent.  The claims are important

09:00  4  because it is the words of the claim that define what a

09:00  5  patent covers.  The figures and text in the rest of the

09:00  6  patent provide a description and/or examples of the

09:00  7  invention and provide a context for the claims, but it

09:00  8  is the claims that define the breadth of the patent's

09:00  9  coverage.  Therefore, what a patent covers depends in

09:00  10 turn on what each of the claims cover.

09:00  11         To know what a claim covers, a claim sets

09:00  12 forth in words a set of requirements.  Each claim sets

09:00  13 forth its requirements in a single sentence.  The

09:00  14 requirements of a claim are often referred to as

09:00  15 elements or limitations.

09:00  16         The coverage of a patent is asserted on a

09:00  17 claim-by-claim basis.  When a thing such as a product

09:00  18 or process meets all the requirements of that claim,

09:01  19 the claim is said to cover the thing or that the thing

09:01  20 is said to fall within the scope of the claim.  A claim

09:01  21 covers a product or process when each of the claim

09:01  22 elements or limitations is present in the product or

09:01  23 process.

09:01  24         You first need to understand what each

09:01  25 claim covers in order to decide whether or not there is

09:01  1    infringement of that claim.

09:01  2            It is my role to define the terms of the

09:01  3    claims.  It is your role to apply my definitions of the

09:01  4    terms I have construed to the issues that you are asked

09:01  5    to decide in this case.  As was explained to you at the

09:01  6    start of the case, I determined the meaning of certain

09:01  7    claim terms identified by the parties.  I have provided

09:01  8    to you my definition of certain claim terms.

09:01  9            You should not take my definition of the

09:01  10   language of the claims as an indication that I have a

09:01  11   view regarding how you should decide the issues that

09:01  12   you are here as judges being asked to decide.

09:02  13           For any words in the claim for which I

09:02  14   have not provided you a definition, you are to apply

09:02  15   what's known as the plain and ordinary meaning of those

09:02  16   terms in the field of the patent.  Patent claim terms

09:02  17   are given the plain and ordinary meaning of those terms

09:02  18   as understood by someone who possesses the ordinary

09:02  19   skill in the art.

09:02  20           The only correct comparison for

09:02  21   infringement is between the accused products and the

09:02  22   claim language.

09:02  23           My claim constructions are as follows:

09:02  24   Whether the '318 patent claim preamble is limiting.  I

09:02  25   found that it was not.

09:02  1          Whether the '089 patent, Claims 14 and

09:02  2  19, preambles are limiting.  I found that they are not.

09:02  3          For "photoresponsive layer" and

09:02  4  "photoresponsive element," for "light input surface,"

09:02  5  for "cavity" and "cavities," for "prevailing plane,"

09:02  6  and for "substantially," I gave each of those terms

09:02  7  plain and ordinary meaning.

09:02  8          For "TIR" or "total internal reflection,"

09:03  9  I gave the following construction:  The phenomenon that

09:03  10  involves the reflection of all the incident light off

09:03  11  the boundary between a first medium and a second medium

09:03  12  of lower refractive index, when the angle of incidence

09:03  13  to the second medium exceeds the critical angle.

09:03  14          I also construed "optically coupled" as

09:03  15  meaning providing for transfer of light from one

09:03  16  optical component to another.

09:03  17          Again, if I did not construe the other

09:03  18  words that are in the claims, that means you give them

09:03  19  the plain and ordinary meaning.

09:03  20          You must accept my definitions of these

09:03  21  words in the claims as being correct.  It is now your

09:03  22  job to take the definitions I've given and apply them

09:03  23  to the issues that you are deciding, in this case the

09:03  24  issue of infringement.

09:03  25          The beginning portion of a claim is known

09:03  1    as the preamble.  And it uses the word "comprising."

09:03  2    The word "comprising" when used in the preamble means

09:03  3    including but not limited to or containing but not

09:04  4    limited to.  If "comprising" is used in the preamble,

09:04  5    if you decide that an accused product includes all the

09:04  6    requirements of that claim, it is infringed.  That is

09:04  7    true even if the accused product contains additional

09:04  8    elements.

09:04  9              For example, a claim wherein a table

09:04  10   comprises a tabletop, legs, and glue would still be

09:04  11   infringed by a table that includes a tabletop, legs,

09:04  12   and glue even if the table also included wheels on the

09:04  13   table's legs.

09:04  14             You heard throughout the trial about

09:04  15   independent and dependent claims.  An independent claim

09:04  16   sets forth all the requirements that must be met in

09:04  17   order to be covered by that claim.  It is not necessary

09:04  18   to look at any other claim to determine what an

09:04  19   independent claim covers.

09:04  20             In this case, the following claims are

09:04  21   independent claims:  Claim 1 of the '342 and Claim 1 of

09:05  22   the '562 patent.

09:05  23             The following asserted claims are

09:05  24   dependent claims:  Claim 3 of the '318 patent, Claim 7

09:05  25   of the '562 patent, Claim 21 of the '342 patent, and

09:05  1    Claim 19 of the '089 patent are all dependent claims.

09:05  2              A dependent claim does not itself recite

09:05  3    all the requirements of the claim but refers to another

09:05  4    claim for some of its requirements.  In this way, the

09:05  5    claim depends on the other claim.  A dependent claim

09:05  6    incorporates all the requirements of the claim to which

09:05  7    it refers.  The dependent claim then adds its own

09:05  8    additional requirements.

09:05  9              To determine what a dependent claim

09:05  10   covers, it is necessary to look at both the dependent

09:05  11   claim and any other claims to which it refers.  A

09:05  12   product that meets all the requirements of both the

09:05  13   dependent claim and the claim to which it refers is

09:05  14   covered by the dependent claim.

09:05  15             If any requirement of a dependent claim

09:05  16   is not met or if any requirement of a claim upon which

09:06  17   the dependent claim depends is not met, then the

09:06  18   product is not covered by the dependent claim.

09:06  19             On the other hand, if the requirements of

09:06  20   an independent claim are met by a product but a

09:06  21   requirement of a dependent claim is not met, the

09:06  22   independent claim is still infringed.

09:06  23             Let's talk about infringement.

09:06  24             I will now instruct you how to decide

09:06  25   whether or not plaintiff has proven that defendant

842

09:06  1    infringed the asserted claims of the asserted patents.

09:06  2              Infringement is assessed by you as the

09:06  3    judges on a claim-by-claim basis.  There may be

09:06  4    infringement as to one claim that's asserted but no

09:06  5    infringement as to a different one.

09:06  6              A patent owner has the right to prevent

09:06  7    others from using the invention covered by his or her

09:06  8    patent claims in the United States during the life of

09:06  9    the patent.  If any person makes, uses, offers to sell

09:06  10   within the United States what is covered by the patent

09:06  11   claims without the patent owner's permission, that

09:06  12   person infringes the patent.

09:07  13             There are different ways a claim may be

09:07  14   infringed.  One is direct infringement.  One is induced

09:07  15   infringement.  Active inducement are referred to as

09:07  16   indirect infringement.  There cannot be indirect

09:07  17   infringement without someone else engaging in direct

09:07  18   infringement.

09:07  19             In this case, the plaintiff accuses

09:07  20   ASUSTeK of directly or indirectly infringing its

09:07  21   asserted patents.  In addition, they allege that

09:07  22   defendant's subsidiaries and customers directly

09:07  23   infringe the asserted patents, and that defendant is

09:07  24   liable for actively inducing the direct infringement by

09:07  25   defendant's subsidiaries and their customers.

09:07   1          In order to prove infringement, plaintiff

09:07   2   must prove that the requirements for infringement are

09:07   3   met by a preponderance of the evidence, that is, more

09:07   4   likely than not that all the requirements of

09:07   5   infringement have been proved.

09:07   6          In reaching your decision on

09:07   7   infringement, keep in mind that only the claims of a

09:08   8   patent may be infringed.  You must compare the asserted

09:08   9   patent claims, as I have defined each to you, to the

09:08  10   accused system or process and determine whether there

09:08  11   is infringement.

09:08  12          You should not compare the accused system

09:08  13   or process with any specific examples set out in the

09:08  14   patent or with the prior art in reaching your decision

09:08  15   on the issue of infringement.  The only correct

09:08  16   comparison is with the language of a claim itself as I

09:08  17   have explained the meaning to you.

09:08  18          You must reach your decision as to each

09:08  19   assertion of infringement based on my instructions

09:08  20   about the meaning and scope of the claims, the legal

09:08  21   requirements for infringement, and the evidence

09:08  22   presented to you by the parties.

09:08  23          Let me explain to you infringement in

09:08  24   more detail.

09:08  25          First, let's discuss direct infringement.

844

09:08  1    In order to prove direct infringement, plaintiff must

09:08  2    prove by a preponderance of the evidence that it is

09:08  3    more likely than not that defendant made, used,

09:08  4    imported, sold, or offered for sale within the United

09:09  5    States a product that meets all the requirements of a

09:09  6    claim and did so without the permission of defendant

09:09  7    during the time of the asserted patents being enforced.

09:09  8            You must compare the product with each

09:09  9    and every one of the requirements of a claim to

09:09  10   determine whether all the requirements of that claim

09:09  11   are met.  A party can directly infringe a patent

09:09  12   without knowing of the patent or without knowing that

09:09  13   what the party's doing is patent infringement.

09:09  14           Even if the party independently creates

09:09  15   the accused product or method, it can still infringe.

09:09  16   You must determine separately for each asserted claim

09:09  17   whether infringement exists.

09:09  18           Separate from direct infringement, the

09:09  19   plaintiff also alleges that defendant is liable for

09:09  20   infringement by actively inducing third-party ACI

09:09  21   and/or end sellers -- and/or end users to directly

09:09  22   infringe the asserted claims, either literally.  As

09:09  23   with direct infringement, you must determine whether

09:09  24   there's been active inducement on a claim-by-claim

09:10  25   basis.

845

09:10  1              Defendant is liable for active inducement

09:10  2  of a claim only if plaintiff has proven to you by a

09:10  3  preponderance of the evidence the following:

09:10  4              That the acts are actually carried out by

09:10  5  ACI and/or end users directly infringe an asserted

09:10  6  claim;

09:10  7              Two, that defendant took action that was

09:10  8  intended to cause and led to the infringing acts by ACI

09:10  9  and/or end users; and

09:10  10             Three, that defendant was aware of the

09:10  11  asserted patents and knew that the acts, if taken,

09:10  12  would constitute infringement of the asserted claims,

09:10  13  or the defendant believed there was a high probability

09:10  14  that the acts by ACI and/or end users infringed the

09:10  15  asserted claims and took deliberate steps to avoid

09:10  16  learning of that infringement.

09:10  17             If you find that defendant was aware of

09:10  18  the claims but believe that the acts encouraged did not

09:10  19  infringe the claim, then they are not liable for

09:10  20  inducement.

09:10  21             In order to establish active inducement,

09:10  22  it is not sufficient that ACI and/or end users

09:11  23  themselves directly infringe the claim, nor is it

09:11  24  sufficient that defendant was aware of the acts by ACI

09:11  25  and/or end users that allegedly constitute direct

09:11    1    infringement.

09:11    2              Rather, to find active inducement of

09:11    3    infringement, you must find either that defendant

09:11    4    intended ACI and/or end users to infringe the asserted

09:11    5    patents or the defendant believed there's a high

09:11    6    probability that ACI and/or end users would infringe

09:11    7    the asserted patents but deliberately avoided learning

09:11    8    the infringing nature of their acts.

09:11    9              The mere fact, if true, that defendant

09:11    10   knew or should have known there was a substantial risk

09:11    11   that purchasers of the accused products or ASUS

09:11    12   Computer International would infringe the asserted

09:11    13   patents would not be sufficient to support a finding of

09:11    14   active inducement of infringement.

09:11    15             In this case, the plaintiff alleges the

09:12    16   defendant willfully infringed the asserted patents.  If

09:12    17   you have decided that ASUSTeK has infringed the claims

09:12    18   of the asserted patents, you must then go on and

09:12    19   address the additional issue of whether it was willful,

09:12    20   which requires you to determine whether plaintiff has

09:12    21   proven it is more likely than not that the defendant

09:12    22   knew of the asserted patents and that they infringed

09:12    23   intentionally or acted with reckless disregard of or

09:12    24   deliberate indifference to the asserted patents or

09:12    25   willfully blinded themselves to its infringement.

09:12 1                  You may find that defendant's

09:12 2     infringement was willful if it knew or should have

09:12 3     known that its actions constituted an unjustifiably

09:12 4     high risk of infringement of a valid patent.  You may

09:12 5     not determine that the infringement was willful just

09:12 6     because defendant was aware of the asserted patents and

09:13 7     infringed one or more of them.  Instead, you must also

09:13 8     find that defendant deliberately infringed the -- at

09:13 9     least one of the asserted patents.

09:13 10                 You may find that an infringer willfully

09:13 11    infringed if you find the infringer's behavior was

09:13 12    malicious, wanton, deliberate, consciously wrongful,

09:13 13    flagrant, or in bad faith.

09:13 14                 To determine whether the defendant acted

09:13 15    willfully, consider all facts and assess defendant's

09:13 16    knowledge at the time of the challenged conduct.  Facts

09:13 17    that may be considered include but are not limited to:

09:13 18                 Whether or not defendant acted

09:13 19    consistently with the standards of behavior for their

09:13 20    industry;

09:13 21                 Whether or not they intentionally copied

09:13 22    a product of plaintiff that is covered by one of the

09:13 23    asserted patents;

09:13 24                 Whether or not they reasonably believed

09:13 25    they did not infringe, that the patent was invalid;

09:13  1          Whether or not ASUSTeK made a good faith

09:13  2  effort to avoid infringing the asserted patents.  For

09:13  3  example, whether defendant attempted to design around

09:13  4  the asserted patents; and

09:13  5          Whether or not defendant tried to cover

09:14  6  up its infringement.

09:14  7          Your determination of willfulness should

09:14  8  incorporate the totality of the circumstances based on

09:14  9  all the evidence presented during trial.  If you decide

09:14 10  that any infringement was willful, that decision should

09:14 11  not affect any damage award you give.  I will decide

09:14 12  that later.

09:14 13          The parties disagree on the level of

09:14 14  ordinary skill of art in this case.  The plaintiff

09:14 15  submits that the appropriate level of ordinary skill is

09:14 16  a bachelor's degree in electrical engineering, physics,

09:14 17  or optics, and at least three years of relevant

09:14 18  industry research or other experience related to

09:14 19  optical devices or a general sense -- science degree

09:14 20  and five or more years of relevant industry research or

09:14 21  other experience related to optical devices.  More

09:14 22  education/training could compensate for less work

09:14 23  experience and vice versa.

09:14 24          The defendant asserts that a person of

09:14 25  ordinary skill in the art would have at least a B.S.

849

09:15  1   degree in physics, electrical engineering, or optics,

09:15  2   as well as three years of academic research or industry

09:15  3   experience in the field of optical devices.  A person

09:15  4   of skill in the art with a higher level of education

09:15  5   may have fewer years of academic or industry experience

09:15  6   or vice versa.

09:15  7            Let's turn now to the issue of damages.

09:15  8            If you find that defendant infringed any

09:15  9   of the asserted claims of the asserted patents, you

09:15  10  must find -- you must then consider what amount of

09:15  11  damages to award to the plaintiff.  If you find that

09:15  12  defendant has not infringed any claim of any patent,

09:15  13  then the plaintiff is not entitled to damages.

09:15  14           The damages you award, if any, must be

09:15  15  adequate to compensate the plaintiff for the

09:15  16  infringement, but they are not meant to punish.  Your

09:15  17  damage award, if you reach the case, should not be less

09:15  18  than what the patentholder would have received had it

09:15  19  been paid a reasonable royalty.

09:15  20           You may not include in your award any

09:16  21  additional amount as a fine or penalty above that what

09:16  22  is necessary to compensate the patentholder for any

09:16  23  infringement.

