## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **SVV TECHNOLOGY INNOVATIONS INC.** | § | |
| | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | **Civil Action No. 6:22-cv-00311-ADA** |
| **v.** | § | |
| | § | |
| **ASUSTEK COMPUTER INC.** | § | **JURY DEMANDED** |
| | § | |
| ***Defendant.*** | § | ███████████ |
| | § | |

## DEFENDANT ASUSTEK COMPUTER INC.'S
## MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

## TABLE OF CONTENTS

I.      LEGAL STANDARDS ……………………………………………………...1

II.     DAMAGES ……………………………………………………………………1

    A.  The Jury's $22.4 Million Verdict Was Not Supported By Substantial ………1
        Evidence Because SVV Failed To Apportion.
    B.  The $22.4 Million Verdict Is Against The Great Weight Of The Evidence. …4

III.    WILLFULNESS ………………………………………………………………6

IV.     INFRINGEMENT OF THE '342 PATENT ………………………………8

    A.  JMOL: No Substantial Evidence Of "Predetermined Alignment." …………..8
    B.  New Trial:  Verdict Is Against The Great Weight Of The Evidence Regarding
        The "Predetermined Alignment" Limitation………………………………12

V.      INFRINGEMENT OF THE '562 PATENT ……………………………… 13

    A.  JMOL: No Substantial Evidence Of "Predetermined Two-Dimensional
        Pattern." …………………………………………………………………….13
    B.  New Trial:  Verdict Is Against The Great Weight Of The Evidence
        Regarding The "Predetermined Pattern" Limitation…………………………16

VI.     INFRINGEMENT OF THE '089 PATENT ………………………………16

    A.  JMOL:  No Substantial Evidence Of "Configured For Injecting Light" …….16
    B.  New Trial:  Verdict Is Against The Great Weight Of The Evidence
    Regarding The "Configured For Injecting Limitation…………………..………17

VII.    INFRINGEMENT OF THE '318 PATENT ………………………………18
    A.  JMOL: No Substantial Evidence Of "Broad-Area Light Input Surface."………18
    B.  New Trial:  Verdict Is Against The Great Weight Of The Evidence
        Regarding "Broad-Area Light Input Surface" Limitation...............................20

ASUSTeK Computer Inc. ("ASUS") respectfully files this renewed motion for JMOL under Rule 50(b) and, alternatively, for a new trial under Rule 59. ASUS moved for JMOL under Rule 50(a) at trial. Dkts. 205–207, Trial Tr., 569:16-577:23, 803:8-12.

## I.  LEGAL STANDARDS

<u>JMOL Under Rule 50:</u> A jury's verdict of infringement cannot stand when it was not supported by substantial evidence. *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.,* 501 F.3d 1307, 1311 (Fed. Cir. 2007). JMOL under Rule 50 should be granted "if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue,' which occurs when 'the facts and inferences point so strongly and overwhelmingly in the movant's favor that jurors could not reasonably have reached a contrary verdict.'" *Johnston v. Ferrellgas, Inc.*, 96 F.4th 852, 857 (5th Cir. 2024). "There must be more than a mere scintilla of evidence in the record to prevent [JMOL] in favor of the movant." *Arismendez v. Nightingale Home Health Care*, 493 F.3d 602, 606 (5th Cir. 2007). "Conclusory allegations, speculation, and unsubstantiated assertions are inadequate[.]" *Newsome v. Collin Cnty. Cmty. Coll. Dist.*, 189 F. App'x 353, 355 (5th Cir. 2006).

<u>New Trial Under Rule 59:</u> FRCP 59 "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). A new trial may be granted if "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Id.* at 613.

## II.  DAMAGES

### A.  The Jury's $22.4 Million Verdict Was Not Supported By Substantial Evidence Because SVV Failed To Apportion.

At trial, SVV presented a "cost savings" damages theory through the testimony of its

expert, Dr. Farber. Dr. Farber, however, analyzed the purported cost savings of an entire infringing monitor, and failed to separate or apportion the cost of the features accused of infringement (i.e., the backlight module) from the undisputedly unpatented features of the monitor (i.e., the rest of the monitor). SVV's approach violates the apportionment requirement, and as a result SVV did not present sufficient evidence to sustain its damages award of $22.4 million.

Specifically, Dr. Farber used a regression model to compare the total cost of an entire "infringing" ASUS display with the total cost of an entire "non-infringing" ASUS display to obtain the purported cost savings associated with use of the patented technology. Dkt. 205, Trial Tr., 448:14-19, 450:18-451:2, 454:24-455:5, 496:22-25, 502:22-503:23. But SVV never claimed that the "entire" monitor was infringing. Instead, SVV accused *only* the backlight module of the display. Yet despite the fact that the backlight module was just one small part of the monitor, Dr. Farber included the cost of the "whole thing" in his damages analysis:

Q: You've heard about the backlight module?