09:16  24           The plaintiff has the burden to establish

09:16  25  the amount of its damages by a preponderance of the

09:16  1    evidence.  In other words, award only those damages

09:16  2    that plaintiff establishes are more likely than not.

09:16  3    While the plaintiff is not required to prove the amount

09:16  4    of damages with mathematical precision, it must prove

09:16  5    them with a reasonable certainty.  You may not award

09:16  6    damages that are speculative or only possible or based

09:16  7    only on guesswork.

09:16  8            The plaintiff seeks damages in the form

09:16  9    of what it contends to be a reasonable royalty.  You

09:16  10   must be careful to ensure the award is no more and no

09:16  11   less than the value of the patented invention.

09:16  12            I'm about to give you more explanation of

09:16  13   what a reasonable royalty is now.

09:16  14            A reasonable royalty is the amount of

09:16  15   royalty payment that a patentholder and the alleged

09:16  16   infringer would have agreed to in a hypothetical

09:17  17   negotiation taking place at a time prior to when the

09:17  18   infringement first began.

09:17  19            In considering the hypothetical

09:17  20   negotiation, you must focus on what the expectation or

09:17  21   expectations of the patentholder and the alleged

09:17  22   infringer would have been having entered into an

09:17  23   agreement at the time and had they been reasonable in

09:17  24   their negotiations.

09:17  25            Unlike in a real-world negotiation, all

09:17  1    parties to the hypothetical negotiation are presumed to

09:17  2    believe that the patent is valid and infringed and that

09:17  3    both parties were willing to enter into that agreement.

09:17  4    The reasonable royalty you determine must be a royalty

09:17  5    that would have resulted from a hypothetical

09:17  6    negotiation, not simply the royalty one party or the

09:17  7    other would have preferred.

09:17  8            Evidence of things that happened after

09:17  9    the infringement first began can be considered in

09:17  10   evaluating what the reasonable royalty should be but

09:18  11   only to the extent that the evidence aids in assessing

09:18  12   what royalty would have resulted from a hypothetical

09:18  13   negotiation that took place immediately prior to the

09:18  14   first infringement.

09:18  15           The amount you find as damages must be

09:18  16   based on the value attributable to the patented

09:18  17   invention as distinct from unpatented features of the

09:18  18   accused products or other factors such as marketing or

09:18  19   advertising or defendant's size or market position.

09:18  20   This is called "apportionment."

09:18  21           A royalty compensating plaintiff for

09:18  22   damages must reflect a value attributable to the

09:18  23   infringing features of the product and no more.

09:18  24           The process of separating the value of

09:18  25   the allegedly infringing features from the value of all

1    other features and aspects of the product is called

09:18    2    "apportionment."  When the accused infringing products

09:18    3    have both patented and unpatented features, your award

09:18    4    must be apportioned so it is based only on the value of

09:18    5    the patented features.  No more.

09:18    6            In determining the reasonable royalty,

09:18    7    you should consider all the facts known and available

09:18    8    to the parties at the time the infringement began.

09:19    9    Some of the kinds of factors to consider in making your

09:19    10    determination are:

09:19    11            The value that the claimed invention

09:19    12    contributes to the accused product;

09:19    13            The value that factors other than the

09:19    14    claimed invention contribute to the accused product;

09:19    15            Comparable license agreements or other

09:19    16    transactions, such as those covering the use of the

09:19    17    claimed technology or similar technology.

09:19    18            But no one factor is dispositive.  You

09:19    19    can and should consider the evidence that's been

09:19    20    presented to you in this case on each and every factor.

09:19    21            You may also consider any other factor

09:19    22    which in your mind might have increased or decreased

09:19    23    the royalty that the defendant would have been willing

09:19    24    to pay and that the plaintiff would have been willing

09:19    25    to accept if they are acting as normally prudent

09:19  1    businesspeople.

09:19  2                    You heard the damage experts discuss the

09:19  3    Georgia-Pacific factors:

09:19  4                    The royalties received by the patentee

09:19  5    for the licensing of the patent-in-suit, proving or

09:19  6    tending to prove an established royalty;

09:19  7                    The rates paid by the licensee for the

09:20  8    use of other patents comparable to the patent-in-suit;

09:20  9                    The nature and scope of a license as

09:20  10   exclusive or nonexclusive or as restricted or

09:20  11   non-restricted in terms of territory or with respect to

09:20  12   whom the manufactured product may be sold;

09:20  13                   The licensor's established policy and

       14   marketing program to maintain his or her patent

       15   monopoly by not licensing others to use the invention

       16   or by granting licenses under special conditions

       17   designed to preserve that monopoly;

09:20  18                   The commercial relationship between the

09:20  19   licensor and licensee such as whether they are

09:20  20   competitors in the same territory and the same line of

09:20  21   business or whether they are inventor and promoter;

09:20  22                   The effect of selling the patented

09:20  23   specialty in promoting sales of other products of the

09:20  24   licensee, the existing value of the invention in the --

09:20  25   to the licensor as a generator of sales of non-patented

854

09:20  1    items, and the extent of such derivative or convoyed

2    sales;

09:20  3              The duration of the patent and the terms

09:21  4    of the license;

5              The established profitability of the

09:21  6    product made under the patents, its commercial success,

09:21  7    and current popularity;

09:21  8              Continuing, the utility and advantages of

09:21  9    the patented property over the old modes or devices, if

09:21  10   any, that have been used for working out similar

09:21  11   results;

09:21  12             The nature of the patented invention, the

09:21  13   character of the commercial embodiment of it as owned

09:21  14   and produced by the licensor, the benefits to those who

15   have used the invention;

16             The extent to which the infringer has

09:21  17   made use of the invention and any evidence probative of

09:21  18   the value of that use;

09:21  19             The portion of the product or the selling

09:21  20   price that may be customary in the particular business

09:21  21   or in comparable businesses to allow for the use of the

09:21  22   invention or analogous inventions;

09:21  23             The portion of the realizable profits

09:21  24   that should be credited to the invention as

09:21  25   distinguished from non-patented elements, the

09:21  1   manufacturing process, business risks, or significant

09:22  2   features or improvements added by the infringer;

09:22  3              The opinion and testimony of qualified

09:22  4   experts;

09:22  5              The amount that a licensor, such as a

09:22  6   patentee, and a licensee, such as the infringer, would

09:22  7   have agreed upon at the time the infringement began if

09:22  8   both had reasonably and voluntarily tried to reach an

09:22  9   agreement; that is, the amount which a prudent licensee

09:22  10  who desires, as a business proposition, to obtain a

09:22  11  license to manufacture and sell a particular article

09:22  12  embodying the patented invention, would have been

09:22  13  willing to pay as a royalty and yet be able to make a

09:22  14  reasonable profit and which amount would have been

09:22  15  acceptable by a prudent patentee who is willing to

09:22  16  grant a license.

09:22  17             In determining a reasonable royalty, you

09:22  18  may also consider evidence concerning the availability

09:22  19  and cost of acceptable noninfringing substitutes to the

09:22  20  patented invention.  An acceptable substitute must be a

09:22  21  product that either does not -- that either does not

09:22  22  infringe the patent or is licensed under the patent.

09:22  23             You heard about license agreements from

09:23  24  both sides.  Comparable license agreements are one

09:23  25  factor that may inform your decision as to the proper

856

09:23    1    amount and form of the reasonable royalty award,

09:23    2    similar to the way in which the value of a house is

09:23    3    determined relative to comparable houses sold in the

09:23    4    same neighborhood.

09:23    5              Whether a license agreement is comparable

09:23    6    to the license under the hypothetical license scenario

09:23    7    depends on many factors, such as whether they involve

09:23    8    comparable technologies, economic circumstances,

09:23    9    structure, and scope.

09:23   10              If there are differences between a

09:23   11    license agreement and the hypothetical license, you

09:23   12    must take those differences into account when you make

09:23   13    your reasonable royalty determination.

09:23   14              The hypothetical license is deemed to be

09:23   15    a voluntary agreement.  When determining if a license

09:23   16    agreement is comparable to the hypothetical license,

09:23   17    you may consider whether or not the license agreement

09:23   18    is between parties to a lawsuit and whether the license

09:23   19    agreement was a settlement influenced by a desire to

09:23   20    avoid further litigation.

09:23   21              I reserve these final instructions until

09:24   22    after I hear the closing arguments, and so I will stop

09:24   23    at this time and I'll ask plaintiff's counsel if you'd

09:24   24    like to begin.

09:24   25              I'm sorry.  We need a very quick recess.

—857—

```
09:24   1    We need a couple of minutes to get set up.
09:24   2                    So, ladies and gentleman, please don't
09:24   3    discuss anything.  When you come back, you'll hear the
09:24   4    closing arguments in this case.
09:24   5                    THE BAILIFF:  All rise.
09:24   6                    (Jury exited the courtroom.)
09:24   7                    THE COURT:  I'm assuming there were no
09:24   8    issues to take up with the slides.
09:24   9                    MR. BURESH:  No, Your Honor.
09:24  10                    MR. CALDWELL:  May we use the music
09:24  11    stand?
09:24  12                    (Off-the-record discussion.)
09:33  13                    THE BAILIFF:  All rise.
09:33  14                    THE COURT:  Please remain standing for
09:33  15    the jury.
09:33  16                    (Jury entered the courtroom.)
09:33  17                    THE COURT:  Thank you.  You may be
09:33  18    seated.
09:33  19                    MR. MCCARTY:  May I proceed, Your Honor?
09:34  20         OPENING ARGUMENT ON BEHALF OF THE PLAINTIFF
09:34  21                    MR. MCCARTY:  Ladies and gentleman, one
09:34  22    week ago we met for the first time downstairs in the
09:34  23    courtroom on Thursday for jury selection.  I told you
09:34  24    then and I'll tell you again now, it's an honor to be
09:34  25    in front of you.
```

09:34 1    I also said it's like drinking from a
09:34 2 firehose.  And I think that's kind of what it's been.
09:34 3 I'd be willing to bet I wasn't too far off with that.
09:34 4    The case has been about, you know, claim
09:34 5 charts and cost savings and licenses, laboratories,
09:34 6 patents.  But let's not forget the simple truth at the
09:34 7 heart of this case.  At the very heart of this case is
09:34 8 a very special company founded by a very humble
09:34 9 scientist who created some incredibly useful technology
09:34 10 that has benefitted and impacted the world.
09:34 11    And just like his product line shows, his
09:34 12 optical lighting technology is not limited to solar.
09:34 13 That's how light works.  That is how his patent works.
09:34 14    It may feel like weeks ago now, but just
09:35 15 Monday morning you heard the testimony of Dr. Sergiy
09:35 16 Vasylyev, a brilliant scientist with degrees in
09:35 17 physics, math, engineering.  Took the chance of a
09:35 18 lifetime to come here to the United States 25 years ago
09:35 19 with next to nothing, with just his wife and his
09:35 20 newborn baby.
09:35 21    You heard at first it wasn't easy.  He
09:35 22 had two, three jobs at a time.  He was working the 9:00
09:35 23 to 5:00 at the county sheriff's department, putting in
09:35 24 time with SVV in the nights and weekends.  He started
09:35 25 in the garage, and now he's in this lab.

09:35  1          You heard about over time the accolades

09:35  2   that started piling up.  He started receiving awards.

09:35  3   He started receiving his patents.  You heard about how

09:35  4   entities like the National Science Foundation and the

09:35  5   DOE's Office of Science have been selecting SVV's

09:35  6   technology over many other companies' technology in

09:35  7   this competitive process to find the best lighting

09:35  8   solutions.  Not solar energy solutions, LED lighting

09:36  9   solutions.

09:36  10          You heard about how he spent years

09:36  11   researching and refining this approach to lighting

09:36  12   solutions.  And he came up with a novel, extremely

09:36  13   valuable approach to handling light.  And for that, he

09:36  14   was granted these four patents that we've been going

09:36  15   through all week; that's the '342, the '562, the '318,

09:36  16   and the '089.

09:36  17          Leading up to today, I asked my client if

09:36  18   there was anything I needed to get into the record,

09:36  19   arguments to make.  And his response I think was

09:36  20   telling.  He said:  It's been a long time, it's taken a

09:36  21   long time to get here.  Please just say thank you for

09:36  22   me.  So on behalf of him and the company, thank you.

09:36  23          Now, this was an important day for SVV.

09:36  24   If you recall his testimony, he testified how proud he

09:36  25   was to get that patent protection.  He explained how

09:36  1   grateful he was for our system that protected his

09:36  2   company. That protected his inventions. And that's

09:36  3   why we're here.

09:36  4            After many years since filing those

09:36  5   applications, getting those patents, the market had

09:37  6   caught up with the features that he worked on and

09:37  7   patented beginning in 2009, 2010.

09:37  8            The evidence showed that he was able to

09:37  9   source an ASUS monitor. He was able to source two

09:37  10  other companies' monitors, Samsung and MSI. What did

09:37  11  he find when he cut those open? He found that Samsung

09:37  12  and MSI were using his technology; not to the same

09:37  13  extent as ASUS.

09:37  14           With ASUS, what he found was that they

09:37  15  had implemented his patented technology to a

09:37  16  significant degree. A significant percentage of their

09:37  17  products were using it, you know, the hundred models in

09:37  18  this case, millions of sales just in this country.

09:37  19           And that leads us to the first issue.

09:37  20  Infringement. We've been talking about it all week.

09:37  21  Let's start with the test and the burden.

09:37  22           So the burden of infringement that we

09:37  23  have to prove is a preponderance of the evidence. You

09:37  24  heard that early and often in this case. And I talked

09:37  25  to y'all about that in jury selection. I give the

09:38  1    patent -- or the football analogy of kind of get to the

09:38  2    50-yard line plus an inch or plus a yard.  And I think

09:38  3    we've done that.  I think we've gone all the way to the

09:38  4    end zone.

09:38  5                Now, let's start with the test.  This is

09:38  6    where there was a dispute in the case.  You might have

09:38  7    noticed I was getting frustrated asking questions of

09:38  8    Dr. Goossen yesterday, their technical expert.

09:38  9                Part of it is we've actually never seen

09:38  10   something like what he was doing.  Dr. Goossen's

09:38  11   arguments seemed like a choreographed effort to confuse

09:38  12   the standard for patent infringement.  His premise and

09:38  13   his arguments were that the patent rules sort of didn't

09:38  14   apply and that we should be looking at the figures and

09:38  15   the specification for patent infringement.

09:38  16                Luckily, as you just heard, the Judge has

09:38  17   clarified through the instructions the following:  You

09:38  18   got to keep in mind that only the claims of a patent

09:38  19   can be infringed.  You must compare the patent claims

09:38  20   to the accused products.  You should not compare the

09:39  21   accused system or process with any specific examples in

09:39  22   the patent.  And the only correct comparison, the only

09:39  23   correct comparison is with the language of the claim as

09:39  24   I've explained the meaning to you.

09:39  25                So with those judges -- with the Judge's

09:39    1    clarifying instructions on infringement, distractions
09:39    2    aside, I'm going to show you right now, we knocked it
09:39    3    out of the park.  We proved infringement.
09:39    4                Now, there's two types of infringement,
09:39    5    direct infringement and indirect infringement.
09:39    6                You'll hear -- I think on Day 1, there
09:39    7    was maybe a dispute about indirect infringement or
09:39    8    induced infringement.  But if you'll recall, the Judge
09:39    9    instructed you that ASUS has agreed that they are
09:39   10    liable for the actions of their subsidiary now.  So
09:39   11    they've kind of taken that issue off the table.
09:39   12                But we believe that the direct
09:39   13    infringement accounts for the infringement in this
09:39   14    case, and the induced infringement is sort of redundant
09:39   15    now.
09:39   16                So what did we show you on the
09:40   17    infringement side?  Remember for infringement, it's the
09:40   18    claims that matter, and we showed you the claims.
09:40   19                For infringement, we brought you a leader
09:40   20    in the field of optics and LCDs, Mr. Tom Credelle.  He
09:40   21    worked at RCA.  He helped invent the LCD displays at
09:40   22    their company.  He developed the first million-pixel
09:40   23    LCD for the U.S. military.  He led a team at Apple that
09:40   24    were working on their LCDs for their laptops.
09:40   25                He knows light.  He knows LCD monitors.