A: Yes.

Q: Okay. Is that part of the patented technology?

A: I believe so.

Q: . . . But that's not where you started.

A: Nope.

Q: You didn't start with the backlight, did you?

A: I did not.

Q: You started with the whole thing, right?

A: Yes.

Q: And we – I think you would agree with me, but you can let me know, the cost of the entire monitor is much greater than just the cost component of the sheets and films and LED lights [of the backlight monitor] that we looked at, correct?

2

A:  Yes.

*Id.* at 507:3-22. Dr. Farber also admitted that by including costs related to the "whole thing," he included costs related to technology that was not an infringing feature, like buttons (*Id.* at 503:20-504:18), the plastic stand of the monitor (*Id.* at 503:19-25), circuit boards (*Id.* at 505:9-19), and the liquid crystal display (*Id.* at 506:8-507:2) to name a few. This led Dr. Farber to an absurd result, as demonstrated by the fact that his purported "cost savings" attributable to using an infringing backlight module exceeded the total cost of the backlight module itself. *Id.* at 752:1-753:20 ("You can't save more than something would cost you in the first place.").

Dr. Farber's methodology was squarely contrary to the law requiring that "the patentee must in every case give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). "No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). And where, as here, "multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Dr. Farber's model considered the cost differential of entire monitor and failed to separate the cost differential attributable to the patented backlight modules. As a result, the jury's award of $22.4 million did not reflect only the value attributable to the infringing features. SVV failed to present sufficient evidence to the jury to support the jury's damages award, and ASUS is entitled to JMOL of no damages, as SVV waived its right to a damages award by choosing to pursue a legally invalid damages theory. *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir.

2017) ("patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory").

Alternatively, ASUS is entitled to a new trial on damages for SVV's failure to apportion. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1382 (Fed. Cir. 2021); *Provisur Techs., Inc. v. Weber, Inc.*, 2024 WL 4363502, at *5-7 (Fed. Cir. Oct. 2, 2024) (reversing denial of new damages trial where district court abused its discretion by allowing case to proceed to jury on entire market value theory without showing patented feature drove demand for entire product).

**B.    The $22.4 Million Verdict Is Against The Great Weight Of The Evidence.**

As discussed above, SVV presented a legally defective cost savings theory that failed to apportion. The outflow of SVV's damages theory was Dr. Farber's opinion that ASUS would have agreed to pay SVV a running royalty of $13.94 per unit. This conclusion, standing alone, was against the great weight of the evidence because there was no evidence that the parties would have agreed to a running royalty structure. In fact, it was undisputed that SVV had never required a licensee to pay a per-unit running royalty for the asserted patents. Dkt. 205, Trial Tr., 497:1-498:1 ("Q: You would agree with me that never has SVV sat down at a table and had an actual real-world negotiation where they made someone agree to this running royalty?   A: Yes."). It was further undisputed that there was no evidence that ASUS had ever agreed to pay anyone a per-unit running royalty in exchange for a patent license. *Id.* at 498:2-5. Instead, the evidence presented to the jury was that SVV had previously licensed its patents for lump sums, and that ASUS also preferred lump sums. *Id.* at 407:21-24, 498:6-499:2. And "lump sum payments [] should not support running royalty rates without testimony explaining how they apply to the facts of the case." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012). Accordingly, ASUS's damages expert, Mr. Ferioli, confirmed that the parties would have agreed to a lump sum

structure. Dkt. 206, Trial Tr., 732:24-733:2, 727:2-744:21. SVV's running royalty structure, then, was against the great weight of the evidence that the parties had previously agreed to and preferred lump sum royalties. *Whitserve*, 694 F.3d at 30 ("to the extent WhitServe argues the award is based on a running royalty, the lump-sum agreements are not substantial evidence in support of the jury's verdict."). For this reason alone, ASUS is entitled to a new trial on damages.