09:40  1    And he analyzed these patents, and he testified that he

09:40  2    wanted to make sure that this was a good case with

09:40  3    strong merit before he got involved, and that's exactly

09:40  4    what he did.  And when he was convinced that this case

09:40  5    had strong merit, he came on board and he came to

09:40  6    analyze these products and testify about infringement

09:40  7    to you for the four patents at issue in this case.

09:40  8              So just to reorient y'all, those four

09:40  9    patents, the '342, '562, '089, and '318, we have

09:40  10   representative products for those four patents.  And we

09:40  11   show them on the screen here.  You'll remember the '342

09:41  12   and '562 are really the bulk of the products, and then

09:41  13   there's some quantum dot products related to those

09:41  14   later two -- later two patents.

09:41  15             So let's start with the ones I've talked,

09:41  16   the '342 patent, our first representative product.

09:41  17   Mr. Credelle performed a detailed teardown live in

09:41  18   court and demonstrated how that worked.  He showed you

09:41  19   the evidence of the light guide plates.  He showed you

09:41  20   the images, analysis, and data for the lenses.  He

09:41  21   showed you all that data for the 27-degree panel and

09:41  22   the microcavities, the LED panel and lighting, and how

09:41  23   the light is optimized using TIR, total internal

09:41  24   reflection, just as it is claimed in the patents.

09:41  25             Likewise, Mr. Credelle just went through

09:41   1   the limitations of the '562 patent for the other

09:41   2   representative product, JTX-005, using the evidence in

09:41   3   PTX-116.  And, of course, it was extremely similar.  He

09:41   4   showed you all the same data, images, analysis, tests

09:42   5   for the specific light guides that infringe the

09:42   6   '562 patent.

09:42   7           He showed you the cross-section analysis,

09:42   8   the 3D microscope, the linear lenses, the

09:42   9   microcavities, and the edge lighting.  Showed you all

09:42   10  that information.  He went through it box by box and

09:42   11  checked all those boxes.

09:42   12          And again, a specific flow for this

09:42   13  '562 patent, he showed you how that works using total

09:42   14  internal reflection.

09:42   15          So I kind of just went through all that

09:42   16  evidence that we showed you real quickly because I know

09:42   17  y'all have been paying attention.  I've been seeing you

09:42   18  guys take a lot of notes, pay attention.  You've been

09:42   19  very attentive.

09:42   20          What I want to focus on now are ASUSTeK's

09:42   21  actually kind of plain-term-based noninfringement

09:42   22  arguments that they've been trying to tell you about.

09:42   23          So for the '342 patent, they brought

09:42   24  Dr. Goossen to say there was no alignment between the

09:42   25  microcavities and the lenses.  They're essentially

09:42  1    saying that -- they're trying to convince y'all that

09:42  2    these high-end lighting panels do not even align the

09:43  3    two main features that have to work together.

09:43  4                    They're essentially arguing that there's,

09:43  5    you know, checkers on a checkerboard or something like

09:43  6    that.  And that's just not credible.  These are

09:43  7    designed products that are not just thrown together

09:43  8    indiscriminately or glued together haphazard.  It's

09:43  9    just not supported by the record.  Mr. Credelle

09:43  10   explained it's not just happenstance.  The way these

09:43  11   are designed are intentional, predetermined patterns

09:43  12   done by a computer design.  It's not a roll of the

09:43  13   dice.

09:43  14                    Mr. Credelle showed you the

09:43  15   computer-generated model number confirming what that

09:43  16   was.  He did a live demo with the microscope showing

09:43  17   that design ID number that corresponds to the

09:43  18   predetermined alignment in the pattern of microcavities

09:43  19   as well as the lenses.  And what did he confirm?  He

09:43  20   confirmed that the dots match up between models.

09:43  21   Between models.  Because they are predetermined in

09:43  22   their design.

09:43  23                    And this makes sense.  Once you optimize

09:44  24   the pattern for a particular product, you keep making

09:44  25   that same product, in this case to the millions, right,

09:44  1    and you don't want them different as between each

09:44  2    product.

09:44  3              So you can actually compare and see that

09:44  4    it's the same pattern.  It's predetermined.  It's

09:44  5    predetermined, right, because they're trying to

09:44  6    optimize efficiency.  That's what these patents are

09:44  7    about.

09:44  8              So they test it, they predetermine it.

09:44  9    And then once they've got the right mix, the right

09:44  10   pattern, then it's repeated.  It's a predetermined

09:44  11   pattern.

09:44  12             Now, the only evidence ASUS has for this

09:44  13   is Dr. Goossen saying that he just doesn't know how

09:44  14   they're made.  You can see the testimony here.  He's

09:44  15   not quite sure how they're manufactured.

09:44  16             I imagine it's something like spilling

09:44  17   checkers on a board, I think he said, but that doesn't

09:44  18   make sense.  Sometimes all the light on the other side,

09:44  19   he doesn't -- he doesn't know.

09:44  20             So even then, he has to admit these are

09:44  21   made using a computer.  But did you catch why

09:45  22   Dr. Goossen claimed he had no idea how these products

09:45  23   are made?  Did you catch why?  I think this was

09:45  24   telling.  This says it all.

09:45  25             He asked ASUS to get in contact with

09:45  1   their suppliers overseas in China.  He wanted to see

09:45  2   the data to see if what he was saying was right.

09:45  3           And what did he say?  He got shut down.

09:45  4   Dr. Goossen did not know how the products were made,

09:45  5   and when he asked to see them, he was told they were

09:45  6   not accessible.  The company with the products, their

09:45  7   name's on the front of the products, they can't even

09:45  8   put him in touch with their panel suppliers so he can

09:45  9   check his theories.

09:45  10          So what did Dr. Goossen know?  He knew --

09:45  11  he said he took some pictures.  He didn't show you any.

09:45  12  He said he took some pictures of himself, himself and

09:45  13  his lab, and they matched the pictures of Credelle.

09:46  14          What does that mean?  It's exactly what I

09:46  15  told you.  They're predetermined.  They're

09:46  16  predetermined alignment.  They match.  That's an

09:46  17  admission right there.

09:46  18          So then they try to argue there simply

09:46  19  can be no alignment by trying to limit the claim to an

09:46  20  example in the patent.  This is another Dr. Goossen.

09:46  21  He doesn't know how the products were made.  He bases

09:46  22  his infringement opinion on showing that the figures

09:46  23  show this alignment.

09:46  24          What do we know?  The Court has told us

09:46  25  you can't base your infringement opinion on what the

09:46  1    figures in the patent look like.  You got to look at

09:46  2    the claims.

09:46  3                Now, we went through this yesterday.

09:46  4    This is that predetermined alignment, and we walked

09:46  5    through the specification which clearly states, right,

09:46  6    that this invention is not limited to this

09:46  7    configuration and can also be implemented where these

09:46  8    red lines are off kilter, right, according to the

09:46  9    predetermined pattern.

09:46  10               We've walked through that.  It's part of

09:46  11   the invention.  It's a design feature of the invention.

09:46  12   It's not a random checkerboard.  It's how they're made.

09:47  13   That's the point of this.

09:47  14               You want to optimize for efficiency.  And

09:47  15   guess what?  What happens when you do it right?  It

09:47  16   tells you right there.  You get the angular spread that

09:47  17   you want, the desired angular spread, that viewing

09:47  18   angle.  That's the point.

09:47  19               So if they come up here and tell you, you

09:47  20   know, if you use this invention, you get a bad viewing

09:47  21   angle because it's a narrow beam, you know that's not

09:47  22   true.  We saw all those films go between you and the

09:47  23   screen, for the screen and the light, to help spread

09:47  24   out that viewing angle.  That's their role.  This is to

09:47  25   optimize that.

09:47  1          Now we go to the '318 patent.  Let's cut
09:47  2  to the chase.  Since ASUSTeK agrees on most of these
09:47  3  limitations, they're really only disputing the
09:47  4  broad-area input surface.  That's that yellow.
09:47  5          Mr. Credelle identifies that yellow not
09:47  6  because it's like happenstance or chance or something.
09:47  7  Again, this is how they're designed.  This is designed
09:47  8  to take in the light from the back reflector sheet.
09:48  9          Every time they show you something on
09:48  10  this patent, they've removed that reflector sheet.
09:48  11  They don't want you to know that's the design of the
09:48  12  product.  The input surface is so it can take in the
09:48  13  light from the reflector sheet.  It's 50 percent of the
09:48  14  light.  Half of the light that goes to that light guide
09:48  15  plate, it's actually coming through that surface.  It's
09:48  16  not incidental.  It's designed that way.
09:48  17          Dr. -- Mr. Credelle further explained
09:48  18  that the prevailing direction of the light is right
09:48  19  there, through that yellow surface.  This is way more
09:48  20  than reasonably capable.  It's designed that way, and
09:48  21  that's why it infringes.
09:48  22          The Court's instructions are clear on
09:48  23  this point.  Right?  Because they say, well, there's
09:48  24  also an input surface from the light, the LED light
09:48  25  that comes in from the bottom.  They say, how can you

09:48  1    have two input surfaces?  That's not a defense to

09:48  2    infringement.

09:48  3             We hear it right here.  If you have

09:48  4    additional input surfaces, that's okay.  Additional

09:48  5    elements do not negate infringement.  A lot of products

09:48  6    have that, right?  You're going to have multiple

09:48  7    surfaces, multiple features.

09:48  8             Now, the '089 patent, this one is kind of

09:49  9    the most incredible.  It's clear what's going on here.

09:49  10            The claim requires that the light guide

09:49  11   plate with the lenses be distributed over an area of

09:49  12   quantum dot film.  When you put them together, it is

09:49  13   matching perfectly.  It's a perfect match.  They're

09:49  14   distributed over the area of one another.

09:49  15            Just like that grate up there is

09:49  16   distributed over the area of the AC, right?  Even

09:49  17   though it's vertical, it's distributed over that area

09:49  18   the whole way.  It's the same exact way in the patent

09:49  19   and in the product.

09:49  20            So what do they have to do?  They have to

09:49  21   deflect and say, well, it's my opinion that the claim

09:49  22   requires a geometric coordination.  That's what he told

09:49  23   me on cross-examination.

09:49  24            There's the claim right there.  Where's

09:49  25   the geometric coordination?  It doesn't say that.

09:49  1    There's no such thing as a geometric coordination in

09:49  2    the claim.  You got to stick to the claims.  It's just

09:49  3    not in there.

09:50  4              Now, what we do see in the products is

09:50  5    that there's a full distribution over an area of the

09:50  6    quantum dot film of those lenses.  So the patents

09:50  7    infringe because we know that the lenses match the

09:50  8    entire area of the quantum dot film.  It's a perfect

09:50  9    match.  I held them up.  There's no overlap.  There's

09:50  10   no missing edges.  It's a perfect match.  One to one.

09:50  11             Now, where do we go from here, right?

09:50  12   Let's talk about how we get here.

09:50  13             Remember that when SVV started seeing

09:50  14   their inventions in some of these products, the minute

09:50  15   they saw that, it was within their rights to bring the

09:50  16   action.  That's how patent -- you know, patent law

09:50  17   works.  They can bring that action.

09:50  18             But they didn't do it.  They reached out.

09:50  19   They wanted an amicable resolution.  They wanted to

09:50  20   talk licensing and do business that way.  They tried to

09:50  21   do the right thing, started the discussion.

09:50  22             He insisted -- as we talked about, you

09:50  23   saw in the e-mails that his representatives, his people

09:50  24   were respectful, polite.  This wasn't a shakedown.  We

09:51  25   heard "gun to the head."  That was offensive.

872

09:51  1              There's nothing violent or extreme about

09:51  2     any of this from our side.  Respectful and polite the

09:51  3     entire time.

09:51  4              When they asked us, hey, go give us some

09:51  5     claim charts.  We knew it was going to take a long

09:51  6     time.  Dr. Vasylyev talked about it.  It was going to

09:51  7     take six months.  He created 40 claim charts.  They're

09:51  8     stacked this high, cut open dozens of products.

09:51  9              And it's not like you just pop open a

09:51  10    product and take a peek.  You saw the data.  You do the

09:51  11    3D microscope, do the cross-section images, you got to

09:51  12    be in the lab.  It took him six months, but he did it

09:51  13    late nights.  He's got a family with kids, but he was

09:51  14    working because it's important to him.

09:51  15             So when he gets back to them with the

09:51  16    claim charts, what does he say?  They say basically,

09:51  17    just kidding.  We're not the appropriate people to talk

09:51  18    to.  These are our products with our name on them,

09:51  19    selling in the United States.  We're taking the profits

09:51  20    on it, but you probably should talk to the panel

09:51  21    manufacturers.

09:51  22             And that's the thing.  Do you think he

09:52  23    had a chance to talk to the panel manufacturers when

09:52  24    they won't even let their own expert talk to the panel

09:52  25    manufacturers?  It doesn't make sense.  It's

09:52  1    misdirection.

09:52  2              Incredibly, the reason that they gave

09:52  3    Dr. Vasylyev and SVV as to why they couldn't put him in

09:52  4    touch with the panel manufacturers is they didn't have

09:52  5    their contact information for all of them, and they

09:52  6    didn't exactly know who they were.

09:52  7              In this courtroom, we know that that

09:52  8    wasn't true.  Mr. Lee came in here and talked about --

09:52  9    he knows.  He's got at least five or six of them.

09:52  10             So on the one hand, they're telling us

09:52  11   they don't know who makes the panels.  They don't know

09:52  12   how to contact them.  They don't have their, like,

09:52  13   phone number, their e-mail address for all these

09:52  14   companies.  They're doing million-dollar product deals,

09:52  15   and they don't have a contact or a rep.

09:52  16             And on the other hand, they're admitting

09:52  17   that they work closely with these guys.  And so we saw

09:53  18   roadblocks, misdirection, deflection.

09:53  19             This is where the rubber meets the road

09:53  20   on this case, I think.  Dr. Vasylyev did the teardowns,

09:53  21   did the lab work, did the testing.  Mr. Credelle did

09:53  22   all those things.  He showed you all the evidence.

09:53  23             From their end, they didn't take -- tear

09:53  24   down the monitors.  They didn't show you the pictures.

09:53  25   They didn't do the tests.

09:53   1                      Dr. Goossen testified he wanted more

09:53   2   information, but he was denied it.

09:53   3                      If you're falsely accused -- we heard

09:53   4   that in opening.  We heard that in jury selection.  If

09:53   5   you're falsely accused, aren't you going to, like, cut

09:53   6   open one of these things and take a look?  Aren't you

09:53   7   going to do the work, get in the lab?  Got all these

09:53   8   engineers, all these lawyers.  Get some data?

09:53   9                      If you're coming to clear your name, is

09:54   10  this how your witness answers this question?  If

09:54   11  Dr. Vasylyev and SVV would prefer to avoid litigation,

09:54   12  what do they have to do to get somebody, anybody at

09:54   13  your company who's technical to read the patents?

09:54   14                      Right there.  They're burying their head

09:54   15  in the sand, and that's willfulness.

09:54   16                      The Judge just instructed you willfulness

09:54   17  requires you to determine whether SVV proved that it is

09:54   18  more likely than not that ASUSTeK knew of the patents,

09:54   19  we know that; acted with reckless disregard, we know

09:54   20  that; deliberate indifference, we know that; willfully

09:54   21  blinded itself, we know that.