Moreover, the aggregate amount of the jury award is against the great weight of the evidence. As Mr. Ferioli, ASUS's expert, explained, the parties would have agreed to a lump-sum payment of $425,158—a number that was based on SVV's real-world license to Samsung. Dkt. 206, Trial Tr., 760:7-12. ███████████████████████████████████████████████████████ ███████████████████████████████████████. *Id.* at 728:6-737:9. Further, Mr. Ferioli explained that "there's no way [ASUS] would pay more [than Samsung] considering its significantly fewer sales. So the parties would start at ████████████████████ and adjust downwards to reflect ASUS's actual licensed sales." *Id.* at 736:18-22. Yet the jury awarded $22.4 million—a number that was not provided by or otherwise supported by SVV's damages methodology, and which was nearly ████████ larger than SVV's largest license to Samsung. There is no evidentiary basis for awarding roughly ████████ the amount of ████████████ ███████████████████████████. *Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332–35 (Fed. Cir. 2009) (finding there was "little evidentiary basis . . . for awarding royalties roughly three to four times the average amount in the lump-sum agreements in evidence" and granting new trial on damages because jury verdict was "against the clear weight of the evidence"). The award was against the great weight of the evidence, and ASUS is entitled to a new trial on damages or, in the alternative, remittitur to a one-time lump sum in the amount of $425,158. *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001).

Additionally, the Court erred by allowing SVV to improperly add 173,200 extra units to its royalty base on the eve of trial because it is undisputed that no expert analyzed these units for potential infringement and previously non-infringing products were changed to infringing. Dkt. 179, *ASUSTeK's Motion to Strike SVV's Late Inclusion of Brand New Accused Products in its Damages Calculations*; Dkts. 204–205, Trial Tr., 3:13-5:23, 429:13-17, 514:3-21. ASUS maintains it was error for the Court to allow these late additions over ASUS's objection. Accordingly, any remaining damages would need to be adjusted accordingly and subject to further briefing. ASUS is entitled to a remittitur, or at least a new trial, on this issue as well.[1]

## III.    WILLFULNESS

No reasonable jury could find that ASUS willfully infringed because the undisputed evidence presented at trial was that ASUS, at all points in time, believed it did not infringe.

"To establish willfulness, a patentee must show that the accused infringer had a ***specific intent*** to infringe at the time of the challenged conduct." *Provisur* 2024 WL 4363502, at *4–5. "We have held knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness." *Id.* Instead, intent "rest[s] on the subjective intent of the accused infringer." *Roche Diag. v. Meso Scale Diag.*, 30 F.4th 1109, 1119 (Fed. Cir. 2022).

At trial, there was not a scintilla of evidence that ASUS had a ***subjective intent*** to infringe. In fact, the only evidence presented at trial is to the contrary. ASUS's corporate representative extensively testified regarding ASUS's investigation and subsequent conclusion "[t]hat the ASUS monitors were not infringing." Dkt. 206, Trial Tr., 604:24-605:12. ASUS held this subjective belief

---

[1] If the Court declines to grant JMOL or a new trial on damages but does grants one or more of the non-infringement JMOLs below, ASUS respectfully requests additional briefing to determine the appropriate damages amount (if any) based on the number of allegedly infringing units sold because not all models are accused of infringing every Asserted Patent.

all the way up to and through the jury trial. *Id.* at 565:2-17 ("we take this very seriously . . . this is why I wanted to come here, to defend ourselves against this claim . . . we need to first clarify whether there was any infringement"). ASUS's subjective belief that it did not infringe cannot satisfy the specific intent required for willfulness. *Provisur*, 2024 WL 4363502, at *4–5.

SVV provided no contrary substantial evidence. While SVV criticized ASUS for asking for claim charts (Dkt. 191-13, PTX-44) and not immediately licensing SVV's patents after receiving SVV's demand letter, this evidence confirms ASUS's good faith actions leading to its subjective belief of non-infringement. Requesting claim charts is reasonable and customary when evaluating a claim of infringement, particularly given the number of patents and products at issue. It took SVV nearly ***nine months*** to prepare the requested charts which contained "thousands of pages." *Id.*; Dkt. 204, Trial Tr., 124:12-126:9. Yet, SVV filed suit just under ***four months*** after providing these "thousands of pages" of charts to ASUS. *Id.*; Dkt. 1. After receiving the charts, ASUS conducted its investigation, received information from the panel makers, and concluded that the "ASUS monitors were not infringing." Dkts. 206, Trial Tr., 604:4-605:12. There is no evidence to support a subjective, specific intent necessary for willful infringement.

There is also not any substantial evidence to support a finding of willful blindness. "Willful blindness . . . is characterized by 'two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.'" *Roche Diagnostics*, 30 F.4th at 1118. While ASUS does not manufacture the display panels at issue, it told SVV this from the initial pre-suit communications and began working to get the requisite information from the manufacturers. Dkt. 191-13, PTX-44. After receiving claim charts from SVV, ASUS conducted an investigation and formed a good faith, subjective belief that it did not infringe. Dkt. 206, Trial Tr., 604:24-605:12.