09:54   22                      Some additional factors for willfulness

09:54   23  that we can talk about, whether or not they have a

09:54   24  defense that the patent is invalid.  You didn't hear

09:54   25  one peep about that.  They're not saying the patent is

09:54  1    invalid.  They made no efforts to design around.  Every

09:54  2    time we asked them, hey, do you have any NIAs,

09:54  3    noninfringing alternatives, they say, no.  Not even

09:54  4    going to go look for them.

09:55  5              Did they try to cover up their

09:55  6    infringement?  Yeah.  They did.  They did.  They played

09:55  7    keep away on who was making it.  If we could or could

09:55  8    not talk to them.

09:55  9              They're not interested in changing

09:55  10   anything or looking to stop their infringement.  They

09:55  11   claim they're here to clear their name.  They say

09:55  12   they're here to stand up for the ASUS name.

09:55  13             They're not here to clear their name.

09:55  14   They're here to keep the entire $21 per unit in their

09:55  15   pocket.  That's the point of this.  It's money.

09:55  16             Use your common sense.  It's pretty easy

09:55  17   to put together.  They're not clearing their name.

09:55  18   This isn't about Bible verses.  This is not about, you

09:55  19   know, noninfringement, any of that.  This is about

09:55  20   money for them.

09:55  21             You heard about how there's other

09:55  22   products out there that don't infringe.  ASUS has some

09:55  23   of those, that doesn't have SVV's technology in it.

09:55  24   But at every single turn, they choose to use our

09:56  25   technology because it saves them money.

09:56  1          On that note, let's talk about damages.

09:56  2          Pete, could I go to 67?

09:56  3          We brought you Dr. Farber.  He presented

09:56  4   his damages opinions, as you recall.  And this is the

09:56  5   math.  He carefully went through this analysis, and he

09:56  6   did a sophisticated regression analysis that we'll get

09:56  7   to in a second.

09:56  8          But why did he do that?  I think it was

09:56  9   mocked a little bit in court.  Why did he do that?  He

09:56  10  did that because the law says in order to assess a

09:56  11  reasonable royalty, you got to look for the use made of

09:56  12  the invention by the infringer.

09:56  13         Who is the infringer in this case?  It's

09:56  14  ASUSTeK.  It's not Samsung.  It's not MSI.  It's not

09:56  15  some other company.  It's not the panel manufacturers.

09:56  16  It is ASUSTeK.

09:56  17         So what we have to do is value how these

09:56  18  patents are being used by ASUSTeK.  How are they using

09:56  19  them?  What benefits are they getting?

09:56  20         And so we ran the regression which is the

09:57  21  way to statistically hone in on the precise amount of

09:57  22  money they get for using our invention.  He showed you

09:57  23  the detail of his regression.  He showed you the

09:57  24  results of his regression.  $21 every time they sell

09:57  25  one of these things in cost savings.

09:57  1          He talked to you about how he did all
09:57  2   this analysis to ensure that it was accurate and
09:57  3   correct, and the result was as follows.
09:57  4          Now, what's interesting is that for every
09:57  5   monitor that ASUS sells with SVV's technology in it,
09:57  6   under our model, under Dr. Farber's model, ASUS still
09:57  7   gets to keep $7.41 every time.  So every time they
09:57  8   infringe, they still make money.  Sounds like a pretty
09:57  9   good deal for them.
09:57  10          And we know they'd take the deal, right?
09:57  11   You remember this from Mr. Lee's testimony.  It's
09:57  12   common sense.  Of course, they're going to -- of course
09:57  13   they're going to take that deal.
09:57  14          So this is the final result.  $13.96
09:58  15   would be the split for how we -- they would break up
09:58  16   that $21 with $13.96 going to SVV and ASUSTeK keeping
09:58  17   the rest.  We know that they sold almost 4.2 million
09:58  18   units, specifically 4,199,168.  And you can do the
09:58  19   math; that equals $58,632,139.
09:58  20          So quickly, how do they respond?  So
09:58  21   first they try to sort of, I guess, shame doing a
09:58  22   regression, calling it a political poll, something like
09:58  23   that.  That's -- that's total nonsense.  In these
09:58  24   cases, regressions are used all the time.  It's a model
09:58  25   that has won Nobel Prizes.  It is an accepted

—878—

09:58  1    methodology for how to value in these types of cases.

09:58  2             So what do they say next?  Well, they

09:58  3    say -- they bring Mr. Ferioli to suggest it's only $14

09:58  4    per monitor as a cap.

09:58  5             Here's the thing.  Mr. Ferioli, he's not

09:59  6    a technical guy.  And that's okay.  He asked for help.

09:59  7    In order to get that $14-a-unit cap, he needed a

09:59  8    technical guy to help him named Dr. Coleman.

09:59  9             Here's the thing.  On Thursday, jury

09:59  10   selection, ASUSTeK said:  We're bringing Dr. Coleman to

09:59  11   support their damages case, to support Ferioli.  See it

09:59  12   right here.

09:59  13            Dr. Coleman told Mr. Ferioli what he

09:59  14   should be measuring for damages in this case, what the

09:59  15   benefits of the patents are.  It's a technical issue.

09:59  16   But Dr. Coleman is wrong about that.

09:59  17            Here's the thing.  We were going to prove

09:59  18   it.  That's why he didn't come here and have his

09:59  19   opinions sifted through on cross-examination.  It's not

09:59  20   credible.  Ferioli knew it too, that if Dr. Coleman

09:59  21   came, he would have to be cross-examined.

09:59  22            What's that mean?  The Judge instructed

10:00  23   us:  The only evidence that you are to consider in this

10:00  24   trial is what you hear from this chair.  The fact that

10:00  25   other people outside of the courtroom may have said

10:00  1  things is completely irrelevant to your decision in

10:00  2  this case.

10:00  3          You know who never sat in that chair?

10:00  4  Dr. Coleman.  You know who never had to answer the

10:00  5  tough questions that can get a little frustrating

10:00  6  sometimes?  Dr. Coleman.  Who never had to justify

10:00  7  their opinions, what they're saying about the case?

10:00  8  Dr. Coleman.

10:00  9          So they want you to look at Samsung.  And

10:00  10  that's what this case comes down to.  They want you to

10:00  11  look at Samsung.  They don't have sales data.  They put

10:00  12  up big numbers because Samsung is a big company.  And

10:00  13  then, of course, they're saying:  Oh, we'll keep out

10:00  14  the washing machines.  We're not going to go for the

10:00  15  ironing boards and all that other stuff they make.

10:00  16          But they put up big numbers, flashed that

10:00  17  around and said:  Oh, look at that.  Pennies on the

10:00  18  dollar we should get.  We already know the evidence is

10:00  19  that they've got like seven monitors that they put this

10:00  20  in, whereas we know there's like 100 from ASUSTeK that

10:01  21  they put it in.  You can do the math.

10:01  22          Dr. Farber, supported by actual live

10:01  23  technical experts, brings you a correct statistical

10:01  24  regression that ASUS does not challenge.  And that

10:01  25  follows the damages loss.  Mr. Ferioli is doing the

10:01  1    work of a witness, Dr. Coleman, who's not here.  He's

10:01  2    absent, hoping to convince y'all to give him the same

10:01  3    deal that Samsung got.

10:01  4                Let me ask you this:  Did Samsung send

10:01  5    SVV down a rabbit hole?  Did Samsung engage in delay

10:01  6    tactic after delay tactic?  Did they pretend to not

10:01  7    know what components are in their products with their

10:01  8    logo on them?  Did they act like they didn't know how

10:01  9    to contact their business patterns?  Claim ignorance

10:01  10   for darn near everything?  They didn't.

10:01  11               The decision is easy.  The appropriate

10:01  12   reasonable royalty in this case is 58 million.

10:01  13               Just going to quickly walk through the

10:01  14   verdict form just to show you how that looks.  You're

10:01  15   going to be asked to fill this form out on

10:02  16   infringement.  You're going to click "yes" for direct

10:02  17   infringement.  That's the one that there was a

10:02  18   stipulation regarding for their subsidiaries.

10:02  19               And we talked about induced infringement.

10:02  20   Same thing, going to click "yes."

10:02  21               Willfulness, we ask that you click "yes."

10:02  22   That's willful blindness, having no invalidity defense,

10:02  23   no noninfringing alternatives and so forth.

10:02  24               And then for damages, the final question,

10:02  25   accept Dr. Farber's model that is valuing the value to

```
10:02   1   ASUS, not Samsung, not MSI.
10:02   2              I'm going to sit down.  My colleague Brad
10:02   3   Caldwell will be up here later for a few more minutes.
10:02   4   But as you're listening to ASUSTeK's lawyer, remember
10:02   5   it's all about the money.
10:02   6              Thank you.
10:03   7       CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT
10:03   8              MR. BURESH:  Good morning, ladies and
10:03   9   gentleman.  Again, it's been a busy few days, and I
10:03  10   concur with my colleague that you guys have taken great
10:03  11   notes.  You've stayed awake the entire time, which is,
10:03  12   candidly, not always the case.  So it's much
10:03  13   appreciated.  I know you guys are doing the best you
       14   can.
10:03  15              I also know that when you're trying to
10:03  16   work and take care of families, this is not what you
10:03  17   want to be doing.  And I think we as attorneys can get
10:04  18   kind of wrapped up in what we're doing and think
10:04  19   you're, you know, just here for our entertainment
10:04  20   sometimes.  And I know that's not the case.  You know,
10:04  21   it's hard to do this, and your service is greatly
10:04  22   appreciated.
10:04  23              I'm going to start out with just what I'm
10:04  24   doing here.  Have you ever had like a speech course in
10:04  25   high school or college or whatever, the ones that are
```

10:04  1    so painful for everybody where you got to stand up and

10:04  2    do this, but it's awkward because you're -- we're young

10:04  3    at that point and it's scary in front of all your

10:04  4    peers.

10:04  5                But the speech courses all tell you the

10:04  6    same thing, right?  When you're talking to people, you

10:04  7    tell them what you're going to tell them, and then you

10:04  8    tell them, and then you tell them what you've told

10:04  9    them.  You ever heard something like that before?

10:04  10               So opening statements was me telling you

10:04  11   what I expected that we were going to tell you.  And

10:05  12   then through this case, we've kept our train right on

10:05  13   the tracks, and I believe we have told you everything

10:05  14   that I said we would.  And now I'm going to just

10:05  15   briefly repeat that.  I'm going to tell you what we

10:05  16   told you, just like a speech class.  And that's the

10:05  17   point of closing arguments.

10:05  18               But I want to be clear about something.

10:05  19   I'm not here to make decisions.  You are here to make

10:05  20   decisions.  And what I'm doing is simply offering you

10:05  21   my perspective on what we've seen.  But I don't want my

10:05  22   perspective to try to trump you guys.  You know, I'm

10:05  23   giving you my perspective to be as helpful as I can be

10:05  24   on behalf of my client, but it's your decision.

10:05  25               You have to find the truth, like we

10:05  1    talked about at the beginning.  And that is the goal.

10:05  2    When we step inside this bar, that's the goal.

10:05  3              And it's something that has -- it's been

10:06  4    important to me.  It's been beautiful to me since I was

10:06  5    a little kid.  My family, my mom and my dad, we

10:06  6    were -- we were not wealthy.  They were working folk.

10:06  7    We lived, as I said, in South Central Kansas.  There

10:06  8    was -- we were near the county seat, you know, like the

10:06  9    little towns where everybody comes together.

10:06  10             There was a courthouse at the county

10:06  11   seat.  And one of the things my dad and I used to do

10:06  12   when I was little, you know, five, six years old, on

10:06  13   Saturday mornings, we'd drive in and go to this donut

10:06  14   shop that was in the little town.  And in that donut

10:06  15   shop, I -- there was always these two guys sitting in

10:06  16   there drinking coffee on Saturday morning, and they

10:06  17   happened to be two lawyers that were -- when I first

10:06  18   met them, they were probably a little older than I am

10:06  19   right now, so they were upper 50s, okay.

10:06  20             And with my dad and I, I'd go to this

10:06  21   donut shop and I'd go in and we'd sit down.  My dad

10:07  22   knew them.  We'd start to talk.  And neither of them

10:07  23   had grandkids, so I kind of became the surrogate

10:07  24   grandkid for both of these lawyers.  They were just

10:07  25   little country lawyers.  They handled all kinds of

—884—

10:07  1   things from, you know, whatever was going on with

10:07  2   families to criminal cases to car accidents.  They were

10:07  3   just doing whatever.

10:07  4          And as I started to get older, they'd

10:07  5   come watch me play baseball or whatever, that sort of

10:07  6   thing, and when they had a case in that county

10:07  7   courthouse, they would let me come over and watch them.

10:07  8   And that was my exposure to doing this.  And that is

10:07  9   what I fell in love with.  And those guys, both of

10:07  10  them, Mr. Martin and Mr. Hill, they were just wise old

10:07  11  guys.

10:07  12         And when I was -- remember when I was

10:07  13  12 years old, I was still going into the courtroom with

10:07  14  these guys to watch, but this is the first time they

10:07  15  got the judge's -- not this judge's, but the judge in

10:07  16  my town, got his permission and let me sit with one of

10:08  17  them at the table when I was 12.

10:08  18         And I didn't even have -- it was comical.

10:08  19  I went in, I had a short-sleeved buttoned-down shirt,

10:08  20  if y'all remember that, remember those.  I don't know

10:08  21  if you can even get them anymore.  I had a clip-on tie.

10:08  22  I had some cowboy boots that I wore, and I put on these

10:08  23  slacks that were about like this.  You know, I could

10:08  24  walk through a pretty good flood, still been okay.

10:08  25         But I'm sitting at that table, and it

10:08    1    felt good.  And I enjoyed it.  I was learning what they

10:08    2    were doing.  It became a beautiful thing.  They

10:08    3    believed in pursuing the truth.  And both those guys,

10:08    4    they always told me the same thing:  When you step

10:08    5    inside this bar, that's what you're doing.  From the

10:08    6    time I was a little kid, that's what I was taught.

10:08    7                One case that I sat with Mr. Hill on, the

10:08    8    other side kept talking about Mr. Hill throughout the

10:08    9    whole case:  Mr. Hill said this and Mr. Hill said that.

10:09    10    And I leaned over because it was making me

10:09    11    uncomfortable, and I said -- I said:  Are they -- are

10:09    12    you getting in trouble?  Like I didn't really know what

10:09    13    was going on.

10:09    14                And he looked at me and he said:  No.

10:09    15    When the other side's coming after you, it's because

10:09    16    you're right in the bull's-eye.  You're hitting the

10:09    17    truth square on, and it hurts.  That's why they're

10:09    18    coming after you.

10:09    19                And my colleagues here have been talking

10:09    20    about me.  They've been talking about Ms. Marriott,

10:09    21    even going back to voir dire and talking about

10:09    22    Mr. Siegmund because we have been telling the truth,

10:09    23    and the truth is painful to them.  So they come after

10:09    24    us.  When you're hitting the bull's-eye of the truth,

10:09    25    that's right where you want to be.

| | | |
|---|---|---|
| 10:09 | 1 | The patent case.  What do you think may |
| 10:09 | 2 | be the number one piece of evidence?  It's not all the |
| 10:09 | 3 | evidence, but the number one piece of evidence might be |
| 10:09 | 4 | in a patent case?  The patents.  Right?  I've been |
| 10:10 | 5 | doing this about 25 years now.  I have never seen a |
| 10:10 | 6 | plaintiff run away from their own patents as much as |
| 10:10 | 7 | I've seen in this case.  Okay? |
| 10:10 | 8 | I mean, if we talk about something in the |
| 10:10 | 9 | patents, our witnesses are getting just berated for |
| 10:10 | 10 | looking at the context of the patents because they |
| 10:10 | 11 | don't want you to look at the patents that Dr. Vasylyev |
| 10:10 | 12 | wrote himself.  Like, literally, just skip over the |
| 10:10 | 13 | first 65 pages and look at these last two columns. |
| 10:10 | 14 | Ladies and gentleman, that's not how this |
| 10:10 | 15 | works.  You have been instructed from the Judge.  You |
| 10:10 | 16 | need to follow those instructions.  The claims are |
| 10:10 | 17 | compared to the products.  That is correct.  We've done |
| 10:11 | 18 | that. |
| 10:11 | 19 | But the claims are understood in light of |
| 10:11 | 20 | the whole novel.  Plain and simple.  And they've been |
| 10:11 | 21 | running from that, and that tells you an awful lot |
| 10:11 | 22 | about the case. |
| 10:11 | 23 | Could I have the ELMO, please?  Thank |
| 10:11 | 24 | you. |
| 10:11 | 25 | And this is really why it's important.  I |

10:11   1   asked Mr. Credelle about this.  Because I do think it's

10:11   2   important.  And here's the thing that's going on.  All

10:11   3   right?  His words.