This is the opposite of willful blindness, and SVV provided no evidence that ASUS subjectively believed that it was infringing yet avoided investigating as required for willful blindness. ASUS is entitled to JMOL of no willful infringement because SVV did not present any evidence that ASUS had the requisite, specific intent to infringe at any time. *Provisur,* 2024 WL 4363502, at *4–5.

Alternatively, ASUS is entitled to a new trial under Rule 59 because the verdict is against the great weight of the evidence for all the reasons explained above. *Smith*, 773 F.2d at 612-13.

## IV.    INFRINGEMENT OF THE '342 PATENT

The jury found asserted claims 1 and 21 of '342 Patent infringed. Dkt. 202.

### A.    JMOL: No Substantial Evidence Of "Predetermined Alignment."

SVV did not present substantial evidence to support a finding of infringement on the '342 Patent. Specifically, all asserted claims require a "predetermined alignment" between at least one deflecting element and lens of a waveguide. The relevant claim language is:

> at least one of said plurality of light deflecting elements . . . is in a predetermined alignment with respect to at least one of said elongated cylindrical lenses."

'342 Patent, claim 1. There was no dispute at trial that "predetermined" requires an alignment that is "by design." Dkts. 205, Trial Tr., 374:15-17. SVV's expert, Mr. Credelle, readily agreed such that a finding of infringement requires an alignment of the two features that is "by design." *Id.*

The design of light guides used in the ASUS Accused Products, as represented by the PA278CV (Dkt. 148), also were not disputed. The lenses on the top surface of the light guide are in straight lines on a parallel grid. The deflecting elements (also referred to as microcavities, surface relief features, or dots) on the bottom surface of the light guides are in "***random* positions**" and "not on a regular grid." Dkts. 204–205, Trial Tr., 280:20-281:15, 282:15-283:15, 374:1-4.

The randomly distributed microcavities are not (and cannot be) in any designed alignment with linear lenses on a parallel grid. The demonstrative Mr. Credelle relied upon illustrated this

point—the overwhelming majority of microcavities (the dots) are not even arguably in *any* "alignment" with the lenses (the horizontal lines):



**Ex. A**, PDX_3.66; Dkt. 205, Trial Tr., 373:8-25 (Mr. Credelle testifying that the dots were "randomly placed" in an "irregular pattern," the lenses are "running horizontal"). When asked about this demonstrative, Mr. Credelle highlighted just two (2) microcavities that "happen to be at the center of the lens." Dkts. 204–205, Trial Tr., 286:10-19, 374:5-9. This was the only factually supported evidence that Mr. Credelle presented to the jury to show an "alignment" of the microcavities with the lenses, and at best it demonstrates a *happenstance* alignment, not a predetermined "by design" alignment.

The claims plainly require more than happenstance alignment, and evidence of happenstance alignment is not substantial evidence to support the jury's verdict of infringement. *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 985–86 (Fed. Cir. 2018) ("The claims require a comparison of two specific things. Evidence of a comparison of something other than those two things does not support a finding of literal infringement."). SVV appeared to recognize that Mr. Credelle's happenstance alignment theory did not fit the claims, because SVV continued to spend significant time at trial trying to get someone to offer substantial, non-conclusory evidence of "alignment by design." No one did.

       1.     *Conclusory Expert Testimony About Unsubstantiated CAD Programs And Manufacturing Tools Is Not Substantial Evidence Of "Predetermined Alignment."*

First, SVV elicited conclusory testimony from Mr. Credelle, unsupported by any evidence, hypothesizing about the manufacturing of the light guides used in the ASUS Accused Products. Mr. Credelle testified that the light guides were "designed by a CAD program" (Dkt. 204, Trial Tr., 283:10-13), and that there was a "manufacturing tool" used to align the lenses and the microcavities (*Id.* at 283:20-284:3). As Mr. Credelle was forced to admit on cross, however, there was **no evidence** of any of this:

> Q:  You keep saying that, and you've said there's somebody that, by design has set this all up. You haven't shown the jury any of these CAD programs you were talking about yesterday, have you?
>
> A:  No. I have not shown the CAD program, but those are – those exist, for sure.
>
> . . .
>
> Q:  Have you showed the jury any CAD program that you're relying on?
>
> A:  I did not show a CAD program.

Dkt. 205, Trial Tr., 375:23-376:13, 380:4-14. The alleged "manufacturing tools" were also unsubstantiated:

> Q:  During your testimony yesterday, and it may be what you're trying to say now, you said there are tools to index the microcavities with the lenses?
>
> A:  That is correct.
>
> Q:  And when did you show those tools to the jury?
>
> A:  I did not show those tools to the jury.