10:11   4               Care must be taken lest word-by-word

10:11   5   definition removed from the context of the patent would

10:11   6   lead to an overall result that departs significantly

10:11   7   from the patented invention.

10:11   8               And he agreed with that statement.

10:11   9               Okay?  Because that's the truth.  If you

10:12   10   look at the claims word-by-word while ignoring the

10:12   11   context, you can do whatever you want and say they mean

10:12   12   whatever they want.  Okay?  And that would lead to a

10:12   13   result that's not good.

10:12   14               So don't accept the invitation to ignore

10:12   15   the very best evidence in this case, which is the

10:12   16   patents.  I promise you, if our witnesses were doing

10:12   17   anything even slightly untoward, who do you think would

10:12   18   have been objecting?

10:12   19               And we have a very good referee sitting

10:12   20   up there on the bench.  If we were doing something

10:12   21   wrong, he would not have let us do it.  Our case was

10:12   22   right down the train tracks, ladies and gentleman.

10:12   23   Right down the middle.

10:13   24               Let's think about some of the witnesses.

10:13   25   As we've just walked through the case, I told you what

888

10:13  1    we were going to do.  Did I follow through on it?

10:13  2                  Dr. Vasylyev was their first witness.

10:13  3    And this is really where the running began.  Okay?

10:13  4                  Now, the instructions tell you a person

10:13  5    can make a mistake in their testimony, and you need to

10:13  6    judge whether that is meaningful or not because you're

10:13  7    the judges.  Right?

10:13  8                  Dr. Vasylyev is probably the most

10:13  9    educated person in this room by a significant margin.

10:13  10   Put simply, he's smart, very smart.  Okay?

10:13  11                 And Dr. Vasylyev wrote these patents.

10:13  12   Dr. Vasylyev along with ASUS has litigated this case

10:14  13   for over two years.  In other words, the patents are

10:14  14   kind of his thing.

10:14  15                 Now, when I asked him, does the '318

10:14  16   patent mention displays, y'all remember this whole

10:14  17   thing.

10:14  18                 I think it may not.

10:14  19                 And I said:  Yes or no, do you know?

10:14  20                 I don't know.

10:14  21                 In other words, Dr. Vasylyev was telling

10:14  22   us he didn't know the contents of his own patents

10:14  23   because the content that I was pointing out was bad for

10:14  24   him.  You need to judge those sort of things.

10:14  25                 Here's another one, the quantum dots with

889

10:14  1    the colorful light show at the beginning.  We were

10:14  2    making the point the quantum dots that they showed you

10:14  3    had nothing to do with his patents.  That's just the

10:14  4    point we were making because the quantum dots in his

10:14  5    patents were doing what?

10:14  6                 Taking our wonderful sunlight and

10:14  7    converting it into electricity.  It's a different type

10:14  8    of quantum dots.

10:14  9                 So I asked Dr. Vasylyev about this color

10:14  10   notion.  And we had an exchange.  And he said -- I

10:15  11   said:  You don't recall whether your patent talks about

10:15  12   changing the color of light or not?

10:15  13                 I don't recall.

10:15  14                 If you remember that testimony, I walked

10:15  15   him through his patents, display, monitor, colors,

10:15  16   those types of concepts.  And we had to do word

10:15  17   searches to establish to him that he had to agree with

10:15  18   me before he would.

10:15  19                 That type of demeanor in the witness

10:15  20   chair.  You know, Lady Justice weighing, balancing,

10:15  21   test the credibility of that.  Is a man with his

10:15  22   intelligence, his access and knowledge of the patents,

10:15  23   is it believable that he can't answer basic questions

10:15  24   about what his patents talked about?

10:15  25                 Credibility.  It's an important thing.

890

```
10:15   1              Then I told you in my opening as well, I
10:16   2   did have what I think was described as an extended
10:16   3   discussion of wheat and chaff.  I didn't feel like it
10:16   4   was that extended.  Maybe it was too long for you all.
10:16   5   I don't know.
10:16   6              But the wheat and the chaff, like I want
10:16   7   to be here -- we want to be here talking about the
10:16   8   patents and our products and keeping the focus on the
10:16   9   train tracks so that it is as helpful to y'all as
10:16  10   possible.  And I told you there was going to be a bunch
10:16  11   of chaff to try to cloud that up.
10:16  12              So Dr. Vasylyev was on the stand for a
10:16  13   long time talking about stuff I even said beforehand
10:16  14   was going to be irrelevant.  And we even heard about it
10:16  15   more in closing, walking through it again.
10:16  16              This is a long piece of testimony, and
10:16  17   this is just to help you recall some of the things that
10:16  18   happened.  But I literally went through the list with
10:17  19   him.
10:17  20              Grants, are they -- the grants you talked
10:17  21   about, do they have anything to do with the patents?
10:17  22              No, sir.
10:17  23              The public recognition that you talked
10:17  24   about, did those have anything to do with the patents?
10:17  25              No, sir.
```

891

```
10:17   1                    The grants you've gotten from the
10:17   2    Department of Energy and California Energy Commission,
10:17   3    those sorts of things, none of them were used to
10:17   4    develop any of the patents?
10:17   5                    No, sir.
10:17   6                    Okay.  The things we're hearing about
10:17   7    from them are literally an hour and a half of testimony
10:17   8    that I suggest, from my perspective, (indicating) let
10:17   9    the wind blow that away.  It has nothing to do with
10:17  10    this case.
10:17  11                    Another thing I said in my opening was
10:17  12    we're not going to see a monitor from Dr. Vasylyev
10:17  13    because that's not the lane he's in.  Like, they talked
10:18  14    all about our monitors and how great they worked and
10:18  15    left me with the impression that they were talking
10:18  16    about the benefits of the patented invention.
10:18  17                    And you remember I asked Dr. Credelle,
10:18  18    that's a big if, right?  There's a big assumption built
10:18  19    into that whole line, which is that our products
10:18  20    actually use your technology.  Then you could use them
10:18  21    as an example.  But that's what y'all are here to
10:18  22    decide.
10:18  23                    So putting the cart before the horse with
10:18  24    that assumption doesn't really make sense.  What I was
10:18  25    inviting was show us a prototype.  Show us a monitor.
```

| | | |
|---|---|---|
| 10:18 | 1 | If you want to claim that your backlight creates all |
| 10:18 | 2 | these great, great things, show me. |
| 10:18 | 3 | Remember the "Show-Me" state?  Show me. |
| 10:18 | 4 | So I made that invitation in opening, and I was |
| 10:18 | 5 | confident it wouldn't happen. |
| 10:18 | 6 | But here's what we got from Dr. Vasylyev. |
| 10:18 | 7 | I asked him point-blank:  You can't say |
| 10:19 | 8 | with any certainty based on real-world prototypes or |
| 10:19 | 9 | testing that your product even works the way you |
| 10:19 | 10 | described it, can you? |
| 10:19 | 11 | And his answer was:  I'm pretty sure that |
| 10:19 | 12 | it will. |
| 10:19 | 13 | Those are words from a very interested |
| 10:19 | 14 | person.  Where's the evidence?  Show me something.  We |
| 10:19 | 15 | have no sense in this room today that his actual |
| 10:19 | 16 | inventions would provide any benefit or even work in |
| 10:19 | 17 | the context of a display.  You've not seen anything to |
| 10:19 | 18 | suggest that. |
| 10:19 | 19 | Now, Mr. Credelle was their expert, and |
| 10:19 | 20 | he is a testifying expert.  No critique; it's a job. |
| 10:20 | 21 | But it's worth weighing.  And it's something to |
| 10:20 | 22 | consider.  If a person makes their living off of |
| 10:20 | 23 | getting in that box and being hired by lawyers and they |
| 10:20 | 24 | need that living because that's their only source of |
| 10:20 | 25 | income, it kind of changes the dynamic of how you weigh |

| 10:20 | 1 | that.  Just from the perspective of human interest. |

10:20    1    that.  Just from the perspective of human interest.

10:20    2         Here's the thing.  You got to test the

10:20    3    testimony, test what the content of his -- of his

10:20    4    presentation was.

10:20    5         One of the things that caught my

10:20    6    attention is he was arguing left and right that a light

10:20    7    guide, that he's called a light guide for as long as

10:20    8    could be, that the industry has called a light guide

10:20    9    since 1997 or '95 or whenever it was, it's been a light

10:20   10    guide the whole time, but suddenly Mr. Credelle sits

10:20   11    down in this case and it's a light trap.

10:21   12         Even though in his testimony he's calling

10:21   13    it a light guide, when I come up to cross him, well,

10:21   14    now it's a light trap.

10:21   15         I don't know what you all want to do with

10:21   16    that.  You know, it's up to you how you want to weigh

10:21   17    that.

10:21   18         From my perspective, when somebody is

10:21   19    willing to stretch their professional knowledge,

10:21   20    stretch what they would call something in their

10:21   21    profession in order to support a case they've been

10:21   22    hired for, that tells you something about where they're

10:21   23    coming from.

10:21   24         But it comes down to opinions.  The case

10:21   25    has always been about, number one piece of evidence,

894

10:21  1   patents, number two piece of evidence, products.

10:21  2   Right?  It's pretty simple really.  Do the claims match

10:21  3   up?  After we understand them, do the claims match up?

10:22  4              The '318 patent, we've looked at this a

10:22  5   few times now.  You saw me do this with him -- with

10:22  6   Mr. Credelle on cross.  You saw it again with

10:22  7   Dr. Goossen.

10:22  8              But here's the deal.  Even Mr. Credelle

10:22  9   knows that that LED is what is injecting light into

10:22  10  this system.  I mean, it's plain as day.  Just look at

10:22  11  the thing, how it works.  It's light coming in here and

10:22  12  then going out the top because the display is up here.

10:22  13  Really is straightforward.

10:22  14             Now, I'm going to do some word voodoo

10:22  15  here, okay?  An input surface, that's the surface where

10:22  16  the light is put in.  Okay?  Input, plain and ordinary

10:23  17  meaning, it's put in.  Where is the light put into this

10:23  18  system?  Right here.

10:23  19             What is Mr. Credelle calling the input

10:23  20  surface?  Down here, where the light actually goes out.

10:23  21  Okay?  And his point is, well, some of it comes back

10:23  22  in.

10:23  23             But this patent, there are not multiple

10:23  24  different input surfaces.  It doesn't even make sense

10:23  25  in the context of this claim.

10:23  1          There's one input surface in this claim.

10:23  2    It comes in the edge, and it goes out the top.  Why

10:23  3    does that mean there's no infringement?  Because this

10:23  4    patent was never about edge-lit displays.  You look at

10:23  5    this, and you need a broad-area input surface that

10:23  6    opposes the broad-area output surface and is parallel

10:24  7    to it.

10:24  8          That's for a solar panel where the light

10:24  9    comes in the top and out the bottom into a harvesting

10:24  10   layer.  That's what it's talking about.  It is not

10:24  11   talking about light coming in the side and going out

10:24  12   the top.

10:24  13         And just so I can orient y'all to your

10:24  14   patents, when you go back, these are what you're going

10:24  15   to have in the jury room.  When you're looking for the

10:24  16   claim limitations we're talking about, they are at the

10:24  17   back.  And the particular one we're talking about is in

10:24  18   Claim 1, and it's that first limitation.  Okay?

10:24  19         Now, Claim 3 is also asserted in this

10:24  20   case, and I don't want there to be any confusion.  It's

10:25  21   what's called a "dependent claim."  It refers to

10:25  22   Claim 1.  So if Claim 1 is not met, Claim 3 can't be

10:25  23   either.  There's nothing separate to look at on

10:25  24   Claim 3.

10:25  25         Make sense?

10:25  1          Now we have next the '089 patent.  This

10:25  2  is another of the light-trapping patents.

10:25  3          And we talked about the array of optical

10:25  4  elements which everyone agrees we should be looking at

10:25  5  these lenses on top of the light guide to consider

10:25  6  whether this meets the right geometry, is it set up

10:25  7  right?  Okay?

10:25  8          Contextually, again, we're talking about

10:25  9  a light-trapping system where the light comes in from

10:25  10  the top, goes through the bottom.  But in our products,

10:26  11  again, it's edge-lit.  And that creates a problem.

10:26  12          These lenses, okay, you tracking me?

10:26  13  They need to be configured for injecting light into a

10:26  14  space.  And that's what they do in this patent.

10:26  15  Remember the images?  Light comes down, hits the lenses

10:26  16  and gets focused into the layer beneath.  It gets

10:26  17  injected into the space beneath.

10:26  18          In this product, what is injecting

10:26  19  backlight into the space?  The space Dr. Credelle

10:26  20  defines is from here all the way up to here.

10:26  21          And I ask you a simple question:  What is

10:26  22  configured to inject light into this space?  Okay?

10:27  23          The light is injected into the space

10:27  24  before it ever even touches a lens.  And it's going

10:27  25  through the lenses backwards.  It's not being injected

10:27  1    into anything.  Those lenses spread the light out like

10:27  2    this.  Okay?

10:27  3              The configuration, the geometry that

10:27  4    Dr. Goossen talks about is completely backwards in this

10:27  5    patent.  And you would expect it to be because this

10:27  6    patent is talking about a completely different system.

10:27  7              When you look at the '089 patent in your

10:27  8    notebooks, I want to show you where these claims and

10:27  9    limitations are.

10:27  10             So in the '089 patent, again, you flip to

10:27  11   the back.  We're talking about Claim 14.  The relevant

10:27  12   limitation is right here with the lenses configured for

10:28  13   injecting.  And 19 is the dependent claim.  Again, same

10:28  14   thing.  There's nothing separate to look at on

10:28  15   Claim 19.

10:28  16             The '342 patent.  Now we're into the

10:28  17   patents that actually do emit light.  And the question

10:28  18   you need to ask is:  Are the products emitting light in

10:28  19   the same way that the design of the patent calls for?

10:28  20   Okay?  Are they collimating?  Collimating is not in the

10:28  21   claim.  It is the why.  Why would our products not want

10:28  22   to do what's in these claims?  Okay?  Because we don't

10:28  23   want beams of light coming out.

10:28  24             Here's the claim limitation that matters.