*Id.* at 377:25-378:14. Mr. Credelle conceded there was no "design document that [he] reviewed from the productions that said, we're going to make two dots align." *Id.* at 377:15-23. And when asked whether he found "an engineer somewhere who testified in a deposition that you reviewed that said, I designed it this way because I want two dots to be aligned while millions of other ones

aren't," Mr. Credelle replied: "No. Because that's not true, what you said." *Id.* at 376:14-20.

This is the definition of conclusory expert say-so that is rejected as substantial evidence. "[J]ust saying something is so does not make it true, especially when there is no record support." *Dominion Energy*, 725 F. App'x at 986 (reversing denial of JMOL of noninfringement where expert's "testimony was conclusory, unsupported, contrary to the evidence in the case, or not directed to the claim limitation at issue"). By Mr. Credelle's own admissions, there was no evidence in the record to support his conclusions, and he certainly did not show any such evidence to the jury. His conclusory testimony is not substantial evidence, and no reasonable jury could have found infringement based on this record.

        2.    *Evidence Regarding Serial Numbers Is Not Substantial Evidence Of "Predetermined Alignment."*

In yet a further attempt to support Mr. Credelle's conclusory opinions, SVV went a step further. Armed with a microscope and two light guides, SVV prompted Mr. Credelle on re-direct to show the jury that two light guide plates were marked with the same serial number. SVV's tactics here are the subject of ASUS's co-pending *Motion to Vacate Judgment Or, Alternatively, For New Trial Due To SVV's Litigation Misconduct And Misrepresentations*. Regardless, this is not evidence that the singular representative accused product had a microcavity and lens in a "predetermined alignment." Moreover, the light guides were not even from the right product— SVV represented that they were "two PG32UQ light guides," but the representative accused product for the '342 Patent was a completely different product (the PA278CV) that Mr. Credelle ***never examined***. Dkt. 205, Trial Tr., 387:8-14. In other words, Mr. Credelle's testimony on this point is irrelevant cannot be substantial evidence that the "predetermined alignment" limitation was met.

Even so, Mr. Credelle opined that the mere existence of a serial number (on the wrong product) showed the "alignment is also predetermined"—allegedly because it was "evidence to a person of skill in the art, certainly to me, that there is a CAD file – there's a computer file that indicates the location of each and every one of those dots[.]" *Id.* at 392:7-14-393:4 (Credelle testifying that the "alignment of the lenses is known. The alignment of the dots is known.").

But as Mr. Credelle was ***again*** forced to admit, he did not have any evidence of an actual CAD file. *Id.* at 394:16-20. Mr. Credelle conceded that the serial number (or part number) that he showed the jury "doesn't say CAD." *Id.* at 393:15-23. He also conceded that "we haven't found the CAD file" that his opinion was based on. *Id.* at 394:16-20. While there was evidence of a serial number, there was no evidence to support Mr. Credelle's opinion that the serial number somehow established the existence of a CAD file that, if it existed, would purportedly somehow show a "predetermined alignment." That evidence did not exist, no expert has ever analyzed it, and Mr. Credelle's opinion was once again just "say so." And again, "just saying something is so does not make it true, especially when there is no record support." *Dominion Energy*, 725 F. App'x at 986. None of SVV's efforts provide substantial evidence, and no reasonable jury could have found infringement based on this record. Accordingly, ASUS is entitled to JMOL.

**B.    New Trial:  Verdict Is Against The Great Weight Of The Evidence Regarding The "Predetermined Alignment" Limitation.**

As discussed above, SVV failed to offer substantial evidence of infringement of the "predetermined alignment" limitation. Conversely, ASUS submitted evidence of non-infringement that the "predetermined alignment" limitation was ***not*** met by the ASUS Accused Products. Specifically, ASUS produced the testimony of Dr. Keith Goossen, who explained that Mr. Credelle's demonstrative slide (**Ex. A**, PDX_3.66, shown above) established the ***lack*** of "predetermined alignment" between the lenses and the microcavities. Dkt. 206, Trial Tr., at 659:2-

664:2 (noting the microcavities are "randomly distributed," "they're not following any pattern," "from one dot to the next, you can't predict the position," and that random microcavities "cannot be" in a predetermined alignment with linear lenses). Dr. Goossen further explained that there is "no reason" to have two (2) out of millions of deflecting elements in alignment with the lenses. *Id.* at 662:9-23. Dr. Goossen likened SVV's happenstance argument to throwing checkers on a checkerboard – if "one of them happened to line up on the square" it's still "completely random." *Id.* at 659:9-16. And Dr. Goossen concluded that the ASUS "accused products do not meet the claim limitation." *Id.* at 662:20-25. Accordingly, the jury's infringement verdict was against the great weight of relevant evidence, and ASUS is entitled to a new trial on the '342 Patent.