10:29  25   Predetermined alignment between the lenses and the

```
10:29    1    surface light-deflecting elements.  Okay?
10:29    2                    There are over a million deflecting
10:29    3    elements on these light guides.  And they are randomly
10:29    4    distributed.  Okay?  When this is set up, they are
10:29    5    spread intentionally random.  You've heard
10:29    6    witness -- even Mr. Credelle says that.  They are a
10:29    7    random distribution.
10:29    8                    The lenses, which you can see here
10:29    9    horizontally, they're just laid out linearly, like
10:29   10    parallel one after another.  It is not possible to have
10:29   11    linear lenses that are in some predetermined alignment
10:29   12    with things that are random underneath them.  That's
10:29   13    not possible.
10:29   14                    And why is it done this way in our
10:29   15    products?  When you set random distributions for those
10:30   16    surface relief features, you are getting the light to
10:30   17    distribute in random patterns coming out so that you
10:30   18    have full dispersion.
10:30   19                    If you align the surface relief features
10:30   20    with these lenses, it creates focal points and you get
10:30   21    beams coming out.  We don't want that in our products,
10:30   22    so we design to randomness.  Okay?  That's just the
10:30   23    facts.  That's the truth.
10:30   24                    And what Mr. Credelle has pointed to, the
10:30   25    two microcavities that he points to that are in
```

| | | |
|---|---|---|
| 10:30 | 1 | alignment, that's not by design.  That's what happens |
| 10:30 | 2 | when you have something random.  Some of them will be |
| 10:30 | 3 | aligned because it happens that way, and a whole bunch |
| 10:30 | 4 | of them, like on the order of millions, will not be. |
| 10:30 | 5 | Okay? |
| 10:30 | 6 | "Predetermined" means by design.  These |
| 10:31 | 7 | are not aligned.  Let me put it this way:  They are |
| 10:31 | 8 | intentionally not aligned by design. |
| 10:31 | 9 | For the '342 patent, when you look in |
| 10:31 | 10 | your notebooks, this is a massively long claim.  Okay? |
| 10:31 | 11 | This is -- you need to kind of look where I'm |
| 10:31 | 12 | highlighting here so you can actually find the language |
| 10:31 | 13 | when you're looking for it.  But it's at around |
| 10:31 | 14 | Line 61, there needs to be a predetermined alignment |
| 10:31 | 15 | right there.  Okay?  That's what you're looking for. |
| 10:31 | 16 | And from my perspective, it's plain as day that that is |
| 10:31 | 17 | not present in our products. |
| 10:31 | 18 | The dependent claim on this one is 21 |
| 10:32 | 19 | over on the next page, right here.  Same deal.  Nothing |
| 10:32 | 20 | new to look at on that one. |
| 10:32 | 21 | And last one, the '562 patent.  This is |
| 10:32 | 22 | really the same deal as we just talked about.  This |
| 10:32 | 23 | particular claim talks about it in terms of a |
| 10:32 | 24 | predetermined two-dimensional pattern.  That's talking |
| 10:32 | 25 | about these microcavities or what the claim calls |

900

10:32   1    "surface relief features."  Okay?

10:32   2                Mr. Credelle, Dr. Goossen, they agree

10:32   3    these are spread in a random pattern.  You will not be

10:32   4    able to repeat these if you get a copy of or picture of

10:32   5    one of these.  And like Dr. Goossen was saying, put

10:32   6    your hand over half of it and try to repeat whatever

10:33   7    you're seeing on the left-hand side, you're not going

10:33   8    to be able to do it because they're random.  They're

10:33   9    random by design.

10:33   10                Now, there was a whole bunch of

10:33   11   discussion about whether random is a two-dimensional

10:33   12   pattern or not.  I don't even know really what to say

10:33   13   about that.  You either are random or you're in a

10:33   14   pattern that you've defined by two dimensions.  I don't

10:33   15   know how you square with those two.

10:33   16                That's why we believe there's no

10:33   17   infringement.  Plain and simple.

10:33   18                Last thing before I leave Credelle and

10:33   19   the patents, just to give me a second to complete my

10:33   20   circuit here.  The '562 patent in your notebooks, so

10:33   21   that you can find the limitations we're talking about.

10:34   22   Okay?

10:34   23                Here, we have Claim 1 of the '562 patent

10:34   24   again at the tail end.  The relevant language is around

10:34   25   Line 45 highlighted on the screen in front of you.

901

```
10:34   1              Predetermined two-dimensional pattern.
10:34   2              And Dependent Claim 7, same issue as all
10:34   3   the rest.  Nothing new to see there.
10:34   4              Before I leave Mr. Credelle, in terms of
10:34   5   keeping the train going down the track, tell you what
10:34   6   we're going to do, tell you what I told you.  That's
10:34   7   moving in the right direction.  What you see sometimes
10:34   8   in cases is when things start to fall apart, you see
10:34   9   parties going off the tracks.  Okay?  They're just kind
10:34  10   of careening at this point.
10:34  11              And what we've seen in this case during
10:35  12   the direct examination of Mr. Credelle, he put the
10:35  13   pictures up that I've been looking at with you.  That
10:35  14   was his opinions.  I cross-examined him, and I'll let
10:35  15   you decide how that went.  That's up to you guys.  But
10:35  16   what we saw on redirect then is Mr. Credelle come back
10:35  17   and start talking about new things, okay?
10:35  18              We're not talking about the pictures
10:35  19   anymore.  Now we're talking about CAD files, whatever
10:35  20   those are, some programs, spec sheets, some machine
10:35  21   that does indexing, all new on redirect, by the way.
10:35  22   And the question I have is:  Where's the evidence of
10:35  23   any of that?  Right?  Did we see it?  The train's
10:35  24   coming off the tracks.
10:35  25              Now, after Mr. Credelle comes down and
```

10:35  1   Dr. Goossen comes up in our case, it goes even further

10:35  2   off the track.  Suddenly we're seeing new pictures and

10:36  3   some, you know, things being pulled together that we

10:36  4   didn't see with Mr. Credelle's direct examination.  We

10:36  5   didn't see it on redirect.

10:36  6            Now the plaintiffs are trying to put some

10:36  7   new stuff for arguments in through our expert that we'd

10:36  8   never even seen before.  Didn't know where they came

10:36  9   from.

10:36  10            That's the train careening, in my

10:36  11  opinion.  And I'd like for you to consider that as

10:36  12  well, the flow of how things were presented, okay,

10:36  13  because that can be informative as well.

10:36  14            Continuing down the string of witnesses.

10:36  15  Mr. Farber -- or Dr. Farber, excuse me -- came up next

10:36  16  and he was presenting the plaintiff's damages case.

10:36  17  What did I tell you in my opening?  He's going to talk

10:36  18  about regressions.  It's going to be kind of black

10:37  19  boxy, hard to see into.

10:37  20            I told you that regressions were fine in

10:37  21  my opening.  I don't have any problem with mathematics,

10:37  22  it's great.  Whatever.  But what I said was garbage in

10:37  23  and garbage out.  Okay?  Because if you put in the

10:37  24  wrong inputs to the math, you get the wrong outputs.

10:37  25  And I did make the comment because I think it's

10:37  1    applicable with political polls.

10:37  2                If someone's paying for a particular

10:37  3    result, you can use the math to get that result.  Okay?

10:37  4    And I think that's what we're seeing here.  I told you

10:37  5    that, and I think we've shown it.

10:37  6                Here's the -- what I think high

10:37  7    level -- this is an example, not a conclusion.  But

10:37  8    Dr. Farber was asked:  That plastic stand could be

10:37  9    attributed to the patented technology.  We haven't

10:38  10   heard anything like that, have we?

10:38  11               Well, we did hear that the benefits could

10:38  12   extend to the plastic stand.

10:38  13               Okay.  Let me back up and give you a

10:38  14   little context.

10:38  15               The questions we're asking is why did you

10:38  16   start from the whole dadgum monitor?  Like the buttons

10:38  17   and the circuit boards and the LEDs and the -- and

10:38  18   the -- the liquid crystal display and the stand?  The

10:38  19   plastic that it sits on?  Why did you start from all

10:38  20   that and then use your regression to narrow it down

10:38  21   from there?

10:38  22               Plain and simple, if you have a bigger

10:38  23   starting point, then your regression ends you at a

10:38  24   bigger place.  What in the world do these patents have

10:38  25   to do with the plastic stand that a monitor sits on?

904

10:38  1    Nothing.  It's garbage in and it's garbage out.  You

10:38  2    can have all the Nobel Peace Prizes you want for the

10:38  3    mathematics.  If you start at the wrong place, you end

10:38  4    at the wrong place.

10:38  5             And I suggest just look at the number he

10:38  6    came up with.  $58 million?  On what planet?  For the

10:39  7    case we've seen -- even if they were right, even if you

10:39  8    agree with them, for the case we've seen, on what

10:39  9    planet does that get you $58 million?  Because on this

10:39  10   planet in the world we actually live in, the best

10:39  11   evidence is what actually happened.

10:39  12             You don't have to have a black box.  You

10:39  13   don't have to have a magic eight ball to get here.  You

10:39  14   look at what a company that was much larger with many

10:39  15   more products paid, and you work down from there to get

10:39  16   to where we should be.

10:39  17             Am I telling you that $425,000 is some

10:39  18   precise, like that's it?  I think it's a reasonable

10:39  19   place.  I think Mr. Ferioli's analysis on that was well

10:39  20   supported.  But if you have to find damages, it's up to

10:39  21   you.  But start from the real world.  Don't start from

10:40  22   some garbage-in-garbage-out regression analysis.

10:40  23             Now we turn to our case.  Okay?  Our

10:40  24   first witness was James Lee.  And I'll just give you my

10:40  25   perspective.  It was challenging to listen to with all

10:40  1    the interpretation stuff going on.  That's challenging.

10:40  2    It's hard.  It's part of the thing, right?  I mean, if

10:40  3    you sue a company in Taiwan, that's what you're going

10:40  4    to get.

10:40  5              But my perception is he answered the

10:40  6    questions to the best of his ability whether they were

10:40  7    good for him or whether they weren't.

10:40  8              THE COURT:  Counsel, you have five

10:40  9    minutes left.

10:40  10             MR. BURESH:  Thank you.

10:40  11             What's that tell you?  He's just honest.

10:40  12   Okay?  Just honest.  One of the big things with him is

10:41  13   where are the engineers?  Why didn't ASUS bring an

10:41  14   engineer?

10:41  15             Well, I think it's no surprise by now

10:41  16   that ASUS doesn't design the monitors.  There are not

10:41  17   engineers at ASUS who have firsthand knowledge of this.

10:41  18   That's it.  It's no secret.

10:41  19             We brought Mr. Lee because he's the

10:41  20   leader of that division.  And in the Taiwanese culture,

10:41  21   that matters.  He comes to answer for it.  Okay?  Just

10:41  22   the way it works.  That's why he's here.

10:41  23             The letters between Jason Wu and

10:41  24   Mr. -- the lawyer for SVV, read them.  We fully stand

10:41  25   behind those letters.  They show a company doing what a

10:41  1   company was supposed to do.  They engaged.  They

10:41  2   communicated.  And the delay they keep talking about,

10:41  3   nine months of it was us waiting for them.  Okay?  The

10:42  4   vast majority of that delay was SVV.

10:42  5             When the complaint in this case was

10:42  6   filed, Mr. Lee told you what happened.  They went into

10:42  7   action.  Mr. Lee sent the legal team, engineers at both

10:42  8   ASUS and the display companies, they came together,

10:42  9   they did an investigation.  That's exactly what's

10:42  10  supposed to happen.  They concluded there was no

10:42  11  infringement.  And that's fine.  That's their opinion.

10:42  12            That's what we presented to you here

10:42  13  today.  You get to decide whether that's right or not

10:42  14  right.  But that's what they did.  And there's nothing

10:42  15  wrong with that.  That's just what a company is

10:42  16  supposed to do.

10:42  17            In these instructions, this is on willful

10:42  18  infringement.  This was not included in the plaintiff's

10:42  19  opening, but I want you to read this sentence:  You may

10:43  20  find that an infringer willfully infringed if you find

10:43  21  that an infringer's behavior was malicious, wanton,

10:43  22  deliberate, consciously wrongful, flagrant, or in bad

10:43  23  faith.

10:43  24            Those are words that would raise our

10:43  25  dander here in the U.S.  In Taiwan and Asia, where

10:43   1   they're an honor society, they're highly offensive.

10:43   2   And I do not believe anything we've seen in this case

10:43   3   justifies those types of allegations to even be in this

10:43   4   case.

10:43   5               Dr. Goossen, I'm not going to go through

10:43   6   the claim analysis again.  I've already done that.

10:43   7               But here's what I want to leave you with:

10:43   8   I believe that Dr. Goossen was the first witness in

10:43   9   this entire case with technical expertise to step on

10:43   10   that stand and try to communicate with you clearly,

10:44   11   like by intention to communicate clearly and simply

10:44   12   without a bunch of clouds just to give you by the best

10:44   13   of his ability the straight shot.  That's my perception

10:44   14   of Dr. Goossen.

10:44   15               And this wasn't me.  I didn't prepare him

10:44   16   for this.  I didn't know this was coming on

10:44   17   cross-examination, but I think it's very telling.

10:44   18               My colleagues on the other side asked

10:44   19   Dr. Goossen:  What side are you on?

10:44   20               And his answer was:  The side of truth.

10:44   21               That's what he was doing.  That's what

10:44   22   we've been doing this whole time.  We've been right in

10:44   23   the bull's-eye of the truth.

10:44   24               It's your decision whether you agree with

10:44   25   us or don't.  But here's the deal:  Fundamentally,

10:44  1  you're asking do you think we were in the bull's-eye of

10:45  2  truth, or do you think the plaintiffs in the way

10:45  3  they've presented their case, that they were in the

10:45  4  pursuit of truth?

10:45  5          If you agree with us, those little

10:45  6  checkmarks with all the yeses that you saw from the

10:45  7  plaintiffs, you just go to the other side.  It's nos

10:45  8  right down.  And I believe, ladies and gentleman, that

10:45  9  that will be a reflection of the truth that it is our

10:45  10  duty to find here today.

10:45  11          Thank you.

10:45  12  <u>CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF</u>

10:45  13          MR. CALDWELL:  Thank you, ladies and

10:46  14  gentleman.  We're almost there.  This is the last time

10:46  15  you have to actually listen to a lawyer in this case.

10:46  16          I have to say I like Mr. Buresh's

10:47  17  demeanor.  I like the way that he talks.  It kind of

10:47  18  lulls you into, I don't know, like you're feeling like

10:47  19  you're in some sort of a story, and it's in some

10:47  20  respects compelling.

10:47  21          But, you know, something that we heard

10:47  22  from the very beginning of this case is that the lawyer

10:47  23  arguments, which includes what I'm telling you, is not

10:47  24  evidence.  The lawyer argument that you heard from my

10:47  25  colleague's not evidence.  And the lawyer argument you

| | | |
|---|---|---|
| 10:47 | 1 | heard from Mr. Buresh is not evidence. |
| 10:47 | 2 | And one thing is pretty interesting about |
| 10:47 | 3 | watching this group that stood out to me -- because, I |
| 10:47 | 4 | mean, you know, the lawyers sit over here and we're |
| 10:47 | 5 | curious and like to see what jurors are doing -- is |
| 10:47 | 6 | you're a very interesting group that took fewer notes |
| 10:47 | 7 | when the lawyers were opening, really started paying |
| 10:47 | 8 | attention when the evidence was on the stand -- the |
| 10:48 | 9 | witnesses were on the stand presenting things to you. |
| 10:48 | 10 | And that's what this is about. And I |
| 10:48 | 11 | just want to make sure that people aren't lulled into |
| 10:48 | 12 | some distraction that takes you away from the evidence |
| 10:48 | 13 | you saw in this case. |
| 10:48 | 14 | You know, I could come up and say this is |
| 10:48 | 15 | the strongest infringement case I've ever seen, and |
| 10:48 | 16 | I've done it 25 years. It's the strongest willfulness |
| 10:48 | 17 | case I've ever seen, and I've done it 25 years. But it |
| 10:48 | 18 | doesn't matter what I tell you as far as that goes. |
| 10:48 | 19 | You're the one who has to answer the |
| 10:48 | 20 | question of whether you believe that the only person |
| 10:48 | 21 | who took that stand and gave you straight answers was |
| 10:48 | 22 | Mr. Goossen. |
| 10:48 | 23 | Now, Dr. Vasylyev, within the span of a |
| 10:48 | 24 | minute, was criticized for how smart he is, criticized |
| 10:48 | 25 | for how smart he is because he put so much information |

910

10:48  1    in his patent, and then criticized for not being

10:49  2    willing to say, I know a certain word appears in one

10:49  3    specification or another.  They're like 50 and 60

10:49  4    columns long in some respects, and he's being careful,

10:49  5    when he said he doesn't know.  And that sort of

10:49  6    criticism happened over and over and over.