## V.    INFRINGEMENT OF THE '562 PATENT

The jury found asserted claims 1 and 7 of the '562 Patent infringed. Dkt. 202.

### A.    JMOL: No Substantial Evidence Of "Predetermined Two-Dimensional Pattern."

SVV's evidence of infringement was equally lacking with respect to the asserted claims of the '562 Patent, which require that the deflecting elements be "formed . . . according to a predetermined two-dimensional pattern." '562 Patent, claim 1. Here, again, SVV conceded that the microcavities in the ASUS Accused Products (represented by the PG32UQ) were in "random positions" and "are not on a regular grid." Dkt. 204, Trial Tr., 280:20-281:5. Mr. Credelle expressly testified that the below photo showed "randomized" microcavities in an "irregular pattern":



**Ex. A**, PDX_3.77; Dkt. 204, Trial Tr., 295:4-10, 295:25-296:3.

But the claims requires evidence that the deflecting elements were formed according to a "***predetermined two-dimensional*** pattern," and once again SVV had no actual evidence of such. Dkt. 205, Trial Tr., 374:15-17 ("predetermined" means "by design"). It is undisputed the microcavities were distributed randomly, and SVV had no evidence regarding the manufacturing process that would have "formed" the microcavities into a predetermined two-dimensional pattern. Random distribution is the exact opposite of a predetermined two-dimensional pattern.

SVV again turned to Mr. Credelle to offer conclusory opinion testimony to try to fill in the holes for the '562 Patent. Specifically, Mr. Credelle opined that there was a "computer program and an optical engineer" that would "decide where the dots should be in order to achieve the uniformity goals of the product, and then to create a program that will instruct the laser where to make the holes." Dkt. 204, at 295:14-296:3. Even assuming such a program exists, some engineer deciding to put one dot here and one dot there in a random distribution is not evidence of a predetermined two-dimensional pattern that the dots were formed according to. Moreover, Mr. Credelle's CAD file testimony is just more conclusory speculation. When asked about the CAD computer program, Mr. Credelle admitted "[w]e haven't seen that program" and confirmed that

the CAD program was merely his own say-so. Dkt. 205, at 380:4-14 (Q: You're just telling us about some CAD program?  A: I am."). After Mr. Credelle suggested a serial number evidenced a "predetermined pattern" because it "identifies the file that determines the locations of the dots" (*Id.* at 388:8-14, 392:7-14, 394:2-8), he was again forced to admit that he did not actually have any evidence of a file that determines the locations of the dots (*Id.* at 394:16-23). And when Mr. Credelle opined that he had personally "compared the dots" on two different light guides and "[t]hey line up" based on "measurements," he conceded on cross-examination that those were "[m]easurements that you haven't shown the jury either." *Id.* at 392:15-18, 395:1-13.

On all accounts, SVV was not able to establish that the microcavities in the ASUS Accused Products were formed according to a predetermined, "by design," two-dimensional pattern with its own expert, Mr. Credelle. There is no evidence in the record to support Mr. Credelle's conclusory testimony. *Dominion Energy*, 725 F. App'x at 986 ("just saying that something is so does not make it true, especially when there is no record support"); *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. 2022-1815, 2024 WL 4558613, at *1 (Fed. Cir. Oct. 24, 2024) (Rule 50(b) affirmed where the expert's testimony at trial "was too conclusory to sustain the verdict").

Unfortunately, SVV then tried to trick ASUS's expert, Dr. Goossen, into agreeing that there was a predetermined two-dimensional pattern. SVV's tactics here are the subject of ASUS's co-pending *Motion to Vacate Judgment Or, Alternatively, For New Trial Due To SVV's Litigation Misconduct And Misrepresentations*. Nevertheless, counsel for SVV questioned Dr. Goossen on the displayed photograph, asking him to agree that the "the pattern on the left, the pattern on the right matches, correct, sir?" Dkt. 206, Trial Tr., 691:12-14. Not surprisingly, Dr. Goossen answered, "I don't even know what they're photographs of." *Id.* at 691:15-17. Because SVV did not even attempt to admit the photograph displayed to Dr. Goossen into evidence, and Dr. Goossen

had no knowledge of the photograph, none of this is substantial evidence to support the jury's infringement finding.