10:49  7                And then when the attacks turned to, you

10:49  8    know what, let's talk about the claims, guys, I started

10:49  9    on Monday saying this is going to come down to the

10:49  10   claims.  I showed you we were going to go through the

10:49  11   checkmarks, which I did.  And then we spent much of

10:49  12   this trial trying to remind you guys this is going to

10:49  13   be about the claims.

10:49  14               Now, who was constantly talking about

10:49  15   solar?  Who was constantly talking about, well, if you

10:49  16   trap, you can't display something?  If you collimate,

10:49  17   it won't work.  If you harvest, this won't work.  Who

10:50  18   was constantly doing that?

10:50  19               And I'm asking for a reason.  This is a

10:50  20   claim.  This is a claim for the '318 patent.  I would

10:50  21   like to point out to you the words "an optical cover

10:50  22   for a light harvesting device."  That's in one of our

10:50  23   claims.  And I'm guilty as everyone here for saying we

10:50  24   got to focus on the claims.

10:50  25               You notice there's not a red check by it,

911

10:50  1    though.  That's because this is called the "preamble"

10:50  2    of a claim.  And the law is that the preamble of a

10:50  3    claim is not limiting.

10:50  4              And not only that, in your instructions

10:50  5    there's a chart with definitions that Judge Albright

10:50  6    has given you.  And you know what it says specifically

10:50  7    about this?  It specifically says:  The preamble of the

10:51  8    '318 is not a limitation.  It literally says that in

10:51  9    the chart that's in here, that's in your papers.

10:51  10             The '089 has something similar.  And the

10:51  11   same chart says it's not a limitation.  That's what

10:51  12   Judge Albright says.  This isn't Mr. Buresh.  It's not

10:51  13   Mr. Caldwell.  It's not Mr. McCarty.  It's none of us.

10:51  14   It's Judge Albright.  It's not a limitation.

10:51  15             Also not a limitation is the preamble of

10:51  16   the '562.  But just for contrast from -- in case

10:51  17   there's any doubt whatsoever that no one would ever

10:51  18   think these relate to these displays, it's absurd.  I

10:51  19   mean, we actually have that preamble, edge-lit

10:51  20   waveguide illumination system, where all you hear is

10:51  21   about solar and capture and trapping and all that.

10:52  22             This is the claim that the United States

10:52  23   Patent Office issued after examining the specification.

10:52  24   Now, I'm not saying that's a limitation.  What I'm

10:52  25   pointing out is the just distraction and the effort to

```
10:52   1    have you look at something that's different.
10:52   2              It's incredibly hard to hear 45 minutes
10:52   3    of a lawyer arguing something that I don't know what
10:52   4    he's going to say and to respond to each point.  But
10:52   5    I'm going to try to respond to a few of them just to
10:52   6    illustrate some points.
10:52   7              But before I do, I would like to ask
10:52   8    y'all to focus on something that is in the charge we're
10:52   9    given.
10:52   10             Now, there's a slide that my colleague
10:52   11   showed up, and he highlighted several bits of
10:52   12   instruction.  But it's Juror Instruction No. 20, 2-0.
10:52   13   And I think a lot of cases, it's not maybe really in
10:52   14   dispute.  But in this case, it's the one that tells you
10:53   15   the thing that matters is the claim.
10:53   16             I keep going back to that because this is
10:53   17   something, you know, my mom has asked me about when
10:53   18   she's like looking at something, I'm trying to describe
10:53   19   a patent to her, and I'm showing her the pictures.  And
10:53   20   she's looking at a picture.  And it's like, but that
10:53   21   doesn't look like an iPhone, you know, something like
10:53   22   that.
10:53   23             And the reason is because -- so I've
10:53   24   tried some cases against Apple that related to the
10:53   25   iPhone, for example.  And sometimes you'll have a
```

10:53  1    patent, and it's about like a software invention, like

10:53  2    encryption, or it's something about how the memory

10:53  3    works, for example.  And really at the end of the day,

10:53  4    it can be in the phone, but the thing you're looking at

10:53  5    might be different.

10:53  6              And in this case, to the person of skill

10:53  7    in the art who's the target for these patents, as we've

10:53  8    all heard, the disclosure is of all the scientific

10:53  9    principles that matter.  And we're not running from the

10:54  10   concepts of light trapping.  The idea is you are told

10:54  11   that's how you hold it in a waveguide.  It's this total

10:54  12   internal reflection where it stays inside the waveguide

10:54  13   until at the places where you've picked, the deflector

10:54  14   points, it can deflect out.

10:54  15             Light can deflect up where you want it,

10:54  16   and light can deflect down off of the reflector sheet

10:54  17   and then back up through.  It can also be recycled,

10:54  18   and, therefore, you get more light through the

10:54  19   photoreactive layers, through the quantum dots.

10:54  20             Every bit of this is internally

10:54  21   consistent, and the scientific disclosure is there.

10:54  22   Because you guys heard during this trial, there are

10:54  23   concepts like written description, where someone could

10:54  24   challenge invalidity if there was a problem with the

10:54  25   description, like if it was inadequate to support the

| | | |
|---|---|---|
| 10:54 | 1 | claims as they're being read.  It's also something the |
| 10:54 | 2 | examiner looks at when the patents were initially |
| 10:54 | 3 | examined. |
| 10:54 | 4 | So while I think we just got drug through |
| 10:55 | 5 | the mud saying we were distracting you by giving you, |
| 10:55 | 6 | what, six minutes of Dr. Vasylyev's background and |
| 10:55 | 7 | awards, we got drug through the mud that we were |
| 10:55 | 8 | distracting you.  And who has spent the better part of |
| 10:55 | 9 | three days talking about this would only work if you're |
| 10:55 | 10 | putting solar cells in here? |
| 10:55 | 11 | So I don't want you guys to forget what |
| 10:55 | 12 | the evidence actually was just because someone says, |
| 10:55 | 13 | hey, the only person that was credible was our guy. |
| 10:55 | 14 | That's not true. |
| 10:55 | 15 | Now, there was criticism.  Mr. Credelle, |
| 10:55 | 16 | he's testified.  Sure.  He's testified a few times. |
| 10:55 | 17 | He's semiretired and he picks cases he believes in and |
| 10:55 | 18 | is willing to help through his technical expertise.  I |
| 10:55 | 19 | hardly feel like that was some indictment on |
| 10:55 | 20 | Mr. Credelle. |
| 10:55 | 21 | Now, they effectively tried to call him a |
| 10:55 | 22 | liar, saying he couldn't have taken these images that |
| 10:55 | 23 | he showed you.  But he got up and walked around in |
| 10:56 | 24 | front of you.  And even in this lighting in the |
| 10:56 | 25 | courtroom, zoomed in and showed you how he looked at |

```
10:56    1    these panels, all things that the other side hasn't
10:56    2    done.
10:56    3           The other side, the one that apparently
10:56    4    can't find their own monitors and apparently couldn't
10:56    5    tear them down until they were in here, and, finally,
10:56    6    for the first time ever opened one of their own
10:56    7    monitors to say, you're asking for too much money.
10:56    8    We've got a circuit board.  Three and a half years,
10:56    9    they can't tear down one of their own monitors?
10:56   10           In closing just now, the very end, within
10:56   11    the span of about 30 seconds, you heard:  It's crazy
10:56   12    that they keep criticizing us for not bringing an
10:56   13    engineer.  Not bringing an engineer, we don't have
10:56   14    engineers that do this.  We outsource it.  Why would
10:56   15    they criticize us of that?  This guy's the head.  We
10:56   16    don't have engineers.
10:56   17           Within 30 seconds, he was telling you, by
10:56   18    the way, the guy who came here told you he's talked
10:56   19    with his engineers back at ASUS, and they tell him
10:56   20    we're okay.  We're not infringing.
10:57   21           Which is it?  Which is it?
10:57   22           We have done everything we can.
10:57   23    Dr. Vasylyev has done everything he can.  And if you
10:57   24    want us to talk about what cases look like, an inventor
10:57   25    who comes out of his pocket and buys literally dozens
```

916

10:57  1    of their products to crack them open and map them and

10:57  2    send it to them, and the minute they know that's

10:57  3    coming, they just say, go talk to somebody else.

10:57  4              In here, oh, yeah.  We didn't have

10:57  5    engineers until they told us something good.

10:57  6              Now, you've heard a lot about the

10:57  7    so-called light-trapping patent.  Okay?  And I hope

10:57  8    that by now, you understand that if you follow the

10:57  9    Judge's instructions, that's been nonsense from the Day

10:57  10   1 -- from Day 1.

10:57  11             But let's be clear.  Their so-called

10:57  12   light-trapping patents constitutes roughly 1 percent of

10:58  13   the damages in this case.  Roughly 1 percent.  That's

10:58  14   the '318 and the '089 is roughly 1 percent, because

10:58  15   those are the ones that require things like reflecting

10:58  16   back through to go to the quantum dots where they

10:58  17   specifically say the quantum dot layer.

10:58  18             Roughly 99 percent of this case is on the

10:58  19   '342 and the '562 patents.

10:58  20             Now, I would like to point out because I

10:58  21   think this keeps getting glossed over.  They say you

10:58  22   can't have predetermined and random.  This claim

10:58  23   doesn't have random, by the way.  But the one that does

10:58  24   actually says that the dots, the surface cavities are

10:58  25   randomized.  It doesn't say they're checkers thrown on

10:59   1    a checkerboard.

10:59   2                Has anybody ever seen this effect?  I was

10:59   3    trying to decide how to describe this.  Let's say my

10:59   4    daughter's got this little pin-striped dress on or

10:59   5    something.  Have you ever seen where somebody has

10:59   6    something like striped and on the other side like a

10:59   7    screen door or something?  And you kind of -- you move

10:59   8    your perspective or whatever, and you kind of see wavy

10:59   9    lines through the screen door?  I don't know if you've

10:59   10   ever seen that effect.  It's called like a moiré

10:59   11   effect.

10:59   12               The idea is if you put stuff that's in

10:59   13   perfect lines and you look at it from different angles,

10:59   14   you start to see weird curve effects and things like

10:59   15   that.  That's what is going on with randomized.  What

10:59   16   they're saying is make the spacing a little irregular.

10:59   17               Now, the other claim, the '342 does

10:59   18   require randomized.  They make the spacing a little

10:59   19   irregular underneath the lenses.  That's it.  That's

10:59   20   what's going on.  And then when you see that it's

10:59   21   predetermined, guys, you keep -- well, they can't be

10:59   22   predetermined.  It's random.

10:59   23               These guys act like they're throwing dots

10:59   24   on a panel each time they make one.  But that's not

11:00   25   true.

11:00  1          This is the demonstration that you saw

11:00  2   yesterday that they actually move them to be outside of

11:00  3   that moiré effect.  They're slightly randomized so that

11:00  4   you don't get this weird effect.  And then they lock in

11:00  5   the location of the microstructures.  They lock in the

11:00  6   location of the lenses.  And when it has even light

11:00  7   distributions like you saw with the LED display, they

11:00  8   reproduce that over and over and over.

11:00  9          And what you're evaluating for

11:00  10  infringement is the monitor that comes in on the boat.

11:00  11  Lands on these shores as the act of importation, sale,

11:00  12  offer for sale.  Okay?  You have to look at that

11:00  13  monitor.

11:00  14          Was the arrangement of the

11:01  15  microstructures and the lenses predetermined?

11:01  16  100 percent.  Absolutely.  It is a design.  That's why

11:01  17  if you look at them over and over and over, they will

11:01  18  always overlap because it is predetermined.

11:01  19          So this idea of somebody throwing

11:01  20  checkers, it's truly -- it's truly absurd and

11:01  21  disingenuous to the field of optics that we're talking

11:01  22  about here.  That's why they keep kind of showing you

11:01  23  like mental, visual images of things like checkers.

11:01  24  It's crazy.

11:01  25          Like I said, I can't go through

11:01  1   absolutely everything that he said, and I'm
11:01  2   unfortunately already finding myself just about out of
11:01  3   time.  But I'd like to start -- hit with damages real
11:01  4   quick.
11:01  5               Look, we tried to do the thing we could
11:01  6   to find the damage to ASUS.  That's why we did a
11:01  7   regression analysis.  You know, stand up here and
11:01  8   criticize that we started with the monitor, not with
11:02  9   the panel.  I agree with you, plastic stand probably
11:02  10  doesn't change.  And I think Dr. Farber would agree
11:02  11  with you that probably doesn't change.
11:02  12              But what he was asked was is it possible
11:02  13  it might?  And it might because when you have to use
11:02  14  significantly more LED material, as you heard, it's a
11:02  15  lot more power, gives off a lot more heat, then there's
11:02  16  more metal for heat syncing.  The bezel changes.  It's
11:02  17  a lot of things.  And that may sound crazy, but it's
11:02  18  literally not crazy.  You get significantly more heat
11:02  19  and power consumption with more LEDs.
11:02  20              But even beside that -- well, first of
11:02  21  all, I don't want to step away from that.
11:02  22              First of all, the regression analysis,
11:02  23  that's the point.  Like, you put in all of the data so
11:02  24  that the regression formula can isolate out what
11:02  25  differences there were as the results of the ones that

11:02　1　do or don't have the infringing panel.  That is exactly

11:02　2　what the regression analysis does.  That's why you can

11:02　3　start with the whole monitor.

11:02　4　　　　　　　Second of all, what they did to try to

11:03　5　say that was absurd is say they have a panel that's

11:03　6　$14.  They bought a report saying a light panel's

11:03　7　70 bucks and another report saying backlight might be

11:03　8　20 percent of that.  So some random, no-name panel

11:03　9　you've literally heard nothing about might cost

11:03　10　70 bucks, and the backlight of that one might be

11:03　11　20 percent.  And so therefore, they get to write down

11:03　12　$14 and say:  Aha, you're asking for too much if we

11:03　13　only look at the backlight panel.

11:03　14　　　　　　　That's what happened for them to show you

11:03　15　$14 and to say that this damages us.

11:03　16　　　　　　　They didn't talk about the extremely

11:03　17　high-end monitors they are selling.  They didn't talk

11:03　18　about the cost of the panels that they put in their

11:03　19　high-end monitor.  And the one that was listed on the

11:03　20　website at a thousand dollars, they didn't talk about

11:03　21　that.  They didn't let their experts have that

11:03　22　information, and they darn sure didn't give it to us.

11:04　23　　　　　　　THE COURT:  Counsel, you need to wrap up,

11:04　24　please.

11:04　25　　　　　　　MR. CALDWELL:  Thank you, Your Honor.

11:04  1          I'll leave you with this.  Thank you,

11:04  2   guys, for paying so much attention.  I just want to

11:04  3   observe that with what you've seen in the

11:04  4   correspondence and how long this has taken, at the end

11:04  5   of the day, there are going to be some phone calls

11:04  6   made.  And Dr. Vasylyev is going to call back and talk

11:04  7   to his wife, and ASUS employees that are here are going

11:04  8   to call back and talk to their bosses.

11:04  9          And I want to know how that call's going

11:04  10  to go.  Are they going to say that by literally never

11:04  11  looking at our product, never investigating, never

11:04  12  producing our panels, the cost of them, the cost of our

11:04  13  backlights, our contact information for all of our

11:04  14  suppliers and then making them sue us before we would

11:04  15  even look at our own stuff, it worked.

11:04  16          Thank you.

11:04  17          THE COURT:  Thank you, sir.

11:05  18          Ladies and gentleman, let me wrap up with

11:05  19  the final portion of my charge.

11:05  20          You've heard the closing arguments of the

11:05  21  parties.  And now it is your duty to deliberate and to

11:05  22  consult with one another in an effort to reach a

11:05  23  verdict.  Each of you must decide the case for

11:05  24  yourself, but only after an impartial consideration of

11:05  25  the evidence with your fellow jurors.