Even further, the entire premise of this line of questioning would not have evidenced infringement even if it were proper (it was not). The asserted claims cover a "illumination system, comprising" several elements including a "a plurality of surface relief features formed . . . according to a predetermined two-dimensional pattern." '562 Patent, claim 1. Looking at a second apparatus does not establish missing evidence in a first apparatus, and thus SVV's improper demonstration thus does not contribute any substantial evidence. *Dominion Energy*, 725 F. App'x at 986 (expert's "testimony was . . . not directed to the claim limitation at issue").

### B.    New Trial:  Verdict Is Against The Great Weight Of The Evidence Regarding The "Predetermined Pattern" Limitation.

As discussed above, SVV failed to offer substantial evidence of infringement of the "predetermined two-dimensional pattern" limitation. Conversely, ASUS submitted evidence of non-infringement that the "predetermined two-dimensional pattern" limitation was ***not*** met by the Accused Products. Dkt. 206, Trial Tr., 664:19-668:2. Dr. Goossen explained the deflecting elements were not "formed . . . according to a predetermined two-dimensional pattern" because they were randomized. *Id.* Dr. Goossen further explained that randomized deflecting elements produces a uniform distribution of light—as opposed to the pattern described (and claimed) in the '562 Patent, which would have negative visual effects in a display screen. *Id.* Accordingly, the great weight of the evidence is against the verdict of infringement of the '562 Patent.

## VI.    INFRINGEMENT OF THE '089 PATENT

The jury found asserted claim 19 of the'089 Patent infringed. Dkt. 202.

### A.    JMOL:  No Substantial Evidence Of "Configured For Injecting Light"

The sole asserted claim 19 of the '089 Patent contains the following limitation, broken into three pieces for ease of reference:

- "a planar two-dimensional array of optical elements distributed over an area of the photoresponsive layer and"

- "configured for injecting light into the space between the optically transmissive and reflective surfaces"

- "at a high angle from a normal to the plane of the photoresponsive layer"

'089 Patent, claim 14 (from which asserted claim 19 depends). At trial, SVV's expert, Mr. Credelle, provided testimony regarding the first bullet point (Dkt. 204, Trial Tr., 308:1-20) and the third bullet point (*Id.* at 308:21-309:12). But **as to the second bullet point, SVV provided no evidence.** The full extent of Mr. Credelle's testimony regarding this entire limitation can be found at Dkt. 204, Trial Tr., 307:17-309:12. The "configured for injecting light" claim language is never mentioned. Mr. Credelle did not even mention the word "inject" or "injecting" during his testimony. This is a wholesale failure of proof, and consequently SVV did not provide substantial evidence of infringement with respect to the '089 Patent.

**B.    New Trial:  Verdict Is Against The Great Weight Of The Evidence Regarding The "Configured For Injecting" Limitation.**

In contrast to SVV's failure of proof, ASUS provided substantial evidence that the ASUS Accused Products do not meet the "configured for injecting" limitation. Further, the ASUS Accused Products are incapable of meeting this limitation based on SVV's mapping.

For context, the '089 Patent depicts light being injected through lenses ***that are outside of the claimed "space."*** *See, e.g.*, '089 Patent, Fig. 11; *see also* '089 Patent, 3:24-27, 7:10-24, 15:7-38, Figs. 12-15. In contrast, applying SVV's mapping, in the ASUS Accused Products the light is injected into the space by LEDs on the side (blue box), ***not*** through the lenses (red box):



**Ex. A**, PDX_3.92 (Credelle Demonstrative, annotated to show the claimed "space" in orange); Dkt. 205, Trial Tr., 368:23-369:13. As a consequence, *the light is already in the claimed "space" before it ever touches the lenses.* Dr. Goossen explained this in his testimony, concluding that the asserted claim was not infringed. Dkt. 206, Trial Tr., 648:16-652:21. In view of the fact that SVV ignored the "injecting" limitation completely, and ASUS provided evidence that the limitation could not be met, the jury's verdict of infringement was against the great weight of the evidence and ASUS is entitled to a new trial.

## VII.    INFRINGEMENT OF THE '318 PATENT

The jury found claim 3 of the '318 Patent infringed. Dkt. 202.

### A.    JMOL: No Substantial Evidence Of "Broad-Area Light Input Surface."

Sole asserted claim 3 of the '318 Patent requires a "broad-area light input surface." It is undisputed, however, that the ASUS Accused Products are *edge-lit* (Dkts. 204–205, Trial Tr., 137:2-4, 359:16-18; Dkt. 191), meaning that the light is input through the LED on the narrow edge of the light guide, as shown in SVV's trial demonstrative:

18



**Ex. A**, PDX_3.98. Mr. Credelle testified the edge "that's facing the LEDs is a light input edge," conceding this edge is "where the LED light leaves the LEDs themselves and goes into the light guide." Dkts. 204–205, Trial Tr., 275:16-19, 294:4-6, 313:15-16, 357:23-358:22. But the edge where the LED inputs light is undisputedly not a "broad area" surface. Accordingly, the only possible "light input surface" in the products does not meet the "broad area" requirement.