922

11:05   1                    During your deliberations, do not

11:05   2   hesitate to reexamine your own opinions and change your

11:05   3   minds if you are convinced that you were wrong.  But do

11:05   4   not ever give up on your own honest beliefs because

11:05   5   other jurors think different or just to finish the

11:05   6   case.

11:05   7                    At all times, you are the judges of the

11:05   8   facts.

11:05   9                    You've been allowed to take notes during

11:05  10   the trial.  Any notes that you took during the trial

11:05  11   are aids to your memory.  If your memory differs from

11:05  12   your notes, rely on your memory and not your notes

11:05  13   because they are not evidence.  If you did not take

11:05  14   notes, rely on your independent recollection of the

11:05  15   evidence.

11:06  16                    Do not be unduly influenced by the notes

11:06  17   of others.  Notes are not entitled to greater weight

11:06  18   than your recollection or impression because each one

11:06  19   of you is a judge about the testimony.

11:06  20                    When you go to the jury room to

11:06  21   deliberate, take a copy of the charge.  Again, the

11:06  22   exhibits will be shown to you on a monitor in the jury

11:06  23   room -- and your notes.

11:06  24                    I'm going to go a little off script for a

11:06  25   second here just because it's easier.

923

| 11:06 | 1 | First thing you need to do is select a |
| 11:06 | 2 | jury foreperson. |
| 11:06 | 3 | Once you've selected the jury foreperson, |
| 11:06 | 4 | that person -- there are blank notepads back |
| 11:06 | 5 | there -- that person needs to say:  I'm the jury |
| 11:06 | 6 | foreperson, date it, and sign it.  And this is the most |
| 11:06 | 7 | important thing.  You need to hand it to William or we |
| 11:06 | 8 | won't know that you've done it. |
| 11:06 | 9 | Occasionally people do that and don't |
| 11:06 | 10 | tell us.  So hand the note to William or whoever's |
| 11:06 | 11 | sitting outside, and then you can begin your |
| 11:07 | 12 | deliberations. |
| 11:07 | 13 | I prefer someone whose handwriting is |
| 11:07 | 14 | legible, but I don't have any control over who you all |
| 11:07 | 15 | pick as your foreperson. |
| 11:07 | 16 | Now, continuing with what's in the |
| 11:07 | 17 | charge. |
| 11:07 | 18 | Your verdict must be unanimous.  After |
| 11:07 | 19 | you've reached a unanimous verdict, your jury |
| 11:07 | 20 | foreperson must fill out the answers to the written |
| 11:07 | 21 | questions in the verdict form and sign and date it. |
| 11:07 | 22 | Answer each question in the verdict form from the facts |
| 11:07 | 23 | as you find them.  Do not decide who you think should |
| 11:07 | 24 | win and answer the questions to try and reach any |
| 11:07 | 25 | result. |

11:07  1        After you've concluded your service and

11:07  2   I've discharged you -- I'll give you more instruction

11:07  3   about that after you come back.

11:07  4        If you need to communicate with me during

11:07  5   your deliberations, the jury foreperson should write

11:07  6   the inquiry and give it to the court security officer.

11:07  7   I will consult with the attorneys and respond to you in

11:07  8   writing.  Very unlikely I will come back and meet you.

11:07  9        Let me go off script a little bit here,

11:07 10   though, too, because this has happened once or twice.

11:08 11        You should never indicate to us in the

11:08 12   note any numerical division that you are at that point.

11:08 13   One of us feels this way or two of us are -- we do not

11:08 14   want to know what your verdict is until we get the

11:08 15   verdict that is unanimous.  So nothing that you write

11:08 16   in your notes should ever reveal where -- any split

11:08 17   that you might have at that particular moment.

11:08 18        And then I'm going to summarize the final

11:08 19   page which is that basically you will not be allowed to

11:08 20   communicate really with anyone while you are

11:08 21   deliberating.  Occasionally we have someone who needs

11:08 22   to contact their spouse or someone about driving or

11:08 23   something like that.  If that comes up, let me know and

11:08 24   we'll deal with it.

11:08 25        But essentially for the remainder of the

11:08  1    day and however long it takes while you're

11:08  2    deliberating, because that's entirely up to you, you

11:08  3    should not be communicating with anyone and you should

11:08  4    not be doing any kind of research or anything like that

11:08  5    on your phone.

11:09  6              Now, if any of you are smokers,

11:09  7    while -- if you need to take a break, please try and

11:09  8    make it as brief as possible.  And while anyone is not

11:09  9    in the room for any reason, the others should not be

11:09  10   deliberating without the person.  You should wait for

11:09  11   that person to return because we don't want anyone to

11:09  12   miss out on any of the discussions that are taking

11:09  13   place.

11:09  14             So I have a -- just letting you know, I

11:09  15   have a small scheduling conflict.

11:09  16             I have -- I had agreed to give a speech

11:09  17   or a talk or something at Baylor, so I will be gone

11:09  18   from about 12:15 to about 1:30 or 1:45.  I won't be

11:09  19   available during that time.  If you have a note, I

11:09  20   won't be able to respond to it.  I'm just letting you

11:09  21   know in advance about that.  I'm not ignoring you.  I'm

11:09  22   just -- I'll be on the Baylor campus for that period of

11:09  23   time.

11:09  24             So with all of that, you are dismissed.

11:10  25   Jen's going to come back and show you how to work the

—926—

11:10   1    exhibit thing.  But before you do that, if you all

11:10   2    would select your jury foreperson and get that taken

11:10   3    care of, that's important.  Let William know who that

11:10   4    is and then we'll move on from there.

11:10   5                    THE BAILIFF:  All rise.

11:10   6                    (Jury exited the courtroom.)

11:10   7                    THE COURT:  Thank you.  You may be

11:10   8    seated.

11:10   9                    So in terms of your -- where you need to

        10   be --

11:10  11                    Could someone put that down real quick?

11:10  12                    In terms of where you all need to be, I

11:10  13   would ask everyone who's a lawyer to remain in the

11:10  14   courtroom until we find out what the note is -- who the

11:11  15   foreperson is.

11:11  16                    Once we have the note from the

11:11  17   foreperson --

11:11  18                    And did we -- Kristie, do you know if we

11:11  19   got lunch for them?  I hope so.  Okay.

11:11  20                    So once we have the note from the

11:11  21   foreperson, then after that, I care only that one

11:11  22   lawyer per side be available either in the courtroom,

11:11  23   on the floor -- or on the floor so if I have another

11:11  24   note, I can tell you what it is the note is and how I'm

11:11  25   going to respond.

11:11  1          As you heard me tell the jury, I'll be

11:11  2   gone from about 12:15 till -- the thing goes from 12:30

11:11  3   to 1:30.  I'll be back as quickly as I can after that.

11:11  4          And so I think that's all that we have.

11:11  5          Is there anything that -- I tell you that

11:11  6   because while I'm gone, you all don't need to be here.

11:11  7   You can go have lunch or do whatever you want because

11:11  8   I'll be unavailable.

11:11  9          Is there anything we need to take up?

11:11  10          MR. CALDWELL:  Nothing from the

11:11  11   plaintiff.

11:11  12          MR. BURESH:  No, Your Honor.

11:11  13          THE COURT:  Okay.  Thank you.

11:12  14          THE BAILIFF:  All rise.

11:12  15          (Recess taken.)

11:17  16          THE COURT:  Okay.  If we could go back on

      17   the record.

11:17  18          The jury forewoman is Alison Rodriguez,

11:17  19   Juror No. 1.

01:12  20          (Recess taken.)

01:30  21          THE COURT:  I've written:  The physical

01:30  22   part was not admitted into evidence.  You have access

01:30  23   to all of the evidence that was.  So no.  You cannot

01:30  24   have the physical part.

01:31  25          The note was:  Is it possible for us to

01:31  1    physically have the parts from the monitor we saw in

01:31  2    court?  The light guide plate?

01:31  3                    (Recess taken.)

04:13  4                    THE COURT:  Okay.  On Page 33 of the

04:13  5    instructions, do all three things need to be met?  When

04:13  6    considering active inducement, does it begin at first

04:13  7    manufacture of products or notification of alleged

04:13  8    infringement?

04:13  9                    I'll tell you what I'm going to tell them

04:14  10   and then I'll read it to you.

04:14  11                   Okay.  To that question I've written:

04:14  12   Ladies and gentleman, you have the Court's instructions

04:14  13   which you must follow.  Please continue to deliberate.

04:15  14                    (Recess taken.)

06:19  15                   THE COURT:  Please remain standing for

06:19  16   the jury.

06:19  17                    (Jury entered the courtroom.)

06:20  18                   THE COURT:  You may be seated.

06:20  19                   Ms. Rodriguez, my understanding is you're

06:20  20   the foreperson?

06:20  21                   THE FOREPERSON:  Yes, sir.

06:20  22                   THE COURT:  And you have a verdict?

06:20  23                   THE FOREPERSON:  Yes, sir.

06:20  24                   THE COURT:  Would you hand it to the

06:20  25   bailiff?

929

06:20  1                          Thank you, sir.

06:20  2                          For the record, I've received Juror Note

06:20  3  No. 4, which says:  We have a unanimous verdict.

06:20  4                          Ladies and gentleman, I would ask you to

06:20  5  listen carefully to -- as I read this because as I told

06:20  6  you earlier, I'm going to ask each of you to stand up

06:20  7  and -- to reflect that it's your verdict as well.

06:20  8                          I'm going to go to Jury Question No. 1.

06:20  9                          With regard to the 2 -- I'm sorry -- '342

06:20  10  patent, Claim 1, yes, Claim 21, yes.

06:20  11                          With regard to the '562 patent, Claim 1,

06:20  12  yes, Claim 7, yes.

06:21  13                          With regard to the '318 patent, yes.

06:21  14                          With regard to the '089 patent, yes.

06:21  15                          With regard to Question No. 2, the

06:21  16  '342 patent, Claim 1, yes, Claim 21, yes.

06:21  17                          With regard to the '562 patent, answer to

06:21  18  Claim 1 is yes.  Claim 7 is yes.

06:21  19                          With regard to the '318 patent, yes.

06:21  20                          The '089 patent, yes.

06:21  21                          With regard to the Question No. 3:  Did

06:21  22  SVV prove by a preponderance of the evidence that

06:21  23  ASUSTeK willfully infringed any of the asserted claims,

06:21  24  the answer is yes.

06:21  25                          With regard to the Question No. 4, the

930

06:21  1   amount of damages -- and I'll read this carefully and

06:21  2   again so the jury will confirm it.

06:21  3                    The amount is $22,434,055.

06:21  4                    I'll say that again:  $22,434,055.

06:21  5                    Did I read that correctly?

06:22  6                    Okay.  Would everyone on the jury who

06:22  7   agreed with the verdict as I just read it please stand

06:22  8   at this time?

06:22  9                    Thank you.  You may be seated.

06:22  10                   Ladies and gentleman, a couple things.

06:22  11  Let me first thank you for your service -- let me sign

06:22  12  this just to get that out of the way.

06:22  13                   Let me thank you for your service not

06:22  14  only on behalf of the Court but on behalf of the

06:22  15  lawyers and their clients.  After six years, I have to

06:22  16  tell you that I'm always amazed at how hard the juries,

06:22  17  you all work.  And I told you I think at the beginning

06:22  18  of the trial I hoped at the end of trial, at the end of

06:22  19  the week, you would find this had been a rewarding

06:22  20  experience.  I hope that's true.

06:23  21                   You could tell the amount of time and

06:23  22  money and treasure and hard work that the lawyers put

06:23  23  on behalf of their clients, how important this matter

06:23  24  was to them and their clients.  And the way our system

06:23  25  works, it's the only one in the world where we ask

06:23  1    seven people to come in and take a week of their lives

06:23  2    or more to render justice, because you all are

06:23  3    impartial and you heard all the evidence.

06:23  4              So thank you on behalf of the Court, the

06:23  5    clients, and their lawyers.

06:23  6              Now, I gave you instructions at the

06:23  7    beginning of trial.  Let me go through them.

06:23  8              With regard to your ability to speak

06:23  9    about what you've done, you are now free to speak about

06:23  10    the trial, anything you want to.  You're free not to

06:23  11    speak.

06:23  12              The only exception -- I don't remember

06:23  13    any confidential information being used in this case.

06:23  14    So the only exception to your ability to speak about

06:23  15    the case is, one, the lawyers in the case cannot

06:24  16    contact you and discuss the case.

06:24  17              And number two, you all were in the jury

06:24  18    room a long time.  I would ask that you not reveal to

06:24  19    anyone what you all discussed while you were

06:24  20    deliberating.  That should remain private between the

06:24  21    seven of you, and so that's -- but anything else you

06:24  22    want to, you can talk about.

06:24  23              Number two, I asked you not to post

06:24  24    anything on social media.  You're free to post whatever

06:24  25    you want, again, other than about your deliberations.

06:24  1          And finally, I know at 6:30, you all

06:24  2    can't wait to get home and start researching about,

06:24  3    first, the panels and these lawyers and their clients,

06:24  4    me.  And so you're free to do that now.  I don't

06:24  5    imagine that any of you will, but you are free to do

06:24  6    that.

06:24  7          Now, I have one final request, which at

06:24  8    6:30, I'm reluctant to make but I will, which is after

06:25  9    every trial, it's -- it gives me great honor to be able

06:25  10   to come back and thank each of you individually for

06:25  11   your service.

06:25  12          If you've had all of this Court that you

06:25  13   want and you want to pick up your stuff and just get --

06:25  14   hit the road, it won't offend me.  I'll be disappointed

06:25  15   I didn't get to thank you in person, but I understand

06:25  16   you all have somewhere else to be.  And if you need to

06:25  17   get gone, that's fine.

06:25  18          But if you would wait for me, I would

06:25  19   certainly like to thank each of you in person when I

06:25  20   come back to the jury room.

06:25  21          So with that, you are excused.

06:25  22          Oh, one more -- well, this is not going

06:25  23   to be a very big deal.

06:25  24          Your jury service is over having served

06:25  25   this, but tomorrow is the last day you could be asked

06:25  1    to serve on this jury, so you're not getting that much

06:25  2    benefit out of this.  But you are -- you will not be

06:25  3    called back for jury service anytime in the very near

06:25  4    future in the federal court.  I think you've done your

06:25  5    duty.

06:25  6                    THE BAILIFF:  All rise.

06:25  7                    (Jury exited the courtroom.)

06:26  8                    THE COURT:  Thank you.  You may be

06:26  9    seated.

06:26  10                   I have a pretty good idea of what it was

06:26  11   that took them six hours to do now.  And I think that

06:26  12   reflects the great job that the lawyers did on behalf

06:26  13   of their clients, and so I want to thank the lawyers

06:26  14   for this week.  I thought you all all did a great job

06:26  15   for your clients.

06:26  16                   I didn't know what the verdict was going

06:26  17   to be until I read it, which means I think

06:26  18   everyone -- I think the clients were represented very

06:26  19   well.  And I think the jury had a very hard time with

06:26  20   this because of the excellent job both sides did.

06:26  21   Ultimately, someone always wins and someone loses, and

06:27  22   from my time trying these cases, I was on -- at both

06:27  23   tables.

06:27  24                   So thank you, all.  I hope you all -- I

06:27  25   have the privilege of having you in my courtroom again,

934

06:27  1  not immediately but take some time off.  But I do hope

06:27  2  I get to have you all in my court again at some point.

06:27  3              So I thank you very much.  Have a good

06:27  4  evening and be safe going home.

06:27  5              THE BAILIFF:  All rise.

06:27  6              (Hearing adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

935

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS     )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 3rd day of

14   October 2024.

15

16                    /s/ Kristie M. Davis
                      KRISTIE M. DAVIS
17                    Official Court Reporter
                      PO Box 20994
18                    Waco, Texas 76702
                      (254) 666-0904
19                    kmdaviscsr@yahoo.com

20

21

22

23

24

25

06:27