Instead, Mr. Credelle contended that there was a second "light input surface," as shown by the highlighted yellow box on the bottom surface of the light guide, depicted above. According to Mr. Credelle, the bottom surface is also a "light input surface" because some light will bounce around in the optical device *after* it is input by the LEDs on the edge, as depicted in his above demonstrative. But as Mr. Credelle admitted, this yellow box was *not* where light was "input" into the light guide device. *Id.* at 275:16-19. Based on the undisputed operation of the representative accused product, no reasonable jury could find that the bottom surface of the light guide is a "broad-area light input surface" as contemplated by the '318 Patent because the products are edge-lit displays—i.e., light is input from the edge, not from either broad surface.

Mr. Credelle anchored his opinion to his understanding that because the "claim is a comprising claim," it meant that "there can be more than one input surface." *Id.* at 313:9-25. Legally, Mr. Credelle's opinion abrogates the plain and ordinary meaning of a light input surface in the '318 Patent. "[C]omprising' is not a weasel word with which to abrogate claim limitations."

19

*Wisconsin Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1348, n.8 (Fed. Cir. 2018). The same light can only be "input" into a device once, and where it is input is the light input surface.

The notion of multiple light input surfaces is also contrary to every disclosure in the '318 Patent. Every embodiment described in the '318 Patent has **one** light input surface, which is, not surprisingly, where light is originally input into the relevant component based on the flow of light, a concept the '318 Patent describes as the "prevailing direction of the light." '318 Patent, 7:47-55. This remains true even though the light bounces around and enters the component through a different surface. *See, e.g.*, '318 Patent, 11:58, 15:3-6, Figs. 16, 20. No reasonable jury could find that the bottom surface of the light guide is a "light input surface" based on Mr. Credelle's legally erroneous "comprising" theory, and ASUS is entitled to JMOL. *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) (rejecting contention that the "comprising" transition of the claim permitted more than one load instruction to be associated with the prediction).

### B.    New Trial: Verdict Is Against The Great Weight Of The Evidence Regarding "Broad-Area Light Input Surface" Limitation.

Contrary to SVV's erroneous interpretation of the claim to allow multiple light input surfaces, ASUS provided evidence that the products lack any "broad area light input surface" as required by the claim. Dr. Goossen opined that (1) the edge of the light guide is where light is "input," but it is not a "broad area," and (2) the bottom surface SVV pointed to was not a "light input surface" because the light had already been input into the light guide through the edge. Dkt. 206, Trial Tr., 632:10-642:2. Dr. Goossen explained that there is only one light input surface in every embodiment described in the '318 Patent, regardless of whether light bounces around and subsequently enters/leaves a surface, such that the plain and ordinary meaning of "light input surface" in light of the '318 Patent is where light primarily enters a layer based on the prevailing direction of light. *Id.* Accordingly, the verdict is against the great weight of the evidence.

Dated:  November 12, 2024                    Respectfully submitted,

                                             **Erise IP, P.A.**

                                             By: /s/ *Michelle Marriott*
                                             Eric A. Buresh
                                             Michelle L. Marriott
                                             Chris R. Schmidt
                                             Nick Apel
                                             7015 College Blvd., Ste. 700
                                             Overland Park, KS 66211
                                             Tel: (913) 777-5600
                                             Fax: (913) 777-5601
                                             eric.buresh@eriseip.com
                                             michelle.marriott@erisip.com
                                             chris.schmidt@eriseip.com
                                             nick.apel@eriseip.com

                                             Mark D. Siegmund
                                             State Bar No. 24117055
                                             Email: msiegmund@cjsjlaw.com
                                             **CHERRY JOHNSON SIEGMUND JAMES,
                                             PLLC**
                                             400 Austin Ave., Ste. 903
                                             Waco, Texas 76701
                                             Telephone: (254) 732-2242
                                             Facsimile: (866) 627-3509

                                             *Attorneys for Defendant ASUSTeK
                                             Computer, Inc.*

## CERTIFICATE OF CONFERENCE

On November 12, 2024, the undersigned conferred with counsel for Plaintiff, who confirmed that Plaintiff opposes this motion.

*/s/ Chris Schmidt*

## CERTIFICATE OF SERVICE

████████████████████████████████████████████

██████████

*/s/  Michelle Marriott*
Michelle Marriott