—1—

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

SVV TECHNOLOGY            *
   INNOVATIONS, INC.      *
                          *      September 23, 2024
VS.                       *
                          * CIVIL ACTION NO. 6:22-CV-311
ASUSTEK COMPUTER INC.     *

BEFORE THE HONORABLE ALAN D ALBRIGHT
JURY TRIAL PROCEEDINGS
Volume 1 of 4

APPEARANCES:

For the Plaintiff:    Bradley W. Caldwell, Esq.
                      Warren J. McCarty III, Esq.
                      Robert Seth Reich, Jr., Esq.
                      Daniel R. Pearson, Esq.
                      Aisha Mahmood Haley, Esq.
                      Bjorn A. Blomquist, Esq.
                      Caldwell Cassady Curry PC
                      2121 N. Pearl St., Suite 1200
                      Dallas, TX 75201

                      Robert D. Katz, Esq.
                      Katz PLLC
                      6060 N. Central Expressway, Ste 560
                      Dallas, TX 75206

For the Defendant:    Eric A. Buresh, Esq.
                      Michelle L. Marriott, Esq.
                      Chris R. Schmidt, Esq.
                      Nickolas R. Apel, Esq.
                      Erise IP, PA
                      7015 College Boulevard
                      Overland Park, KS 66211

                      Mark Siegmund, Esq.
                      Cherry Johnson Siegmund James, PLLC
                      The Roosevelt Tower
                      400 Austin Avenue, 9th Floor
                      Waco, Texas 76701

Court Reporter:       Kristie M. Davis, CRR, RMR
                      PO Box 20994
                      Waco, Texas 76702
                      (254) 666-0904

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

(Hearing begins.)

THE BAILIFF:  All rise.

THE COURT:  Good morning, everyone.  You may be seated.

My understanding is that we have a couple of issues to take up.

Jen, would you call the case, please?

DEPUTY CLERK:  A civil action in Case 6:22-cv-311, SVV Technology Innovations, Incorporated versus ASUSTeK Computer Incorporated.  Case called for a jury trial proceeding.

THE COURT:  And what are the issues?

MR. SIEGMUND:  Good morning, Your Honor.  Mark Siegmund on behalf of the defendant.

The first one is our motion to strike some new accused products that the plaintiffs put in their supplemental expert report.

And so what's important here, Judge, is that the accused products are these computer monitors that you've seen us loading, but the model number and the display panel number are what are the specific accused item of infringement.

So in other words, it matters what's in the display panel attached to the back of the monitor.

And so in their expert report, in

Dr. Farber's expert report, which I'll just show you very quick. You can see this.

It's very tiny so it's hard to see. One second.

Okay. So what you see here, Judge, is you see the product right here, that's the model. And then you have the component model number, that's the display panel. And then Dr. Farber, and I believe Mr. Credelle, you know, go through and say, okay. It's accused or not accused.

So what they did is whenever we provided updated sales information, they actually added some of these unique combinations to their royalty base. And we think, you know, two days before trial, or whenever it was they did this -- I think it was on Friday -- that's entirely improper.

And what's worse is, actually, if you look at this report, Judge, they actually changed a product from not accused to now accused completely. So it's even worse than just adding products that they didn't include in the very beginning. He literally changed the analysis.

Obviously, there's no infringement opinion on these newly identified products or anything like that, and we think that's entirely improper.

The thing that they're going to point to, I think, is a representative product stipulation, which I'll put on the screen right now.  And the whole point of -- I've represented a product stipulation, obviously, Judge -- is for the parties to present evidence on one model so we don't have to go through 90 accused products, or however many there are.

And so what they said was, well, you agreed on this stipulation that only the model number matters.  And that's completely not true.  At the time we entered into the stipulation, the expert reports were done and everyone knew it was a unique pairing of model number and display panel.

And so we think them adding these 13 new accused products is improper, and relying on this stipulation that's supposed to make trial more efficient is really kind of an ambush tactic, in all fairness.

So we don't think that that's right. Obviously, they can update their numbers.  We don't have a problem with that.

So that's the first issue that we have, Judge.

THE COURT:  Response?

MR. PEARSON:  We don't agree.

Daniel Pearson, Your Honor, on behalf of plaintiff SVV.

The stipulation determines how the jury will decide infringement.

If I could, please, see Paragraph 9, Mr. Diaz.

Under the stipulation, if the jury finds infringement, all of these model numbers at the model number level will be found infringing. And Mr. -- Dr. Farber merely updated his royalty base to track what the jury's verdict will be, which is if a model unit is found infringing by the jury, it should be assessed a per-unit running royalty under his analysis.

This is not a surprise. It's not an ambush. This model-level stipulation was entered into with the full and fair agreement of both parties, and, in part, I believe it was done because the sales data about the models and the panels was a mess.

You're going to hear a lot of testimony throughout this trial about how little data ASUS could give us -- little information ASUS could give us about the sales data, which is, in part, why the stipulation was entered into.

And so, Your Honor, all we are asking is

7

that the stipulation not be modified as they asked in their --

THE COURT:  When your expert testifies -- when your technical expert testifies, is he going to do infringement by model numbers?  Is that how he does it?

MR. PEARSON:  Yes, he's going to follow the stipulation.

THE COURT:  So in your opinion, these -- what the defendant is calling additional products, in your opinion, your technical expert has provided an opinion that would encompass these because they fall within the same model number?

MR. PEARSON:  That is my opinion; it's also the binding text of the stipulation entered into by the parties and filed.

THE COURT:  I'm more concerned about, when we get to that part of the trial, when you're having to put on your infringement case, what -- and if they're going to say -- if they can say that it's not in his report because he didn't consider those models, your response would be, no, he did consider these models.

MR. PEARSON:  Yes, Your Honor.

THE COURT:  And then what your argument is is that the damages expert has now updated and

included these models for purposes of the amount of money that -- that he wants the jury to award.

When you're putting on your damages evidence through your expert report, is he going to break it down?  Does he essentially have a royalty rate, and then he says, we've got sales of these products and if we apply the rate against the sales of those products, we come up with X bottom number?

MR. PEARSON:  Yes, Your Honor.  And that's why we think it's important to conform the units in the royalty base to the stipulation where the party -- where the jury will find infringement so that those two things match and we don't get an inconsistent verdict.

THE COURT:  So when you are putting on the evidence, are you able to do it in a way through your damages expert that would make it clear in the record of how many units the stub -- what I'm calling the stub group here, that the defendants are unhappy about, would you be able to put into evidence how many those are?

Does that make sense?

MR. PEARSON:  If Your Honor asks me to, I can.

THE COURT:  Well, what I'm thinking is,

I'm going to allow you to do it.  But if you do it that way, if -- on appeal, if the Circuit thinks that I was wrong for allowing it, it's a pretty easy fix, I would think.

You -- to -- in the amount -- I think it's okay for you to do it.  But I think it would be easier on the record to make it clear which -- what amount of the damages came from the products that the defendant is unhappy about and thinks that you shouldn't get to talk about.

MR. PEARSON:  Very well, Your Honor.  And I will say that that specific total is not currently listed in Dr. Farber's attachments, but --

THE COURT:  So as long as you get into the record the evidence that'll allow the defendant to argue it's too high and it should be reduced by this amount, then I think both sides will be protected.

MR. PEARSON:  Very well, Your Honor.

THE COURT:  And I also think it's more efficient to allow them to consider those products now and give us one number.

MR. PEARSON:  Thank you, Your Honor.

THE COURT:  What other issues do we have?

MR. SIEGMUND:  I think just two more. This one should be pretty easy, Judge.  So the products

stipulation that you just heard about is what we believe should be controlling, and it seems like it is.

So what they wanted to do is enter into evidence a whole bunch of exhibits that are just pictures of the products and some teardown. This is what I'm showing you on the screen like this.

And we have no problem with them doing that with the representative products, but the -- I don't know -- 40 or 50 products that are not representative products, we have objected to and said it's key motive, it's confusing to the jury.

And that's the whole point of the representative products, that you put in evidence of infringement of the representative products that -- so that's our issue. We don't have a problem if they use the representative product.

Does that make sense?

THE COURT: Sure.

MR. MCCARTY: Good morning, Your Honor. It's Warren McCarty for the plaintiff.

The objections to these exhibits are actually with respect to our fact witness, Dr. Vasylyev, whose job it is -- it's not to prove infringement. So the representative product stipulation is a little bit of a side issue. We're not

going to be wasting the jury's time on side issues or other products that aren't at issue in the case.

What we are going to do or potentially need to do is prove things like presuit notice, where you had knowledge of our infringement contentions through our presuit letters and so forth. And those relate to some products that aren't the representative products in the case. So we need to be able to say here's how they look and --

THE COURT: I'm just going to hear what you offer them for at trial.

MR. MCCARTY: We're not going to waste the jury's time. Thank you.

THE COURT: Yes, sir.

MR. SIEGMUND: I think this might be the last one.

This is the product stipulation. I believe the plaintiffs want to offer it into evidence, and our position is it's not evidence. It's a stipulation, and that's pretty much it on this one.

THE COURT: I think what I would prefer to do -- I -- I don't think the stipulation should come into evidence, but what I would suggest that you all do is come up with some very anodyne -- something -- a paragraph, short paragraph I could read in the jury

charge that says that there's been this type of stipulation.

I worry that if a jury saw this, they might think that it meant more -- it meant that the defendant was actually stipulating to some form of -- the way it looks to me, I think it'd be prejudicial.

But I'm happy to have -- if you all can come -- cobble together a paragraph that explains why the jury didn't have to see a thousand products and how they can consider the evidence, that would be, I think, the best solution.

MR. BURESH:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. SIEGMUND:  That's it, Your Honor.

THE COURT:  Anything from plaintiff?

MR. CALDWELL:  Nothing from the plaintiff.

(Brief off-the-record discussion.)

THE COURT:  Okay.  We'll get started. I'll let you know as soon as they're all here.  I'll give you a five-minute warning from then, and then we'll get started with opening arguments.

Does the defendant -- are you going to do your opening argument immediately after theirs?

MR. BURESH:  Yes.  We are, Your Honor.

THE COURT:  Okay.  Very good.

Anything else?

MR. CALDWELL:  No, sir.

THE COURT:  Okay.

(Recess taken.)

THE BAILIFF:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT:  Thank you.  You may be seated.

DEPUTY CLERK:  A civil action in Case 6:22-cv-311, SVV Technology Innovations, Incorporated versus ASUSTeK Computer Incorporated.  Case called for a jury trial proceeding.

THE COURT:  Counsel, if you'd be so kind as to introduce yourself and introduce the folks who are at your table and who'll be presenting to the jury. I'll start with the plaintiff, please.

MR. CALDWELL:  Thank you.

Should we do it from the lectern, Your Honor?

THE COURT:  Wherever you think you can be heard the best would be great.

MR. CALDWELL:  Good morning.  My name is

Brad Caldwell, and I have the pleasure of representing SVV Technologies.

You've already met my partner, Mr. Warren McCarty, and then the inventor, Dr. Sergiy Vasylyev. And then also presenting this case with us is my partner Seth Reich, Aisha Haley, and Daniel Pearson.

And there's other folks that are behind the scenes that make everything actually work, but I won't introduce all those folks, then. We look forward to presenting the case to you.

THE COURT: Yes, sir.

MR. BURESH: Thank you, Your Honor.

Ladies and gentleman, my name is Eric Buresh. This is the first time we've got to chat. In about 30 minutes, I'll get to chat with you a little bit more.

By way of introduction, you'll be hearing from Michelle Marriott, who's sitting with me at the counsel table. You've met Mark Siegmund last week, and you'll be hearing from him.

And then coming in from Taiwan is our corporate representative on behalf of ASUS, and his name is James Lee. And like the plaintiff, there's a whole lot of people that help us do what we do that are sitting around the rest of the room. So we look

forward to presenting our case, and I'll chat with you again in a few minutes.

THE COURT:  Ladies and gentleman, let me introduce myself formally to you since we didn't meet during the voir dire.  My name is Alan Albright.  I'm the United States district judge for the Waco Division of the Western District of Texas.

To give you an idea of how large -- I know some of you all had to drive a ways to get to this courthouse in the Waco Division.  To give you an idea of how large our district is, San Antonio is in our district, Bastrop's in our district, and El Paso is in our district.

So Los Angeles is closer to El Paso than San Antonio and we are.  So it's the biggest -- other than Alaska, it's the biggest district in the United States.

So you all are very blessed this morning. I've had all of these lawyers in front of me on several occasions.  They're really outstanding.  I don't -- we don't always have that good fortune, but you are lucky here to have really good lawyers.  The case is going to be very interesting.

You're about to hear the opening arguments in this trial.  These arguments are only a

blueprint or a roadmap for what the lawyers believe or anticipate the evidence is going to be.

You're not going to hear any evidence until the plaintiff calls their first witness, and at that point you can begin considering what you hear for purposes of resolving this case.

But that's not to say that the opening argument isn't important. It is. And it's usually one of the most enjoyable parts of the trial. So I look forward to hearing both lawyers tell us what this case is about.

Counsel?

MR. CALDWELL: Thank you, Your Honor.

OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

MR. CALDWELL: Good morning. Thank you again for graciously performing your civic duty. It's quite an honor. I think it's often said that it's the second highest form of service you can provide to this country besides being in the armed forces, and we really appreciate you guys being here.

You spoke quite frankly with us on Thursday, and so I feel like I should do the same, a little bit of background, kind of same level you gave.

I grew up down Highway 31 in Athens, Texas. I have an electrical engineering degree from

Texas A&M, and I have a law degree from the orange school down in Austin. And now I live in Dallas where I get to practice these kinds of cases with a lot of my best friends. So other than actually living in England for three months when I was in law school, I've pretty much always been within 100 miles of here.

I met my wife when she was in vet school at Texas A&M. She's the smart one in the family. We have two kids. I have a 16-year-old. She got her driver's license eight days ago. So stay out of her -- seven days ago, so stay out of Dallas for a little bit. And then I have a little boy who, despite living in Texas, is somehow addicted to playing ice hockey.

So one of the big things about this job is that you get to meet really cool people and learn remarkable things, and if you're a bit of a nerd like me, it's pretty awesome.

But one of the things is occasionally you meet someone that just really stands out. And it's sometimes said that the American dream is the ideal that through hard work, determination, and initiative, really anyone in this country can achieve success and prosperity.

And today you're going to meet someone who's an American citizen who has certainly held up his

end of the bargain.  And I'm proud to represent Dr. Sergiy Vasylyev and SVV Technologies.

Dr. Vasylyev, please stand up.

Thank you.

Now, Dr. Vasylyev has a remarkable story to tell and you're going to hear it this morning, so I'm not going to steal his thunder.

Now, he's brilliant.  He has two Ph.D.s; one's in physics and one's in math.  He's what you might call an astrophysicist, and he's an expert in light and optics.

So what does that mean, to be an expert in light or have a business that's in light?  And you might think of like a lamp or these ornate overhead lights or even the sunlight, which is pretty intense sometimes, as you know.  And you're not far off when you think that way.

The thing is, though, that SVV and Dr. Vasylyev focus on very high-tech applications of light, and it's pretty important.  They run a business under the tradename of Lucent Optics and offer a variety of products.  The common thread is they want to make the absolute most out of the light that you have available to you.

And I'll just highlight one of these for

fun, is this one in the middle right here with the hand called the Daylighting Fabric.

So if you imagine an office building or even this one; of course, we have massive windows in this particular room.

But in a typical office building, sometimes maybe there's a smaller window. And right in front of it, like your candles are melting from the heat of the sun, but throughout the rest of the room, it's still kind of dark. And you turn on a lamp and turn on the overhead lights and all that. So it's real hot in some spots, and you're burning electricity in others.

Well, with the Daylighting Fabric, assuming this is that room as an example, when you add Dr. Vasylyev's fabric, basically it grabs the light and can steer it and channel it and spread it uniformly and evenly. It's pretty amazing.

In this week, though, we're going to focus on SVV's work in the high-tech field of screens and monitors like computer screens.

Now, like many groundbreaking companies, SVV started in a garage, and in this picture Dr. Vasylyev was working on something he called a "solar concentrator."

20

But the laboratory's a bit more refined these days.  And what I'm showing here is Dr. Vasylyev's laboratory in Sacramento, California.

And while SVV may not have been known to you until Thursday or known to us before we got to work on this case, it's not an unknown in the industry.  I think it's fair to say the industry has taken notice.

SVV and Dr. Vasylyev have grants from entities like the United States Department of Energy, the National Science Foundation, California Energy Commission.  They've all gotten behind the work of Dr. Vasylyev.  Sometimes it's grants or sometimes they hire him to help them tackle challenges that they're facing.

And it's not only governments too. Monitor companies like Samsung and MSI have paid to get permission to use Dr. Vasylyev's patented ideas.

So why monitor companies, if I've shown you this lighting film?

Well, as Dr. Vasylyev will explain, as he was innovating and capturing, steering, and concentrating light, he was in some ways developing the reverse technologies of expanding, steering, and transmitting light evenly.  They have similarities, just kind of in reverse.

And we're here today because some of Dr. Vasylyev's inventions are extremely light efficient, cost-efficient ways to light up monitor screens.  So in context, let's step back just a little bit.

Anybody remember TVs in, like, the '80s and '90s?  So we had one just like this.  This is a Curtis Mathes television.  I wonder if anybody's, like, old enough to remember Curtis Mathes.

Believe it or not, they were made in Athens, Texas.  My mom worked at Curtis Mathes for years in the accounting department.  Dad worked in the furniture department when he -- finishing, when he was in high school.

Anyway, those days are gone, and you won't really see TVs like this anymore if you run down to Best Buy, because I think we all kind of know they went sort of towards flat panels.

But even when they first went to flat panels, they weren't that thin.  I mean, they're kind of more like this.  But over time what's happened is they've just gotten thinner and thinner and thinner. It's like a race to be the thinnest.

But there's also issues of power consumption and good imagery and even lighting, all of

that.  And managing light was a headache from the start, and it only gets worse when you try to go thinner.

In those modern kinds of screens, the light typically comes from an LED, a light-emitting diode.  And oftentimes, they're blue.  And if you ever heard of, like, color being made from RGB -- like red, green, and blue -- that's the blue part of it.

Initial efforts at using LEDs weren't actually great.  Like I said, the monitors weren't that thin.  They generated, oftentimes, too much heat, which can be bad for longevity and warranty concerns.

If you're wasting a bunch on heat, you're also burning electricity you don't need to.

They had too many LEDs, which cost more.  And they had patchy images.

So in the early days, a lot of the critiques of thinner monitors were the visual hot spots where some areas were really bright kind of in front of where the LEDs were, and other areas were sort of darker.

But if you enter Dr. Vasylyev's technology, what he did is he invented an efficient, slim, elegant way to spread that harsh blue light.  And it's called a "waveguide," which he can explain later.

But basically, if you imagine that the light originates from just a thin row of LEDs -- and I'll point to the top of this monitor just sort of for reference, but a thin row of LEDs on the edge.  And then it's steered, spread out, and emerges from the front in an even spread that he refers to as collimating the light instead of scattering it.

And it very efficiently uses the LEDs you have.  You can use fewer, it can be smaller LED material; more cost efficient, heat efficient, energy efficient, everything.

And that's what Dr. Vasylyev is going to describe to you.  But again, the aim is to use the light you have as efficiently as possible.

Now, Dr. Vasylyev's inventions, it turns out, also work with a very cool emerging technology called "quantum dots."  I love to give this kind of cool demonstration.

This right here is a vial of quantum dots.  It looks like kind of a dark orange color, right?  And that's -- it's neat, in and of itself, but that doesn't mean much.

But what quantum dots are is a chemical nanoparticle that has pretty cool properties.  If you excite it, or energize it, with light or energy of a

24

certain wavelength, it retransmits a different wavelength.

So in this one, when we shine the blue light on it, it glows red.  If you shine more blue light on it, it glows even more red.  It's pretty amazing.

Now, what you'll find is, I already mentioned the blue.  So when you use blue backlights and red and green quantum dots, you get the RGB, the red, green, and blue you need to mix to make colors.  And those things make beautiful colors that help sell monitors.

So it helps ASUS sell these really, really high-end gaming monitors.

Dr. Vasylyev thought his ideas were real breakthroughs.  So he wanted to file patent applications.  Let's talk very briefly about what a patent is.  And I know you guys got to watch the video on Thursday.

Patents have their origin in the Constitution, because the Founding Fathers invited Congress to pass laws that would encourage innovation.

And the idea is, you pass a law that says if you'll come up with stuff, you'll dump money into research or writing books or, you know, creating

content, but inventing things in particular, if you dump money into that and then you write it up and disclose it to the public to teach other people, the government will give you an exclusive right to your invention for a limited period of time.

And that's basically what it is.

But you don't just say, hey, I want a patent and get one.  You have to apply, and then it's examined by an examiner, as you've heard, who will determine whether it's new -- meaning it's not -- it's new, it's called "novel" -- and it's not just an obvious change from something that came before.  And if they agree that you've met those requirements, you are awarded patents.

So in this case, Dr. Vasylyev has been awarded four patents by the United States Patent and Trademark Office, and each one has this longer number on it.  This is 9,880,342.  Just to avoid the mouthful, we'll call this the '342 patent.  And we will refer to the others as the '562, the '089, and the '318.

So years after Dr. Vasylyev had put his patent applications on file with the Patent Office, he started seeing ASUS products with familiar hallmarks.  And he wondered how they were doing their backlighting.

So what you're going to hear is, he

26

bought an ASUS monitor, he opened it up and started looking inside to see how they were doing. And it looked a bit too familiar. ASUS was using his patented waveguide invention.

So as Dr. Vasylyev can explain, these are some teardowns -- or photos from his teardown of the very first ASUS that he bought to test. And he'll explain what he found on the inside.

Now, he could have sued ASUS right at that moment. Okay? You don't have to send them a letter, you don't have to engage. At that point, if you believe there's patent infringement, you can file a lawsuit that day.

But he's not that type. They didn't want to just run to court against ASUS. But he hired a lawyer and they wrote a polite letter to ASUS.

Now, ASUS has some companies that are sort of all over the world, we'll talk about that in a minute, but he wasn't sure if United States patents were handled by the folks in Taiwan or handled by someone in the United States. So he actually sent the letter to both of them.

And this is the letter, and we don't have to read every bit of it, but basically, he introduces that he has United States patents. He references the

four that are in this case.  He references that monitor I showed you, and he gives example claims that he thinks are at issue, because if they practice one claim, that's patent infringement.  Doesn't matter if it's 2 or 12.  One claim, that's patent infringement.  And he gave several examples.

So after about a month, SVV got a response by e-mail.  I'd like to show you.  This is going to be some of the evidence in the case that I think is pretty important.

This came from a gentleman named Jason Wu at ASUSTeK in Taiwan.  At first he says he's from the legal affairs center.  He's going to be the person, I guess, that engages with us that -- out of Taiwan.  Okay?

Now, he says:  We are open to engaging with SVV in discussions regarding patent licensing.

Great.  But he also makes a request.  He says:  I would like you to provide us with exemplary claim charts.  So I want you to go back and look at your patents and tell us how our products compare to your patent.

Okay.  And it might just be a delay tactic, but, you know, maybe this is a -- the way that they like to negotiate in good faith.

28

So Dr. Vasylyev tried to be optimistic and went back to do that. They entered a very common confidentiality agreement. And he set to work. And it turned into several months of work. Many, many -- like six or eight months worth of lab work for Dr. Vasylyev and his lab assistant.

They bought a bunch of monitors and they put together 40 charts mapping ASUS monitors to his patent claims. Now, that's dozens of products. But obviously, they don't sell one of each type of monitor, right?

It's -- this is likely meaning millions of monitors sold with his patented technology. And here's some of the monitors that he tore down.

So right when SVV was about ready to send those charts over to ASUS, they reached back out and said, I just want to make sure, Mr. Wu, that you're still the person I need to send these to because we're ready to keep going in our negotiations.

And this is where the correspondence seems to get a little strange.

Before I go to the response, I kind of want to remind you about last Thursday. Remember ASUS' lawyers said to you, this case is very important to our client. It's so important that he's traveling all the

way from Taiwan -- which if you've looked at a map, that's a pretty long ways from here. We've been falsely accused and we're coming to the courthouse to clear our name.

Well, what do they say to SVV back in 2021? Remember, this is nine months after asking Dr. Vasylyev to go make claim charts for him. They decide they don't even want the claim charts.

He says, you know, actually, ASUSTeK is not the appropriate company for you to discuss. He's not saying go talk to the folks in California. He's now going to put it off on third parties. He's like, it turns out ASUSTeK does not manufacture any display panels and we don't know how the display panels are implemented.

So he's basically saying it doesn't matter if somebody put our name on it. You need to go talk to somebody else that made it for us. And if there was any doubt how ASUS was going to approach SVV in these negotiations, that doubt didn't linger too long.

Mr. Wu says: If you insist on talking to us, you should expect it's going to take much longer time.

So SVV, though, they didn't give up hope.

30

They still sent the claim charts.  And a little while later, after sending the claim charts, they heard back from ASUS again, but ASUS just continued to dig in a little further.

They tell us actually, now, ASUS outsourced design and manufacturing to ODMs, like other -- it's original device manufacturers or an acronym like that.  ODMs, third parties.  We don't know what panels our monitors have in them.

And then he says:  Maybe you can figure it out yourself since you're tearing them open.  You can figure out what panels we have in our monitors.

So if you kind of think about the big picture here starting nine months earlier, first it was, please go away and spend your time making these charts.  Delay.

Now that you've made the charts, I don't want them, go talk to a third party.  Deflect.

And then last Thursday, it was, we can't wait to come in here and clear our name, because they're going to say they don't infringe.  So now it's deny.

It's been delay, deflect, deny.  And that about sums up how this goes.

Now, as you can see, they have deflected

Case 6:22-cv-00311-ADA   Document 244   Filed 02/24/25   Page 31 of 321

31

left, right, and center for years, but I'd like to give you a diagram of some corporate entities to kind of help put that in context.  The idea is to sort of help you follow both the money and the finger-pointing that's in this case.

So what I've done here is a little diagram with -- and I don't know if the light green is showing up on your monitor, but sort of the box in the middle with a little bit light green dotted line around it.  And that's kind of the ASUS family of companies. There's more, but those are the ones that really matter for this.

We've got the one at the top in Taiwan, ASUSTeK Computer.  That's the defendant in this case, out of Taiwan.

Down at the bottom, ACI, that's their U.S. affiliate.  It's -- in the -- even though it's the U.S. one, it's called ASUS Computer International. That's a U.S. one.

And then there's this other one in the middle, ASGL.  That's what they call it, but what it really means is ASUS Global Pte Limited.  It's sort of a middleman based in Singapore.

But anyway, all the stuff in the green box is ASUS.  All the dollars rode to the red box at

*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

32

the top, okay, that's the defendant that's in this case.

So now, when ACI wants to sell a monitor to a U.S. person, they tell the Singapore folks who tell the people in Taiwan and the people in Taiwan pick something that their outside manufacturer can make.

So you put our name on it and send it to the folks in the U.S.  So that's kind of the product flow here, is you guys -- someone else make it, send it to the folks in the U.S.  And when those dollars come in, they go all the way up to ASUS in Taiwan.

I've also got this other entity on here that is the panel manufacturer, because in some cases, this outside maker of the monitors, assembler of the monitor, may get the light-up display panel from someone else.  So these are kind of the parties that you may hear referenced.

Now, the law says that Dr. Vasylyev and SVV have the right to exclude others from using his invention.  And the actual words in the patent law is he has the right to exclude others from making, using, offering for sale, or selling the patented inventions or from importing them.

And we believe the evidence will show -- and by the way, any one of those -- pick any one of

those, that is an act of infringement under the law, and the Court will instruct you on that later in the case.

But we think they're ticking the box a lot of different ways, via selling, offering to sell, and importing.

So to help you sort out the issues related to infringement by ASUS, we're going to present what's called an "expert witness."  And, I mean, he is an expert in this legitimately, but "expert" also has sort of a meaning in the cases in the sense that he can offer you opinions on the issues that are going to be asked of you later in the case on the verdict form.

And the expert that we're going to present on technology, who has amazing credentials right in this area, is a gentleman named Mr. Thomas Credelle.

Mr. Credelle, will you please stand up?

Thank you.

Now, Mr. Credelle's experience in this area is legit.  Like we said, 40 years of real-world experience in this area.  He spent his career doing research, development, and engineering of flat panel displays.

He has a master's from MIT in

electro-optics in solid-state electronics, and he's worked for GE, Apple, Motorola, and others.  He's going to tell you some pretty fascinating things that he was responsible for in this industry, the display industry.

In this case, Dr. Credelle did the hard work of studying the insides of the infringing monitors, and he's going to get into the details of the lighting systems in those monitors.

And then what he's going to do is he's going to go carefully limitation-by-limitation through the asserted patent claims, which is kind of like a checklist of infringement.

And I won't do it now, but you'll see boards like this where the patent claims that are asserted in this case are sort of broken down into elements like a checklist.  And we -- it's our burden to prove infringement, and he's the one that's going to do it.

Now, remember, we only need to show one claim, and there's several claims in these patents. We're not going to go through all of them.  It's not going to be, I don't know, a ten-hour technical death march or anything like that.  But it will take time because we want to give you the evidence you need to be confident in your verdict.

35

So we'll show a few different claims which I'll flip through on the screen here.  I'm not going to go through all the details, but we're going to do some claims in each of the four patents.

Now, how do you prove infringement?  The law is that SVV is entitled to damages, like money damages as compensation.  That's what you can get in this court is money damages.  And we know that SVV is entitled to damages because it is the law.

And Section 248 of the patent laws says that the compensation has to be adequate to compensate for infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer.

So ASUS can't just say, I tell you what, give this guy a small amount.  It'll be fine.

Like, they can't do that.  It has to be based on ASUS's use of SVV's patented inventions.  I mean, that's not a trivial matter to assess, right?  So we're going to have to present evidence to you to help quantify and value the value of ASUS's infringement.

It involves breaking down numbers that are specific to ASUS, like internal financials and sales information and things that, outside this courtroom, you wouldn't be allowed to see or I wouldn't

be able to see, and then to this day, Dr. Vasylyev hasn't been allowed to see.

But we have a different expert, an expert in economics and finance that it has been allowed by the Court to see these financials from ASUS. And so we will present that expert. And he is Dr. Matthew Farber.

Dr. Farber?

Thank you.

So Dr. Farber will be the one who walks you through kind of the dollars and cents side of how ASUS has benefitted. Kind of like Mr. Credelle, an amazing background in this, he's a patent valuation expert with access to the right information, and he'll step you step-by-step through the benefits that ASUS receives.

He's going to describe how experts in this field use the law that you will get from Judge Albright. In particular, you'll hear this case. It's kind of a famous case that the patent lawyers all talk about called Georgia-Pacific, where a court laid out some factors you should consider depending on what's applicable in your case. And he'll go through all that.

And that case looks at this thing called

a "hypothetical negotiation." And it's hypothetical because it never happened, but what you do is sort of imagine like if ASUS had done the right thing on Day 1 and sat down with us and said, I tell you what, we're going to use your invention, how much do we need to pay to do it, you start looking at what would the parties have negotiated.

It's not a simple math problem. You can't just sort of compare the cost of one monitor to another. You can't even just compare the cost of one monitor to another or even one display panel to another.

Because think about it. Like, there might be things like different features, different sizes, and even the price may have changed over time. Right?

Like, if you guys have a 50-inch flat screen you bought this year, it probably cost a little bit less than if you bought it ten years ago. Things like that happen, right? So it's pretty complicated, and crunching the numbers accurately is not a trivial matter.

So Dr. Farber's going to explain how he did it, and he performed a sophisticated statistical analysis called a "regression analysis." And it

statistically hones in on the impact to ASUS of their infringement.

So what he discovered was that infringing is great business for ASUS. It turns out ASUS unlocks about $21 per monitor they sell in cost savings by using Dr. Vasylyev's design. And, of course, if a monitor sells at a given price and your cost drops by 21, that's a good thing if you're ASUS.

Now, you might think --

THE COURT: Counsel, five minutes.

MR. CALDWELL: Thank you, sir.

Now, you might think that if ASUS is saving $21 a monitor that SVV should get $21 a monitor, but that's not going to be Dr. Farber's opinion. He's going to explain how he thinks if they sat down and were to negotiate, they would find an equitable way to split the savings.

It's, you want to do it. You want to make some more profit. And we would give you permission, and you would compensate us.

And at the end of the day, after he goes through the financials, he'll explain his opinion that ASUS and SVV would have agreed to pay -- that ASUS would pay SVV $13.96 per monitor in order to unlock the savings, and they get to keep the rest.

39

Now, as a last data point, you're going to hear that ASUS sold a whole lot of these monitors. Okay? I'm -- not dollars. Monitors.

And I don't know if any of you guys are video gamers, but for some reason when you sell something to the gaming market, like the price goes up.

And these have the beautiful quantum dots and fast performance and all these things that are cool features, and they sell -- they sell well and are very desirable. Those are not inexpensive monitors. Let me put it that way. And they sell -- they've sold about 4.2 million monitors that use Dr. Vasylyev's invention.

So once you have the 13.96 and you know how many monitors they sold, at that point it's kind of like simple multiplication. That's why we'll be asking for a reasonable royalty in this case of $58,632,139.

So what is ASUS going to say? Look, it bounces around. A few years ago it was, we don't know our products. Go talk to the vendors. Four days ago it was, we're happy to have a chance to speak up.

Sometimes it was, we don't know who makes our monitors. Sometimes it was, we don't know who makes the panels that are in our monitors. Yet somehow they manage to sell them and offer warranties on them.

So look. Ultimately, at the end of the

day, our request is that you don't check your common sense at the door with whatever argument is the argument of the day.

Sometimes it's been, we have no idea if our subsidiaries are selling these monitors. But does that make any sense? It's like we created a subsidiary in the U.S. We send them monitors. They send us money. But we don't know if they're selling stuff in the U.S. We also advertise there and other things. So I guess we'll see if that argument's still alive.

But now they kind of imply that they've figured it out, and they've decided they don't infringe. But remember, they never had a single problem with the claim charts we sent them three years ago.

So when all that doesn't work, ASUS will likely ask you to let them out of this case at a bargain price. I think you're going to see that's what they really want in this case, is out at a bargain price.

They'll probably ask you to give them a good deal that someone else like Samsung got, or maybe they'll even try to slice that down further. I guess we'll see.

But I think you'll see that ASUS'

theories just don't add up.  And you're the ones who get to decide if they do.

As the Court told you last week, you're the judges of the facts.  You're the judges of the credibility, credibility of the evidence, the witnesses we bring, and the witnesses they bring.

So no question ASUS has the right to defend itself.  Absolutely not, of course they do.  But they don't have the right to take SVV's technology and put it in their products and profit handsomely off of using that invention and pay nothing, when that's exactly what they try to do.

Please don't check your common sense at the door.  And pay close attention when you see our experts walk you through the claims, walk you through the Court's claim construction, and walk you through the financials, and see who you think's credible.

Thank you for your attention and your service.  I'm so excited we finally get to present the evidence to you.

Thank you, Your Honor.

THE COURT:  You bet.

MR. BURESH:  With permission, Your Honor.

THE COURT:  Of course.

OPENING STATEMENT ON BEHALF OF THE DEFENDANT

42

MR. BURESH:  Well, good morning again.

I really got to angle this thing up, you know, it's -- first of all, my voice carries like nothing, and second of all, I'm taller than some folks.

So let's get started.  Okay.

Again, my name is Eric Buresh.  I think that, just to keep everybody on equal parity, I'll do the same thing that everybody else has done, just the biographical information.

I have never lived in Texas.  You can probably tell that because my accent's a little different.  I come from up I-35 in Kansas, and I've lived in Kansas my whole life.  In Kansas, I have a wife of 28 years.  Her name is Terah, and she is pretty much an angel for putting up with me for 28 years while I run around doing this fun stuff.  And my wife and I have raised four boys together.  She's also an angel for that reason.

My oldest now is married and he lives in Kansas near me.  My second oldest -- first's name is Ethan.  My second is named Noah; he's married and living in Ohio.

My third is named Grant.  He's actually at school here at Baylor.  So I do have some time to -- have had opportunities to be in Waco for reasons other

than a good time with Judge Albright.

My fourth son is still in high school. He's graduating this year. We nicknamed him Huddy. His full name is Hudson, but we also call him Closer because he is the last one. And praise the Lord, he's the last one.

With that, that's my biographical information.

And I also wanted to give a little further introduction to James Lee.

If you could stand up, James.

We've brought James here because he's the head of the monitor division at ASUS. And he is the most appropriate person to speak to you about their monitors and what they do.

You've already heard from my colleague on the other side that ASUS doesn't manufacture these monitors, and that is not us pointing fingers. We are here to answer for the monitors and to present to you our case that we have put together based upon our assessment and the engineering that went into these displays. Okay?

We're not pointing any fingers. We're not pointing any fingers at any other companies. We are here to answer. All right? And our answer is

this -- this is my main idea for you folks today in my roughly 30 minutes.

ASUS does not use Dr. Vasylyev's patents. That's the main message. We do not use his patents.

We have a firm conviction that that is the truth. Truth is kind of an interesting word. One of the things I like about practicing law is that's what we do. We pursue truth.

There's a lot of symbolism in this courtroom, including the fact that the Judge sits up on an elevated bench, because he's in charge. There's also this big beam that runs across the room, okay, with the little gate that we walk through. It's called "the bar."

Now, the bar sets what we're doing apart from whatever else goes on out in the world. This is a special place. It's a special place where we come together to pursue truth. And the fact of the matter is, you're the deciders. Okay? You're the deciders of what is going to be true and what is not.

And that can be a complicated job, not because the truth is complicated. Truth is rarely complicated. Truth is usually pretty straightforward. But there can be so much noise. There can be so much of a cloud of other stuff around it that it's hard to

45

find.

I grew up in South Central Kansas. And if -- have y'all driven through Kansas at all? I mean, it's flatter than a pancake. You can see four horizons in every direction. There's hardly even a ripple. And while we don't have a lot of people in Kansas, one thing we do have a lot of is wheat.

You ever seen wheat fields flowing? They go on for thousands of acres, and I grew up right in the middle of that.

So I know wheat. I've driven trucks where the combines are shooting the grain into the -- into the truck and I take it off to the silos. I grew up doing that stuff.

Here's the deal. Wheat and chaff. Y'all ever heard that metaphor before? Separate the wheat from the chaff. I mean, that metaphor goes back all the way to the Good Book, goes back way back in time. Okay?

And here's the deal. When you get wheat, it's got all this chaff on it, all the husks and all the things that cover the grain. Back in ancient times, there was a threshing floor, used to take the sheaves of wheat, throw it into a threshing floor, and they'd have cattle or oxen trample over it until it was

all broken up.

Then you'd take your fork, and on a breezy day, you would throw the combination up in the air. And what would happen? The wind would blow the chaff away. And you'd be left with the wheat. Okay? The good stuff.

That is what we're going to be trying to help you guys do for the next few days. There's going to be a whole lot of chaff, and we're going to be searching for those grains of truth. And the grains of truth are not that complicated.

Some of the chaff we've -- and it was a very good opening statement. But there was chaff even in the opening statement, some things I want you guys to watch for.

Dr. Vasylyev is -- I mean, he's got more degrees than you can shake a stick at. He's a brilliant guy. Our view of the situation is that he's gotten outside his lane. Okay?

Like, we have lanes that we can be the most amazing people in the world at. Like talking in front of people. I can do that pretty easily; some can't. But if I go try to -- like my colleague here, he played college football. If I tried to play college football, I'd get split in two the first time somebody

47

hit me.  I'm not built for that.  Right?  I'd be outside my lane.

So what you saw so far, like window lighting, films, that we were talking about earlier, what's that have to do with this case?  ASUS isn't making window films.  ASUS doesn't make anything that collects solar light.

I think a little later in the case you're going to see something called an LED panel that Dr. Vasylyev developed.  It's for lighting commercial buildings.  It's got nothing to do with display monitors.  Okay?

A lot of that stuff is chaff.  You've got to throw it up in the air, let the wind blow it away, because -- focus on the things we really need to talk about.  Okay?

Some other -- some other chaff that we heard during the opening from my colleague.  Polite letters back and forth.  Okay?  We didn't get to see the whole letter.  We're going to see the whole thing later in this case.

And I'd like to show you just a couple more pieces that my colleague didn't show you of that exhibit he flashed up.

Mr. Pubentz.

This is part of that same e-mail chain. And allegedly, we're pointing our finger at suppliers. Trying to hide information. Well, look what happens in this e-mail chain. R. Katz, Robert Katz, that's Dr. Vasylyev's attorney. Look at what he said.

I appreciate your follow-up. I would like to continue to discuss with you. However, if you can provide me with the points of contact for your panel manufacturers, I'd be happy to contact them directly, which may help to reduce your role as a go-between, as you mention, may expedite the process.

Provide some claim charts.

Please let me know if you have any problem with the charts. I look forward to hearing from you.

In other words, Dr. Vasylyev's lawyers asked ASUS to provide information on the panel manufacturers so that Dr. Vasylyev and his lawyer could go contact them directly. It's not us pointing the finger. We're doing what we're asked to do.

That's chaff. You can throw it up in the air and let the wind blow it away.

We also saw a large TV that I think was part of the family business or something to that effect. We've all seen those cathode-ray tube TVs. I

think we're all old enough to have seen those.

And yes, monitors are now thinner. But here's the deal. ASUS has been selling flat panel monitors since 2004, 2005 time frame. The industry has been selling flat panel monitors since before 2000.

When did Dr. Vasylyev's patents come along? The ones we're going to be talking about in this case. 2009. I mean, if he's a panel person, that's Johnny-come-lately. Okay? A little late to the party on those.

But I had a question when I was listening to the opening. If Dr. Vasylyev is responsible for taking those big TVs and getting them down to a flat panel monitor, why aren't we seeing that? Like, where was the flat panel monitor that Dr. Vasylyev has put together?

And I'm not saying manufacture millions of them or anything like that. Show me a prototype. Okay? But you haven't seen one of those. Because he's not in that lane. It's just a lot of chaff. So watch for that.

What is the truth, the kernels I want you to watch for?

I can't prove my case in an opening statement. Ten, 15 years ago, I tried once to prove my

case in an opening statement. It didn't work. Hasn't worked anytime since. But I want to preview some things for you so that you can follow along better. All right?

Could I have the ELMO, please? Thank you.

This is a pro tip, okay, as you're in your role as jurors. There's going to be a lot of slides flashing around. Those are not going to be with you back in the -- in the jury room. Okay? So if you see something as we go through slides that you think is important, take a note down. If you're interested in doing that. Okay? Just giving you a fair warning, they're not going to be there.

You do, however, have in your notebooks the patents in this case. And anytime you want, you can look at those while we're going through them and follow along, because these patents are pretty useful. Right? They're the patents that are in the case. They're good evidence.

And here's the thing. These patents were written in the 2009, 2010 time frame, before Dr. Vasylyev was on his campaign to come after display people like us. Okay? So the words in these were prelawsuit. So they're worth looking at. All right?

51

I'm going to start with the '318 patent. And if you see in your juror notebook, and you want to find a patent, the number's right up here, '318.

Y'all with me?

This here is called the title of the patent. Okay? This is a Light-Trapping Optical Cover.

You see that?

Now I'm showing you the '089 patent. And if you go with me to the title, we see Light-Converting System Employing Planar Light-Trapping and Light-Absorbing Structures.

We're going to call these two patents, when we work through this case -- it's going to be pretty creative. Ready? -- the "light-trapping patents." Okay? It's right in the title. Light trapping.

Now, here's what I want you to watch for. If you're going down to Best Buy, okay, and you're looking for a display monitor like this one or the ones that are in front of y'all, are you going to walk down the aisle and say, Mr. or Mrs. Best Buy employee, can you show me the displays that trap light inside of them?

Anybody going to ask that? Okay. This is not church. When I ask rhetorical questions, I

52

don't expect you to raise your hands.  All right?

Here's the deal.  Solar panels trap light.  Because the sun comes down.  The light goes in. It gets converted and absorbed into electricity and it's gone.  Light's gone.  We now have electricity. That's what solar collectors do.  It's not what displays do.

If you have a display that traps light, you know what you're going to get?  A black screen. Because all we see is light.  We don't actually see -- like this piece of wood in front of you, you're not actually seeing that piece of wood.  You're seeing light reflecting off that piece of wood.

If you shut and trap light in a display, it's not a display.  Okay?  That's true.  We don't use light-trapping systems.

And before I leave those two, ladies and gentleman, I just want to add, when we look through these patents, you're not going to see a single mention of a display or a monitor or anything like that. They're just not about that.  Dr. Vasylyev and his lawyers are outside their lane.

Two more patents.  This is the second kernel of truth I want you to watch for.

These two patents are -- we call them

53

"related."  The technical term is a "continuation."  Right?  That means they have the same specifications, the words, the same figures.  The claims of these patents are different.  All right?

So I'm going to show you the '342.  Okay?  The '342 patent is titled The Collimating Illumination System.

Now, I want to give Dr. Vasylyev and his team some credit here.  These patents actually do put light out.  Okay?  They're not trapping it in like the others.  They started from a light-trapping system.  And you heard counsel on the other side talk about this.  It's called the "reversibility of light."  Okay?

Now, I'm going to go real deep here.  We're going to look at a figure.  If you turn with me or just follow along on the screen, these are the figures.  Okay?

Now, if we look at Figure 13.  And you can take notes on your patents all you want.  So everybody had a chance to turn there if they want to.

Okay.  Here's light in Figure 13 coming into this system from the top like that.  It's hitting some optical elements.  If we track this one through, it will hit this deflecting feature down here, and then the light is all bouncing this way.  Okay?

54

Over here, 45, we have a solar cell. That's light trapping, okay, where you're sucking up the light, turning it into energy.

Now, this reversibility of light concept, I've got to turn back a few figures. If you could join me at Figure 27.

Everyone have a chance to join me there? Thank you.

Now, here, instead of a solar cell, we have a light source over here. Okay? So we're not sucking the light in. Now we're pushing the light out. But the light follows the reverse path. It heads this way. Eventually hits one of these deflectors and gets shot up like this.

Y'all see that? That's called "collimating light." "Collimating" is like a 50-cent word. Right? It just means putting out light in narrow beams. Narrow beams.

Here's my question for you as you watch the evidence: Do you want narrow beams of light coming out of a display monitor? Is that what you're looking for when you go to Best Buy? Because I can tell you the result of that.

If you're sitting, watching your TV -- switch to a pen here -- and you're sitting in this

55

area, you will be okay. Okay? Because you can see some light. It might not be great because it's coming out in beams, but you can at least see it.

But now slide down your couch, all right, to your recliner that's at the end of the couch. And we're going to sit ourselves over here. Anybody see a problem? We are not okay.

Here's the truth: You can reverse light all day long from a solar collector, but simply pumping light out of a solar collector backwards does not make for a good display design at all.

These monitors from -- I mean, even the ones in the courtroom, but like you're going to see from my client, they go for the widest viewing angle possible. That means they are spraying light everywhere they can.

Our monitors are spec'd to a 178-degree viewing angle. That's side to side, top to bottom. What does that mean, to help you orient? Can y'all see this display up here? I'm straight on. This would be, you know, coming straight out. But can you see this monitor from an angle? Yes.

It's 178 degrees. So you can be almost beside it. I'm sorry, ladies. I know you can't see it. But you can be almost beside it and see monitors

because they're blasting light out all over the place.

Monitors do the exact opposite of collimating light.  They scatter the light from the very get-go.  The design that Dr. Vasylyev came up with to reverse light just doesn't work for monitors.  That's the truth.

Now, I'm going to come back to this point.  We've heard that Dr. Vasylyev's designs improved the lighting.  They reduce energy consumption.  They improve the color of light.

Where's the evidence of any of that?  Where will it be?  We would need to see something, right, to show us that that's the case.

My dad grew up in Missouri before he moved to Kansas.  Anybody know the slogan of the Missouri -- of the state of Missouri?  It's the "Show-Me" state.  It's still on the license plate.

And I remember back in the day, my mom used to take me to church every Sunday, and I say my mom because my dad was already there.  My mom would take me to church, and she'd let me sit in the seats.  This is when I was a little kid, like eight, nine years old.  I had to actually listen when I got older.

But then she gave me a bulletin, she gave me a hymnal, and she gave me a pencil.  And one of the

things I'd like to do is draw plans for paper airplanes while I sat listening to the service.

When I came out of the service and talked to my dad, I'd say, Dad, this thing -- this glider that I've drawn is going to be awesome. It's the most amazing glider that I've ever drawn.

You know what my dad would do? Well, son, you're going to have to show me. He didn't let me brag about anything. You're going to have to show me. And he thought that was funny because he's coming from the state of Missouri.

But here's the deal. It's right.

You can say stuff all day long if you never build it. If you never try your idea, you can say whatever you want about it, but you can't prove it because there's nothing to show. Okay? His design does not work for display monitors.

We're going to have Dr. Goossen.

If you could stand up.

This is our expert. Okay? He's been in the industry for 35 years. He's a professor. He works at the University of Delaware. He's a good teacher. He's in the classroom all the time. He's going to do his very best to explain the details of all this to you. Okay?

58

But those are the kernels of truth.

Another kernel of truth that I want you to look for, there are no partners in this case. We heard during voir dire from my colleague that Dr. Vasylyev has found partners. They're not partners.

Samsung --

THE COURT: Counsel, you have five minutes.

MR. BURESH: Thank you very much, Your Honor.

Samsung that you heard about a little bit from my colleague, they were sued, just like ASUS, by Dr. Vasylyev. Samsung made the decision to settle their lawsuit. That's not a partner.

We are very excited and proud to present our case to you, but I can tell you, we're not happy to be here. You don't want to get sued when you wake up in the morning. It's not a good feeling. But when you are, when you're accused, you defend yourself.

Samsung made the choice of settlement. ████████████████████████████████████████ ████████ Okay? You're going to see the evidence of that.

Here's the deal. Samsung we've all heard of. They're a huge company. TVs, display monitors,

59

phones, all that. Their relevant sales for their products are 40 times larger than my client's. 40 times larger. ███████████████████████████ ████████████████████ Okay? Fraction of the size, paying a multiple more. On what planet does that make sense?

You've heard about regressions. I hear the term "regression," I'll tell you what I think about. Political polls. Regressions are used all the time in political polls.

Here's something we know about political polls: Regardless of what side you're on, they're not right. We've seen entire elections go the other way from what the polls were saying.

Because here's the truth. Whoever's paying for the poll gets whatever result they want. Because you can pay people to put garbage in and get garbage out. The simple truth is, look at what happens in the real world. Because we know that in this case. We know that.

But don't be confused here. When I talk about Samsung and that stuff like that, it's not because I think we infringe. We don't. But put yourself in our shoes. If you were accused of infringement and there's these -- or accused of

60

anything and there's these other kind of big pile of stuff that goes along with it, you say no to all of it.

Wouldn't you?

And that's what we're doing here.  But don't forget the main idea.  The main idea is this: ASUS does not use Dr. Vasylyev's patents.  That's the plain and simple truth.

When I stand back up in, let's say, three days, that's what I'm going to ask you to find.  That's what I'm going to ask you to decide is the truth. Follow along with us.  Toss the stuff up that you hear. See what the wind blows away.  Stay focused on the truth.

Thank you very much.

THE COURT:  Thank you, sir.

Counsel, do you have a witness?

MR. MCCARTY:  Your Honor, plaintiffs call Dr. Sergiy Vasylyev.

(The witness was sworn.)

DIRECT EXAMINATION

BY MR. MCCARTY:

Q.    Good morning.

A.    Good morning.

Q.    Would you please introduce yourself to the jury?

A.   Sure.  My name is Sergiy Vasylyev.

Q.   Are you a Dr. Vasylyev?

A.   Yes, sir.  I have Ph.D. in physics and mathematics.

Q.   And what is your role in this case, sir?

A.   I'm here to testify about my company and my technologies.

So I'm the CEO and the founder of SVV, and I'm also the inventor on the patents at issue in this case.

Q.   You mentioned that you're the inventor on the patents, correct?

A.   That is correct.

Q.   Now, during Mr. Buresh's opening statement, when he was showing the patents, he showed the title.

Do you recall that?

A.   Yes.  I do, sir.

Q.   He showed a couple figures.

Do you recall that?

A.   Yes, sir.

Q.   Did he go through the patent claims in the patent?

A.   Not at all, sir.

Q.   When the jury's determining infringement in this case, do they look at the title of the patent or do they look at the claims of the patent?

A.    They look at the claim.  The claims.

Q.    You mentioned your company is SVV.

Where's that company based?

A.    We're based in Sacramento, California.

Q.    Is that accent of yours from Sacramento?

A.    Oh, no, no.  I've lived in the United States for about 25 years, but I was originally born in Eastern Europe.  So I'll try to speak, like, slowly so the jury can understand me better.

Q.    Are you a U.S. citizen?

A.    Oh, yes.

Q.    Okay.  How long have you been a citizen for?

A.    Next March it'll be 19 years.  I remember the date quite well.  That was a very important event in my life.

Q.    What about your company, SVV, is that a U.S. company?

A.    Yes.  It is a U.S. company.

Q.    Tell us about SVV.  What kind of company is it?  What does it do?

A.    Yeah.  So we are an innovation company.  Our products and technology is a range from, like, commercial lighting to some bigger projects like energy, including, like, solar energy that we receive from the sun.

63

Q.    What kind of -- actually, as the founder and CEO of that company, are you kind of on a day-to-day more on the technical side, or do you work on the business side with the books and the accounting and all that?

A.    Yeah, obviously as the CEO, I take, like, a lot of business, you know, responsibilities, but my real passion is in the technology.

Q.    And when did you create this company?

A.    In the -- 2000, so it was 24 years ago.

Q.    And who are some of SVV's customers on the commercial side?

A.    So our customers depend on the projects, so you ask me about the commercial customers.  Some examples include, like, Corning Incorporated, OptoGlo, Acuity Brands.

Q.    This may sound a little bit different, but are some of SVV's customers governments and utility companies?

A.    Yes.  So some examples would be like federal governmental agencies, also state governmental agencies, and some municipal entities as well.

Q.    Did you bring some slides that we can look at today to help the jury?

A.    Yes.

64

MR. MCCARTY:  Could you put that up, Mr. Diaz?  Thanks.

BY MR. MCCARTY:

Q.    So what are you showing on the screen here?

A.    So this is our office there in Sacramento.

Q.    It says Lucent Optics on the top.  What's that all about?

A.    So when I started my company 24 years ago, I named it SVV because these are just my initials, and at the time it was just me.

But over time, I just wanted a better brand that would better describe the focus of my company and also be, you know, more memorable by the -- our customers.  And, basically, "lucent" means glowing with light.

Q.    And what are those logos on the right, then, next to your -- next to your building?

A.    Yeah.  These are some of our past customers that I mentioned before, like Corning, Acuity Brands, and others.

Q.    And has your company won any awards for its technology?

A.    Yes.  And I list just a couple on the bottom.

Q.    What's the -- you know, pick one -- what's the TechConnect award about?

65

A.    So we won that national innovation award, and that award recognizes technologies that can make big impacts on specific industry sectors.

Q.    Are these some of your company's products?

A.    Yes, sir.

Q.    Can you just walk us through and talk about them?

A.    Yeah, so these are just some examples.  So on the left you can see our mobile solar energy appliance.  It's unique in that it allows to capture the free energy from the sun and produce both heat and electricity at the same time.

And in the middle are -- you see our window film, which we call Daylighting Fabric.  It's also unique in a way because if you put it on a window, it redirects the daylight, the free energy from the sun, towards the ceiling and deep into the space so your space can be illuminated more brightly using natural light, and you can reduce your reliance on electrical light.

And on the right, it's one of our -- another innovation, which is a flexible LED lighting panel.  It's essentially the world's first flexible LED panel and also the industry's thinnest in that category.

MR. MCCARTY:  Mr. Diaz, would you be able

to go to my client's website?

BY MR. MCCARTY:

Q.    So that's lucentoptics.com, right, sir?

A.    Lucentoptics.com, right.

MR. MCCARTY:  If you'd go to the
Innovation tab, that'd be good.  It's on the top there.
Thank you.

BY MR. MCCARTY:

Q.    In opening statements, I think ASUSTeK's
lawyer mentioned that your business, quote, has nothing
to do with backlights or displays.

Did you hear that?

A.    Yes, sir.  Very clearly.

Q.    Yeah, and some of the innovations here,
what --

MR. MCCARTY:  If you go up a little bit.

BY MR. MCCARTY:

Q.    -- on the right, what is that talking about
there, sir?

A.    It says:  Advanced light coupling and
oucoupling for LCD displays.

Q.    And it says:  Helping improve the brightness
of LCD displays using advanced backlight
configurations.  Correct?

A.    That is correct.

Q.    Are the products at issue in this case LCD displays?

A.    They're not.

Q.    They're LCD monitors, correct?

A.    Right.  I mean, they -- the products in this case, yes, LCD monitors, yeah.

Q.    With backlights?

A.    Yes.  They include backlights as the main component.

Q.    Thank you.

        MR. MCCARTY:  You can go back to our slides, Mr. Diaz.

BY MR. MCCARTY:

Q.    You mentioned that SVV also works in collaboration with some kind of governmental entities. Can you talk about some of those projects?

A.    Yeah. Sure.  So some of our partners have been quoted, the United States Department of Energy, also the National Science Foundation and California Energy Commission, and some others as well.

Q.    Can you give us an example -- let's just pick one.  Let's do the U.S. Department of Energy.  Can you tell us about one of the projects that you worked on with them?

A.    Yeah.  Sure.  So that project actually

included our LED -- flexible LED lighting panel that -- similar to what we just saw on one of the previous slides.

So we proposed our LED lighting panel to replace the old and bulky fluorescent fixtures, the lights that you can oftentimes see, like, in the ceilings, like in office buildings and the like. There's, like, more energy efficient and cheaper technology.

And the Department of Energy determined that our technology was innovative and potentially impactful, and they actually funded this project to develop this technology.

Q.   Was the project a big success?

A.   It was huge success.  Yes.  The Department of Energy liked the technology and also the outcome of that project.  And they even came back just this last summer and awarded us with two more projects to develop our manufacturing capabilities and also some applications of these panels.

Q.   Thank you.

I may be outing myself as like not knowing a lot about how that process works, but is it competitive when you're talking about working with some entity like the U.S. Department of Energy?

69

A.    It is extremely competitive.  There are many companies applying and they all have some competitive technologies, and the success rate to get this funding is very, very low.

Q.    And they picked SVV?

A.    Yes, sir.

Q.    So now that we know a bit about your company, can we learn about you?

A.    Yes.  Absolutely.

Q.    How old are you, sir?

A.    I'm 56.

Q.    Are you married?  Do you have kids?

A.    Yes.  I have a wife and two sons; ages 23 and 28.

Q.    What does your wife do?

A.    She has a science background just like me. This is how we met.  We had physics class together. And after working as a schoolteacher for a while, and also besides raising our kids, she also helps run SVV with me.  Mostly on the administrative side.

Q.    What about your sons?  Are they following your (sic) dad's footsteps and becoming scientists?

A.    Yeah, quite a bit.  At least partially.  So my older son is starting astrophysics towards his Ph.D. at the University of California in Berkeley.  And my

70

younger son just graduated with master's degree in technology management from the University of California in Santa Barbara.

Q.   Congratulations.

A.   Thank you.

Q.   Did those boys give you and your wife any grandbabies yet?

A.   Not yet, but my wife keeps her fingers crossed that this will happen soon.

Q.   And where do you live?

A.   I live in Elk Grove.  It's a small town near Sacramento.

Q.   Where'd you grow up?

A.   I grew up in Eastern Europe, and this is where my accent comes from.

Q.   When you were growing up, what'd your parents do?

A.   They both were scientists, actually.  And they studied astrophysics, and my father eventually became a university professor and my mom became an engineer.

Q.   When you were growing up, was your family wealthy?

A.   Oh, not at all.  No.  Actually, when I was young, we couldn't even afford dining out.  It wasn't until both of my parents obtained their Ph.D.s, it's

only then we could start going to, like, a restaurant. And only on special occasions. Just to give an example.

Q.   What made times hard at that, you know, period of history for a family like yours?

A.   Well, at that point of time and the place where I lived, there was very little money.  And the government basically controlled and owned everything.

Q.   What did you want to be when you grew up?

A.   I wanted to be a great scientist just like my dad.

Q.   What are you showing here?

A.   It is actually me and my dad.  I'm just about like two years old here, apparently inspecting the telescope.

Q.   Did you share his passion for studying physics?

A.   Yes.  Sure.

Q.   Were you a good student?

A.   Yes.  So I shared his passion in science, in physics and optics and especially in light and ways of studying light.  And I think I was a good student.  I received some scholarship -- actually, almost always received scholarships based on my academic achievement and also later received very prestigious fellowship in

my field.

Q.   What are your degrees in again?

A.   So my -- I have a master's in physics and astronomy and also a Ph.D. in physics and mathematics.

Q.   Did you develop some specialities in the field?

A.   Yes.

Q.   And what are those in?

A.   I became an expert in optics and light, especially in the ways of using light in different innovative ways.

Q.   And what does the field of light encompass?

A.   Well, light is actually a very big field of technology.  And if you -- when people think about light, they might think like of sunlight or a light bulb, but it -- the science of light is actually much more complicated.

Q.   So let's ask the million-dollar question: What is light?

A.   Well, light in simple terms can be described as an electromagnetic wave that moves from one place to another.

Q.   Are all light waves the same?

A.   Not at all.  And that's actually how we perceive the colors.

73

Q.   So what are we seeing here?

A.   So it's like longer wavelengths of light give you those like oranges and red that you can see on the bottom, and the shorter wavelengths give you like the blue and purple, for example.

Q.   Are all electromagnetic waves visible to the humans as colors on that spectrum?

A.   No.   Actually, the spectrum is so broad, and there are portions of that spectrum that are invisible to the human's eye, for example, radio waves.

Q.   Is that what you're showing here on the screen?

A.   Yes.   That is a broader spectrum.

Q.   Now, we've been talking about light as like a single oscillating wave.

Is light a little bit more complicated than that?

A.   It is much more complicated.   It actually includes many different wavelengths and also many waves that are mixed together.

Q.   Can you help the jury understand a little bit about how light behaves?

A.   Right.   So light actually can be very difficult to control at times because it behaves differently based on the object it encounters.

74

Q.    Okay.  So let's look at a beam of light here. Let's say we emit a beam of light from a light source. Does it go on forever?

A.    Yeah.  So if you emit a beam of light like that, it can propagate very long distances until it strikes an object.

Q.    What do you mean by "an object" or "an obstacle"?

A.    Well, for example, we have like a smooth and shiny surface like glass.  Light will just bounce off it at the same angle against the surface.

Q.    Is there a hypertechnical scientific term for something that reflects light?

A.    A mirror.

Q.    Okay.  All right.  Now, what are you showing here that's a little bit different?

A.    It's another fascinating property and behavior of light.  It's when it meets a boundary between one optical medium and another, like between two different materials, it bends.

Q.    And is that called "refraction"?

A.    And it is called "refraction."

Q.    And what makes light -- a light wave bend in refraction?

A.    So when the light travels from one medium to

another, the speed of light changes and that's what -- that causes light to bend.

Q.   Doesn't all light move at the same speed of light?

A.   Yes.  But the speed of light actually depends on the medium.  So, for example, the speed of light in air is different than the speed of light in water.

Q.   Is a lens a common device for refracting light?

A.   That would be a very common popular device.

Q.   Okay.  Is there another behavior of light that relates to reflection and refraction that you want to talk about?

A.   Yes.  And yet another fascinating and important property of light is the so-called "total internal reflection."

Q.   Can you describe what total internal reflection is?

A.   Right.  So this is a phenomenon that occurs when the light strikes a denser medium and actually strikes a boundary of it.  After a certain angle, it no longer refracts but instead can reflect back into the medium without exiting.

Q.   Can you kind of describe what we're seeing on the screen here?

76

A.   Yeah.  So as we see here, the light strikes the top surface.  And as you move the, you know, angle of light further, it still reflects inside without exiting, without escaping.

Q.   And if we add another surface maybe on the bottom, what are we seeing here?  Does the TIR continue on on the top and the bottom?

A.   Right.  This phenomenon, the TIR, which is short for the total internal reflection, occurs at both surfaces.  And this is how you can trap light and let it propagate long distances without having it to escape.

Q.   Now that we have the basics, how are these concepts used in various applications?

A.   So these mechanisms and these properties and behaviors of light are very, very useful in different applications, including the backlights for LCD supplies.

Q.   Now, we talked about your background.  We got some kind of technical basics down about light.  I want to hear about how you came to start SVV, the company.

A.   Sure.

Q.   Did that have something to do with you coming to the United States?

A.   Yes.  Actually, that is what coming to United

States has allowed me to do.

Q.   Tell me about that transition from where you were born and grew up to the United States.

A.   Right.  So as I mentioned, I was born outside of the United States, and I came here about 25 years ago.  And I started my company shortly after I came.

Q.   And about what year was that and who came over?

A.   Yeah.  So I came here in 1999, and it was just me, my wife, and our older son, who at that time was just a little baby.

Q.   Was that difficult leaving your home, your family, and kind of coming to the United States with just your wife and your newborn baby?

A.   Yes.  It was extremely difficult.  So we had to leave our families, our friends, our belongings, pretty much everything.

Q.   What were you looking for in kind of dropping everything and coming here?

A.   American dream.

Q.   And what does that mean to you?

A.   To me, it means to live in a place where I could raise my family in a safe neighborhood, where my kids can get a good education, when there is a freedom, which is important, where I could also innovate in my

78

scientific field and create new technologies and products that improve other businesses and enhance lives of other people.  And where if I work hard and do the right things, I could build a better life for my family.

Q.    Did you want to own your own business?

A.    Yes.  I have always wanted to have my own business.

Q.    So once you got to the United States, did you start your company, SVV?

A.    Yes.  I started shortly after arriving to the United States.

Q.    And did you hit it big right away?

A.    Not at all.  This is actually when all the hard work was just beginning.

Q.    So right away, if you weren't able to make enough money to put food on the table early on, did you have to take on other jobs and opportunities?

A.    Yeah.  So I had to take parallel jobs just to make ends meet.

Q.    So when you first got here, you started a company.

What other jobs did you do in order to make ends meet?

A.    Yeah.  For example, I was hired by the

Sacramento County Sheriff's Department to fix their emergency dispatch system, which was basically failing and was causing a lot of officers and public safety issues.

Q. So how could a young light scientist like yourself, at the time, help fix a security system for the sheriff's department in Sacramento?

A. Yeah. So what happened was that that system was almost entirely software based, and I happened to have a very deep expertise in software development. And also knew that if I put enough effort, I would be able to do it.

Q. And did you fix the system for them?

A. Yes. That was a successful job, and I was able to fix that system. And that system had run after that for a number of years.

Q. So while you were working at the sheriff's department in Sacramento, did you have any time left over for the company, SVV?

A. Very little. So I had to work nights and, you know, many, many hours after my daytime job to actually continue working for SVV and innovating in my field.

Q. So you're working sort of a 9:00 to 5:00 ordinary job, and then in the nights and weekends in the garage with SVV?

80

A.    Yes.

Q.    At some point in time, did you guys have your first big achievement at SVV?

A.    Yes.  For example, we have developed a first of a kind solar concentrator.

Q.    Did you prototype that design?

A.    Yes.  And we build that product, a working prototype of that.

Q.    What are we seeing on the screen here?

A.    So on the left you see me holding that prototype.  It's the concentrator, which is called "slat" or a "concentrator."  And on the right, it's my dad and I next to a smaller version of similar concentrator that we built together.

Q.    I think I know the answer.  I can tell by the fashion.  But was this the early days of SVV?

A.    Yeah.  It was like in mid-2000s.

Q.    And so does this solar concentrator receive any recognition in the industry?

A.    Yes.  Write-ups, like in the local magazines.  Also, it was noted by many researchers in the solar industry field.  So they referenced our developments, and also we received some awards.  And we've got two U.S. patents for that and received some research grants for that as well.

81

Q.    What are you showing here?

A.    So these are some of the local magazines that I mentioned that wrote about my -- our company and our technology.

Q.    What was so notable about the original solar concentrator prototype that y'all had made?

A.    So it was managing light very efficiently, and we were able to make it such that it didn't waste any light.

Q.    How did this -- or how did you design this concentrator to work so efficiently with the light?

A.    We spent actually years iterating and employing different tools and also expanding and prototyping.  And one of the tools we used was the so-called optical modeling and ray tracing.

Q.    Can you show us what that looks like?

A.    Yeah.  So that's example how like ray tracing works, where we essentially trace the behavior of thousands and thousands of light waves through our system.

Q.    Is this another example of that ray tracing?

A.    Yes.  It is.  And this one is specifically for light collecting application.

Q.    And as you were working on all this optical modeling, what did you discover as it relates to

applying your inventions to the emission of light like in lighting displays?

A.    That the same principles can be equally applied for whether you want to collect light or you want to emit light.

Q.    And does that refer to the inventions that we're here in court for today?

A.    Yes, sir.

Q.    Can you help us understand those inventions?

A.    Yes.  Will be happy to.

Q.    When you were first starting your research, what did the --

THE COURT:  Counsel, this seems like a good breaking place.

MR. MCCARTY:  It'd be great.  Yeah. Thank you.

THE COURT:  Ladies and gentleman, a couple of things.  We take a break, a recess, in the morning and in the afternoon of 10 or 15 minutes. Whenever we take a break, whether it's during the day or this evening when you go home, there are a couple of rules you have to abide by.

The first is that you can't talk about the case until you begin deliberating on Friday.  I don't care what else you talk about.  If it were me,

I'd talk about the Longhorns winning or the Cowboys losing.  But that's me, not you.  So -- but you're free to talk about whatever you want.

Number two, my sons who are in college tell me there's social media.  I'm unfamiliar with it, but I'm aware that it exists.  I'm not saying you can't be on social media, but please don't post anything about the trial while you're serving on the jury.

And finally, the technology that we are hearing about is fascinating to me.  But the lawyers have worked extremely hard to put together their views of the case to present it to you here in the courtroom.  So don't feel like you'll be helping them by going and doing your own research.

What the lawyers want and what I'm instructing you to do is to listen to the evidence that's presented this week and make your decision based only on the evidence and not any independent research that you might want to perform on your own.

From now on I'll just say:  Please remember my instructions.  But those are what the instructions are.  So we'll take a short recess and we'll be back in about 10 or 15 minutes.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

THE COURT:  You may be seated.

Doctor, you may step down.

My sense is that we have --

This doesn't need to be on the record.

(Off-the-record discussion.)

THE COURT:  Anything we need to take up?

MR. BURESH:  No, Your Honor.  Thank you.

(Recess taken.)

THE BAILIFF:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT:  Thank you.  You may be seated.

Doctor, you may be seated.

Counsel?

MR. MCCARTY:  Thank you, Your Honor.  May I proceed?

THE COURT:  Please.

MR. MCCARTY:  All right.

BY MR. MCCARTY:

Q.    So picking up where we left off, when you were first starting your research, what did display technology look like?

A.    Yeah.  At that time the displays were mostly

85

like large and bulky and very, very inefficient.  And the -- you can, you know, judge the bulkiness, like based on this picture, for example.

Q.    What made those old large, like, TV screens in this instance, very large and bulky?

A.    They required like different projection kind of optics to direct light towards the screen so that the images and -- light and images could be brought towards you, and also they required the bulky and inefficient light sources.

Q.    And so how did those old systems work on some of those older displays?

A.    So the light source was illuminating different optical components, and that light was redirected towards the screen so you can see images on it.

Q.    At some point did the industry start moving away from those older systems to something thinner?

A.    Yes.

Q.    And what are you showing there on the back labeled LEDs?  What are those?

A.    This is the so-called full array, a full LED array backlight where you use a bunch of small light sources called "LEDs" arranged in rows and columns to illuminate that screen.

Q.    Did the transition to LEDs in screens cause

any problems?

A.    It was causing initially a lot of problems even though the intent was to make thinner displays, but actually, using the LEDs in that way created hot spots on the screen and various non-uniformities.

Q.    So why did the introduction of LEDs cause inconsistencies in light on the screen like hot spots?

A.    Because you can think of LED, which stands for light-emitting diode, as a very concentrated light source in a small package.  And when you have them at distances from one another, it will create these hot spots on the screen, like a series of like brighter areas and darker areas that would be very unpleasant.

Q.    So what were these manufacturers doing to avoid hot spots?

A.    So they had to keep a distance between the LEDs and the screen.  And in addition to that, they had to use a bunch of, like, costly optical components called "diffusers" which added to the cost and also prevented them to actually make really thin displays.

Q.    Did your technology help solve these problems?

A.    Yes.  It does, sir.

Q.    Okay.  What is one aspect of your technology that you introduced?

A.    Well, I didn't focus on array-based LEDs.

Instead I used like a single strip of LEDs along one edge of the display.  And that would be called "edge-lit LED backlight system."

Q.    If you'd transition from like the full array grid of lights to just an edge, does that mean that like only the bottom of the screen in this instance would be illuminated?

A.    Yes.  And that was one of the biggest problems initially.

Q.    So how did you address that?

A.    So I used the very specialized optical device which is called "optical waveguide" that I used to actually take that light from the LEDs and spread it evenly across the entire screen.  And that what created uniform illumination on the screen.

Q.    Were you the first person ever to use a waveguide?

A.    No, sir.

Q.    What are two ways that your waveguide helped solve the problems that we just walked through?

A.    So it was a very special kind and concentration of the waveguide.  For the first time it used like microstructures on the bottom and formed in a pattern.  And also, these microstructures were coupled to parallel lenses formed in the top surface of that

waveguide.

Q.    So we've got two there.  Let's start with the first one, the microstructures on the bottom.

Can you describe the role of the microstructures in the waveguide?

A.    Yeah.  Sure.  So microstructures I used to actually take that light out of the waveguide and direct towards the lenses.

Q.    In this example, what are some important features of the microstructures?

A.    So by using these microstructures, especially when they're arranged in the ways I invented, you can spread light evenly over long distance over large display area and extract it from the waveguide and emit towards you in a very uniform way.

Q.    Are these microstructures in some sort of pattern?

A.    Yes.  They're formed in a pattern.

(Clarification by Reporter.)

BY MR. MCCARTY:

Q.    And is the pattern -- can there be a random pattern or an irregular pattern?

A.    My patterns display different kinds of patterns, but it include regular patterns and also includes random or randomized patterns as well.

Q.   And how can something be a randomized pattern? Those seem like opposites of one another.

A.   Right.  So basically there needs to be a pattern to be able to control how you extract and emit that light to make the system efficient.  But also, you need the pattern to be randomized so that you avoid different unpleasant visual effects like nonuniformity, so you can make the light vary and very uniform.

Q.   What else did you pair and align with those microstructures?

A.   So I paired those microstructures with the linear cylindrical lenses which are arranged in parallel in the top surface of the waveguide.

Q.   And how do the microstructures align with the parallel lenses on top?

A.   Right.  So they're aligned relatively to other -- one another, and that allows you to direct light better towards the screen.

Q.   And we talked about collimation a little bit in opening.

Is it important to have some collimation on these products?

A.   Well, it -- there are circumstances when the collimation is important.  And for the most part, yes. It is important because it allows you to -- not only to

more efficiently use light but also to make the display brighter.

But it doesn't mean that all light has to go towards like a perpendicular, towards one direction. No.  It still go to different direction and still be considered collimated.

Q.    Can you show us how this waveguide would work using a figure from your patents?

A.    Absolutely.

Q.    Okay.  So what are you showing on the right here?  Is that a figure from one of your patents?

A.    Yes.  It's like a colored figure from my patent, and you can see these microstructures on the left side which are numbered with -- as 14.

Q.    And what are you showing on the top there, like the little white kind of semicircle on the top?

A.    So that is our light source, which can be LED, the light-emitting diode.

Q.    What happens when you turn that LED on?

A.    So that LED actually sends light towards the edge of the waveguide, and that light propagates through the waveguide, is extracted by those microstructures, directed to the lenses, and the lenses then further collimate and direct light better towards the display.

Q.    Let's slow that down a little bit.

First, focusing on the two aspects we discussed earlier, where are the microstructures in this example?

A.    In this example on the right, so they're shown like on the left, leftmost surface.  And they're numbered 14.

Q.    And what about the lenses?

A.    And these are shown on the right side, and the numbers are 6.

Q.    And it looks like there's a gap in the middle.

Does there have to be a gap there?

A.    No.  It doesn't have to be.  It's just one of these implementations.  But also in my patents, I describe implementations where there's no gap at all.

Q.    So those can be directly adjacent to one another?

A.    Yes.  It can be made as a monolithic structure.

Q.    So let's play that animation again, but let's go slowly this time.  And can you explain what's happening?

A.    Right.  So you see like these individual lines which we call "light rays."  And so those light rays propagate through the light guide because they're

received on the edge.  And then they propagate far enough until they heat these microstructures.

And the microstructures are designed in a special way to redirect that light towards the lenses so that the light can be further shaped and the diversions angle can be controlled better and directed better towards the screen so you can see the images more clearly and higher brightness.

Q.   So if we kind of zoom in to really figure out what's going on, why is that light not shooting off to the right when it hits that first surface?

A.   Yeah.  Remember I was talking about the fascinating property of light, the total internal reflection.  This is actually what is happening here.  So we have the total internal reflection of the surface of the waveguide.  So light does not escape; instead, remains trapped in the light guide.

Q.   Is that what the trapping can refer to?

A.   Yes.  That can refer to this particular mechanism as well.

Q.   I see that it -- a layer called "quantum dots."

Does that refer to the colorful vials that Mr. Caldwell showed to the jury in opening?

A.   Yes, sir.  It does.

Q.    Okay.  And how does your invention and waveguide pair with those quantum dots?

A.    Yes.  So if you add a layer that contains these quantum dots, then you can significantly improve the color gamuts of the images that you see on the screen.

Q.    What is a quantum dot?

A.    So quantum dot is a very, very small particle called a "nanoparticles."  And that they -- the color they emit light depends on the size of that nanoparticle.

Q.    Why are you showing the red, green, and blue dots here?

A.    Because in order to make the so-called RGB displays -- displayed -- and this is the type of displays that are currently made -- you need like three colors, like red, green, and blue.

So theoretically, you would need like three types of quantum dots, but in the actual displays, because the blue quantum dots are very expensive to make, you can use just blue backlight, blue LEDs, for example, and only use two remaining colors.

Quantum dot -- quantum dots is two remaining colors, like green and red.  And this is how you still can make RGB display.

94

Q.    Are there some other attempts around the same time as you at solving similar problems?

A.    Yes.  There were lots of attempts.

Q.    And what were some of the problems with others -- others' attempted solutions?

A.    Yeah.  So they use like different types of light guides, different shapes, configurations.  And for the most part, they were like using this jagged surfaces which were not efficient at guiding light and were not useful for creating large displays with uniform emission in this high efficiency.

Q.    And what about on the prisms on the right?  What's wrong with that?

A.    So some developers also tried to add prisms to those waveguides, but that didn't work well either because prisms are -- were used like to disperse light.  But they're not useful for controlling light in the way that would be useful for displays.

Q.    Now, did you hear in opening about how ASUSTeK said they have been making screens since like the early 2000s?

A.    Yes, sir.  I do remember.

Q.    I'm about to get to the patents.

Roughly, when did you file for your original patents?  What years?

A.    It was in 2009.

Q.    Okay.  And what were the state of the displays around that time?

A.    Yeah.  So at that time, most displays were bulky and inefficient.  And even though there were already some so-called flat panel displays on the market, they were still not as thin as they are today.  And they were very inefficient.  And they were not even using for the most part LEDs.  They were using instead the so-called fluorescent tubes.

Q.    So the products at the time were using fluorescent tubes?

A.    Yes.  For the most part.

Q.    Did you bring an example product of SVV's that you can walk through with the jury to show your breakthroughs?

A.    Yes, sir.

MR. MCCARTY:  Your Honor, can the witness leave the witness stand and show the demonstrative?

THE COURT:  Sure.

MR. MCCARTY:  Thank you.

BY MR. MCCARTY:

Q.    Okay.  So what are we looking at here, sir?

A.    So we're looking at the flexible LED lighting panel that we have developed and are proud of the --

96

you know, being manufactured in the United States.

Q. And what makes this panel sort of interesting and special?

A. There are many things. First of all, it is flexible. Then it is transparent, as you can see. Then it is extremely lightweight. It also uses very few raw materials, and the components for making this panel are relatively inexpensive. So it saves the cost of making this panel, and it's very efficient.

Q. And what happens when you turn it on?

A. It becomes -- when you turn it on, it becomes a very uniform, super bright, beautiful light source that can be used in many, many applications from just general lighting to LCD displays and the like.

Q. And are there actual lights sort of on the screen or on the film where it's all lit up, or are there light sources elsewhere?

A. And that's the beauty of this design, is that there are no light sources across the area. So all light sources, which are in this case LEDs, are located in this -- within these narrow strips at the edges.

Q. So is this an edge-lit panel?

A. This is an edge-lit panel.

Q. Thank you.

Now, how does the light, once it comes from

the edge, kind of get emitted, you know, across the whole -- across the whole film?

A.    So the secret sauce here is that it includes a pattern, a specially designed pattern of microstructures which are distributed over the surface of the waveguide.  So you have a waveguide and the large number of microstructures, possibly millions of them.

Q.    And are those perfectly precisely patterned in a random fashion?

A.    So there is -- it is a pattern, but at the same time it is a randomized pattern.

Q.    Thank you.

So did this product of yours win any awards or recognition in the industry?

A.    Yes, sir.  For example, the well-known Illuminating Engineering Society has recognized this product as a unique and significant advancement in the art and science of lighting.

Q.    And what would this product be used for?

A.    So this product would be useful for a variety of applications.  They range from like replacing fluorescent pictures and making them more efficient and also more beautiful for, you know, in appearance, also for backlighting like in the LCD displays or like LED,

like different -- different devices that you can use for advertising and so on.  So many, many applications.

Q.    Thank you.

Is this related to that big project that you were working on with the Department of Energy?

A.    Yes.  It is.

Q.    And did the Department of Energy like this technology?

A.    They liked it very much.  And actually, they even wrote a success story about that project.  And they even came up and -- with a follow-up funding to further develop this technology and also its applications.

Q.    And what was one of the big advantages of this technology?

A.    It's reducing the cost and also saving energy.

Q.    Thank you.

You can set that down and we'll get back.

So thank you for that.

One of the benefits you mentioned was the cost.  What are some of the technical benefits that are sort of unlocked by your inventions?

A.    So you can get brighter light sources of that large size.  You can also improve significantly efficiency and -- which applies equally to the LCD

displays and lighting.  But for displays particularly, you can reduce the size of the bezel on the display. You can also make this panel more uniform.  And again, very importantly, high brightness and low cost.

Q.    Thank you.

Now, once you had these inventions, did you apply for patent protection at the Patent Office?

A.    Yes.  I did.

Q.    Why?

A.    Because I wanted to protect my ideas before starting working on making products out of them.

Q.    Did you go hire a lawyer?

A.    Initially I did, but very soon after filing for patent -- patent applications, I do the process on my own.

Q.    Why did you decide to handle patent prosecution yourself?

A.    Well, so far -- first, it was extremely expensive.  I didn't have enough money.  And second, I thought if I put enough effort, I would be able to do it on my own and actually happened to be successful in that.

Q.    Now, in the spring of 2009, did you write and file at the Patent Office what's called a provisional patent application?

A.    Correct.  It was in April 2009.

Q.    Was that provisional application No. 61/214,331?

A.    Yes, sir.

Q.    Okay.  If you would, please, turn in your binder to Tab 1.

A.    Okay.  I'm here.

Q.    Is this a copy of that provisional patent application that you drafted and filed?

A.    Yes, sir.

MR. MCCARTY:  Your Honor, plaintiff moves PTX-5 for admission into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, would you please pull that exhibit up for us?

BY MR. MCCARTY:

Q.    Did this initial provisional application discuss the structure of your waveguide that we just walked through?

A.    Yes, sir.

MR. MCCARTY:  Mr. Diaz, would you go to Figure 12 on this application?

BY MR. MCCARTY:

Q.    Is this your waveguide right here, sir?

A.    Yes, sir.

Q.    Now, did you file a second provisional just shortly into the next year in March of 2010?

A.    Yes.  Around that time, just a few months later.

Q.    And is that Application 61/339,512?

A.    That is correct.

Q.    If you would, please, turn in your binder to Tab 2.

A.    Yes.

Q.    Is that document at Tab 2 a copy of that provisional patent application?

A.    Yes.  Exactly.

MR. MCCARTY:  Okay.  Your Honor, plaintiff moves PTX-6 for admission into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. MCCARTY:

Q.    Why did you file a second provisional application?

A.    Because I wanted to add some more features to the original patent applications that I wrote, and also I include some additional applications for that technology.

Q.    And did you continue to file additional

applications?

A.   Yes.  I filed many more.

Q.   Was one of the additional provisional applications Application No. 61/399,552?

A.   Yes, sir.

Q.   Okay.  Was that provisional filed just shortly after these two that we just looked at?

A.   Yes.

Q.   Now, after you had those patent filings then with the Patent Office, was SVV comfortable then going out and trying to commercialize some of its lighting solutions?

A.   Yes.  At the time, yes.

Q.   And what steps were you taking?

A.   So I did -- tried many things.  I attended trade shows.  I talked to manufacturers.  I talked to potential partners, to some larger corporations as well.  I tried to raise funding.  So I did a lot of activities on that.

Q.   Were you successful kind of breaking into that industry right then?

A.   Not quite.

Q.   Okay.  Why do you think so?

A.   Well, I encountered like a sort of resistance from like bigger industry players to work with smaller

companies like mine and consider these ideas that are not coming from them internally or somewhere else.

Q.   Do you remember any instances that come to mind during that time period?

A.   Yeah.  I talked to companies like 3M, Dell, DuPont, Flextronics, and many others.

Q.   But during this time, the patent filing was working its way through the Patent Office, right?

A.   Correct.

Q.   So eventually, did you receive some good news in October of 2012?

A.   Yes.

Q.   Okay.  What happened in that time?

A.   So the first patent in the group of patents in this case was finally issued by the United States Patent Office.

Q.   And if you'd turn to Tab 4 in your binder in front of you, is that a copy of that first issued patent, U.S. 8,290,318?

A.   Yes, sir.

MR. MCCARTY:  Your Honor, plaintiff moves JTX, Joint Exhibit 1 into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. MCCARTY:

Q.   Do you remember what it felt like knowing that the Patent Office after three years had examined your patent and granted you that patent right?

A.   Yes.  I do remember that quite well.  I felt extremely happy and proud of my accomplishment.

MR. MCCARTY:  Mr. Diaz, would you mind putting that one up on the screen?

BY MR. MCCARTY:

Q.   If you zoom into the top there, it says United States patent.  And below it is your name, correct?

A.   Yes, sir.  It is.

Q.   What are those numbers on the right?

A.   So on the right it's like a numeric identifier of the patent, which is unique to each patent.  But it's kind of mouthful.  So we usually like use a -- refer to them by the last three numbers, which would be '318 in this case.

Q.   And did the Patent Office subsequently grant the three other patents in this case following the issuance of this patent?

A.   Yes, sir.

Q.   And did you feel the same sense of pride and accomplishment when those were granted?

A.   I felt extremely proud.

Q.   And are those later three patents U.S.

9,880,342, 10,439,089, and 10,627,562?

A.    Yes, sir.

Q.    Would you mind turning in your binder to Tabs 5 through 7 and have a look at those patents?

A.    5 through 7?

Q.    5, 6, and 7.

A.    5, 6, and 7.

Yes, sir.

Q.    Are those the three remaining patents in the case, sir?

A.    Those are three other patents, yes.

MR. MCCARTY:  Your Honor, plaintiff moves Joint Exhibit 2, Joint Exhibit 3, and Joint Exhibit 4 for admission into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, why don't we take a look at one of those?  If you could go to JTX-4. Thank you.

BY MR. MCCARTY:

Q.    Is this one of the four patents in the case, sir?

A.    Yes, sir.

Q.    And which one is this?

A.    This is the '562 patent.

Q.     And right there on the front cover, it's got a figure down at the bottom.

Do you recognize that figure?

A.     Yes.

Q.     And what's that figure?

A.     This is actually the essence of our invention, which is an illumination system that uses LED and the waveguide.  So it's edge-lit system that uses the microstructures and lenses working in tandem.

Q.     I think we heard in opening from ASUSTeK's lawyer a statement that the patent does not mention displays or backlights.

Did you hear that?

A.     I hear that very clearly.

Q.     Okay.

MR. MCCARTY:  Mr. Diaz, could you go in this patent of Dr. Vasylyev's to Columns 3 and 4?  And just maybe zoom in on the top half of this page.

BY MR. MCCARTY:

Q.     And in these patents, sir, just to orient the jury to what we're looking at, what are these words on the page here?  Is this sort of the description?

A.     Yes.

Q.     And if you look here on Column 3, do you see in the middle paragraph there the discussion about LED

technology?

A.    Yes.  I see that.

Q.    And it's in the context of illumination systems?

A.    Yes, sir.

Q.    Okay.  Is illumination system the same as a solar concentrator?

A.    No.  It's complete opposite.

Q.    And what's at issue in this case?

A.    Yes.  These are illumination systems.  Because the backlights used in those monitors are illumination systems.

Q.    LED illumination system?

A.    They're LED-based and waveguide-based illumination systems.

Q.    And if you go in there, and I guess it'd be Column 4, just to the right of where you highlighted and a little bit down at about Line 17, 18, 19, do you see where it talks about backlight and projection display systems?

A.    Yes, sir.

Q.    Okay.  Are backlight display systems at issue in this case?

A.    Yes, sir.  These are backlighting -- backlight systems.

108

Q.      Thank you.

Did you also --

MR. MCCARTY:  You can take that down, Mr. Diaz.

BY MR. MCCARTY:

Q.      Did you also ensure that the patents were properly assigned from you personally over to your company, SVV?

A.      Yes.  I made sure that this was done correctly.

Q.      Could you turn to the back of your binder? It's at Tabs 15, 16, and 17.

A.      Yes, sir.

Q.      And what are these documents at 15, 16, and 17?

A.      So these are the documents that assign the patents to the -- to my company from me being the inventor.

Q.      And you have knowledge of these documents?

A.      Yes, sir.

MR. MCCARTY:  Your Honor, plaintiffs move the assignment documents for the case, PTX-12, PTX-13, PTX-14, into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. MCCARTY:

Q. Okay. Thank you.

All right. Now, at some point in time, sir, did you begin to suspect that other companies were implementing your patented technologies into their products?

A. Yes. I did.

Q. How did you form that belief?

A. Mostly by coincidence. So I just was looking at the, like, displays on the market and started noticing some, you know, improvements and changes and which were exhibiting some of the hallmarks of my patented technology.

Q. And what were some of those hallmarks?

A. Like the displays were getting thinner, brighter, more uniform, and they had like -- were having like smaller, thinner bezels at the edges and several others. And they were also becoming more and more efficient.

Q. And did you get your hands on some and look inside to see what technology they were using?

A. Right. So I was curious and just I wanted to, you know, take a few apart and see what actually those manufacturers were doing.

Q. And what did you find?

A.   I found that some of those manufacturers were not using their own technology but instead, they adopted my patented technology.

Q.   Can you give us an example of three companies that were using your technology?

A.   Yes.  So those would be, for example, ASUS, Samsung, and also Micro-Star, or MSI.

Q.   Now, those three companies, have any of them licensed or gotten permission to use your technology?

A.   Yes, sir.  Two of them.

Q.   Who?

A.   Samsung and MSI.

Q.   Okay.  Let's start with Samsung.

Did you enter into an agreement with Samsung to license your patents?

A.   Yes, sir.  They took a license to use it.

Q.   Okay.  How did that agreement come to be?

A.   Oh, it just --

MR. BURESH:  Your Honor, may we approach momentarily?

THE COURT:  Sure.

(Bench conference.)

MR. BURESH:  This is getting into negotiations between Dr. Vasylyev and Samsung.  And this is a sword and shield issue that I'd like to bring

111

to the Court's attention, which it starts up here but the punch line is here, where -- you can read it:  Can you tell me anything about the negotiations that led to the agreement?

Same instruction, which is an instruction not to answer.

Yeah.  Besides the fact that there was a negotiation, I can't answer.

THE COURT:  Are you going to get into the negotiations?

MR. MCCARTY:  Not about the negotiations at all, sir.

THE COURT:  Okay.

MR. MCCARTY:  This is about his -- the background of the license and the facts that led to the license, not about the parties' back-and-forth negotiations.

MR. BURESH:  He's going to talk about his -- what he views as his side of the negotiation. This entire script is coming off the last trial where he said that he gave Samsung a first mover discount. And if that starts to come out, that would violate the sword and shield rule because he did not answer those questions during his deposition.

MR. MCCARTY:  That's just a

112

mischaracterization of --

THE COURT:  Is the first mover deal part of the licenses?  It's in the license?

MR. MCCARTY:  It's what was in his mind. It's not a negotiation.

THE COURT:  If it's not in his license, then he shouldn't talk about it.

MR. MCCARTY:  Okay.  Thank you, Your Honor.

(Bench conference concludes.)

BY MR. MCCARTY:

Q.    Picking up where we left off, sir.

Now, in -- after you had determined that Samsung was using your technology in some of its products, did you have to bring an infringement suit?

A.    Yes.  Eventually.

Q.    Okay.  Was that a difficult decision?

A.    It was extremely difficult decision.

Q.    Why?

A.    Well, because before that time, I had never been involved in a, like, technology dispute like that. So it was completely foreign for me.

Q.    Okay.  Did that matter resolve with Samsung?

A.    Yes.  It resolved, thankfully, pretty quickly. Within one year.

Q.    Did you have to go to trial with a jury?

A.    No.  Not at all.  They were willing to do that, resolve that.

Q.    Did Samsung pay to license several of your patents?

A.    Yes.  They did.

Q.    Okay.  Without getting into any of the economic terms or negotiations, can you tell me how it felt having Samsung pay the licensure technology?

A.    Yes.  It felt very validating because that was the first instance of any company, especially a company of that kind of size and -- and importance, like Samsung, it's a household name, to recognize the value of my technology and pay for it, for using it.

Q.    During opening statements, did you hear that the damages at issue in this case are quite a bit larger than

A.    Yes, sir.

Q.    Okay.  Did you personally investigate the extent to which Samsung used your technology?

A.    Yes.

Q.    About how many Samsung products were you able to confirm had your technology in it?

A.    We found that they used our technology in seven PC monitors.

Q.    Seven?

A.    Seven different models.  Yes.

Q.    Of monitors?

A.    Monitors.  Yeah.

Q.    Did you also learn about the future of Samsung's LCD business?

A.    Yes.  So several months before, like, I entered into license agreement, I learned that Samsung was going to shutter their internal production like of these LCD panels.  These are -- these -- like all kinds of backlights.

Q.    Now, you mentioned one other agreement with the company called MSI, correct?

A.    Yes, sir.

Q.    Who is that?

A.    MSI is a computer company.

Q.    And did you enter into a license with them?

A.    Yes, sir.

Q.    Did the MSI case have to go to a trial with a jury?

A.    No, sir.

Q. Now, you mentioned you also suspected that ASUSTeK had used your patented technology, correct?

A. That is correct.

Q. How did you come to that understanding?

A. So I, like, noticed that some of the monitors specifically under the ASUS brand also were exhibiting some of the hallmarks that would be attributed to my technology.

Q. Like what?

A. Like they were getting thinner. They're having like thin bezel. They were getting more efficient. And also more -- provided, you know, better uniformity and had -- many of the monitors had exceptionally good color gamut.

Q. Did you perform an investigation on ASUSTeK products?

A. Yes, sir.

Q. What did your initial investigation reveal?

A.     It revealed that ASUS was using my patented technology in their PC monitors, specifically in the backlights.

Q.     Did you immediately, you know, have to file a patent suit at that time?

A.     No.  I didn't want to actually initiate patent suit at all initially.

Q.     Did you contact ASUS to ensure that they were on notice of your patented technology at some point in time?

A.     Yes.  I felt that was important, and I asked my lawyer to send them a letter to put them on notice.

Q.     And did you authorize that -- did you authorize your attorney at that time to send a letter to ASUSTeK?

A.     Correct.

Q.     Okay.  Can you please turn in your binder to Tab 8, sir?  Is --

A.     Yes.

Q.     Is that a letter dated February 19th, 2021?

A.     That is correct.

Q.     And is this the letter that you authorized your counsel at the time to send to ASUSTeK?

A.     Yes, sir.

                    MR. MCCARTY:  Okay.  Your Honor,

117

plaintiff introduces into evidence Plaintiff's Exhibit 16.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, could you put that one up on the screen?  Thank you.

BY MR. MCCARTY:

Q.   Now, what were you hoping to achieve through this letter?

A.   Well, it just says it right there.  So basically to engage in discussions regarding the amount of damages that would be proper to remedy ASUS's use of the patents and come up with a amicable resolution, if possible.

Q.   Did you send the letter to ASUSTeK to put them on notice of their patent infringement before granting your license to Samsung?

A.   Yes, sir.

Q.   Looking at the top of the February 19th, 2021 letter to ASUSTeK, who did this letter get sent to?

A.   So that letter was sent to ASUSTeK Computer, Inc., which is the Taiwanese patent company.  And also, it was sent -- a copy of that letter was also sent to their U.S.-based subsidiary, which is the ASUS Computer International.

MR. MCCARTY: Mr. Diaz, if you scroll to the cc line of this letter and highlight ASUS.

BY MR. MCCARTY:

Q.    Is that the company that's the -- kind of the office of ASUSTeK in the United States, ASUSTeK Computer International?

A.    The one that's just -- on the top or on the bottom?

Q.    On the bottom.

A.    On the bottom, yes.  This is their U.S.-based subsidiary.

Q.    So you sent the letter to the parent and the local office?

A.    Correct.  I sent to both.

Q.    Why both?

A.    Because I didn't know at that time what company or part of the company I'll be dealing with. So I decided to send to both so that they're on notice of my patent.

Q.    And in your letter to ASUSTeK, were you careful to make sure that you listed all the relevant patents in this case?

A.    Yes, sir.  This is what I did.

MR. MCCARTY: And, Mr. Diaz, if you could just highlight.

BY MR. MCCARTY:

Q.    Did you list the '318 patent?

A.    Yes, sir.

Q.    And the '342 patent?

A.    Yes.

Q.    And the '089 patent?

A.    Yep.

Q.    And the '562 patent?

A.    Exactly.

Q.    And did you also identify for ASUSTeK some particular example products that you believed had adopted your patented technology?

A.    Yes, sir.  This is what I did here.

Q.    Why?

A.    Because I wanted to give them some example -- some examples to get them quicker up to speed and to give them some actual examples where we believed that our technology was being used.

Q.    And did you keep a record of delivery of the letter so that you knew if and when it actually was received by ASUSTeK?

A.    Yes, sir.  I did.

Q.    Okay.  If you could turn, please, in your binder to Tab 9.

A.    Yes.

120

Q.    Is this a copy of that delivery receipt for the letter to ASUSTeK?

A.    Correct.  In this case, it was DHL.

MR. MCCARTY:  Your Honor, plaintiff moves into evidence PTX-15.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, would you put that one up, please?

BY MR. MCCARTY:

Q.    Is this the confirmation that ASUSTeK received your initial correspondence?

A.    Yes, sir.  It is.

Q.    And what date does it confirm it was delivered?

A.    It was delivered on February 25th of 2021.

Q.    So at this point, it was confirmed that ASUSTeK received notice of your patents and your allegations of infringement for licensing purposes?

A.    Correct.

Q.    Okay.  Did ASUSTeK respond to your letter?

A.    Yes.  They did.

Q.    Who did that response come from?

A.    That response came from the parent company, from the Taiwanese company.

Q.    Can you turn in your binder to Tab No. 10, please, sir?

A.    Yes.

Q.    You saw this in opening.

Is this the response from ASUSTeK responding to your February letter about your patents and their products?

A.    Yes, sir.  It looks -- it is.

Q.    And you're familiar with this -- this document?

A.    Yes.  I am.

MR. MCCARTY:  Your Honor, plaintiff moves into evidence PTX-18.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, thank you.

BY MR. MCCARTY:

Q.    All right.  Is this the e-mail response that you were just talking about in PTX-18 from ASUSTeK?

A.    Yes, sir.

Q.    Okay.  And what's the date of this correspondence?

A.    It is dated March 12th of 2021.

Q.    A little less than a month from when you originally sent your letter, correct?

122

A.    Yeah.  Approximately.

Q.    And Mr. Wu states that:  ASUSTeK Computer, Inc. ("ASUS") is aware of your letter dated February 19th, 2021.  We are open to engaging with SVVTI and discussions regarding patent licensing matters.

Did I read that right?

A.    It sounds precisely right.

Q.    Now, earlier you mentioned that you had delivered the letter to both the Taiwanese parent entity as well as the smaller U.S. sub, right?

A.    Correct.

Q.    Did Mr. Wu here work for the parent Taiwanese entity or the U.S. office?

A.    It says it right here.  So he worked for the parent company, the ASUSTeK, and he's from the legal affairs center.

Q.    And what was your impression of that?

A.    That their parent company was responsible for handling all of the patent infringement issues.  So from then on, I assumed that I would need to continue communicating with them.

Q.    Now, did you take Mr. Wu up on his offer to discuss -- sorry.  Let me rephrase that question.

Did Mr. Wu take you up on your offer to

123

discuss damages and royalty rate for a resolution?

A.    Not at all.

Q.    Well, did -- it says he's interested there, but did he ask for something?

A.    Yeah.  So instead, he asked for some exemplary claim charts.

Q.    And what is a claim chart?

A.    Oh, a claim chart is like a special type of document, essentially like a table that compares claims of the patents with the features in the product.

Q.    What was your reaction to that?

A.    It felt very strange, and I was disappointed because I felt that, okay, ASUS is a large company. They have like massive legal department.  They have engineering department.  So they had our patents.  They obviously had their own products, their own monitor. So they have everything.  So what -- why would they even ask for the claim charts from us?

Q.    But did you nevertheless get to work on those claim charts?

A.    Yes.  We still went ahead and started working on fulfilling that request.

Q.    In the meantime, did your attorney work on doing an NDA or a confidentiality agreement with them?

A.    Yes.  I felt that I needed some protection,

and I entered into a nondisclosure agreement with ASUS. Yeah, with ASUS.

Q.    And which company, the parent or the subsidiary, did you enter into a contract with?

A.    With the parent company.  The one that I believed was responsible for the infringement.

Q.    And why did you enter into an NDA?

A.    Because I wanted to be protected.  So I was dealing like it was a foreign company on the matters involved in like the U.S. and some confidential matters like patents, and I wanted to just be protected.

Q.    Now, once you had the NDA, was it a quick process getting the claim charts together and investigating all the products?

A.    No.  It was a extremely tedious and labor-intensive and resource-intensive process because making claim charts is not easy.  It takes long tame.

Q.    Can you describe what went into that long process?

A.    Right.  So for creating each claim chart, we would need to acquire that product, take it apart very carefully, go through all of the details, document everything, then analyze in -- in very like little details, including specialized tools, and then document all that, do the measurements, and then compile claim

125

charts based on that information.

Q.   And how many different products did you investigate during this time?

A.   So initially we investigated around like 40. So we created like 40 claim charts, but we were -- like analyzed like 60-plus products.

Q.   Recall when we were discussing Samsung, you mentioned -- I think you were able to confirm seven monitors.

Was that your testimony?

A.   Yes, sir.

Q.   Okay.  How many eventually have you been able to confirm ASUSTeK uses in their products?

A.   About 100 different monitors.

Q.   And were you here in opening when Mr. Caldwell mentioned how many different -- how many units have been sold?

A.   Yes, sir.  I do remember.

Q.   And how many was that?

A.   They sold over 4 million monitors --

Q.   Now, you --

A.   -- with my technology in it.

Q.   Thank you.

You mentioned it would take, I think, six months or seven months to get all those -- all that

126

data to ASUS.

Did it have to take that long?

A.    Yes.  That's how, you know, labor intensive and time consuming that process is.  So for creating like those initial 40 claim charts, which, by the way, contained like thousands of pages, so we had to perform all this work, all the analysis, all the teardowns and documentation and make -- to make sure that everything was done correctly and very precisely.

Q.    If you'd turn in your binder to Tab 11, sir.

A.    Yes, sir.

Q.    Are these photos and test results that you personally documented analyzing the ASUSTeK product?

A.    I'm sorry.  You said like 11 through?

Q.    Just Tab 11.

A.    Tab 11.

Yes, sir.  It's just one exemplary product, I think.

Q.    And with lots of different pictures and analysis?

A.    Correct.

Q.    And did you personally run all those tests and take all those pictures?

A.    Yes.  I either did it myself or directed my engineers to perform that work, but of course I

personally verified everything.

Q.   And what particular product are we looking at here in Tab 11?

A.   Tab 11, we're looking at the ASUSTeK -- ASUS monitor, which has identifier PA278CV.

MR. MCCARTY:  Your Honor, plaintiff moves PTX-109 into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, can we go back to the slides?  Thank you.

BY MR. MCCARTY:

Q.   Now, you mentioned we're going to look at PA278CV, correct?

A.   Correct.

Q.   Why are we going to walk through that one?

A.   Because the -- my understanding is that the parties agreed that this is one of the two representative products.  So we won't waste time, like, looking at all of the monitors that we have disassembled.

Q.   So what are we seeing here on the screen?

A.   So here, we have like the shipping box, the box in which the display is shipped.  So we're just checking that it has the correct identifier of the

128

model of the monitor.

Q.   And if you look at your screen on the next slide on the screen?

A.   Yeah.  We're also like checking the -- that that's correct monitor, like the shipment, the correct shipment and the like.

Q.   If you look on the screen, I'm projecting that for the jury so they can see it too.

Is this kind of the physical product once you take it out of the packaging?

A.   Yeah.  So on the left, you see like the front and back of the display.

Q.   And what are we focusing in on there on the right?

A.   On the right, we're again verifying -- it's like the serial number label on the back.  We're verifying that's indeed an ASUS product, that it is -- shows the correct model, which is in case PA278CV, and it was manufactured in January of 2021.

Q.   And what about here?  What's on this screen?

A.   So here, after we, like, carefully took off the back cover, we're seeing that there's like a panel, the so-called LCD backlighting assembly.  And we are also checking the labels on the panel and where you find that it was, like, manufactured by one of the ASUS

OEMs, which is in the case interlocks. It also identifies the panel by certain numbers.

Q. All right. So what are we looking at here? What are the components?

A. So this is actually when we separated the actual screen, the LCD screen from the other part, which is a backlight, which is -- you can see on the bottom.

Q. And in that second photo, it looks like it's lit up; is that right?

A. Correct. So the backlight part is -- is lit when you switch the monitor on.

Q. All right. Now, I'm going to grab a board, but we can, as I do that, explain what's on the screen here.

A. Yes. Absolutely.

So we are basically drilling down and opening that backlight unit. And what we see inside is that there are five, like, optical layers sandwiched between the -- like the back color, metal color in the back, and the LCD screen on the -- on the -- on the top.

Q. So this is actually in the back of the ASUSTeK product, correct?

A. That is correct. That is the backlighting unit.

130

Q.    Okay.

A.    Inside of it.

Q.    And can you just kind of walk us through what these various films and components are?

A.    Absolutely.

So the first layer of that kind of wide sheet is a reflector sheet.  And then the next one is the light guide where you can -- waveguide or LGP in short. And also -- and above that, we have like three different optical layers which are called "optical diffusers."

Q.    Thank you.

Now, which of these components did you kind of drill down into your next out of these?

A.    So next, we're focusing on the LGP, the light guide.  That's the thicker part.

Yes, that one.

Q.    That's the thick guide?

A.    Correct.

Q.    All right.  We're drilling down here.

What's on the blow-up board here now?

A.    So we're looking at that light guide, this very high magnification.  In this case we're just looking at the very corner of that light guide.

Q.    And is this that thicker piece that we saw in

131

the stack earlier?

A.   Yes.   Exactly.

Q.   What were you looking for on this light guide plate that you can see on the top?

A.   So on top you can see like a parallel array of, like, bridges.

Q.   And what are those?

A.   And those are actually the linear lenses that are part of my inventions.

Q.   We talked about lenses and then also microstructures.

Did you find the microstructures in the product?

A.   Yes, sir.   So the microstructures were found on the back surface of that light guide.

Q.   Can you tell us what we're looking at here?

A.   Yeah.   We're looking here at the highly magnified image of the bottom surface of the light guide where you can see this, like, tiny structure formed in the surface, which we call, like, microstructure.

Q.   And that red legend in the bottom, I don't know if the jury can see it.   It says, I think, 150 micron; is that right?

A.   Yeah.   So that scales -- that's scaled between

132

like those small, vertical, red kind of lines.  It shows you the scale.

Q.    Can you give us a sense of how small that is?

A.    Yeah.  So it shows 150 microns.  Basically 1 micron is 1,000 times smaller than a millimeter.

To give you a comparison, like the thickness of the human hair is roughly about 70 microns.  So you're looking at like the scale of these microstructures of about the size of a human hair.  This is how small they are.

Q.    Did you also perform analysis of these features, the lenses and the microstructures, under a microscope?

A.    Yes.  This is what we're showing here.

Q.    Can you explain, just kind of walk through what we're looking at, on the slide of PTX-109?

A.    Right.  So on the left below the -- that image of the -- close-up image of the light guide, you see a three-dimensional highly magnified image of a small, small portion of that light guide.  And that image was taken as special instrument, which is called "three-dimensional microscope."

Q.    And what about on the right?

A.    On the right, you're seeing like a -- just a highly magnified, you know, image on the top.  And on

the bottom, you're seeing similar three-dimensional image of an individual microstructure.  You can see the shape of it.

Q.   Are you showing test measurements of those lenses and those microstructures in the ASUSTeK products here?

A.   Yes, sir.  So these images and analysis came from analyzing the shapes of those features like lenses and microstructures.  So here, we're measuring their, like, dimensions, their exact shapes, different angles, also like examining the cross section.

Q.   And what tool are you using to measure all of these -- all this data?

A.   We -- we are using here a 3D optical profiler.

Q.   What is the 3D optical profile measuring?

A.   So it's measuring like different features, like particularly geometrical features of this very high magnification.  And also allows you to study them in a cross section and study how these shapes are, you know, exactly -- you know, what shapes they're followed.  And you can measure different parameters, like the radius of that curvature or the angles at which the surfaces are sloped relatively to the surface.

Q.   Last one.  What are these images showing on

134

the screen at PTX-109?

A.   So these are just showing the light source, the LEDs which are used in this case, which are arranged along an edge of this panel.

Q.   So is the product at PTX-109 an edge-lit monitor?

A.   It is an edge-lit monitor.

Q.   Thank you.

If you turn in your binder, just one more, to Tab 12.

A.   Yes, sir.

Q.   Can you explain what we're looking at in the document at PTX-116 in Tab 12?

A.   Yes, sir.  So this is the other one representative product that the -- the parties agree actually to be representative.

Q.   And are these the test data images and so forth that you personally collected with respect to this product?

A.   Yes.  For that particular, the second product.

Q.   And what is the product here?  Is it the PG32UQ?

A.   Yes.  It says PG32UQ.  Yes.

MR. MCCARTY:  Your Honor, plaintiff moves into evidence PTX-116.

135

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. MCCARTY:

Q.    All right.  We'll walk through these a little bit quicker.

A.    Okay.

Q.    Did you perform the same analysis that you did with the first product on this product?

A.    Yes.  Pretty much the same, and that is following the same procedure.

Q.    Did you perform the same verification and cataloging of information?

A.    Exactly.

Q.    And what are we seeing on the screen here?

A.    So on the screen, like you see front and back of a display.  And then also after we took off the back cover, you see the serial number kind of label where you can verify the -- that -- who the panel manufacturer is, the OEM, and have an identifier.  And it also shows you the manufacturing date.

Q.    And did you go through the same process of tearing down the monitor and analyzing it?

A.    Exactly.  So we're seeing here the screen and the backlights separated.  We're seeing the drill down, like, of the internal layer of that backlight.

136

Q.    Now, this is for PTX-116.  We looked at this.
It looks pretty similar.

But is there an additional film in this one
that was not in the previous product?

A.    Yes, sir.

Q.    And which one is that?

A.    It's that yellow -- yellow color one.  Yes.
That's added to that product.

Q.    And what is that film, sir?

A.    That is a specialized film that contains
quantum dots, those materials that you saw the
demonstration of.

Q.    And is that the film that contains those red
and green nanoparticles we discussed earlier?

A.    Correct.

Q.    Did you carefully analyze that as well?

A.    Yes, sir.

Q.    Okay.  In the PTX-116 product, did you confirm
the existence of the linear lenses on the top?

A.    Yes.  Yes, sir.  In the same fashion.

Q.    And what about microstructures, did you find
that on the bottom?

A.    We did find them on the bottom as well.

Q.    And did you perform the same tasks and
analyses to confirm the structures?

137

A.    Exactly.

Q.    And is the product at PX-116 an edge-lit LED?

A.    It is an edge-lit LED, except the LED color is blue.

Q.    Thank you.

Now, did you perform this same analysis across all the products at issue, I think we said over 60 different products that you analyzed?

A.    Correct.  We analyzed over 60 different products.

Q.    And for all of those product investigations, did you personally or, you know, with your team, do all the imaging, testing, and analysis?

A.    Exactly, yeah.  We did follow pretty much the same procedure for all of them.

Q.    Did you do that in your lab?

A.    Yes.

Q.    Is it fair to say that this investigation resulted in a lot of data and evidence and product imaging?

A.    It is fair to say.

Q.    All right.  If you stack it all up, is it coming up several binders' worth in just data?

A.    Yes.  That's exactly how it looks.

Q.    We're going to go through all that.

A.    No.  I don't want to go right now.

Q.    Once you had your initial set of evidence complete, did you instruct your lawyer to deliver it to ASUSTeK as they asked?

A.    Yes, sir.  That's what I did.

Q.    Will you please turn in your binder to Tab 14?

A.    Yes, sir.

Q.    Is this the e-mail correspondence at PTX-130 (sic) that follows up from the initial correspondence with your letter and Mr. Wu from ASUSTeK?

A.    Yes.

Q.    And are you familiar with this correspondence, sir?

A.    Yes, sir.

MR. MCCARTY:  Your Honor, plaintiff moves PTX-30 for admission into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. MCCARTY:

Q.    Now, is this the same e-mail chain with ASUSTeK and Mr. Wu in Taiwan that we looked at earlier, just kind of a little later in time?

A.    Yes.  It's the same kind of, like, chain.

Q.    Now, what is the date of this correspondence?

A.    This one has a date of December 2nd of 2021.

Q.    And does that correspond with about the time it took to create all that data and do all that claim charting?

A.    Yeah.  So basically, we, like, spend like the whole summer and fall on doing these teardowns and analysis and creating all these claim charts.  So I remember, like, finishing around Thanksgiving or something like that.  And that this is when we were ready to provide this information.

Q.    And at that point in time, about how many charts were you able to provide?

A.    I think at that time, we provided 40 charts, if I remember correctly.

Q.    After all that effort, what were you expecting from ASUSTeK?

A.    Well, of course I expected that it would take a little bit of time for them, like, to go over all these, like, claim charts because there were so many.

But at the same time, I expected them to actually realize the extent to which they were using our technology in their products, and they'll just enter into a licensing agreement with us as the law requires.

Q.    Is that how they responded?

A.    No.

Q.   What do you mean by that?

A.   Well, instead, ASUS came back and said that, you know what?  We, like, had you to go through all this process.  We promised that we will engage in negotiations.  And now they're saying, oh, like just kidding.  We're not appropriate company to discuss.

They say that the -- they're not manufacturer of display panels.  And they even don't know how the displays are implemented.  So they don't know how they're made or how they work.

Q.   Now, I see there that Mr. Wu does still say that you could give him the claim charts; it was just going to take a long time?

A.   Yes, sir.

Q.   Did you give the claim charts to him still?

A.   We did.

Q.   Is that what's happening at this December 4th e-mail in PTX-30?

A.   Correct.  This is an e-mail from my lawyer where he puts a link to the claim charts.

Q.   Now, when they indicated that you should really not talk to ASUSTeK but to some other company, did you have your lawyer ask for that other company's information?

A.   Yes, sir.

141

Q.    Okay.  And did they provide you with that information?

A.    Not really.

Q.    Okay.  What are we seeing on the screen here?

A.    Well -- well, they said that we don't have the information regarding the panel manufacturers of the monitors and the points of contacts for those panel manufacturers.

Q.    How did that make you feel?

A.    I was shocked, honestly.  It just felt almost inconceivable that they don't have -- after having sold, like, over 4 million of those particular monitors that use my technology, but probably much more than that of other types.  So they didn't even know who their suppliers are and their contact information.

Q.    Did you try to contact some of those suppliers eventually?

A.    Yes.  We did try to contact them on our own.

Q.    Was it a dead end?

A.    Yes.  It pretty much resulted in a dead end. They were playing the same kind of game, like claim charts and so on.

Q.    At that point, how long had you been dealing with this with ASUSTeK?

A.    I think it was like slightly over a year.

142

Q.    Did you eventually decide that, you know, you had to get a case on file to protect yourself?

A.    Yeah.  At that point, I realized that it was not going anywhere, and I thought enough was enough. And I initiated an action.

Q.    Just a couple more questions.

You were here during jury selection, I guess it was last Thursday, correct?

A.    Correct.

Q.    I think ASUSTeK's lawyer, when he was giving his speech, said that they were, you know, coming to clear their name and that they make the monitors.

Do you recall hearing that?

A.    I do recall that.

Q.    Is that what they were telling you when you were giving them their claim charts before this lawsuit?

A.    No.  They're telling complete opposite.

Q.    How did that make you feel, hearing -- hearing that discussion last Thursday?

A.    Disappointed.  I'm very disappointed.

Q.    There's a jury in the box now, all impaneled and gathered together to evaluate your patents filed 15 years ago with your company over 25 years ago, to analyze ASUSTeK's infringement.

How does that make you feel?

A.    I'm just, you know, so grateful that this process is in place to protect companies like mine, and it's also honor to have you all to hear my story.

MR. MCCARTY:  I pass the witness, Your Honor.

THE COURT:  Ladies and gentleman, we're going to take our lunch recess.  If you all would be back by about 1:20 or so, and we'll get started around 1:30.

I don't know really on Mondays what -- next door there's a food court, but it's closed on Mondays.  So I'm not sure exactly what to advise you to do today for lunch.  There are some places nearby.  And down by the highway, there's -- there are more fast-food stuff.  So you're sort of on your own today, but tomorrow it'll be much more accessible.

Please remember my instructions, and we'll see you at 1:30.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

THE COURT:  You may be seated.

Doctor, you may step down.

Is there anything we need to take up?

MR. MCCARTY:  Not from the plaintiff,

144

Your Honor.

THE COURT:  If you'd go ahead and take down that board.

MR. MCCARTY:  We'll do that right now.

MR. BURESH:  Nothing, Your Honor.

(Recess taken.)

THE BAILIFF:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT:  Thank you.  You may be seated.

I'm blaming this -- the heat in here on the jurors who complained it was too cold before lunch. I told you don't say anything about it.  This is what happens.

(Laughter.)

THE COURT:  So, Doctor, if you would please take the stand.

CROSS-EXAMINATION

BY MR. BURESH:

Q.   All right.  Good afternoon, Dr. Vasylyev.  How are you?

A.   Good afternoon.  Very good.

Q.   I'd like to start out maybe correcting the

145

record.  Is that all right with you?

A.    Absolutely.

Q.    Okay.  When you were testifying, you had the '562 patent, some figures from that.

Do you recall that testimony?

A.    Yes, sir.

Q.    And your counsel asked you a question.  He said:  I think we heard in opening statements from ASUSTeK's lawyer.

That's me, right?

A.    Right.

Q.    Yeah.  We heard a statement from ASUSTeK's lawyer that the patent, the '562, does not mention displays or backlights.

Did you hear that?

A.    Yes, sir.

Q.    And your response to that was:  I heard that very clearly.

A.    Yes, sir.

Q.    Okay.  Now, during my opening statement, do you recall that I went two patents by two patents?

Do you recall that?

A.    Can you rephrase this question?

Q.    Sure.

I went through two light-trapping patents.

Do you remember that?

A.   You call them light-trapping patents?  I'm not sure that I agree with your characterization of those patents.

Q.   I'm not asking you whether you agree or not.

Do you recall me describing to the jury two light-trapping patents?

A.   Yes.  I do.

Q.   And I said that those two patents don't have anything to do with displays.

Do you remember me saying that?

A.   Yes, sir.

Q.   And then I got to the other two patents, which would include the '562, and I actually gave you credit. I said:  These two patents actually do talk about displays and illumination systems.

Do you remember that?

A.   I think you said like illumination systems, but I'm not sure that you mentioned displays in your statement.

Q.   So you're not sure?

A.   I'm not sure.  I don't remember that part exactly.

Q.   So you are not sure you clearly heard me say something that I didn't say.  You're not sure you heard

147

that, right?

A.    Now you're asking me about like a different phrase that is said.

Q.    Not really.

Let's talk about the '318 patent because you were very quick to show the jury the word "display" and "backlight" in the '562, which we all agree are there.

You didn't show the jury anything as to the '318 or the '089, did you?

A.    No.  I didn't.

Q.    And you agree with me that the '318 patent does not mention displays?

A.    It probably does not.

Q.    Do you know your patents?

A.    Yes, sir.

Q.    Does the '318 patent mention displays?

A.    I think it may not.

Q.    Yes or no?  Do you know?

A.    I don't know.

Q.    Let's talk about the '089, the other thing that I called a light-trapping patent.

It doesn't mention displays, does it?

A.    I'll just take your word.

Q.    I'm not asking -- these are your patents, sir.

The '089 patent doesn't mention displays, does

148

it?

A.   I don't know.  I would need to read through the entire specification.  It's a very lengthy specification.

Q.   So sitting here today, the patent that you're suing on, sir, you don't know whether it talks about displays or not?

A.   That -- which particular patent are you referring to?

Q.   This is the '089 patent.

A.   Okay.

Q.   And you're telling me that sitting here today, you do not know whether your own patent talks about displays or not?

A.   Yes, sir.  That particular patent, yeah.  I don't know if it is talking about the displays or not.

Q.   Well, let's see.

MR. BURESH:  Mr. Pubentz, let's do this in order.  Let's pull up the '318 patent.  Do you have that in searchable form?

BY MR. BURESH:

Q.   Do you recognize the patent on the screen in front of you?

A.   Yes, sir.

Q.   It's the '318 patent?

A.   Yes.  It is.

MR. BURESH:  Okay.  Now, just to see that this works, could you do a search for the word "trapping"?

BY MR. BURESH:

Q.   Okay.  So we're seeing results, correct?

A.   Correct.

Q.   All right.

MR. BURESH:  Now, Mr. Pubentz, could you do a search for the word "display"?

BY MR. BURESH:

Q.   And we're showing zero results; is that correct?

A.   That's correct.

MR. BURESH:  Eric, could you do a search for the word "monitor"?

BY MR. BURESH:

Q.   And we're showing zero results, correct?

A.   That is correct.

MR. BURESH:  Could you take me back to the cover of the '318?  Now -- the '318, please.

BY MR. BURESH:

Q.   And, Dr. Vasylyev, you wrote these patents yourself, correct?

A.   That is correct.

Q.   And that was in the spring of 2009 time frame?

A.   Not the -- this particular one.  Yeah.  I think it was filed like several months later.

Q.   Okay.  I'm just going off your testimony this morning.  You said you were writing these patents in spring of 2009.

A.   Right.  The provisional application.  Right.

Q.   Okay.

A.   But you're talking about, like, the full utility application, which is a different one.

Q.   But you wrote these yourself?

A.   Yes.  That's correct.

Q.   You chose the words that would go in them?

A.   Yes, sir.

Q.   You agree with me that you chose to title this patent the Light-Trapping Optical Cover?

A.   Yes, sir.

Q.   Okay.  And in the abstract on the front page, you again talk about a light-trapping optical structure, correct?

A.   That is correct.

Q.   Other concepts we'll find in this patent are light harvesting, correct?

A.   That is correct.

Q.   And light harvesting is when you take light

and turn it into heat or electricity, correct?

A.    To whatever usable form of energy.

Q.    But it's not light anymore?

A.    It can be light because light is still a usable form of energy.

Q.    You also talk about light absorption in this patent, correct?

A.    That is correct.

Q.    Okay.

MR. BURESH:  Could we go to the field of the invention in the '318 patent?

BY MR. BURESH:

Q.    And if you're following along, this is going to be Column 1, Dr. Vasylyev.

Now, you see here in the first sentence:  The present invention relates to a device and method for enhancing the light trapping in light-harvesting devices.

A.    Yes, sir.

Q.    Is that a fair characterization of the field of the invention that you were working in?

A.    Yes.  That was one of the applications.

MR. BURESH:  If we go to the summary of the invention in Column 2.

BY MR. BURESH:

Q.    The present invention solves a number of light-harvesting problems within a compact system utilizing efficient light deflection and trapping mechanisms.

A.    That is precise.

Q.    I'm sorry?

A.    Yes.   That is precise.

Q.    That's a summary of the invention?

A.    It's a part of the summary of the invention. Yes.

MR. BURESH:   Let's go to the '089 patent.

BY MR. BURESH:

Q.    Now, Dr. Vasylyev, again, we see a system that is employing planar light-trapping and light-absorbing structures in the '089, correct?

A.    Yes, sir.

Q.    And if we walk through the abstract, the other components of this patent, we're going to see a lot about light trapping and light harvesting.  Is that fair to say?

A.    Yes, sir.

Q.    The field of invention in the '089 gets even a little more specific.  The present invention relates to a device and method for harvesting radiant energy emanated by a distant radiant energy source,

particularly to collecting the sunlight and absorbing it.

A.   Yes, sir.

Q.   That's a fair description of the field of invention that you were working in with respect to the '089 patent, correct?

A.   Yes, sir, part of it.

Q.   Would you agree with me that a display is not a light-harvesting system?

THE COURT:   I'm sorry.  I couldn't hear you.  If you could, just repeat the question.

BY MR. BURESH:

Q.   Would you agree with me that a display like my clients sell is not a light-harvesting system?

A.   I'm not sure about that because it includes light-harvesting components in some cases.

Q.   Do my client's displays harvest light?

A.   Yes.  Inside in some of the displays, they do harvest light from the LEDs and convert it into another form of light.

Q.   So you would like this jury to believe that my client's displays that are emitting light so they can see it are harvesting that light.  Is that what you want the jury to believe?

A.   No, sir.  You mischaracterized what I said.

154

Q.    Now, we had a light show during counsel's opening statement, your counsel's opening statement, correct?

A.    Okay.

Q.    With the quantum dots?

A.    Yes.  We saw the quantum dot demonstration.

Q.    Okay.  Now, you didn't invent quantum dots, did you?

A.    No, sir.

Q.    In fact, quantum dots were around well before 2009?

A.    Yes, sir.

Q.    And the quantum dots you described were for changing the colors of light, right?

A.    Yes, sir.

Q.    Now, I want to go through this briefly. Starting with the '562 patent this time.

      The '562 patent does not mention quantum dots, does it?

A.    It probably doesn't.

Q.    Again, do you know or not?  Do I need to do a search?

A.    If you can.

          MR. BURESH:  Would you pull up the '562 patent, please, and search for "quantum."

155

BY MR. BURESH:

Q.   Zero hits.  You agree with that now?

A.   Yes, sir.

Q.   The '562 patent does not discuss quantum dots.

A.   Correct.

Q.   Now let's go to the '342 patent.  Do you know whether it mentions quantum dots?

A.   I don't remember that.

Q.   Okay.  So the emphasis of the show that your counsel put on with the jury is talking about quantum dots and shining lights through it, and you can't tell this jury with just a simple yes/no whether the '342 talks about quantum dots?

A.   Yeah, because we're talking about four patents, and some of those patents actually do mention quantum dots.

Q.   Is it hard to keep track of four patents?

A.   I mean, what do you mean "keep track"?  I do keep track of them.

Q.   But you don't know which one talks about quantum dots?

A.   Yeah, because these patents contain very lengthy specifications.

Q.   Be hard to get through them, right?

A.   No.  If you know what to look for.

Q.   Okay.  Well, let's go ahead and look in the '342 patent.

MR. BURESH:  We're going to run a search for "quantum."  Thank you.

BY MR. BURESH:

Q.   No hits.

Will you agree with me now that there's no mention of quantum dots in the '342 patent?

A.   Looks like it.

MR. BURESH:  Let's go on to the '318 patent.

BY MR. BURESH:

Q.   Dr. Vasylyev, does it mention quantum dots?

A.   Same answer.

Q.   Which one?

A.   I don't remember.

Q.   Okay.  Let's go ahead and do the search.

MR. BURESH:  If we could search in the '318 for the word "quantum."

BY MR. BURESH:

Q.   Zero hits.

Do you agree with me that the quantum dots is not mentioned in the '318 patent?

A.   Looks like it.

Q.   Okay.  Last but not least, the memory test

157

apparently is over, the '089 does have the word "quantum dots" in it.  Okay?

A.    Okay.

Q.    Now, the quantum dots in the '089 patent --

MR. BURESH:  Probably get there more quickly if you do the search.

BY MR. BURESH:

Q.    And just to remind the jury while we're waiting for that, the '089 is one of the light-trapping patents, correct?

A.    It's how you refer to them.

Q.    You used the word "light trapping" in the title.

A.    Correct.

Q.    Okay.

A.    But I would not refer to those patents as light-trapping patents.

Q.    All right.  In the '089 patent on the screen in front of us --

MR. BURESH:  Could you scroll up and -- scroll up and show us the column number, please?

BY MR. BURESH:

Q.    This is Column 11.  Okay.  Now, in Column 11 in about Line 31, we begin a new paragraph, fair?

A.    Yeah.

Q.    Okay.  Photovoltaic layer 4 can incorporate Si or other semiconductor photovoltaic materials.

Do you see that?

A.    Yes, sir.

Q.    And that can include quantum dots?

A.    Yes, sir.

Q.    And in the context of this description, what the photovoltaic layer is doing is converting light into electricity, correct?

A.    Yes.  If it is a photovoltaic material, then yes.

Q.    There are different kinds of quantum dots, are there not, Dr. Vasylyev?

A.    Yes, sir.

Q.    There are some quantum dots that convert light to electricity, correct?

A.    Depends on how you design them.  Yes.

Q.    And there are other types of quantum dots that change the color of light, correct?

A.    Yes.  It depends how you design them.  Yes, and use.

Q.    They're different types?

A.    Well, I'm not sure I agree with your characterization regarding different types.  These are quantum dots.  You can call them different types, if

you want.

Q.   One set of quantum dots can be used to convert light to electricity, correct?

A.   Correct.

Q.   And another set of quantum dots can be used to change the color of light?

A.   Right.  But it doesn't mean that you can use them interchangeably.

Q.   I agree.  You can't use them interchangeably, correct?

A.   In some cases probably, yes.

Q.   Now, the quantum dots you're describing in the '089 patent are the ones that convert light to electricity, aren't they?

A.   They're described -- they're just quantum dots.  They're described in an application that -- exemplar application of the invention in the context of photovoltaic layer.

Q.   That's all I'm asking.

A.   Yes, sir.

Q.   The example you've described is using quantum dots to convert light to electricity, correct?

A.   Correct.  In that example.

Q.   And the example that your lawyers and you have talked about is quantum dots that are used to change

the color of light?

A.   Yes, sir.

Q.   And those are not interchangeable, are they?

A.   I'm not sure about that.

Q.   Does the '089 patent that discusses the quantum dots in the context of light to electricity, does it say anything about changing the color of light?

A.   I don't recall that.

Q.   You don't recall whether your patent talks about changing the color of light or not?

A.   I don't.

MR. BURESH:   Pull back up the '089 patent.

BY MR. BURESH:

Q.   This time --

MR. BURESH:   Sorry.   That went by kind of fast there, Eric.

BY MR. BURESH:

Q.   We're going to run a search for the word "color" in the '089 patent.   All right?

A.   Yes, sir.

Q.   Zero hits.

A.   Correct.

Q.   Okay.   So the only patent where you actually mention quantum dots, you don't talk about color

161

changing?

A.   I'm not sure about that.  I can explain.

Q.   The other three patents, Dr. Vasylyev, you don't mention changing the color of light either, do you?

A.   I'm not sure about that.

Q.   You think the word "color" is going to appear in one of the other three patents?

A.   There are different ways to refer to change in color other than just color -- color change.  You can refer to like change in the wavelengths, as I explained, for example, in my testimony.

Q.   Couldn't it be possible that you weren't talking about changing the color of light in your patents because back in 2009 before you started cooking up this lawsuit, you weren't even thinking about changing the color of light because what you were working on was solar cells.  Isn't that possible?

A.   I disagree with your characterization.

MR. BURESH:  All right.  Could we pull up PTX-19, please?  I'm sorry.  16.  I read my number upside down.

BY MR. BURESH:

Q.   Now, this is the letter you spent some time talking about this morning, correct?

A.   Yes, sir.

Q.   And I believe the four patents you've asserted are listed in this group, right?

A.   That is correct.

Q.   But there's a whole lot of other patents listed in that group too, aren't there?

A.   Yes, sir.

Q.   Correct me if I'm wrong, but 14 total?

A.   I didn't count right now.  But yeah.  It might be around that number.

Q.   Okay.  So you send a letter to ASUS saying, I've got 14 patents and you've got some monitors; pay me some money?

A.   I disagree with your characterization.

Q.   Okay.  14 patents to ASUS in Taiwan and you expect them to just kind of play Go Fish with your portfolio of patents here and figure out what you're talking about?

A.   I disagree with your characterization.

Q.   Now, Dr. Vasylyev, on the stand in a case that we've been working on, you know, against each other for like two years now, you can't give me the content of the basic things you're talking about in court and whether or not they're in your own patents, but you expect ASUS to go through and figure out 14 patents.

163

Is that what we're hearing?

A.   Can you rephrase your question?  It was kind of like so long statement.  What is the actual question?

Q.   My actual question is this:  Do you think it's reasonable, when you can't even remember the contents of your own patent, to expect ASUS to dig through these lengthy specifications to figure them out?

A.   I disagree with your characterization.

Q.   Do you think it's unreasonable for a company that receives a letter like this with no details at all to say, could you give me some claim charts to let me know what's going on?

A.   I disagree with you.  I think it -- letters provide -- this letter provides more than enough details.

Q.   Okay.  If you were a company that made computer monitors and you received a whole bunch of patents, many of which don't even mention monitors, don't even mention displays, but instead are focused on solar light trapping, do you think it might be reasonable for them to say, help us understand what's going on, Dr. Vasylyev?  You're making the accusation.

Is that reasonable for them to ask?

A.   I disagree with your characterization.

164

Q.   So you don't think it's reasonable for a company to just ask for a little help to understand?

A.   It might be reasonable in certain context, but in this particular case, I thought it was more than enough information.

Q.   This letter right here, is that what you're talking about?

A.   Yes, sir.

MR. BURESH:   Okay.   Let's pull up PTX-44.

BY MR. BURESH:

Q.   These are the e-mails you looked at with your counsel this morning, correct?

A.   Yes, sir.

Q.   Now, these are all in one chain.   So we can actually see them in an organized fashion.

MR. BURESH:   And I'd like to go back to the start, please.   So we're going to work in reverse order.   So I'm looking for the March 12th e-mail. Thank you.

BY MR. BURESH:

Q.   So your letter was on February 19th -- I'm sorry.   It's not your letter.   It was Mr. Katz, your lawyer's, letter, correct?

A.   He acted on my behalf.

Q.   Okay.

165

A.    Yes.

Q.    It's February 19th.  By March 12th you're getting a response back from ASUS, correct?

A.    Yes, sir.

Q.    Identifying themselves, saying they're open to talk about things and asking for more information?

A.    Yes, sir.  It specifically asks for exemplary claim charts.

MR. BURESH:  Okay.  And then if we can go up to the next piece.

No.  Down one.  Okay.  Okay.  Down to the March 16th one, please.  Thank you.

There we go.

BY MR. BURESH:

Q.    All right.  Then on March 16th, this is your lawyer writing back to Mr. Wu from ASUS saying:  Thank you.  He's pleased that ASUS is open to discussions.

And then he proposes a nondisclosure agreement to ASUS, correct?

A.    This is correct.

Q.    Okay.  Couple of days later, Mr. Wu responds: We've received the NDA.  And we'll get back to you as soon as possible.

Do you see that?

A.    Yes, sir.  I do.

166

Q.   And your lawyer responds:  Thank you.

A.   Yes.

Q.   Three days later -- sorry.  Four days later, Jason responds with a revised draft NDA, correct?

A.   Yes, sir.

Q.   And five days after that, your lawyer responds, agreeing with the NDA, correct?

A.   Yes, sir.

Q.   And the next e-mail up, there's a countersigned NDA from ASUS to your lawyer?

A.   Which one are you referring to?  Which date?

Q.   I'm sorry?

A.   Which particular e-mail are you referring to?

Q.   Yes.  The April 6th e-mail.  Hi, Bob. Attached please find the countersigned --

A.   The counter -- yeah.  I can see that.  Yes.

Q.   Okay.  Now, at this point, ASUS has asked for a little help in receiving claim charts from you guys. NDAs go back and forth.

And we come to April 6th now.  There's a giant gap between that and the next communication, isn't there?

A.   I'm not sure I understand your question.

Q.   Okay.

A.   Which communications are you referring to?

167

Q.    Mr. Wu on April 6th sends back the draft, the countersigned NDA, correct?

A.    Yes.  Correct.

Q.    Now, your lawyer doesn't respond back until December 2nd?

A.    Yes.

Q.    That's April to May to June to July, August, September, October, November, December.  So there's an eight-month gap where your lawyer's not saying anything, even though ASUS has done everything that your lawyer's asked, right?

A.    Pardon me.  Can you rephrase your question?

Q.    There is an eight-month --

A.    I hear that.  Yeah.  There was a gap, right, between these letters.  Yes.

Q.    And the gap was waiting for your lawyer to respond again, not ASUS delaying.  Your lawyer.

A.    I'm not sure that I agree with your characterization.  We were preparing the claim charts, as I explained in my testimony.

Q.    And we'll get to those.

But we're talking eight months between when we signed your NDA and when you come back to us, right?

A.    Yes.  Correct.

Q.    Now, on the same day, Jason responds.  It's on

the screen in front of you.  And they say:  As you've pointed out, ASUSTeK doesn't manufacture the panels. We don't have all the information on them.

At this point you haven't sent any claim charts, have you?

A.    No, sir.

Q.    Okay.  If we go to next paragraph, we see: Having said that, I am still the ASUS person to handle this case.  Please provide us again with the exemplary claim charts for each of the patents at issue as we requested at the very beginning.

That's what he said, right?

A.    Yes.

Q.    Still waiting?

A.    Correct.

MR. BURESH:  Okay.  Let's go up to the next one.  December 4th.

BY MR. BURESH:

Q.    Your lawyer, Mr. Katz, comes back a couple days later:  I appreciate your follow-up.

Sounds pretty collegial, doesn't it?

A.    Sounds like what?  I'm not sure I understand.

Q.    Collegial.  These guys, they're just talking.

A.    Okay.  Yes.

Q.    Yeah.  I would like to continue to discuss

with you.  But we're looking now at your lawyer's comments.

If you can provide me with the points of contact for your panel manufacturers, I would also be happy to contact them directly, which may help to reduce your role as a go-between, as you mention, and may expedite the process.  Right?

A.    Yes.  This is what Mr. Katz says.  Yes.

Q.    On your behalf?

A.    Correct.

Q.    So it's not unreasonable for ASUS to be providing that contact information that your lawyer is asking for.

That's not unreasonable, is it?

A.    Can you rephrase the question?  I'm not sure I understand it.

Q.    It wouldn't be unreasonable for ASUS to provide the contact information for its vendors that your lawyer is asking them to provide.

That's not unreasonable, is it?

A.    Can you phrase it like in simple terms?  My apologies.  It's just I'm trying to, like, comprehend the phrase.

Q.    Okay.  Your lawyer asked for the contact information for vendors?

170

A.    Correct.

Q.    It's not unreasonable for ASUS to respond by giving him that contact information?

A.    They could respond with the contact information.  That's my understanding.

Q.    Okay.  And if we go up to the next e-mail, which is a February 18th e-mail.

We've seen this one before too.  This is Mr. Wu from ASUS coming back to your attorney with identification of the vendors and contact information for at least one of them, correct?

A.    Say it again.

MR. BURESH:  Okay.  Could we highlight the sentence beginning "More specifically"?

BY MR. BURESH:

Q.    More specifically, you may find out AU Optronics and Innolux are the panel manufacturers for some of the identified monitors.

Do you see that?

A.    Yes.

Q.    So you now know the panel manufacturers at this point?

A.    A couple of names of those manufacturers.  Yes.

Q.    And Mr. Wu provided the e-mail address of the

contact person for AU Optronics; isn't that correct?

A.    That is correct.

Q.    He said:  I'll let you know when we get the contact information for Innolux.  Correct?

A.    Can you say again?  I'm sorry.

Q.    He concluded:  I will let you know if we get the contact information for Innolux.

A.    Yes.

MR. BURESH:  Can we go up to the next e-mail?

BY MR. BURESH:

Q.    Now, this is Mr. Katz responding to Mr. Wu on February 19th of 2022, correct?

A.    Yes, sir.

Q.    And he says:  I appreciate your response.  Still a cordial discussion.

A.    Yes, sir.

Q.    Mr. Katz asks:  Is it okay with you if I tell Linh Ha that I received his contact information from you?

That's what it says, right?

A.    Yes.

Q.    And if we go up one more e-mail, Mr. Wu responds:  It is okay to let Linh Ha know that you received the contact information from me.

172

A.    What's your question?

Q.    Isn't that what it says?

A.    Yes.  It does.

Q.    Okay.  This is February 21st, 2022?

A.    Yes, sir.

MR. BURESH:  Okay.  Now let's go forward one more e-mail, and I promise to all y'all, this is the last one.

BY MR. BURESH:

Q.    February 21st Mr. Katz responds:  Thank you, Jason.  I will reach out to Linh Ha.  Do you have any contact for Innolux?

Do you see that?

A.    Yes.  I do.

Q.    Now, one month from that date, you filed a lawsuit against ASUS, correct?

A.    Right.

Q.    Without any further communication?

A.    I'm not sure about that, but at least in this e-mail chain, I don't see any communication in between.

Q.    And just so the record's straight, I said one month, but I don't want there to be any imprecision. You filed the lawsuit on March 24th of 2022.  So it's one month and three days later?

A.    Yes, sir.

Q.   You said at one point during your direct that the color in ASUS' display was exceptional.

Do you recall that?

A.   Yes, sir.

Q.   Do you know how they get my client -- how do they get exceptional color in their displays?

A.   In some of them, yes.  I do.

Q.   All right.  Do you know that 99.5 percent of the products at issue in this case don't have quantum dots in it?

A.   I don't know that number.

Q.   Okay.

A.   And that ratio.

Q.   Well, assuming that it is a huge ratio that does not have quantum dots in it, how do you think that my client's displays get exceptional color?

A.   Because we disassembled several sample products and we did find these features, and the manufacturer, ASUS, advertises those monitors as such.

Q.   In the 99.5 percent of products that do not use any quantum dots at all, you think ASUS' products still get exceptional color?

A.   I don't think so.

Q.   Oh, those are worse?

A.   I think so.  Compared to the ones that use

174

quantum dots, yes, they're much, much worse.

Q.   Would it surprise you to hear that ASUS in the very few products that use quantum dots has discontinued that product line?

A.   I don't know about that.

Q.   Okay.  Would it surprise you to know that ASUS has never ever used a quantum dot to convert light to electricity like you talk about in your '089 patent?

Would that surprise you?

A.   I don't know whether or not it will surprise me.

MR. BURESH:  Could we pull up from the plaintiff's demonstratives 2.47?

BY MR. BURESH:

Q.   This is the ASUS PA278CV, correct?

A.   Yes.  This is what it says.

Q.   And this is one of the products that does not have any quantum dots, right?

A.   Yes, sir.

Q.   Okay.  Now, when you crack that thing open, there's really two panels in that -- in that display, right?

A.   Like two components.  Yes.

Q.   One is the liquid crystal component, right?

A.   Yes, sir.  That's correct.

175

Q.    And we see that in black leaning up against the wall?

A.    Exactly.

Q.    And then you have a backlight component, right?

A.    Yes, sir.

Q.    And that would be the -- the white part that's laying down on the floor?

A.    Precisely.

Q.    Okay.  So in this backlight, there's no quantum dots?

A.    No.  There are not.

MR. BURESH:  Could we go to the next slide, please?

BY MR. BURESH:

Q.    Now, here, is this your hand we're seeing?

A.    Is this what?

Q.    The blue glove, is that you?

A.    I'm not sure about that.  It might be me. Yes.

Q.    Okay.  But what we have here is a series of optical films, correct?

A.    Yes, sir.

Q.    Okay.  I believe you said first there was a prism sheet on top working our way down?

A.    No, sir.

Q.    What's the top one?

A.    The top one in this particular product I believe is a diffuser.

Q.    Okay.  A diffuser.

How long have diffuser sheets been around?

Let me narrow this down.  Well before 2009?

A.    Yes, sir.

Q.    You can go to any number of different vendors and buy a diffuser sheet, right?

A.    Yes.

Q.    Okay.  You didn't come up with that?

A.    No, sir.

Q.    Okay.  Let's go to next layer down.  What's that one?

A.    I believe that's another diffuser sheet.

Q.    Okay.  Same answers.  It's been around a long time before your 2009 work that you were doing, right?

A.    Yes.  The concept of diffuser sheets, yes.

Q.    And you can --

A.    It was.

Q.    Well before 2009, you could buy these multiple places on the market?

A.    I'm not sure about these, but yes.  You can buy some forms of diffuser sheets.  Yes.  Some types.

177

Q.    What's the next one down?

A.    It's, I believe, yet another diffuser sheet.

Q.    So same answers?

A.    Yes, sir.

Q.    Now, beneath that is the light guide?

A.    That is correct.

Q.    And then beneath that is a reflector sheet?

A.    That is correct.

Q.    Now, reflector sheets were around a long time before 2009?

A.    Yes, sir.

Q.    Widely available?

A.    Yes, sir.

Q.    Okay.  Now, this light guide that I kind of skipped over, let's spend a little more time there.

Light guides for backlights have been around long before 2009?

A.    Light guides were -- yes.  They were available before.

Q.    Okay.  Edge-lit light guides have been around a long time before 2009?

A.    Well, I'm not sure about your characterization of "long time."  Yes.  But they were known at the time.

Q.    Okay.  How about ten years before?

A.    I'm not sure about that.

178

Q.    Okay.  But before 2009?

A.    Right.

Q.    And by edge-lit, we mean if we hold up the piece of plastic, we're pumping light into the thin edge, right?  Have an edge-lit light guide?

A.    Yes.

Q.    Using LED lights, right?

A.    Yes.

Q.    Now, I believe you said during your direct, and I just want to check this to confirm I heard you right, that by 2009 most edge-lit backlights were using fluorescent tubes?

A.    Correct.

Q.    You're sure of that?

A.    Yes, sir.

Q.    Now, during your description of your teardown as well as your patents, you never mentioned the LCD component, the piece that was up against the wall, at all, did you?

A.    I believe I mentioned it in one way or another.

Q.    But that was not part of your inventive work in your opinion?

A.    Right.  That's correct.

Q.    Now, an LCD, that's the part when you hear

about the number of pixels.  The pixels are in the liquid crystal display, right?

A.   Correct.

Q.   They're not the little dots that you've been pointing to, the surface deflection features.  Pixels are in the LCD?

A.   Yes.

Q.   And the way pixels work is they're basically millions of little shutters to let light out at specific times and specific ways to create an image?

A.   Yes.

Q.   And you didn't have anything to do with that in your invention or that in my client's products, right?

A.   You combined like two different substances.  Can you like --

Q.   You didn't have --

A.   -- rephrase your question?

Q.   -- anything to do with that in my client's products, the LCD component?

A.   No.

Q.   You showed the jury a flexible LED panel.

Do you recall your testimony about that?

A.   Yes, sir.

Q.   Can I pick this up?  Do I have your

180

permission?

A.     The box?

Q.     Where did the LED panel go?

          (Conference between counsel.)

BY MR. BURESH:

Q.     Do you mind?

A.     If my counsel does not mind.

          MR. MCCARTY:  It's okay.  Do you need some help?

          THE WITNESS:  May I ask you to handle by the edges only?

          Yes.  Thank you.  Appreciate that.

BY MR. BURESH:

Q.     Now, this is not a backlight for an LED panel, is it?

A.     It's a component that can be a part of a backlight.

Q.     You can see through this, can't you?

A.     Yes, sir.  You can.

Q.     Now, when you get my client's product out, which I think the jury will see pretty soon in this case, can you see through the light guides?

A.     You don't see the light guide in the display because it's hidden underneath the screen.

Q.     When you tear down a product and you get a

181

light guide out of it, can you see through it like this?

A.     Not like that, but in some portions, yes.  It would be more or less transparent.  In some, it would not.

Q.     In my client's, are they transparent or not?

A.     Oh, no.  They're not transparent like that.

Q.     They're not like this?

A.     No.

Q.     Okay.  Now, when you turned this on, as you did, it was pretty dadgum bright, wasn't it?

A.     I believe it was.

Q.     Would we want a display pumping out the degree of bright light that these folks saw this morning?

A.     For backlight, you would want it.

Q.     Well, for a big light you would.  But how about for a display screen that we have to look at while we're reading patents?  Would we want all that light being blasted into our eyes like the jury saw this morning?

A.     It won't blast it into their eyes because it will be behind the LCD display.

Q.     I didn't ask that.  Do we want the degree of light that this put out in the jury's eyes this morning coming at us from a display, yes or no?

182

A.   In some applications, probably you won't, if it is for indoors.  But for outdoors, you might need it to be that bright.

Q.   So it kind of comes down to the application, doesn't it?

A.   It depends on what you ask about.

Q.   Whether you want super bright light or not depends on the application, doesn't it?

A.   To some extent, yes.

Q.   Because you might have a LED display along the highway pumping out gigawatts -- I don't even know what the term is -- a whole bunch of light so that people can see it from the highway.  You might want that.  That'd be an application that would have a benefit from really bright light coming out, fair?

A.   Fair.

Q.   But if we're looking at these screens in front of us and we're trying to look at them for long periods of time because we're sitting at a desk working, do we want really bright light coming out at us, yes or no?

A.   You need at least a minimum brightness, and in many cases, you want it to be as bright as possible to a certain degree.  But there's like a -- kind of like a range of brightness that would -- you would need to have.

Q.    This is simple.  I got to sit in front of this monitor for the next six hours staring at it.

Do you think that I want really bright light coming into my eyes?  Yes or no?

A.    It depends on your application.  If you are a gamer and you use like a gaming monitor, then you would want like the so-called HGR.  And the HGR requires the monitor to be output in exceptionally bright.

Q.    So you think gamers want to be blinded?

A.    Well, I hope the jury did not get blinded from this panel.

Q.    I mean, I was almost blinded from across the room.  I was scared for what was happening in front of them.  Given too long in front of that, they might start tanning.  It's a lot of light, isn't it?

A.    It is a lot of light.  Yeah.  We're very proud of that, that we were able to achieve that kind of brightness.

MR. BURESH:  Could we go to the slides for SVV, please?  The Vasylyev slides.  PDX.  Let's go with 2.3.

BY MR. BURESH:

Q.    This was from your testimony today.

Do you recognize it?

A.    Yes, sir.

184

Q.    Okay.   The solar energy appliance on the left, not a display monitor, right?

A.    It is not.

Q.    The daylight redirecting window film in the middle, that's something you put on your windows, not a display monitor, correct?

A.    That is correct.

Q.    And this daylight film doesn't have anything to do with the patents either, right?

A.    No.  I don't believe it doesn't have to do anything this patent, except that it uses similar concepts and some microstructures in it.  But it's not part of the claimed invention.

Q.    It doesn't use the patents?

A.    Pardon me?  No.  It does not use the patents. That would be a better way to put it.

Q.    Now, the flexible panel that we've been talking about, it's used for general lighting like replacing fluorescent fixtures in commercial buildings or making architectural or decorative lighting; isn't that correct?

A.    It's one of the many applications of these panels, but there are many more.

Q.    This flexible LED panel is not a display monitor?

A.    It is not, sir.

Q.    And in fact, it is different from your patents?

A.    Yes, sir.  If you are talking about these particular patents, yes.

Q.    Yeah.  These four.

A.    Yes.  It's different.

Q.    So all of the products that you've shown to the jury here on these slides, none of them was a monitor?

A.    That is correct.

Q.    And you've never sold a computer monitor?

A.    No, sir.

Q.    You've never sold components for use in a computer monitor?

A.    No, sir.

Q.    You've never sold an LCD panel backlight like the ones we're talking about in this case, correct?

A.    I'm not sure that that would be the -- correct.  So we have sold some backlights.

Q.    Have you ever sold an LCD panel backlight?

A.    No.

Q.    Now, to be clear, you've never actually sold any product that embodies the inventions in these four asserted patents, have you?

A.   No, sir.

Q.   You also talked --

MR. BURESH:  Let's go to the next slide, PDX-2.4.

BY MR. BURESH:

Q.   You talked about some awards and some grants that you got during your testimony?

A.   Correct.

Q.   Okay.  Now, those awards, you can't say any of those were for the inventions described in these four asserted patents, can you?

A.   No, sir.

Q.   And the public recognition that your lawyer and you talked about, you can't say that any of that recognition was for the inventions described in these patents, can you?

A.   Yes.  That's correct.

Q.   Finally, these grants from the U.S. Department of Energy and California Energy Commission, those sorts of things, none of them were used to develop any of the inventions described in the asserted patents?

A.   That's correct.

Q.   We also saw after the light lesson a picture of a big TV.

Do you remember that?

187

A.    Yes, sir.

Q.    And you talked about how you were making TVs thinner?

A.    I disagree with your characterization.

Q.    Well, you thought your invention would lead to TVs or monitors being thinner?

A.    Yes.  That would be a correct statement but not the previous one.

Q.    But again, you didn't show the jury anything to give them an opportunity with their own two eyes to see that that's actually the case, did you?

A.    Well, I showed the examples of the products that they have developed which can be components of the TVs or monitors.

Q.    Did you ever look around and say, I could -- I could buy the liquid crystal component from a vendor just like ASUS does?  You could do that, right?

A.    I'm not sure about that.

Q.    Did you ever try?

A.    Yes.

Q.    Okay.  Did you ever try to build these -- or excuse me -- buy these various optical films from a vendor?

A.    Yes.

Q.    Did you put together a monitor?

188

A.     No, sir.  If you're talking about computer monitors, no.  LCD monitor.

Q.     So you can't say with any certainty based upon real-world prototypes or testing that your product even works the way you've described it, can you?

A.     I'm pretty sure that it will work.

Q.     Just like I was pretty sure my paper airplane was going to fly?

A.     So what's your question?

Q.     You have not shown me, have you?

A.     Anybody in the field of optics will recognize and understand that these systems will apply and work.

Q.     I seriously doubt that.  But we do have your opinion.

Now, you are the sole shareholder of SVV, right?

A.     That is correct.

Q.     You control where the money goes?

A.     Yes, sir.

Q.     So if you win this case, big -- you know, all this money you're asking for, if you got it, it would come to you, right?

A.     No, sir.

Q.     Come to your company that you fully control?

A.     That is correct.

Q.    Okay.  Do you think it's possible that when you have that kind of interest in this case, that your view might be skewed just a little bit?

A.    That is wrong.

Q.    We're all human here.  A giant self-interest, you don't think that skews your view in my way?

A.    I don't think so.

Q.    Okay.  Now, when you went through the process of preparing the claim charts -- and I think the testimony was you prepared the claim charts that were sent by your lawyer to ASUS, correct?

A.    Okay.

Q.    Is that correct?

A.    Yes, sir.

Q.    Is it possible that when you were preparing your claim charts, your view of how you might interpret one thing or another could be a little off because of your goals?

A.    No, sir.  I completely disagree with that.

Q.    Okay.  Let me ask it this way:  You're not trained in the law, are you?

A.    No, sir.

Q.    And you can't really tell the jury anything about infringement, can you?

A.    I have certain expertise, but I'm -- certain

190

knowledge, but I'm not expert in assessing infringement.  Yes.

Q.    In fact, you wouldn't be in a position to even make a connection between the claim charts you put together and a finding of infringement.

You're just not positioned to do that, are you?

A.    I don't believe so.  I mean, I disagree with what you're saying.

Q.    So you said you disagree with me?

A.    Right.

Q.    Okay.  Let me ask you this:  The claim charts you made are identifying, in your opinion, how ASUS products infringe the particular patents discussed here?

A.    Yes, sir.

Q.    You agree the term "infringement," it's sort of a legal term?

A.    Yes.

Q.    Okay.  So at the time you were deposed in this case, you could not express any opinion whatsoever about infringement, could you?

A.    I'm not sure that I would agree with your characterization of what I said.

Q.    You have no understanding of what the term

191

"infringement" means; is that correct?

A.    That is incorrect.

Q.    But you cannot testify to any questions that would include the notion of infringement?

A.    No.  I cannot provide legal opinion or to be precise in the absolute legal terms, but I can understand how the infringement works to a certain extent, to the extent I was able to actually map those products and create the claim charts.

Q.    Let me break this down as simply as I can.

You cannot testify on the questions that would include any meaning of the word "infringement," can you?

A.    Right.

Q.    And you're not trying to tell this jury that you've reached conclusions of infringement because you can't do that?

A.    Right.  I believe that these products were infringing based on my analysis, but we have dedicated expert who will testify specifically on the infringement.

Q.    I understand your opinion.  And my final question to you is:  You're not entitled to offer that opinion, are you?

A.    I'm not sure about that.

MR. BURESH:  I pass the witness, Your Honor.

MR. MCCARTY:  Your Honor, may we approach quickly?

THE COURT:  Yes.

(Bench conference.)

MR. MCCARTY:  On cross-examination, Your Honor, Mr. Buresh opened the door on several MILs relating to the Court's claim construction order. Specifically the dispute in the claim construction was whether the terms --

THE COURT:  We're not going into anything that was debated during construction.

MR. MCCARTY:  Exactly.  And that's what just happened.  He's told --

THE COURT:  The time to deal with that was when he asked it and you could object.

MR. MCCARTY:  Okay.  But this is a -- we blew right through that MIL and I need some help understanding whether or not --

MR. BURESH:  I didn't even talk about a claim term.

MR. MCCARTY:  Absolutely.

THE COURT:  This isn't between you two.

MR. BURESH:  Sorry, Your Honor.

MR. MCCARTY:  If I could, Your Honor.

THE COURT:  So what is it you want to ask him?

MR. MCCARTY:  So there are three issues. The first is, the quote is, the products don't convert light to electricity like you say in your patents. That's what he just said.  That is precisely the argument that Your Honor rejected and ended up being our claim construction order.

The same exact thing happened with the light harvesting term.  It's a very specific thing.

THE COURT:  Well, you can have your expert explain why the answers he gave are irrelevant to the -- in your opinion are irrelevant to infringement because they're not part of my claim construction.

MR. MCCARTY:  So there's one additional thing that I wanted to raise, which is the fact that this actually came up at the pretrial order because they were --

THE COURT:  No.  Let me back up and say your expert can't go and say, no.  They argued that at claim construction.  What he can say, you were here when counsel asked the inventor this and he said that, does that have anything to do with infringement?  No.

194

Why not?  Because what the Court said was X.

MR. MCCARTY:  Okay.  I'm just clarifying that because --

THE COURT:  I got it.

MR. MCCARTY:  Yeah, okay.  Thank you.

THE COURT:  But what doesn't come up is a dispute -- anything happened prior to me giving the construction.  What you wanted, what they wanted, whatever that is.  That doesn't matter now.

If you think that counsel's trying to mislead the jury by asking something that doesn't fall within the ambit of my claim construction, that is appropriate for you to deal with but not with this witness.

MR. MCCARTY:  Okay.

THE COURT:  Another reason, he wasn't at the claim construction.

MR. MCCARTY:  Yeah.  So I think it's appropriate for Mr. Credelle to do it and we can address that at that time.

THE COURT:  Okay.

MR. MCCARTY:  Thank you.

(Bench conference concludes.)

MR. MCCARTY:  Just some follow-up, if I may, Your Honor?

REDIRECT EXAMINATION

BY MR. MCCARTY:

Q.   Dr. Vasylyev, thank you for your testimony.

There was an insinuation about money coming into your company and maybe to you.

Do you recall those questions?

A.   Yes, sir.

Q.   Are you trying to get rich off this case, sir?

A.   Not at all.

Q.   Can you explain to the jury where money from licensing and things like this go to and what they're used for?

A.   Yeah.  First of all, the jury needs to understand that I have to pay very significant bill -- legal bill for being represented in this case.  Then typically what happens to the rest -- to what's left, roughly half goes into taxes because in California in addition to federal taxes, we also have California tax.

And then the remaining proceeds of some -- my plan is to use this money to further grow the business, to create new technologies and products, and also expand into new markets so that we can be a leading manufacturer of lighting technologies that use our patented -- patents in particular.

Q.   Thank you.

Now, there were some questions about the term "light trapping."

Do you recall those questions?

A.    Yes, sir.

Q.    Okay.  Mr. Buresh seemed to be acting like light trapping is not related to the displays at issue in this case.

Did you get that sense?

A.    Yes.  It sounded like that.

Q.    Do you agree with that?

A.    No.

Q.    Okay.  What did you explain earlier about the relationship between light trapping and total internal reflection in the products at issue in this case?

A.    Right.  So there are different ways how light trapping works in the LCD displays.  One way would be how the light is trapped is in the light guide itself.

And if you remember, I was explaining how the light is, you know, confined in that light guide so it bounces back and forth.  So it actually stays trapped until it is extracted by those microstructures when it -- where it's needed so that you can get a very uniform light.

Q.    And that's for displays, correct?

A.    Yes.  It's for displays, just one example.

Another example of light trapping would be when you use the quantum dot film, then you have another play with light trapping when you have light bouncing back and forth between like top layer, which would be in that case the so-called brightness enhancement film and reflector on the back.

So the light actually bounces back and forth multiple times so that it can pass through that quantum dot film many, many times, and so you can get a richer color and that would provide you an improved color gamut.

And you can also save costs on using less quantum dot materials which are -- by themselves are very and very expensive.

Q.    In order to determine the infringement of the patents, do we look at the title of the patent?

A.    No, sir.

Q.    The summary of the patent?

A.    No, sir.

Q.    The background of the patent?

A.    Not at all.

Q.    The abstract of the patent?

A.    No.

Q.    What do we look at?

A.    We're looking at claims specifically.

198

Q.   Did Mr. Buresh go through all the claims in this case?

A.   No.   None.

Q.   Do you understand that that is a rule, or is that the test for patent infringement?

A.   Yes, sir.

Q.   Do you remember some questions about how like the '342 patent and the '562 patent don't mention quantum dots?

A.   Yes.   I remember.

Q.   Okay.   Are those patents even applying or applicable to the quantum dot products at issue in this case?

A.   No, sir.

Q.   Now, regarding quantum dots --

MR. MCCARTY:   Could I have the '089 patent?   Let's look at the abstract.   If you could zoom in in that, Mr. Diaz.

BY MR. MCCARTY:

Q.   It says:   The light trapping optical structure includes a photoresponsive layer including semiconductor quantum dots.

Did I read that correctly, sir?

A.   Yes.

Q.   Does that say anything about converting to

electricity?

A.    No, sir.

Q.    Does that say anything about photovoltaic or solar energy?

A.    No, sir.

Q.    Can you explain to the jury why quantum dots can change light to particular colors?

A.    Yes.  So it's not about like being -- them being of specific type.  Actually it's the size of the quantum dots that defines the color in which they need light.  So that's important to understand.

MR. MCCARTY:  Mr. Diaz, could we have the '318 patent?  If we could go to Column 15, Lines 15 through 25.

BY MR. MCCARTY:

Q.    The suggestion I got from counsel for ASUSTeK was that the '318 patent had no discussion of anything related to this case.

Do you recall that insinuation?

A.    Yes.

Q.    Okay.  If we could look down here at the patent -- '318 patent.  What have I underlined there, sir?

A.    It says:  Optical waveguides, lighting panels.

Q.    Do you remember showing this to the jury, sir?

A.    Yes, sir.

Q.    PTX-109.010?

A.    Yes.

Q.    Is this one of the products in the case?

A.    Correct.

Q.    Is that film right there an optical waveguide?

A.    It is a waveguide.

Q.    And is that waveguide inside of a lighting panel?

A.    That is correct.

Q.    In the products at issue in this case?

A.    Yes, sir.

Q.    Do you remember being asked questions about -- well, let me ask you:  In direct examination, do you recall answering questions about how you filed several different applications?

A.    Yes.

Q.    Can you explain to the jury how filing different applications allows you to cover different aspects of your invention?

A.    Yes.

Q.    Please go ahead.

A.    Yes.  So basically a single application can describe multiple inventions.  In fact, there can be many and many inventions described in a single patent

application.

And then in your claims, you can direct your specific invention to a particular application, or one or two, or a specific implementation.

And then in continuation applications, for example, you can like file additional patent applications that are based on your initial one where you can explore further applications and describe more and more applications.

So this is how -- how it works.  So basically in a single patent -- the bottom line is, in a single patent, you can describe and then claim many different technologies and many different applications as long as you have them described in the patent.

Q.    Did you get the sense from some of these questions that Mr. Buresh was trying to insinuate that your inventions were limited to solar energy?

A.    I do.

Q.    Have companies paid for the right to practice your patents?

A.    Yes, sir.

Q.    Can you name one?

A.    MSI.

Q.    Is that a solar energy company?

A.    No, sir.  They make computer monitors.

Q.   Are there any other companies that have paid for the right to practice those patents?

A.   Would be Samsung.

Q.   Is Samsung a big solar energy company?

A.   I don't believe so.

Q.   Was that issue about computer monitors and --

A.   Yes.  That was about computer monitors.

Q.   Now, do you recall answering some questions about the kind of back-and-forth between Mr. Katz, your attorney, and the folks at ASUSTeK before?

A.   Yes, sir.

Q.   Mr. Buresh kept calling it "collegial."

Do you recall that?

A.   Yes.

Q.   Are you certain -- or do you ensure that your attorneys and your representatives working on your behalf are respectful to other people?

A.   I believe it's very important.

Q.   Like always respectful?

A.   Yes.

Q.   Do you think that you should be blamed for making sure that your folks that represent you are respectful to others?

A.   Yes.  No.  I believe that I -- yeah, should not be blamed for that.

MR. MCCARTY:  Could we go to PTX-30, Mr. Diaz, and go to the December 2nd e-mail?

And could we please go down one more to Mr. Katz's e-mail?  Yes.  It says:  Hi, Jason.  Or sorry.  Yeah.  Just there.

BY MR. MCCARTY:

Q.   Now, when Mr. Buresh was going through this correspondence, it seemed to me like the insinuation was that Mr. Katz, your attorney, was asking for information on how to contact the third-party suppliers and manufacturers.

Do you recall that?

A.   Yeah.  It sounded like that.

Q.   But did he come up with that notion out of the blue?

A.   No.

MR. MCCARTY:  Pete, if you'd go to the Jason Wu e-mail.  December 2nd.

BY MR. MCCARTY:

Q.   Who gave him the idea that he probably needs to go talk to somebody else in the first place?

A.   I'm sorry.  Can you repeat?

Q.   Who gave Mr. Katz the idea that he needs to talk to someone other than ASUSTeK?

A.   Oh, actually, that was said by the ASUS.

Q.   So ASUS told him to go talk to somebody else?

A.   Exactly.  Yes.  So they tried to redirect.

Q.   Do you recall questions about whether or not you make all the components of an LCD monitor?

A.   Yes.  I do.

Q.   And do you make full LCD monitors to sell in the market?

A.   No, sir.

Q.   Is there another company in the room that doesn't make LCD monitors?

A.   Yes.

Q.   Who's that?

A.   Would be ASUS.

Q.   Do you think it's a fair line of questioning?

A.   No.

Q.   Does it relate to whether or not they infringe your patent?

A.   No, sir.

Q.   You showed your light guide plate, and there was a question about whether or not it was transparent.

Do you remember that?

A.   Yes, sir.

Q.   You know some of the patent claims require that they're transparent, right?

A.   Yes.

205

Q.     And so when you said that the ASUSTeK products weren't transparent, you were referring to in comparison to that particular product, correct?

A.     Correct.  So you cannot see, like, objects clearly behind it because you have like this complex structure.  But the material itself is of course transparent.

Q.     It is your job in this case to prove infringement?

A.     No, sir.  Not my role in this case.

Q.     You're a fact witness, correct?

A.     Correct.

Q.     Okay.  Whose job is it to come in here and explain to the jury how the infringement works?

A.     It would be Mr. Credelle.  So he will be testifying on that.

Q.     Now, do you recall questions at the end there about whether your invention benefits products by making them thinner?

A.     Yes.

Q.     And you were asked if you had any -- seen any evidence or shown any evidence that your invention actually offers a benefit.

Do you recall that?

A.     Yes.

Q.   When you performed your analysis of all the products that we went through today of ASUSTeK's, did you find some that did not have your invention in them?

A.   Yes.  I did.

Q.   How many total did you cut up?

A.   The ones that did not infringe?

Q.   Total.

A.   Total.  Well, dozens and dozens.  So --

Q.   And every once in a while, there'd be one that did not have your technology?

A.   Right.  Let's say roughly speaking, we found like 60-plus, like, infringing and maybe 20, 25 not infringing.

Q.   Is one of the products that you cut open that did not have your technology in it the VG27AQ?

A.   Yes.

MR. MCCARTY:  Mr. Diaz, could I get Slide 13 up there from a couple of extra slides?  I think it's the other set of slides that I just made up for you.

BY MR. BURESH:

Q.   Okay.  What are we looking at here, sir?

A.   So we're looking at like very close photograph of like individual LEDs that are used in that display.  And also we see their measurements.  The measurements

207

of their, like, dimensions.

Q.   And did you analyze the same thing for a product at issue in the case, the VG27AQL1A?

A.   Yes, sir.

MR. MCCARTY:  Go to the next slide.

BY MR. BURESH:

Q.   Did the LED get smaller?

A.   Yes.  Considerably smaller.

MR. MCCARTY:  Can you go to the next slide?

BY MR. MCCARTY:

Q.   Tell me what we're seeing here and how that works.

A.   Yeah.  So on this slide, like on the top, on the top line, you see the LEDs that are used in the product that is not using my patented technology.  And on the bottom, you can see the product that is using my patented technology.  And you can see how big a difference in the amount of LED materials used in those displays.

Q.   And so the LEDs got smaller?

A.   The LEDs got smaller.  So if you, like, compare the area, I think it's like 1.7 times' reduction.  If you compare like the whole -- the volume occupied by LEDs, that would be like 2.4 times'

reduction.  It's a huge reduction in the use of raw and pretty expensive materials.

Q.    Are there other materials that you don't need when you use your technology?

A.    Yes.  So basically, there are actually several areas where you can benefit and reduce the amount of raw materials.  For example, in the optical layers. Let's talk about them first.

So you can get a thinner light guide and save on that, you know, optical plastic, which is much more expensive than a conventional plastic.  You can use thinner -- a smaller number and thinner optical layers like those diffusers.

You can also -- besides just optical layers, you can also save on LEDs as well, just as you've seen before, just on this slide, for example.

Also, these, like, pad on which the LEDs are mounted, which is called the "PCB," or printed circuit board, so it has like a special metal core.

MR. BURESH:  Your Honor, it took me a minute to confirm.  I don't believe we've ever seen this before.

MR. MCCARTY:  I'll get you a copy.

MR. BURESH:  I don't need a copy.  I've never seen it before.

MR. MCCARTY:  It's your products.

THE COURT:  Counsel, if he hasn't seen this slide before.

MR. MCCARTY:  You can take it down, please.

MR. BURESH:  Why are you putting -- I'm sorry, Your Honor.

THE WITNESS:  Do I need to continue?

MR. MCCARTY:  That's okay.

Dr. Vasylyev, thank you for your testimony.  Appreciate your time.  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Any other questions?

MR. BURESH:  Can we approach?

THE COURT:  Yes.

(Bench conference.)

MR. BURESH:  Gave it to me the night before.

THE COURT:  Gentlemen, you talk to me.

MR. BURESH:  I'm sorry, Your Honor.

THE COURT:  Not to each other.

MR. BURESH:  Understood.

I believe there's a door opening when Dr. Vasylyev said that he was not going to be taking home much money because he had to pay his lawyers.  I

210

believe that goes through the in limine on contingency fee arrangements and allows me to ask questions as to his lawyer arrangement -- his lawyer pay arrangement. Excuse me.

THE COURT:  What exactly did he say?

MR. BURESH:  He said of the whatever money I take home, I'm not going to be able to receive most of it because much of it will go to the lawyers.

MR. MCCARTY:  He said, I think, legal fees or legal costs, something like that.  And there was absolutely no door opening.

The issue was responsive to the question of the insinuation that we were just going to get rich, going to make a bunch of money, his responding to that. I didn't open a door about fee arrangements or any of that stuff.

And I also didn't ask the question, hey, are you paying your lawyers a bunch of money or anything like that.  I just asked:  Are you going to be pocketing all this money?

And he answered:  No.  There's other considerations and what I intend to do with the money.

THE COURT:  I agree.  I'm not going to allow you to do that.

Are you going to ask him any questions?

211

MR. BURESH:  I am.  Thank you, Your Honor.

(Bench conference concludes.)

RECROSS-EXAMINATION

BY MR. BURESH:

Q.    Dr. Vasylyev, you have just answered a few questions about light trapping, and I believe you said that light guides trapped light?

A.    Yes, sir.

MR. BURESH:  Okay.  Could we pull up PDX-2.35?

BY MR. BURESH:

Q.    Now, in this slide, Dr. Vasylyev, the dark blue is a light guide?

A.    On the right, yes.

Q.    On the right.  Okay.

And the LED is pumping light in the edge of the light guide?

A.    That is correct.

Q.    And then the light hits deflecting elements and exits the light guide?

A.    Correct.

Q.    So when I think of a trap, I think of something coming in being trapped so it can't get back out.

212

Do you have some different understanding of what a trap is?

A.   Yes, sir.

Q.   Okay.

A.   Do you want me to explain?

Q.   Let me ask it this way:  You see that door back there?

A.   Yes, sir.

Q.   And I'm right here at this podium.  Am I trapped in this room during the time it takes me to walk from here to the door?  Am I trapped during that time?

A.   I don't believe so.

Q.   Okay.  Your counsel asked you:  Did Mr. Buresh, that's me, ask you anything at all about the claims of the patents?

And you, I dare say, gleefully said:  No.  He did not.

A.   Yes, sir.

Q.   Now, when you were on your direct, you didn't talk about the claims of the patent, did you?

A.   I don't remember.  Probably not.

Q.   You don't remember your testimony?

A.   Yeah.  I mean, it was lengthy one, but I can't recall.

Q.   You don't know whether two hours ago you talked about the claims or you didn't talk about the claims?

A.   I can't recall.

Q.   Hmm.  Well, it wouldn't be surprising, assuming you didn't, because we never heard it, that I wouldn't ask you questions about something you didn't testify about.  That's not real surprising, is it?

A.   I disagree with your characterization.

Q.   Now, the claims of the patent, they're the ones at the end, right?  They're the part of the patent at the very end.  The numbered paragraphs?

A.   Yes.  Typically in the printed form, they oftentimes appear at the end, yes.

Q.   And they're the -- kind of the important conclusion of the patent, right?

A.   I disagree with your characterization.

Q.   You don't think --

A.   These are not conclusions, these are claims.

Q.   Okay.

A.   It's a different term.  I think you should know.

Q.   The claims are important and they're at the end of the patent, fair?

A.   Yes.

214

Q.   Okay.  Now, let's say I open up a novel. Okay?  And there is an exciting conclusion in the last chapter.  I mean, it's -- it's really important.  The conclusion is beautiful.  But if I don't read the first 15 chapters of the book, I don't really understand that conclusion in the last chapter, do I?

A.   I don't know.  I don't see any, you know, comparison that can be drawn between the -- a novel and a patent.

Q.   Okay.

A.   These are just completely different types of writings and documents.

Q.   So you would have this jury believe that they should just ignore the entirety of the patents, don't look at those patents, up until the claims.  You don't want them to look at it?

A.   This is not what I said.  I disagree with your characterization of my words.  The description is important, but the scope of the patent is defined by the claims.

Q.   I agree.  The description is important.

Let's go to the '089 description.

MR. BURESH:  Could you pull up for me the abstract to begin with?

BY MR. BURESH:

Q.    Now, your counsel showed you this abstract and said there's nothing about converting light to electricity right here in this abstract.

Do you recall that?

A.    I'm not sure that that was the exact wording that he used.

Q.    Okay.

MR. BURESH:  Let's go to the field of invention which begins the written description.

BY MR. BURESH:

Q.    Field of invention:  The present invention relates to a device and method for harvesting radiant energy emanated by a distant radiant energy source, particularly to collecting the sunlight and absorbing it by a light sensitive material, medium, or device.

Do you see that?

A.    Yes, sir.

Q.    So if we turn a page, we start seeing your patent talk about solar collection, right?

A.    It does talk about solar collection here. Yes.

MR. BURESH:  Let's go to the '318 patent. Column 15, please.  And if you could zoom in on the paragraph from Lines 15 through 25.

BY MR. BURESH:

Q.    Now, we just saw this a minute ago, right?

A.    Yes.

Q.    And I believe your counsel highlighted "optical waveguide" in the last -- second-to-last line there, right?

A.    Yes.

Q.    And lighting panel, right?

A.    Yes, sir.

Q.    Now, let's look at the context of this paragraph because context is important.  Just the paragraph.  The optical cover 2 employs an optical cladding layer 22.

Do you see that?

A.    Yes, sir.

Q.    Okay.  Now, layer -- the next sentence or the second sentence down:  Layer 22 should be made from a material having a lower refractive index -- and it goes on from there.

A.    I see that.

Q.    So we're now talking about a cladding layer, right?

A.    Right.  That's in this device.

Q.    Okay.  Now, go down to "suitable" about halfway down there:  Suitable cladding materials may include low refractive index monomers, polymers,

-217-

fluoropolymers, low-n optical adhesives, thin films, and other materials that are commonly used for cladding in optical waveguides, light panels, and photovoltaic cells.

Do you see that?

A.    Yes.  I can see that.

Q.    So we're just talking here about we could go look at these other devices to get suitable cladding materials.  That's what it's talking about, right?

A.    I'm not sure I would agree with your characterization what it says.

Q.    This is not saying that your invention would be used -- the '318 patent invention would be used in the context of a waveguide or a lighting panel.  It's not saying that, is it?

A.    I believe it implies by virtue of using this language and mentioning these devices.  Anybody, I think, in -- you know, skilled in the art in this field will understand it this way because it suggests that these are the contacts and applications of the device.

Q.    It suggests it'd be a good place to go to find some cladding materials, right?

A.    No.  I disagree with your characterization.

Q.    All right.  MSI and Samsung.  You said these are display companies that have paid to use my

technology, right?

A.    Yes.

Q.    With a gun to their head, right?

A.    Totally disagree.

Q.    You sued MSI?

A.    That is correct.

Q.    You sued Samsung?

A.    Yes, sir.

Q.    Now, earlier I think you said the law requires a party like ASUS to enter a licensing agreement.

Do you recall saying something to that effect?

A.    If they infringe, yes.

Q.    And that's the big if, right?

A.    Correct.

Q.    If my client doesn't infringe, you would agree with me that they do not owe you one red cent, right?

A.    Yes, sir.

MR. BURESH:  Pass the witness, Your Honor.

MR. MCCARTY:  Just a couple of questions, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. MCCARTY:

Q.    Do you remember when I was asking you if you make sure that your attorneys and your representatives

treat people respectfully?

A.    Yes, sir.

Q.    Including in the courtroom?

A.    Yes.

Q.    You think characterizing this situation with a Samsung or an MSI as "a gun to your head" is respectful?

A.    Absolutely not.

MR. MCCARTHY:  Could you please go to Slide 2.35?

BY MR. MCCARTY:

Q.    Is the light trapped until it hits a microstructure then to exit out collimated?

A.    That is exactly what is happening.  It propagates the index light guide in the trapped state until it hits one of those microstructures, and then it continues -- the rest of the light continues propagating also in the trapped state until it hits one of the further microstructures along its path.

So the whole purpose of this waveguide is actually to confine, in other words, trap that light and prevent it from coming out until it's needed.

Q.    Does it have anything to do with whether or not that door's locked?

A.    No.

220

Q.   And when that light is trapped in there until just the right time it can get out, what does that allow you to do in terms of the size and the --

A.   Yeah.  So trapping that light actually is extremely beneficial for LCD displays because in their backlights, you can propagate light long distances and emit light only where it's needed so that you can make very big large-area displays and not sacrifice any uniformity or, let's say, to significant degree the efficiency or brightness.

Q.   Is that what we saw with your prototype design down there?

A.   Yes, sir.

Q.   Okay.

MR. MCCARTHY:  No further questions.

MR. BURESH:  Nothing further, Your Honor.

THE COURT:  You may step down.

You may call your next witness.

THE WITNESS:  Thank you.

MR. REICH:  Your Honor, Seth Reich for SVV, and we call Mr. Tom Credelle.

(The witness was sworn.)

DIRECT EXAMINATION

BY MR. REICH:

Q.   Good afternoon, Mr. Credelle.

A.   Good afternoon.

Q.   Are you an SVV employee?

A.   No.  I'm not.

Q.   Are you what's called an "expert witness"?

A.   Yes.  That's my role.

Q.   What is the role of an expert witness in a trial?

A.   It's to use my experience and knowledge to understand all the issues regarding these claims and these infringement that we'll discuss today.

Q.   And can you see confidential information of ASUS' that SVV employees cannot see?

A.   Yes.  That is correct.

Q.   Now, as part of being an expert witness, did you know Dr. Vasylyev before this case?

A.   No.  I did not have the fortune to meet him before this case.

Q.   And that helps in your independence?

A.   Yes.  That certainly makes me independent.

Q.   Now, are you being compensated as your role as an expert witness in this case?

A.   Yes.  I'm compensated at my normal rate.

Q.   And does your compensation have anything to do with the outcome of this trial?

A.   It does not.

222

Q.   Did you have some slides that you prepared to aid your testimony today?

A.   Yes.  I did.

Q.   Now, before we get too deep into your opinions in this case, can you tell the jury a little bit about yourself and your personal background?

A.   Sure.  I was born and raised in Seattle, Washington, in the Northwest.  I went to school back East at Drexel and MIT.  I'm married to my lovely wife for now 43 years.  We have two sons, age 42 and 39.  We didn't waste any time.

I have two beautiful granddaughters age 5 and 3 who love their grandma and grandpa, and we love them back.  I now live in a small town in Oregon called Bend.  It's a mountain town, very small.

Q.   Now, I think you mentioned your schooling.
Where did you go to school?

A.   I did get my undergraduate degree at Drexel University.  Field is electrical engineering with an emphasis in solid-state materials.

Sorry for my voice.

After graduating from Drexel, I was lucky enough to be awarded a full scholarship to MIT, which allowed me to go to graduate school.  So I did go to MIT and received my master's degree, also in electrical

engineering, with strong emphasis in the optical properties of materials.

Q.    And where did you go after you finished your schooling?

A.    I got a taste for doing research and development.  And this is in the '70s.  There were quite a few industrial laboratories in the United States that did R&D focused on products.

One of those was RCA.  We were talking earlier about those large TVs.  They invented color TV.  I was hired by the research department to help develop new products.

Q.    And so what did you do while you were at RCA?

A.    I used my knowledge about materials to get involved with several projects.  But after a couple of years, a new project cropped up.

The chairman of RCA said:  We have to do something about these big TVs.  We want to make a hang-on-the-wall television maybe as big as 40 inches.

That was our goal.  It seemed like a very interesting concept.  We didn't know exactly how to do it, but I was really enthused to get involved in something that would be so impactful to our lives.

Q.    Now, how about next, what'd you do at GE?

A.    So at RCA we did develop finally some small

224

working prototypes using LCD technology, what we'd been talking about today with backlights, although they were lamps.

RCA was purchased by GE in the mid-'80s, and GE also had a development program for LCDs, but they were focused on building displays for fighter jet cockpits. The fighter jet cockpit is very small, and the idea of putting a flat panel screen in there was very attractive to the military.

And we developed prototypes that were approximately about 5-inches-by-5-inches in size that were geared for that application.

(Clarification by Reporter.)

BY MR. REICH:

Q.    Now, did you receive any recognition for your work at GE that you were just describing?

A.    Yes.  As a matter of fact, our team did. There's a magazine called Popular Science.  Maybe some of you have seen it.  It's been around for over 100 years.  And it covers topics at a layman's -- from a layman's point of view about what's going on in technology.

They did an article on our work at GE. There's a picture here of the avionics screen.  In fact, if you look in cockpits today, you'll see those

kind of screens in every airplane.

But this was a first.  This was the first LCD with a million pixels, which isn't very big by today's standards but was quite impressive in 1988.

Q.    And so is that your photo by the cockpit and your name in this Popular Science?

A.    Yes.  That's a very young picture of Tom Credelle.

Q.    Now, was your technology that you developed at GE commercialized broad scale?

A.    Yes.  It was commercialized, and it was adopted by the U.S. military for fighter jets as well as other applications in commercial aviation.

Q.    Where did you work after your time at GE?

A.    So by the time I was at GE, I'd been working in R&D for about 20 years.  And I really had the itch to get involved with more product development, in consumer products especially.

And there was a small company in California at the time called Apple, and Apple wanted to build laptop computers.  It didn't exist until that point.  I was hired to run the group that would engineer flat panels LCDs into laptop computers, and in that process we had to work with suppliers.  We had to modify the characteristics of the panel because Apple has very

specific needs.  But we did introduce the very first laptop computers from Apple in around 1992 called the PowerBook.

Q.   And were you in charge of that team that introduced Apple's very first laptop?

A.   Yes.  I was.

Q.   Now, were you at Apple for another 20 years?

A.   No.  I wasn't.  Apple at that time was -- I have to say it was kind of drifting.  Steve Jobs was not at the company at that time.  And it didn't look like it had a real vision for the future.

And I had the opportunity to work for some companies that were doing real product development for the flat panel display business, which is my love.  I'm a display nerd.  So I did leave Apple and went to work for Honeywell.

Q.   Well, since leaving Apple, what have you been doing in the display industry?

A.   The theme has always been displays, but it's run from electronics to packaging, to software, to power saving.

For example, at Honeywell we were doing backlight systems to improve the quality of LCDs in those days.

Motorola worked on a -- I was director of

product marketing for a new technology that Motorola was developing for TVs and monitors.

I worked at a company called Clairvoyante, where we were actually inventing new ways to build displays that would save power and reduce costs. And my patents and that technology is probably used in almost all cell phones today, especially the OLED type.

(Clarification by Reporter.)

BY MR. REICH:

Q.    And do you also have experience in nanotechnology? I know we heard about quantum dots. But other technologies in the display products?

A.    Yes. It's a very hot field, I would say, nanotechnology. And I had the opportunity to work for a company called Innova Dynamics. They were developing -- or did develop what's called "nanowires," very, very thin nanoscaled wires that could be embedded in a plastic film.

And that could be used as conductors for electricity, and that could be used in touch screens or in flat panels. And that technology was very similar to the way quantum dots are made.

My job was to put them into products. How do we use it? How do we convince the manufacturers that this is good technology? And we did do that.

Q.    During the course of your work in the display industry over the last 40 years, did you get any patents where you yourself were the inventor?

A.    Yes.  I did.  I'm proud to say that I received -- I think it's 83 U.S. patents.  And these patents have -- wasn't only when I was in R&D but kind of span my career.

I'm a problem solver, and often when you solve a problem, you've got an idea that's novel.  And you can file for a patent and you can get awarded a patent.

But they do span technologies from LCDs to display fabrication to electronics, software to drive pixels better, that kind of area.

Q.    And what role do patents play in your experience in the industry?

A.    When I joined RCA, I knew about patents certainly, but I really didn't appreciate the importance that they were to even large companies.

RCA has a lot of patents.  I allowed them to build products ahead of their competition, and eventually when they licensed that patents -- those patents, they could generate some revenue for the company.

For small companies, it was probably even more important.  Because when you're a small company, you

don't have the resources always to protect your ideas against competition. So a patent allows you to do that.

So for example, at the company Clairvoyante, I probably have 20 or 30 patents that we generated specifically so we could control these new ideas.

Q. Have you been previously qualified as an expert witness in a patent case?

A. Yes. I have.

MR. REICH: Your Honor, the plaintiff offers Mr. Tom Credelle as an expert in LCD displays, light optics, and nanotechnology in LCD displays.

MR. BURESH: No objection.

THE COURT: He'll be admitted as an expert.

BY MR. REICH:

Q. Mr. Credelle, are you a lawyer?

A. I am not.

Q. So how is it that you understand the patents in this case?

A. Actually, patents are -- may be written, but they are actually written for engineers.

THE COURT: Doctor, Doctor. Sorry. I should have -- I just think now would be a good time to break before he gets started.

So ladies and gentleman of the jury, we are going to take our afternoon recess, 10 or 15 minutes.  Please remember my instructions not to discuss the case.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

THE COURT:  You may be seated.

Let me make an observation.

You may be seated.

Occasionally I worry or wonder if my demeanor, which I'd like to think is mild mannered or whatever word you want to use, is misunderstood by lawyers that I don't realize that I'm a federal judge in the way you all act with each other, in the way you act with me.

Now, I've done this six years now.  Kristie forgot last -- last week was my six-year anniversary.  She forgot.

But there are really only a handful of tools I have to work with.  There are judges who give people more time or less time.

Another way of dealing with issues is by dealing with them discreetly or not discreetly in front of the jury.

So I'm not sure what I'm -- how I'm going

to deal with if I have any more issues with the fact that you guys can't get along. That's -- you know, that's up to you.

But I'm letting you know now that the next time I have to deal with the fact that you all can't play nice with each other, I'm offended by it because there are -- I won't say who, but I think we all know there were several.

I will say Judge Sparks, who's no longer -- I can't -- it wasn't always great when we were getting along. But I would not have not gotten along in front of him. And so if you all want to see my best imitation of Sam Sparks, I was a magistrate of his. I was in front of him a lot. And I can go toe-to-toe with Sam Sparks if that's what I have to do.

So I'm going to assume that me admonishing you is enough. But I'm not going to -- I'm not going to deal with this with you all again.

So we'll be back in 10 or 15 minutes.

(Recess taken.)

THE BAILIFF: All rise.

THE COURT: Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT: Thank you. You may be

seated.

Counsel, you may continue, please.

BY MR. REICH:

Q.   Mr. Credelle, where we left off, since you're not a lawyer, how is it that you understand the patents in this case?

A.   As I was saying before the break, patents are written for technical people, may be written by lawyers, but the purpose of a patent is to be able to explain the invention to a technical person so technical people can read them and understand them.

Q.   What technical background does a person need to understand the SVV patents in this case?

A.   In this particular case, a person of skill in the art would have a bachelor's degree in electrical engineering, physics, or optics, and at least three years' experience working in the field of optical devices or light sources using LCD backlights or lighting, and/or a general -- a science degree with five years of experience.

Q.   Now, if this level of skill in the art is required to understand the patents in this case, how is someone like me or the jury supposed to understand the issues that you're presenting?

A.   Well, that's part of my job this afternoon is

to try to explain the technology to make it understandable so you can really appreciate how the claims apply.

Q.    All right.  Do you have a roadmap of the issues that you need to address today?

A.    Yes.

Q.    What are they?

A.    Really they break into four categories:  The patents-in-suit, the four patents; the ASUS monitors; my infringement analysis, which will be most of my testimony; and some comments about technical value for damages.

Q.    Before we dive into all of that, can you give us and the jury a brief summary of your conclusions?

A.    Yes.  My conclusions are that ASUS infringes Claims 1 and 21 of the '342 patent; ASUS infringes Claims 1 and 7 of the '562 patent; Claims 19 of the '089 patent; and finally, Claim 3 of the '318 patent.

Q.    How did you approach your investigation in this case?

A.    I looked at a lot of different material and performed a lot of tasks.

So starting with an understanding of the patents-in-suit, teardowns of ASUS products.  We heard something about teardowns this morning.  An

234

investigation of any documents from ASUS that were confidential as well as public data, material that could be found on the Web, for example. And responses from ASUS' personnel, testimony from their experts, all of this material was used to form my opinions.

Q. And did you prepare a report of your opinions in this case?

A. I did.

Q. And how long about was that report?

A. With all the exhibits, it was several thousand pages.

Q. Can we start with the patents-in-suit?

A. Sure.

Q. What are you showing on the screen here to the jury?

A. These are the four patents-in-suit. They're in your binder. JTX-1, 4 -- I'm sorry. 1, 2, 3, and 4, I believe. I'll refer to these patents by the last three digits as I've already done -- as has been done this morning.

So these are the patents that we'll be discussing.

Q. And were all four patents part of your investigation?

A. They were.

Q.   Can you explain whether these patents are related in some way?

A.   There actually is a relationship.  And I've indicated that by the color coding.

The first three patents stem from a father patent, if you will, the '007.  They're continuations of that patent with new claims.  Sometimes they share some of the same specifications.

Q.   Now, can we go back, you know, the jury heard last Thursday the Court's patent video, and can you walk us through one of these patents where we hit those three main parts that the Court's video talks about?

A.   Sure.

Q.   Let's start with the '342 patent and the information page.  What are you showing here?

A.   So I'm showing the title of the patent, the inventor, the date of the patent, the date it was issued, of course the patent number, and some data relating to this concept of a family of patents.

This particular patent, the '342, stems from a patent '007, and that '007 has a provisional application that was filed on April 21st, 2009.

Q.   Now, what is a provisional application?

A.   A provisional application is something an inventor can do to kind of hold its place in line at

the Patent Office.  It's submitted.  It describes the invention, but it's kind of a rough -- a rough draft. It can still be -- some new figures could be added, but it basically is when the clock starts of your invention and then it becomes a full patent.

Q.    Why is that priority date of April 21st, 2009, significant?

A.    It's significant because that is the date the invention was made.  That's what the law says.  So if you try to use this patent anytime after 2009, you can -- you can be charged with infringement even though the patent didn't issue until 2018.

Q.    And is that when the inventor discloses all of their information to the public, that constitutional bargain that we heard about in opening?

A.    Yes.  That's correct.

Q.    Now, in this case is ASUS challenging the validity or the fact that SVV was the first company and Dr. Vasylyev the first person to invent the technology that's claimed in these patents?

A.    They're not.

Q.    Moving on to the second main part of the '342 patent, the specification, can you describe what's going on here in the specification?

A.    Specification usually starts with a

description of the background of the invention, then there's an abstract and some other details I'll cover. But, for example, this is an optical reflecting device, an apparatus for collecting or distributing energy.

The abstract describes that it's a planar waveguide and a collimating array with deflector elements of some of the key parts of what will be described in the patent.

And another excerpt from the specification states that there are collimating lenses that are -- that are lenticular lenses. That's what it describes, among other things.

Q. Now, moving on to the final part or the third part of the patent that was described in the Court's video, the claims, what are you showing here?

A. Yes. The claims certainly are -- I would consider the most important part of a patent, as this outlines what is claimed. Claim 1 is called an apparatus claim. There's two types. There's method claims or apparatus. So this is a device as opposed to how to build something.

Q. And I think it's worth taking a step back. We heard a lot about titles of patents.

Do you recall that?

A. Yes.

Q.   We heard a lot about specific figures and lines of specification.

Do you recall that?

A.   Yes.

Q.   What actually matters for purposes of determining whether a patent is infringed?

A.   Only the claims.

Q.   And is the title and the background -- what's the point of that?

A.   It's instructive.  It gives examples, but it's not -- it's not what is claimed necessarily.  So you really have to look at the claims.  They can be slightly different than the title for sure.

Q.   And is the Court going to instruct the jury on the law that the claims are what matters?

A.   I believe so.

Q.   Now, just looking at one of those examples, though, that you talked about, can we compare one of these claims to an example in the '342 patent?

A.   Sure.

Q.   What are you showing here?

A.   This is Figure 26 from the '342 patent.  You might have seen this earlier.  I've color-coded the figure and highlighted some text in the claim.

For example, the planar waveguide, it's also

called a "light guide," I'll be showing you one of those later, is colored in yellow.

The LEDs are mounted on the edge of that light guide colored in blue.

There's an input edge that's a requirement of this patent. It's highlighted in purple.

And finally, there are deflecting elements so light that is trapped in the light guide will come out if it hits one of those protrusions, if you will, or those little notches, and once the light comes out, it goes through a plurality, that means more than one, cylindrical lens.

Q.   And again, just so we're clear and that there's no confusion by anyone, is this figure a limitation on the invention of SVV's patents?

A.   Absolutely not.

Q.   It's just an example?

A.   Just an example.

Q.   Now, you've only highlighted some of this claim. Are there additional elements that we're going to walk through when we have to address ASUS' products?

A.   Yes. Of course. My job is to look at all the claim elements, all the words, and interpret them and show whether or not they -- features are in the ASUS accused products.

240

Q.    And I know we did one of the '007 patent, but are there additional limitations and differences in the other two members of this family that we'll also address later?

A.    They are related.  But they have a new set of claims claiming different aspects of the invention which is allowed by the patent system.

Q.    And returning to this set of family members, you also have the '791 patent?

A.    Yes.

Q.    Can we also talk about that?

A.    Yes.  In the same way.

Q.    What are you showing on this?

A.    Again, from the front page there is the -- the title -- the title of the patent, the inventor, the dates, as I mentioned.  And in this case this particular patent is a continuation or a division stemming from the '791 patent that I've highlighted in yellow.  And that '791 comes from a provisional application filed August 21st -- I'm sorry, July 13th, 2010.

Q.    Did you say -- yes.  The provisional application was filed on July.

A.    Yeah, July and August.  Yes.  Two different provisionals.

241

Q.   Now, again, to be clear, even with this patent, is ASUS in this case challenging the validity or the fact that SVV and Dr. Vasylyev was the first company and person to invent the inventions that are claimed in the '089 patent?

A.   They are not disputing that fact.

Q.   Now, this is the patent that has that title that says light trapping.

Do you recall?

A.   Yes.  It's in the title.

Q.   Is the title, the fact that it says light trapping here, a limitation on the claim?

A.   Absolutely not.

Q.   What is the purpose of the title?

A.   The title gives some -- usually an inventor, and I put myself in this category, you try to come up with a title that's reasonably descriptive of the invention but it is not a limiting to the invention.

So you have a concept of light converting and light trapping and light absorbing, those are parts of the claim -- of the patent, but it isn't meant to say they have to be -- it's not what determines the claim, the interpretation.

Q.   And do many patents have multiple embodiments or examples in them?

A.    Yeah.  It is very common, and certainly with these patents, there are multiple examples which are sometimes called "embodiments" that describe different ways to use the invention.

Q.    So you can have one patent that has some examples for solar and some examples that would be useful in displays?

A.    That's correct.

Q.    Now, I want to look at the specification of the '089.

What are you showing here?

A.    The '089 adds a feature that we've heard a little bit about this morning, a photoresponsive layer. That's a layer that reacts to light.  And it includes in this case quantum dots.  We've heard a bit about that.  And there's also a optical system that allows the light to recirculate and make the display brighter by having multiple passages through the quantum dot.

Q.    And can you show us one of the claims?

A.    Yes.

Q.    What are you showing here with respect to the Claim 14 of the '089?

A.    Claim 14 is one of the asserted claims, and I've highlighted the planar photoresponsive layer and quantum dots.

243

Q.    And are we going to go through all the relevant claim limitations for the '089 patent?

A.    Once again, we will go through every sentence.

Q.    Mr. Credelle, are we ready to turn to the accused products in this case, ASUS' monitors?

A.    Yes.

Q.    What ASUS products are accused of infringement in this case?

A.    There's a long list of monitors.  I think the list is around 90 different monitors are accused.  And we have, I think, an example of one of them.  This is the ROG Swift PG32UQ.  It's a gaming monitor.  And it is actually what I'm going to show you in a few moments about what's inside this monitor.  But this is an example of one of the accused products.

Q.    And is this the one that we saw the big, big box that Mr. Caldwell showed in opening?

A.    Yes, that's correct.

Q.    Now, to be clear, do all of ASUS' products, all their monitors infringe SVV's patents?

A.    No.  As a matter of fact, they do not.

Q.    And so how do you go about determining which monitors infringe and which don't?

A.    You basically have to take them apart. This -- these are physical characteristics of the

lighting system in a monitor so we can look at the details either under a microscope or with our human eye and determine whether there is a feature that is infringing.

Q.   Can you walk us through a demonstration to show the jury what one of these teardowns would look like?

A.   Yes.  I'd be happy to.

MR. REICH:  Your Honor, may Mr. Credelle come down?

THE COURT:  Sure.

THE WITNESS:  Okay.  Am I live?  It will make it much easier to demonstrate like --

BY MR. REICH:

Q.   All right.  What do you have here?

A.   What I have here is that ROG Swift.

(Off-the-record discussion.)

THE WITNESS:  That monitor I just described is a diagonal gaming monitor.

(Clarification by Reporter.)

THE WITNESS:  Okay.  I'll try to be clear.  If you can't hear me, please let me know.

So I've taken apart one of these monitors, and I've kind of put it back together.  I want to show you sort of step-by-step what is in this

245

backlighting system.

This is -- we're looking at the back case now, but this is a typical monitor. If you looked at the back, it has the wires going in just like any monitor.

BY MR. REICH:

Q.    And now this doesn't quite look like a monitor we would normally see.

Do you have some slides to help us kind of piece it all together?

A.    Yes. The slides will help hopefully orient yourself where we are.

Q.    All right. Now, the monitor on our slide looks like a normal monitor and this doesn't.

What's going on?

A.    I'm going to carefully hold up this very thin piece of glass. This is the LCD. This is what makes the picture. We heard a little bit about that this morning.

You can see some electronics in the bottom that's plugged into a video card. This is a 4K resolution. There are lots of pixels. Again, they act like little shutters, but they don't create any light. So for this to work, we need to have a light source, a bright light source behind it to make the picture we

246

see.

Q.   And what is this whole component that we're looking at called?

A.   If these are together, it's referred to as an LCD module, liquid crystal display module.

Q.   And do the LCD modules have any kind of identification information on them?

A.   Yes.  On the back of the LCD module, there's a label that tells you something about the module itself. I'm not talking about the monitor but this LCD module. In this case it's made by a company called AU Optronics.

Q.   And where is this particular model made?

A.   This is made in China.

Q.   Now, does ASUSTek make any of the LCD modules at issue in this case?

A.   They do not.

Q.   Now, as we reconstruct your deconstructed monitor, what's the first set of components we need to look at?

A.   So what we have here is the first set of components.  There's a row of LEDs on the bottom.  It's maybe a little hard to see, but you'll see them when they're turned on, and a very bright white reflector. That's a very high-efficiency reflector, this white

sheet of plastic.  And that plastic is also -- not like a mirror, it diffuses the light so light can go in different directions.

Q.   Can I turn this on?

A.   Let's try.

Q.   One second.

A.   It's bright.

Q.   It'll flicker?

A.   It'll flicker.  It should come on.  Yeah. Okay.  So try not to look directly at the LEDs.  They are quite bright.  They're going to generate all the light we need.

(Clarification by Reporter.)

THE WITNESS:  They're going to generate all the light we need for this entire back surface.

BY MR. REICH:

Q.   And this is pretty bright, is it not?

A.   Yes.  It's pretty bright and it's blue.  We kind of think you need white light behind an LCD, which is generally the case.  But this is a display.  It uses some extra components that uses a blue light.

Q.   You know, Mr. Buresh said earlier it's going to blind your eyes.  I think this is that level, do you think?

A.   Yes.  I'm trying not to look at it directly,

and I advise you not to as well.

Q.   And so what's the next component that we need to look at?

A.   The next component is what's called the "light guide."  I talked about that briefly.

Q.   Now, can you show the jury the light guide plate?

A.   So this is the light guide plate.  And you can actually see through it.  It's very clear plastic.  The reason it looks a little bit odd is there are lenses on the front side.  It's microstructures on the backside.

But if you look down the -- down along the edge, you see it's very clear plastic.  The idea is you don't want any light to get lost.  You want to get it to where it's supposed to be.

Q.   And is there anything else important on the edges?

A.   Yes.  There's actually reflective tape on three of the edges.  And the idea is you don't want light that goes to the top or the sides to be wasted.  You want to reflect that back into this -- this light guide.

Q.   Can you show the jury what happens when the light guide plate is added to the system?

A.   Okay.  So now the LEDs are not so bright

because the light is being channeled into this light guide. All that light is going up towards the top, and some of it bounces back. And I'll show you some animations later about how that works.

But there are little deflecting elements scattered on this sheet, millions of them or hundreds of thousands, so that the light can come out uniformly everywhere, from the bottom to the top, to the right, to the left. And you can see that there's not a lot of wasted light coming out the edges.

Q. And can we show the jury what those microscopic features look like?

A. Yeah. So on your screen, you should see a view of the top of this light guide system which has these lenticular or linear lenses. You can see a cross section, I think, in the -- you can see a top view in the picture.

On the backside are small microcavities that are going to be used to get that light out of the light guide.

Q. Now, what's the next layer that you want to show the jury in this reconstruction?

A. So the next layer is what's called a "quantum dot layer."

Q. And first, I just want to stop you there.

What is a quantum dot? We've heard about it a little bit. Can you explain it?

A. Yes. So a quantum dot is a semiconductor particle, a nanoparticle. It's very small. And when energized with photons, with light, it generates an electron that can then decay back and create a photon, which is another color light by its very interesting design.

But based on the size of these dots, you get different colors. This is a very, like, unique device. And I think we saw them this morning but --

Q. There you go.

A. So a blue light. When you shine blue light on these quantum dots, now the blue light is converted to red. And these are red quantum -- these are red quantum dots based on their size.

And if they're a little bit smaller, they can be green. And you can actually design the color you want. But for a display, as you heard earlier, we want red, green, and blue lighting ultimately.

Q. And you said something just now that was really interesting that I want to unpack a little bit. Okay? Is that okay?

A. Yes.

Q. You talked about and we've heard about the

idea of quantum dots converting energy.

Do you recall that?

A.    Yes.

Q.    How does it work?  Now we're going to have to step back at the atomic physics level.

How does quantum dots -- how do quantum dots convert light to energy?

A.    So they are a unique semiconductor particle, but like all semiconductors, if you excite electrons inside those semiconductors by energizing them, by putting like, for example, light on those, you'll have energized electrons.

And as those decay back to their normal state, they emit light.  This is a way many photo materials work.  But it's unique that they emit a certain wavelength light depending on their size.

Q.    So do I have it right, light --

THE COURT:  Do you need him to be there still?

MR. REICH:  Yes.  We're going to do the rest, if that's okay, Your Honor.

THE COURT:  I'm having a hard time hearing him, but that's okay.

MR. REICH:  Just try to talk a little bit more in the mic.  Maybe bring it up.

252

THE WITNESS:  Okay.  I think I can do it.

BY MR. REICH:

Q.    And so as I understand it, you have light converted to energy converted to another color of light; is that right?

A.    Right.

Q.    Okay.  Can you show the jury the quantum dot film and where it goes in the monitor?

A.    So this is the quantum dot film.  You can see it's a little bit transparent.  But it has billions of quantum dots embedded in this film scattered uniformly across the whole film.

Q.    Will you place it in the monitor?

A.    I'm going to place this slightly offset so as I add these films, you can kind of see the improvement. I think right away you see the light is no longer blue, but it's not red and green.  The reason is that the quantum dots are so small, you really wouldn't see an individual dot, but you see the accumulated effects.

If you have blue light with a little bit of red and a little bit of green, you got a whitish color. The goal is to have pure white.  It's not quite there yet.

Q.    Now, what happens if we cut into this layer? What would we see?

A.   We do a cross-sectional cut, which we've done as shown on the screen.  There is a quantum dot layer surrounded by some protective films.  Inside that grayish layer are the quantum dots.  They are so small that they don't even show up in this high-powered microscope.  You need a super high-powered microscope to see them.

Q.   How small are we talking?

A.   We're talking 5 to 7 nanometers.  Maybe 10,000 quantum dots equals one human hair.  We're using that as a reference point, but it's 5 to 7 nanometers, which is a billionth of a meter.

Q.   And can you show us how that works?

A.   Yes.  So on your screen I've indicated blue light coming into this film, and I've expanded the size of those dots showing two types of dots, green ones and red ones.  When the blue photon or light ray hits the quantum dot, you'll generate a little bit of red light or a little bit of green light.  Coming out the front is blue, red, and green.  Not quite balanced yet for white, but it's one pass through this film.

Q.   What's the next layer in our teardown?

A.   It's a -- the next layer is just a diffuser to help smooth out the light.  We'll put that on next.

That's just -- that helps control where the

254

light goes and make it a little bit more uniform.

Q.   What's next?

A.   What's next is something that we call an optical film stack because it is a stack of more than one layer.  And the purpose of that, I'll describe.

Q.   Can you show the jury the optical film stack?

A.   Yeah.  I'll try to do that first.  So this is an optical film stack.  It's -- obviously it has to be transparent because the light has to come through it.  But it has some very almost funhouse mirror effects based on its design.

And I'm going to put this in front of the -- next one down.

Q.   Please do.

A.   So I think now you can see that it's brighter and whiter.

Q.   Why is that?

A.   And that is because there's some light recirculating, there's some light trapping going on in this structure.  The light that is coming forward to this film can reflect backwards towards that back reflector, and when that happens, those blue photons can have a better chance or another chance to hit a quantum dot.  The idea is that happens until the light finally comes out in sort of the right collimation, the

255

right angular spread, to be used in a monitor.

Q.    If we cut into this optical film stack, what do we see?

A.    So what we see are these prismatic structures which are sometimes called "brightness enhancement films," but they are structures that allow light to go backwards by this concept of total internal reflection that we heard about this morning and I'll talk more about in a few minutes.

Q.    And what are the black triangles in this image?

A.    In this particular image, the black part is air.  So we have plastic and we have air.  And plastic has a higher index of refraction, so we're going to get this total internal reflection that Dr. Vasylyev showed this morning.

Q.    That's the whole speed of light changing thing?

A.    Yeah, that's right.  The speed of light changes and the angles change, and I'll show some graphics of that in a few moments.

Q.    What's the next layer?

A.    The final layer before we get to the LCD is another diffuser.  Again, diffusers are used mostly to kind of smooth out the light distribution, but what

we've achieved here with the optics and the light guide plate that I described with those lenses and those dots and these layers is a very uniform emission of light that now when you put the LCD on top, you will get a picture.

Q.    Now, in opening I believe I heard Mr. Buresh, ASUS' counsel, say something about what do light films have to do with this case?  I think he was talking about Dr. Vasylyev's light films, but did you catch that?

A.    Yes.

Q.    Does light work the same way whether it's in Dr. Vasylyev's light guide film or these light guide films?

A.    Yes.  The operation is the same.  Light reacts to lenses or surfaces within these structures in exactly the same way, whether it's in a lighting system for illumination, like Dr. Vasylyev was illustrating, but -- by the way, it's almost exactly like this light guide plate that I showed you.  It has the same features.

This has additional light films to manage the light, but the goal of this system and the goal of this invention really is to manage where that light goes, to get it in the right place to create a bright, efficient

image in a very thin package.

Q.   And so this case is all about light films; is that fair?

A.   It's all about light films.

Q.   Now, we've almost got a reconstructed monitor. What's the last piece?

A.   Yeah.  If I was putting this together, I would put this on top.  I would plug in the circuit board.

I was afraid that was going to happen.

And then it would -- I won't do that today.

MR. REICH:  Your Honor, may we publish -- we have another set of these -- to the jury real quick so that they can see these?

THE COURT:  You may.

THE WITNESS:  So the first thing I'll pass around is the light guide plate.  The entrance edge is here, and if you kind of run your fingernails across the top, you can kind of feel the lenticular -- it's kind of like those postcards for 3D that you have those little ridges.  And the back has structure that you can't see.  They're microstructures.  As I mentioned, there's millions of them on the back distributed across this area.

This is the quantum dot film.  There's really not much to see unless you have a light behind

258

it, but it's kind of a yellowish color.  It's reacting to the light in the room actually.

I'll just pass around one more item.  The diffusers are kind of uninteresting and really not part of the claims in these patents.

So this is an optical film stack which has those prismatic structures.  And again, it has kind of a very interesting optical effect, but it is very clear.  Light can go through it.

Oh, yeah, there is one more.  I'm sorry.

This is the reflector sheet that's on the back.  This is that very highly reflective white material.  So there you have it.

BY MR. REICH:

Q.   Thank you, Mr. Credelle.  You can return to the stand.

MR. REICH:  I'll turn this off.

BY MR. REICH:

Q.   Now that we know about all the components in these models, do you have an animation that will help us understand how the light flows as you've demonstrated?

A.   Yes.  I do have an animation.  I'll try to explain it now that you've seen how it works in real life.

259

Q.    What are you showing here on the screen?

A.    So the films you just saw there, the five films are indicated on this diagram.  Starting with the reflector, it's a cross section greatly expanded in scale in one direction.  The light guide plate, the quantum dot layer, the optical film stack, and finally the LCD layer.  I'm going to ignore the diffusers because they aren't important for this discussion.

Q.    And on the left side, what are you showing?

A.    The left is a photograph, I think we might have seen this earlier today, that shows the components stack starting with that reflector and then the light guide and all the other films.

Q.    And we may have seen it tipped over earlier today.  Why is yours tipped up?

A.    Well, it's tipped up because that's actually the way they are in the product.  I believe I can make this statement that all monitors -- almost all monitors have the LEDs along the bottom.  There are some that have more than one set of LEDs that they have to be super bright, but generally the LEDs are on the bottom and the display is oriented like we use it as a monitor.

Q.    What is the first component that you want to emphasize in this animation?

A.    The light guide.  The light guide plate is a very critical component I'd like to describe first.

Q.    And what are you showing here?

A.    So this light guide plate, if you tip it sideways, you'll see those lenses, those lenticular lenses, on the front surface.  When we do a cross section, you can't really see them.  So I'm going to tip it back now to show the light flow.

Q.    Now, what are you showing with the light, the LED at the bottom?

A.    I'm indicating there's an LED at the bottom of this light guide just like the teardown demonstration.  Those LEDs emit light over a broad range of angles much like you may have seen, you know, lights in your home that are LEDs, the light can come out at wide angles.  They're very bright.  And I've indicated a few of those light rays here for my illustration.

Q.    For simplicity, can we follow just one of those light rays?

A.    It's easier to understand if we just do them one at a time, yes.

Q.    What are you showing here?

A.    I'm showing a light ray that strikes the walls of this light guide plate where there are no microcavities.  And because of this principle of total

261

internal reflection, the light guide being plastic surrounded by air, it will -- the sidewalls will act as mirrors.  So the light is effectively trapped if it doesn't hit the microstructures.

When it gets to the top, there's a reflective mirror that will send the light back down again, and when it gets to the bottom, it'll probably hit the LED and be reemitted as a scattered light, but this is -- this is the way the light would flow.

Q.    So is the light trapped until it finds the right angle?

A.    Essentially, yes.

Q.    Now, let's follow a beam, if you will, that hits a microcavity.  What happens then?

A.    So I've drawn a different light ray with a slightly different angle, and now that happens to strike one of these microstructures.  I've shown a magnified view of what these microcavities look like as a cross section.  They have kind of an annular ring around the structure, and I'll show some close-ups of that again later.

But all of those surfaces can be used to either reflect or refract or with TIR, total internal reflection, pass the light through that little structure.

Q.   If we're using Mr. Buresh's analogy of being locked in a room, is this the key to get out?

A.   This is the key to get out.  This is the key to get out.  There are a lot of keys.

Q.   Now, can we follow just one beam going up and back for simplicity?

A.   Yes.  So a light ray will strike -- if we think of a light ray as like a bundle of light, some of the light will hit part of the microstructure that will cause the light to immediately go to the right, which is to the front.  That's where we want the light to go eventually, all the light.  But some of it will go to the back.

Q.   Now, if the goal is to get light to the front, why would you ever want light to go to the back?

A.   It's actually by design.  To make a more efficient, more uniform light source, using the back reflector, which is a diffuse surface, helps to smooth out the nonuniformities that might be occurring by having these little sharp microdots.

So when that light hits the back surface, it is a diffuse white material.  It will send light out in different directions, and that helps to homogenize, if you will, the light coming from this light guide plate.

Q.   So is this actually an intentional part of a

design to send light back towards the rear reflector?

A.   Yes.   As a matter of fact, almost 50 percent of the incoming light goes backwards.   It's counterintuitive, but this makes a better backlight. And I'll have to say, in the old days, that was not the way they were built.

Q.   And again, you've got a lot of arrows.

Can we just follow one to keep it simple?

A.   Yes.   I picked one of those.   Of course all of them will be involved in making light eventually, but I'll pick one.

Q.   So what do we have here at this stage of the light flow?

A.   So what I've shown is that the light that was deflected to the right and that was deflected to the left will finally get to those lenses.   The lenses are on that front surface.   And those collimating lenses will change the angle or direction of the light going forward from that point.

Q.   We've also heard a little bit about this idea of collimation.

Do you recall that?

A.   Yes.   I do.

Q.   And I believe, if I heard it correctly, Mr. Buresh said in opening -- he picked two of the

264

patents.  He called them the "collimating patents."

Do you recall that?

A.    Yes.  I do.

Q.    And he suggested that you don't want a system with lenses in collimation in an LCD display.  It's somehow bad for monitors.

Do you recall?

A.    I heard him reach that conclusion based on one of the figures.

Q.    Based on your experience in the industry at LCD displays, why is that wrong?

A.    Well, it turns out that these collimating lenses are actually more effective at steering the light.  I like to think of this as turning where the light's going to go.

And since there are light rays coming from everywhere along that back surface, you have a lot of light rays that Mr. Buresh didn't consider.  He just looked at a few.

So every bundle of light is going to have a different angle and hit these lenses in such a way that they'll give a uniform distribution of light to the user in a more effective way than if you don't have lenses.

Q.    And to be clear, Mr. Credelle, have you

personally designed LCD displays in optical systems?

A.   I have.

Q.   So this is 100 percent in your lane; is that fair?

A.   It's in my lane.

Q.   And so would it be wrong to suggest that with a system like this, that has the lenses, that does the collimation, you're going to have happy person here and sad person here?

A.   That's a mistake.  That's simply a mistake. It doesn't work that way.

Q.   Now, what's the next step for this light as it leaves the lenses collimated?

A.   The next thing that can happen is the quantum dot layer.  So the light leaves the light guide plate, and as I described earlier, some of those blue light rays will hit quantum dots.  And when they do, they'll create some red energy and some green energy coming out of the quantum dot film.

Q.   And then what happens when it goes to the optical film stack?

A.   When it reaches the film stack, a couple of things can happen depending on the angle of the light. Some of the light will go through that sheet.  Some of it will be reflected using that total internal

reflection concept and go backwards.

The light that goes backwards offers another chance for quantum dots to be struck, create more red and green light.

And I think you saw that when we put the optical film stack on top, the brightness got better because we're recycling and reusing that light that -- getting it organized. And also, the amount of red and green went up because we have more red and green dots, more quantum dots being struck.

So that's the way this system works, and it depends on that recirculating or multiple passages through the film to achieve the desired goal, which is white, bright light over a distribution of angles that meets the customer's requirement.

Q.   And is this another example here, this total internal reflection, in which light is trapped until it receives the key to get out at the right viewing angle?

A.   That's correct.  And the key is the angle of incidence, if you will.  As the light makes these traverse passages, the angles will change.  And eventually the substantial portion or the majority of the light will exit towards the LCD.

Q.   And is that what you're showing here?

A.   And finally -- yes.

Finally, that's what I'm showing here.  I'm showing additional quantum dots can be hit by that one light ray.  But now imagine billions of light rays going through this system, and you have a good opportunity to make a bright, efficient display.

Q.    Now, we've done one teardown, and walk through the light flow.

Do you have a complete list of all the products that infringe in this case?

A.    I do.

Q.    What are you showing here?

A.    So I've grouped these monitor products.  They all have a model name by patent.  And we've identified these groups of monitors as infringing the patents that are in the box next to it.

Q.    Are we going to have to look at components for all 90-plus products in this case?

A.    Fortunately not.  It would take us weeks to do that, but I've done, as you say, the heavy lifting and identified some representative products that we can -- that can be used in our analysis to show infringement.  And those representative products will apply to all the other models within that grouping.

Q.    And what is a representative product?

A.    It's just that.  It represents the performance

and attributes of all the other modules, all the other monitors.  There may be slight differences in the spacing of the dots or maybe in the shape of the lenses, but they all have the same characteristic.

So we proposed these two representative products, and ASUS has accepted those as representative.

Q.   Now, why did you use two representative products?  I know we looked at one.  But why two?

A.   Well, I wanted to show that there's, you know, some variety between these monitors.  And I picked one that has quantum dots and one that does not.  And I can -- will show the infringement under each of those conditions.

Q.   And do these monitors turn out to otherwise be very similar?

A.   Otherwise, they are very similar.  Yes.

Q.   Can you turn to Tab JTX-5 in your binder?

A.   Okay.  I'm there.

Q.   What is JTX-5?

A.   This is a stipulation agreement between SVV and ASUS that these representative products will represent the models for infringement purposes.  That means if the representative product infringes, they all infringe in that category.

269

MR. REICH:  Your Honor, we move to admit JTX-5 into evidence.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. REICH:

Q.    And so if the jury wants to ever look at this list, that's at JTX-5?

A.    JTX-5 should be in your binders, I believe.

Q.    Now, you mentioned you came up with kind of the representative products.

How did you get to that conclusion based on the ultimate set of evidence?

A.    It came down to looking at all of the teardown data either done by SVV or myself and looking for similarities and identifying a product that would fit this -- would be a representative product, just like the words say.

Q.    Now, for the teardowns of the representative products, are those available at PTX-109 and PTX-116?

A.    Yes.  That's correct.

Q.    Now, we heard that Dr. Vasylyev did some of the teardowns as well earlier.

How do you know that Dr. Vasylyev's teardowns are good teardowns or accurate teardowns?

A.    I've done a lot of teardowns myself, and I did

for this case.  But in the past, I have a lot of experience in that area.

I visited Sacramento on multiple occasions to examine the actual teardown parts that you see on the screen.  I looked at the data.  I looked at the tools that Dr. Vasylyev has in his lab and how he characterized and photographed and recorded the information.

I was very impressed.  It's a small company. But he did a very good job of highlighting and I say recording the features so that I could make recommendations regarding representative products.

Q.   And have you personally torn down the representative products yourself in this case?

A.   Yes.  I've done a couple of them myself.

Q.   Based on your review, your oversight, your own personal teardowns, were the teardowns of the ASUS products in this case that are identified in PTX-109 and PTX-116 reliable and accurate?

A.   I would call them reliable and accurate.

Q.   All right.  Are we now ready to get into that infringement analysis?

A.   Yes.

Q.   Did you have some boards made with the asserted claims?

271

A.   Yes.  To go through the claims, I made some boards that are kind of a checklist as we go through. And we can keep track -- I can keep track.  We can keep track of where we are in analyzing the claims.

MR. REICH:  Your Honor, may I set up the claim boards?

THE WITNESS:  The first claim is quite long.  It takes two boards.

BY MR. REICH:

Q.   Can you see this?

A.   I can see it, and I have a copy.

Q.   Now, is this the exact same claim language that's found in the exhibits in the jurors' binder, the patents themselves?

A.   Yes.  It's a word-for-word copy, but it's been broken into small pieces.  So it looks a little different, but it's the same verbiage.

Q.   And these little boxes, we added those?

A.   We added boxes.  And that's what we'll use to kind of keep track of our infringement analysis.

Q.   I'm not tall enough to reach it.  It's where it was before.

All right.  Where should we start with the '342 patent?

A.   Let's start with Claim 1.

Q.   And this first part up here, an illumination apparatus comprising, there's no checkbox here.

What is this part of the patent?

A.   It's referred to as the preamble.  It's not a limiting claim term, but it describes generally what is to follow, and everything below it is included in this, in this case, an illumination apparatus.

Q.   And so what are the illumination apparatuses that you identified as infringing the '342 patent?

A.   That would be all of the models of ASUS products listed in the red box for the '342, and the agreed representative product is indicated as the PA278CV.

Q.   And the jury can get the list of the full set of products in JTX-5?

A.   Those are all in JTX-5, correct.

Q.   And so this is the other representative product that we haven't torn down.  We're going to see it?

A.   That's right.  That's right.

Q.   Now, for this first limitation, it begins "a planar waveguide."  It ends in "three-dimensional textured surface."  I won't read the whole thing.

Did your analysis show that this claim limitation is met?

273

A.   Yes.  It did.

Q.   Now, it's pretty long.  Can we break it down?

A.   Let's do that.

Q.   What is the first part of this claim limitation talking about in the '342 representative product?

A.   It has identified what I showed you as -- I called it a "light guide."  That's a term that I use probably more than "waveguide."  It's planar.  It's a rectangular box.  It's very optically transmissive so the light can go through it.  So that light guide plate does satisfy this particular highlighted area.

Q.   And is the evidence for this product found in PTX-109?

A.   Yes.

Q.   And that's the PA278CV?

A.   Yes, that's correct.

Q.   And just so we're clear, the other representative product, the PG32UQ, it's also in this bucket.  We're just only focused on this one for this particular patent; is that right?

A.   Yes.

Q.   Now, one thing I wanted to ask you about the preamble here that I missed, what does the word "comprising" mean?

274

A.     "Comprising" means including.  So everything below it needs to be satisfied in the product, but there can be other features that aren't on this list, but these as a minimum have to be shown to be in the accused product.

Q.     Now, going back to your slide, the light guide that's in your slide is bright yellow, and that's not what we saw.

Did you add that highlighting?

A.     Yes.  Throughout this presentation I'll be using some highlighting to point out, you know, where it is in the picture.  So in this case it's highlighted yellow, but in fact it really is clear, as you saw.

Q.     Now, moving on to the rest of this limitation talking about a three-dimensionally textured surface, where did you find that in the representative '342 product?

A.     Yes.  For that, I've identified the top surface, the lens surface that we saw, as the three-dimensionally textured surface, and the backside is planar.  That's where the micro dots -- or microcavities are located, and they're substantially parallel, as you saw.

And showing a microscopic image of those microcavities, you can see them on the right image, and

in kind of a faint gray and black, you're seeing the lens is out of focus.  The thickness of this like -- is about 2 millimeters, and we can't really focus on both surfaces at the same time.

Q.   And so may I put a checkmark by this limitation?

A.   Yes.

Q.   For the next limitation:  Said planar waveguide having a light input edge disposed between said three-dimensionally textured surface and said planar surface.

Did your analysis show that this claim limitation is met?

A.   Yes.  It did.

Q.   How so?

A.   The front edge that I showed you in the teardown that's facing the LEDs is a light input edge. That's where the LED light leaves the LEDs themselves and goes into the light guide.  That edge is between these two surfaces.

Q.   We're talking about this edge?

A.   Yes.  The edge without the tape.

Q.   And why are the LEDs white in this example?

A.   Yes.  The lower image it shows the LEDs illuminated.  This particular product doesn't use the

quantum dot technology so, therefore, it needs a white LED. So the white LED generates the light that goes into the light guide plate.

Q.    May I put a checkmark by this limitation?

A.    Please do.

Q.    The next limitation is: A light source positioned adjacent to said light input edge and optically coupled to said planar waveguide.

Did your analysis show that this claim limitation is met?

A.    Yes. It did.

Q.    All right. It looks like we have something that's highlighted in blue. What are you trying to show?

A.    So occasionally the Court will construe a term that might be confusing or it might have more than one meaning. In this case, the term "optically coupled" is construed by the Court to mean providing for the transfer of light from one optical component to another.

Q.    And does the jury have the Court's constructions in their binder?

A.    I believe they do.

Q.    Now, applying the Court's claim construction, how is this limitation met?

277

A.    This limitation is met because the light source, the LEDs, transfers light or energy to the planar waveguide.  I put a little circle around the LEDs in that 3D picture or the perspective picture, and you can see the LEDs lit up at the bottom image, actually same image as before.

Q.    And that's -- when we put the light guide into the teardown, the whole thing got bright; is that right?

A.    Yes.  The LED light went into that end with pretty good efficiency.

Q.    May I put a check by this limitation?

A.    Yes.

Q.    The next limitation begins "said planar waveguide" and ends with "total internal reflection." It's a longer one.

Did your analysis show that this claim limitation is met?

A.    Yes.  It did.

Q.    Why did you highlight "total internal reflection" in blue?

A.    This is another example of a Court construction for total internal reflection.

Q.    What is the Court's construction?

A.    I'll read it.  It's:  The phenomenon that

involves the reflection of all the incident light off the boundary between a first medium and a second medium of lower refractive index, where the angle of incidence to that medium exceeds the critical angle.

It's very wordy, but I have some pictures to help put that in context.

Q.   All right.  How does this Court's claim construction apply in the representative '342 patent product?

A.   So applying this construction, we are determining if that property is satisfied by light leaving the LEDs and going up this light guide plate.

Q.   And what are you showing here?

A.   If we look at a detail of two light rays I've shown that look like they're mirror image reflections, I want to show you where the TIR angle is.

Q.   What is this little dashed line?

A.   So I'm going to draw a normal line -- a normal incident line to that plane.  That's the way the optical formulas are developed.  And the critical angle depends on the index of refraction of the material versus what's on the other side, which in this case is air.  I think Dr. Vasylyev mentioned a little bit about that.

For these materials, that angle, just for your

279

information, is about 42 degrees. And that means that any light ray that has a larger angle than 42 degrees will be perfectly reflected off that edge even though there's no mirror there. It acts like a mirror.

Q.   So that light is trapped back?

A.   That light is trapped and goes forward. It does not escape. And as long as that angle is met on these two surfaces in the light guide plate, it'll stay in that light guide plate.

Q.   And so the planar waveguide is configured to propagate the light like this using internal reflection in the '342 accused products?

A.   Yes. The propagation is really a function of these two parallel surfaces that are flat and smooth, and when it doesn't hit the microcavity, it will do this bouncing.

Q.   May I put a check by this limitation?

A.   Yes.

Q.   And just in case any of the jury wants to look at the claims, are those located at the back of the patents?

A.   Yes. Each patent you can see the total claim list at the back of each patent.

Q.   Now, the next limitation begins "a plurality of light-deflecting elements" and ends with "said

planar surface."  It's another long one.

Did your analysis show that this claim limitation is met?

A.    Yes.  It did.

Q.    Can we break it down?

A.    I think that'll be helpful.

Q.    So it starts "light deflecting elements being surface relief -- discrete surface relief features," what did you identify in the '342 representative product for this limitation?

A.    When you look under a microscope at those microstructures, you'll see the cavity shape, which I've shown on the right as a top view and a perspective view.  This has a surface relief.  It has some high points and some low points.  Kind of looks like a crater on the moon a little bit.  That's the -- and there are clearly discrete microcavities separated by flat, smooth planar portions, as you can see from the photograph.

Q.    Now, this next portion talks about a randomized two-dimensional pattern.  That maybe seems like to a layperson who's not in optics, like me, a little contradictory.

But can you explain what's going on here?

A.    Sure.  I think by looking at this image, you

can see that these microcavities are not on a regular grid.  So when you make a pattern, you can have a regular pattern like rows and columns in a spreadsheet, or you can have an irregular pattern which is -- has random positions.

But they're not truly random because the location has to be known to be able to fabricate this device.

So the optical engineers will randomize this two-dimensional pattern so that we avoid, I think Dr. Vasylyev called them hot spots and cold spots, when you look at the light coming out of this system, and you can see that the spacings are different.  They are on an irregular -- it's an irregular pattern, but it is randomized to accomplish the light extraction that's -- that's the goal of this backlight system.

Q.   And you mentioned it a little bit briefly.

How are these randomized or irregular patterns designed for light guide plates?

A.   For light guide plates, the spacing of these dots depends on really two factors.  One is that near the LEDs, you want to have less light bouncing out; and far away, you want to have more because it's being used up, if you will.  So the spacing and density of these dots changes from the bottom to the top.

282

But in addition, you want the pattern to be randomized so you don't see these hot spots.  And all that's done in a computer.

And they do some analysis.  They do some testing.  And once they decide they have a pattern they like, it becomes a computer program, a file.  And that computer CAD file goes into the laser machine that creates these dots.

So they just go and very fast hit all those locations across this sheet according to that predetermined pattern, that pattern that's created by the CAD program.

Q.   May I put a check by this limitation?

A.   Yes.

Q.   The next limitation begins "a plurality of elongated cylindrical lenses" and ends with "light-deflecting elements" so that we can follow along.

Did your analysis show that this claim limitation is met?

A.   Yes.  It did.

Q.   What are the elongated cylindrical lenses in the representative product?

A.   In these products, there are these cylindrical lenses that run completely from the bottom to the top

of the light guide plate.  And we've measured them. And SVV's lab has a 3D microscope which allows you to get these profiles so you can see what the profile of that lens looks like.

And this one you can see has a cylindrical shape, and it has some focusing characteristics due to that cylindrical shape.  So it is a lens.

Q.   And how are these lenses designed in the manufacturing?

A.   Once again, the lenses are designed by a CAD program.  In this case, the CAD program is going to determine how tall they should be, how wide they should be, and how many they should be spaced apart.

They are a regular pattern.  They're just linear lenses.  Once that data's accumulated, a mold is made so that you can actually mold these surfaces in a kind of a stamping machine to make these lenses.

Q.   And are the lenses in the microcavities designed in conjunction with each other?

A.   They're designed in conjunction with each other because there needs to be -- because there's an alignment that will happen between these two.  So the lenses are on the top.  The microstructures are on the bottom.

And that alignment is done, again, in the

tool, in the manufacturing tool.  You'll create the lenses first, and then you'll make those dots.  And you'll put them always in the same place.

And we've done some testing to show that two light guides, light guides from two different -- of the same model under a microscope are exactly the same.

Q.   All right.  Well, focusing on the rest of this limitation, how are the elongated cylindrical lenses in the light-deflecting elements in an energy-receiving relationship?

A.   Light is energy, as we heard this morning.  So basically, the light from the microstructures, whether it's directly or through the back surface, provides light energy that will go towards the lenses on the right colored with the turquoise box.  So they are in a energy-receiving relationship.  Light goes in from the microstructures to the light, to the lenses, through the light guide.

Q.   May I put a check by this limitation?

A.   Yes.

Q.   Now, we still have some aspects of this claim on another board.  Is that okay?

All right.  For this next limitation, continuing in the '342 patent, Claim 1, the limitation is:  Wherein said planar waveguide and said planar lens

array form a monolithic optically transmissive structure.

Did your analysis show that this claim limitation is met?

A.   Yes.  It did.

Q.   How is this claim limitation met in the '342 representative product?

A.   When we examined the light guide plate that you saw earlier, it is one structure.  We examined it to see if there's any glue lines or any molding lines, but it is one monolithic structure.  Lenses are on the top.  Microstructures are on the bottom.  So it satisfies this claim element.

Q.   May I check this one off?

A.   Yes.

Q.   The next limitation begins "wherein at least one of said plurality of light-deflecting elements" and ends with "cylindrical lenses."

Did your analysis show that this claim limitation is met?

A.   Yes.  It did.

Q.   Let's break this one in half.

How -- what are you showing here with respect to the PA278CV representative product?

A.   A key part of this claim element is that the

light-deflecting elements have a curved surface sloped at an angle with respect to the planar surface, which is the flat surface on the back of the light guide plate.

And again, we've taken careful measurements of those shapes that you see and identified a curved surface that's annular in shape.  So there's a curved surface that can interact with the light that's in the waveguide.

Q.   And with respect to this next part of the claim, what is being referred to here in the PA278CV product for this predetermined alignment that's being discussed?

A.    This claim element simply says that there needs to be a predetermined or known alignment between the top and bottom surfaces.  I've indicated a couple microcavities that happen to be at the center of a lens.  Because the pattern is randomized, there are others that are at different locations.

But because the location of the lenses is predetermined, the location of the microcavities is predetermined.  And the tool that makes these two parts indexes one to the other.  We have a predetermined alignment between those dots on the bottom that are randomized and the linear lenses on the top which are

287

regular.

Q.    And so about this predetermined issue, are the lenses and the microstructures in this waveguide from that product, just a different one, the same as the one in that computer monitor?

A.    In this computer monitor, yes.  It is the same as the 32-inch that I did for the teardown.

Q.    Because these both came from the same product?

A.    They came from a -- yeah.  They came from the same model number, but we bought -- I think we bought three of them.  But these -- this is two of the light guides from two that we purchased.

Q.    May I put a check by this limitation?

A.    Yes.

Q.    This next limitation says "wherein the area" and ends with "elongated cylindrical lenses."

       Did your analysis show that this claim limitation is met?

A.    Yes.  It did.

Q.    How so?

A.    This one's fairly straightforward.  There's a little math.  The lenses are actually 347 millimeters long.  It's basically the height of the light guide plate and about 150 microns or .15 millimeters wide. Whereas the cavities are 60 microns in diameter.

So you run the math. I think it's pretty clear that the lenses are much larger than the microcavities. In fact, the microcavities are 20,000 times smaller than the lens.

Q. May I put a checkmark by this limitation?

A. Yes. Please do.

Q. For the next limitation, "wherein each of said plurality of light-deflecting elements" and ending with "the plurality of elongated cylindrical lenses." It's the last claim limitation.

Did your analysis show that this claim limitation is met?

A. Yes. It did.

Q. How is this claim limitation met in the PA278CV representative product?

A. This product has the microstructures that I've identified previously. And as I also discussed previously, the light that hits the -- any microstructure, depending on its angle, will either go to the front or to the back.

If it goes to the front, it goes directly to the lenses. If it goes to the back, it bounces off that white reflector and goes to the front. And substantially, all of the light will go towards the lens. So it's a -- certainly a substantial portion

will go towards the lenses from the light input edge of the planar waveguide.

Q.   And then substantially all of that light, does it end up getting angularly directed, collimated, and sent to the viewer?

A.   Basically, that's what happens when you look at the whole system.  So we're starting with just the light in the planar waveguide and extracting out, as I've described.

As I said earlier, about 50 percent of the light goes to the back.  50 percent goes to the front. There'll be some losses, but a substantial portion of that light goes towards the viewer.  And the lenses and the other features of the optics will create the light distribution that the customer wants to see.

Q.   And just to be clear on your 50/50, that's at the microcavities.  But then all that that goes back, it comes forward too?

A.   Yes.  That white reflector has a very high reflectivity, 98 percent or some number like that.  So you have very efficient reflection, but it's also scattering which helps the optics.  So all that light finds its way to the LCD and then ultimately to the user.

Q.   May I check this one off?

290

A.    Please do.

Q.    All right.  We've checked every limitation of the '342 patent Claim 1.

What does that mean?

A.    That means that Claim 1 is satisfied, and the ASUS products infringe Claim 1.

Q.    How many claims need to be infringed for the patent to be infringed?

A.    Just one claim is sufficient.

Q.    But we have a second claim here; is that right?

A.    Yes.

Q.    Now, what are you showing with respect to Claim 21 of the '342 patent?

A.    I'm showing that it is a dependent claim.  I think maybe in your instructions you heard about independent claims and dependent claims.  This is the second category.  And it depends from Claim 1, which means all the elements of Claim 1 have to be satisfied, and in addition, the language of Claim 21.

Q.    How is dependent Claim 21 met by the accused representative PA278CV product?

A.    Well, when we zoom in on the sloped edge that I showed you and I show a yellow arrow pointing to the edge of this annular section of the microcavity, we can

actually calculate the angle versus position.

We've identified that this -- if you look at the graph, it's actually a slope. It's actually the shape of that wall, that annular ring.

And you can see there's a reasonable section that's around 27 degrees -- that is 27. And the angle does change. The claim says at least a portion of the curved surface be at 27 degrees. So it's my -- this claim element is satisfied. This claim is satisfied.

Q. Why is it beneficial to have at least a portion of the cavity go through a 27-degree angle, a curve?

A. There's a lot of work that went into determining what are optimum tradeoffs in a lighting design such as Dr. Vasylyev invented, and trading off the light going down the -- down the light guide versus the light being extracted and how it's extracted and how it changes the angle. It turns out that 27 degrees is kind of a reasonable compromise to achieve. It's not an absolute number, but it's -- it was a recommended angle to have in this system.

Q. May I check off Claim 21 as infringed?

A. Yes.

Q. All right. What's next?

A. What's next is the next patent, the '562.

Q.    Are we starting with Claim 1 again?

A.    Yes.  This -- we're going to start with Claim 1 and then include Claim 7.

Q.    Again, the preamble, is it limiting?

A.    It's not limiting.  It does describe this is a device.  In fact, this is an edge-lit waveguide illumination system as we heard about earlier this morning.

Q.    And what are the products that we're going to be focusing on for the '562 patent?

A.    Again, in JTX-5 is this model list of -- I'm not sure I counted them up, but all the models in the red box are infringing the '562 and that's what I intend to show, with the representative product being the PG32UQ, which is the model number of the device I tore down and showed you this morning -- or this afternoon.

Q.    For the first limitation beginning with "a thin planar body" and ending with "broad surface area," did your analysis show that this claim limitation was met by the PG32UQ representative product?

A.    Yes.

Q.    Let's break it down.  What is the thin planar body?

A.    That would be the light guide plate that we

293

discussed before.

Q.   And is that optically transmissive?

A.   Yes.  As I showed, that is optically transmissive to allow the light to go throughout that light guide plate.

Q.   And for the record, can the jury find this information in PTX-116?

A.   Yes.  That's correct.  I should have mentioned it.

Q.   Now, what about this next part of the limitation?  How are these met in the representative product?

A.   I'll start with the broad area surfaces. There's a first and second broad area surface.  I've identified the lens side as the first broad area surface and the back as the opposing second broad area surface, and there are edges, as we saw, along the perimeter of that light guide plate which satisfies the requirement for edges.

Q.   Is this the edge?

A.   Yes.

Q.   May I check this limitation off?

A.   Yes.

Q.   For the next limitation:  A plurality of light-emitting diodes optically coupled to an edge of

294

said optically transmissive material.

How is this met in the '562 accused products?

A.   This is met by the LEDs, the blue LEDs, we saw earlier, and using the Court's construction, light is coupled from those LEDs into the edge of the light guide plate.

Q.   And again, is that why we saw light go all the way to the top when we plugged it in and showed it?

A.   Exactly.

Q.   May I check this limitation off?

A.   Yes.

Q.   The next limitation is:  A plurality of linear lenses formed in said first broad-area surface.

How is this limitation met in the PG32UQ representative product?

A.   We've identified the top surface as having an array of linear lenses.  A close-up picture is shown here in the shape of those lenses for this product. You can see the shape's a little different from the other teardown, but it is a -- it is a linear lens.

Q.   May I check this limitation off?

A.   Yes.

Q.   The next limitation begins "a plurality of surface release features" and ends "predetermined two-dimensional pattern."

Did your analysis show that this claim limitation is met?

A.    Yes.  It did.

Q.    How is this claim limitation met in the representative PG32UQ product?

A.    The microstructures on the rear side second surface are shown in magnified image.  They're the same as we looked at previously.  They are in a two-dimensional pattern.  It happens to be an irregular pattern just like we saw earlier.

And again, that was designed by a computer. So their locations are well known so the computer can control the laser that creates these microcavities.

Q.    And so can you explain, again, how can a pattern be randomized in the first claim and predetermined in this claim?  How does that work again? Can you explain it?

A.    Sure.  Actually, in both cases they're predetermined, because as I explained, the -- the method to make these dots is to have a computer program and an optical engineer decide where the dots should be to achieve the uniformity goals of the product, and then to create a program that will instruct the laser where to make the holes.

This claim element is -- requires a

predetermined pattern, which it is because of that fact. Two-dimensional, it's an array. Doesn't have to be randomized in this case, but they are randomized.

Q. May I check this limitation off?

A. Yes.

Q. For the next limitation beginning "wherein said optically transmissive material" and ending "total internal reflection," did your analysis show that this claim limitation is met?

A. Yes.

Q. How is this claim limitation met in the PG32UQ products?

A. Again, using the Court's definition or construction for total internal reflection, I've superimposed the little angles on this drawing. But the light ray that I'm showing reflects off the walls of the light guide plate and goes down to the opposing edge where it strikes a reflector.

Q. And is this the light physics that we all got to observe with our eyes when we saw the light go to the top?

A. I'm sorry, the light?

Q. The physics of light. We got to observe this here?

A. Yes. We did. If this concept did not apply,

297

what we would see is a very bright screen at the bottom and nothing at the top.  Without the ability to let the light go throughout that area without TIR, without total internal reflection, it wouldn't work.

Q.    May I check this limitation off?

A.    Yes.

Q.    The next limitation is -- where it begins "wherein said plurality of surface relief features" and ends with "linear lenses."

Did your analysis show that this claim limitation is met?

A.    Yes.  It did.

Q.    How is this claim limitation met in the representative PG32UQ product?

A.    I'm showing the surface relief features on the back of the light guide plate, and I'm showing light that is striking one of those microstructures, and when it strikes those microstructures, the extracted light comes either to the right or to the left, and if it goes to the left, it hits the reflector and comes to the right, and all that light from all of these rays and all of these microcavities will be distributed from that surface of the plurality of lenses as it goes through.

The idea, again, is to get a uniform flux of

light, well controlled by the use of these lenses, to achieve the properties of the backlight.

Q.    And were you able to observe these optimized properties in the representative product?

A.    I was.

Q.    May I check this limitation off?

A.    Yes.

Q.    We've checked off all the limitations of Claim 1 of the '562 product.

What does that mean?

A.    That means that the accused monitors as represented by the representative product infringe Claim 1.

Q.    Now, we have another claim for the '562, Claim 7.  Is that another dependent claim?

A.    Yes.  It is.

Q.    How is Claim 7 of the '562 met by the representative PG32UQ product?

A.    Claim 7 is identifying the opaque reflective layer, which was the tape that I showed you on the top of the light guide plate and what Mr. Reich is showing now.  That is -- opaque is a reflective layer, and it is configured to reflect light back down towards the backlight to save that light that would normally be lost.

Q.    May I check this limitation off?

A.    Yes.

Q.    So is Claim 7 of the '562 patent infringed by ASUS' products that are identified in JTX-5?

A.    That is correct.

Q.    So we have the '089 patent next.  Where are we starting with this one?

A.    Again, we'll start with the preamble.  Oh, in Claim 14.

Q.    So what is the Claim 19?

A.    I'm sorry.  Yes.  What's accused is Claim 19. And Claim 19 is a dependent claim, so you can see on your screen, and it depends from Claim 14.  So we will have to analyze Claim 14 first and then move to Claim 19.

Q.    Now, the preamble in Claim 19 of -- or sorry about that.  The preamble in Claim 14 of the '089 patent is:  A light converting optical system, comprising.

A.    Yes.

Q.    We heard about light converting when Mr. Buresh talked about this patent earlier.

Do you recall that?

A.    I do.

Q.    Is this preamble limiting?

A.   It's not limiting.

Q.   Does the jury have in their juror's notebook an order from the Court saying that this preamble is not limiting?

A.   I believe they do.

Q.   And so if Mr. Buresh was trying to suggest that this was a limitation, that would have been irrelevant?

A.   That's correct.

Q.   But you explained how quantum dots work.

Do they also convert light?

A.   They do.  They are light -- a light-converting system converting one wavelength blue to another wavelength red or green.  That is a conversion.  And it is an optical system.

Q.   And do they in fact convert light to energy between those two steps?

A.   They do.

Q.   How so?

A.   Atomically, if you look at the way quantum dots work, they do -- they absorb a blue energy from the blue light which creates an excited state, where an electron is in a higher level state, and as that electron relaxes back to its normal state, it can emit a photon of a different color depending on its size.

So it is an electronic semiconductor feature, but it's used in this case just to convert light from blue to red or green.

Q.   And we've been going through claims for a while.  We haven't had to check off any boxes on titles, have we?

A.   On what?

Q.   On patent titles.

A.   No.  This -- the patent titles are just somewhat -- somewhat instructive, but they're not part of the claims.

Q.   And again, this is that patent, the '089, that does have the patent title that says light trapping, fair?

A.   Yes.  It does have light trapping in the claim, and there is light trapping in the device, actually.

Q.   And so can you explain -- we've talked about a lot how there is, in fact, light trapping going on in the ASUS monitors?

A.   The light guiding system, that's been around for a long time, but this idea of a planar waveguide with smooth surfaces, the light will be trapped until it hits a deflecting element.  That's how light got from the bottom to the top.

If it wasn't trapped, if it just leaked out, we wouldn't have a good system.  So that in these kind of illumination systems would be called "trapping." The light is trapped until it could hit something to be expelled.

Q.   So is light trapping a fair and descriptive title that a person of skill in the art would know relates to this technology?

A.   They would absolutely know that this is a very kind of intra-level understanding of how backlight works.

Q.   But it would not be fair or even relevant to suggest that the claims technically require some sort of light box in which no light comes out?

A.   That is certainly correct.  If you look at the -- all the -- all the words in the claim, it doesn't claim anything related to that.

Q.   And just a few more on this.  We also saw some examples from the '089 patent.

Do you recall that?

A.   Yes.

Q.   A figure in the '089 patent or a description, is that a limitation on the claims?

A.   No.

Q.   Why do we have figures and descriptions and

examples?

A.     The figures and descriptions are to teach about the invention kind of fundamentally how it works and what it does, but they're just examples.  And there are many examples, typically, in these patents.  They're not meant to be restrictive to the claims.

Q.     Is the only thing that matters for infringement whether these claims are met by that product?

A.     The claims are what count.

Q.     Well, we'll see if we hear more examples or pull out a figure or something.

But let's go through the claims.  Okay?

A.     Okay.

Q.     What are the products we're looking at for the '089 patent?

A.     It's a smaller list.  There are three products listed for the '089 patent.  And the PG32UQ is one of them.  It is also the representative product.

Q.     With respect to the first limitation beginning "a broad area optically transmissive surface" and ending in "total reflection," because we're at a different patent, are we actually going to be talking about some different layers in this one?

A.     Yes.  This patent will cover some of the

304

additional layers in the design that we haven't talked about in detail yet.

Q.   So what is the broad area optically transmissive surface of the '089 patent in the PG32UQ product?

A.   What we identify as a broad area optical transmissive surface is the optical film stack that I showed you in the teardown.  This is an optically transmissive surface.  Even though it has some kind of interesting mirror effects that you can see, that is the optically transmissive surface.

Q.   And what are the surface relief features in that optical film stack?

A.   As we showed before in detail, these prismatic or pyramidal structures surrounded by air are the surface relief features of the optical film stack.  And they are configured to reflect light by this TIR principle using the Court's construction, that if the angles are correct when the light hits those pyramids, it will be sent actually 180 degrees backwards.  It's a property of a -- if the prism has a certain angle, you'll have the light go straight back.

Q.   And may I check this limitation off?

A.   Yes.

Q.   The next limitation is a -- begins "a broad

area reflective surface" and ends "scattering light."

How's this limitation met in the PG32UQ product?

A.    I've identified the rear reflector, the white sheet as a broad area reflective surface.  It is parallel to the optical film stack.  And as I indicated earlier, it is configured for scattering light if we -- it's not a mirror.

Q.    That was something that I was confused about just as a layperson.

Why is a white sheet reflective?  It doesn't look like a mirror to me.

A.    The concept of reflection is to return the light backwards in the opposite direction effectively, and if it's a diffuse surface like a white sheet, light will be reflected and it'll be scattered in different directions.

It's like a snowfield on a sunny day.  That same thing happens.  So light is reflected back even though it's not a mirror.  And this particular film has a very high reflectance.  It's designed to have -- I think it's 98 percent.

Q.    May I check this limitation off?

A.    Check.

Q.    The next limitation begins "a planar

photoresponsive layer" and ends with "spectral range."

How is this limitation met in the PG32UQ representative product?

A.    So what we're looking at here is the quantum dot film that I showed you earlier.  That is a planar.  It's a one-dimensional photoresponsive layer.  I've shown you some images that are kind of cross-sectional.  And that's disposed between the optical film stack and the reflector in the stack up.

Q.    Now, the next part of the limitation talks about "comprising quantum dots."

How is that met by the quantum dot film?

A.    Well, as I indicated earlier and showed, the quantum dots are distributed in this film, uniformly dispersed, the red and green dots.  And that is transmissive.  Light can go through it.

And it -- these quantum dots absorb light in a certain spectral range, namely blue, and then can emit different colors like red and green.

And if you look at a spectral diagram, this is -- I think Dr. Vasylyev talked about light and having different wavelengths.  Blue light excites these quantum dots into this energy state that can create light.  So that's -- some of that blue light gets turned into red and green light when the light goes

307

through it.

So that's what's illustrated on this diagram. After the light goes through a quantum dot, if you compare that to before the quantum dots, you'd have a very tall blue peak.  Now you have less blue and you have some red and green.  Not perfectly balanced yet, but it's showing promise, let's say.

Q.   And ultimately, to get white, what colors do we need?

A.   White, generally we want to make red, green, and blue light, but we want to have the right quantity of each color so the light doesn't look pinkish or greenish or bluish.  So we need to get that balanced by the design of the system.

Q.   May I check this limitation off?

A.   Yes.

Q.   The next limitation is "a planar two-dimensional array of optical elements" and it ends with "photoresponsive layer."

Did your analysis show that this claim limitation was met by the PG32UQ representative product?

A.   Yes.  It did.

Q.   Can we break this apart?

A.   Yes.

Q.    What is the two-dimensional array of optical elements?

A.    The lens array that we discussed before is an important optical element in this design, and it's a planar two-dimensional array.

Q.    Now, how are these lenses distributed over an area of the photoresponsive layer?

A.    If we look at the light guide plate area, the length times width, and we look at the quantum dot layer, length times width, those optical elements are distributed over that area.  They're a one-to-one match.

So you have a complete coverage, which is important for the optics that all the lens elements are over that area of the quantum dot to improve the efficiency of the system.

Q.    And is that what you're illustrating here?

A.    Yes.  I guess it's already happened.  But I show the two parts coming together, and they are the same size as you just demonstrated to the Court.

Q.    And how about the rest of this limitation?  How is that met in the representative product?

A.    This requires that the space -- there's light -- let me, I'm sorry, catch up.

The light that's moving between these two

layers, so it's these two layers of the optical film stack and the reflective surface.  This claim element says there has to be light traveling at a high angle to the normal to the film.

And the light that's traveling within the light guide, I've indicated with the blue arrows, is traveling in that proper direction.  And that is done to spread the light out so we can get the efficiency that we need for the system.  So that satisfies this claim element.

Q.    May I check this limitation off?

A.    Yes.

Q.    The final limitation of Claim 14 of the '089 patent is:  Wherein the thickness of the photoresponsive layer is less than a minimum thickness sufficient for absorbing substantially all incident like in a single pass.

How is this limitation met by the PG32UQ representative product?

A.    The film, the quantum dot film itself is slightly transparent.  Again, this is by design.  We want to have multiple passes through this film.  If it was completely absorbing, we wouldn't get the same efficiency of the system.

So this is an important element of this claim.

And the images show that that film is partly transparent, especially when you put it against a light. And I think we saw that in the court. So this claim element is met.

Q.    May I check this limitation off?

A.    Please do.

Q.    All right. For dependent Claim 19, how is dependent Claim 19 met by the PG32UQ product?

A.    Claim 19, which depends on Claim 14, which we just showed, is met by the representative product. The photoresponsive layer is configured for multiple transverse light passage.

So this means, as I've described before, the design of this systems is to have light go through that film more than once. It could be -- two is enough but multiple times in order to generate more red and green light and subtract blue light to get the result that I showed you in the teardown.

Q.    And is that result what you're referring to when we went from the purple and then you added the optical film stack and we saw that brilliant bright white?

A.    That's correct. It was a striking difference, especially those of you sitting in front of the monitor.

311

Q.   May I check this limitation and dependent Claim 19 off as infringed?

A.   Yes.

Q.   Last patent.

Where are we starting with the '318 patent?

A.   The '318 we're asserting Claim 3, which is a dependent claim depending on Claim 1.  So we will begin with Claim 1.

Q.   And before we get there, this was another one of the ones that Mr. Buresh called the light-trapping patents.

Do you recall that?

A.   I think I heard him say those words.  Yes.

Q.   Again, does the title have any bearing on the actual limitations in this claim?

A.   There's nothing in the claims that refer to light trapping.

Q.   Do we need to waste any more time talking about titles?

A.   I hope not.

Q.   All right.  Now, the preamble, an optical cover for light-harvesting devices, we also heard about that, but does the jury have an order from the Court saying that the preamble is not limiting?

A.   Yes.  That is correct.

Q.   So no boxes need to be checked there?

A.   None.

Q.   The first limitation:  A layer of -- well, before that, what are the products at issue for the '318 patent?

A.   I think they're on the next slide.  I think it was five products that are in this category.  And again, the PG32UQ is the representative product, and I believe it's in JTX-5, if you want to look at the list.

Q.   And these are all quantum dot products?

A.   These are quantum dot products.  Yes.

Q.   Now, the first limitation, "a layer of optically transparent material" and ending in "transversal light passage."

Did your analysis show that this claim limitation was met by the PG32UQ representative product?

A.   Yes.  I did.

Q.   First, what is the layer of optically transparent material in the representative product?

A.   With respect to this claim and this claim element, I've identified the light guide plate as the layer of optically transparent material.

Q.   And what are the broad area input and output surfaces in the representative product?

313

A.    I've color-coded these two surfaces.  The back surface is a broad area light input surface.  All the light that's reflected off that back reflector, which if you recall, I said is about 50 percent of the light, will input that light edge from the back, and the opposing broad area light output surface is the lens surface, which I've colored in kind of a turquoise color.

Q.    Now, I want you -- to hold you up right there. Because I thought these were edge-lit so the edge is at the bottom light monitors.  Why is it that there's a broad area input surface in the back as well?

A.    There can be more than one input surface.  The claim is a comprising claim.  The -- what defines an input surface is where light travels.  So certainly light enters the edge of the light guide plate.  That could be called an input surface.  But the light -- a significant portion of the light enters that back surface that I drew around with a yellow box.  So that is clearly an input surface for this system.

Q.    So the word "comprising" here allows us to also have infringement on systems that have that edge input as well?

A.    That's correct.  It's an additional element, but this is -- right, this is a comprising claim.

314

Q.    Now, about that requirement for a broad area input surface, what would happen if the light guide plate in a hypothetical system didn't have a broad area input surface on the backside?

A.    Well, I think if you -- it would -- the light would be lost.  So it wouldn't be a workable system.

Q.    And what does the fact that there's a rear reflector in the accused ASUSTeK products tell us about whether there is, in fact, a broad area input surface in these products?

A.    Well, if no light was going backwards by some magic, you wouldn't need a reflector.  If all the light went forward, then you wouldn't have a need for that reflector.  The fact there is a reflector and the fact we've made measurements that a significant portion of light is coming back from that reflector indicates that it is indeed an input surface.

Q.    All right.  Moving on to the rest of this limitation -- oh, excuse me.

How is this ultimately configured for substantially unimpeded transversal light passage?

A.    Because the light guide plate is made from a high-quality plastic, there is unimpeded transversal light passage through that film.

Q.    May I check this limitation off?

A.    Yes.

Q.    The next limitation begins "said layer" and ends "said surfaces."  It's a bit longer.

How is this limitation infringed by the representative PG32UQ products?

A.    Again, we've identified the light-deflecting elements as those microcavities on the -- on the prevailing plane, on that light input plane.  And the aperture, meaning the area of those microcavities, compared to the area of the light guide plate, it's a very small fraction.

Q.    And so is there more of the flat surface than there is of the cavity?

A.    Much more of the flat surfaces.  I think you can see from the image on the right, if you just kind of roughly scale it in your head, there's a lot more planar parts than there are microcavity parts.

Q.    May I check this limitation off?

A.    Yes.

Q.    The next limitation begins "said light input surface" and ends with "total internal reflection."

How did you find that this limitation was met by the PG32UQ products?

A.    I show that here in this diagram.  The light input surface is that rear surface that we've been

discussing, and a significant portion is planar without microstructures. And the concept of total internal reflection, again using the Court's construction, shows that light can hit that surface at the right angle that will be transmitted, if you will.

Q.   And we observed this in the demonstration?

A.   Yes. We did effectively.

Q.   May I check this off?

A.   Yes.

Q.   The last limitation of Claim 1 of the '318 patent begins "wherein each of said light-deflecting elements" and ends with "total internal reflection."

How did you find that the PG32UQ product met this limitation?

A.   For this limitation, we have to look at the details of how the light interacts with those microcavity structures, those annular structures that I illustrated. And as light flows towards those little microstructures, depending on their angle and position, again, the light can go to the right, to the left, or it can continue through total internal reflection upwards or downwards depending how the light is flowing. And that angle is large compared to the normal.

Q.   May I check this limitation off?

A.   You may.

Q.   All right.  Our last limitation with these boards.

It's dependent Claim 3 of the '318 patent. How did you find the PG32UQ product infringed Claim 3 of the '318 patent?

A.   This one's pretty straightforward hopefully by now.  These are microscopic cavities that you can't see without a microscope.  That's kind of the definition of "microscopic."  And so this claim element is met.

Q.   And so does that mean that Claim 3 is infringed?

A.   That means that Claim 3 is infringed by the accused products represented by the PG32UQ.

Q.   Are we finally done with the claim boards?

A.   I believe we are.

Q.   Now, we went through a lot of claims, a lot of elements.  At all during opening or during the cross of Dr. Vasylyev, did you hear Mr. Buresh, ASUSTeK's counsel, mention a single claim limitation that they think's not infringed?

A.   I didn't hear him talk about any claim limitations.

Q.   We might hear some later, but we'll see.

Titles.  That's not claim limitations, right?

A.    Right.

Q.    Right.

All right.  We talked about the claims.  Can we now talk about ASUSTeK's acts of infringement?

A.    Sure.

Q.    Why do we need to talk about ASUSTeK's acts of infringement even after you proved all these monitors --

THE COURT:  Counsel?

MR. REICH:  Yes, Your Honor.

(Bench conference.)

THE COURT:  How much longer do you have?

MR. REICH:  I may have maybe 25 to 30 minutes.  If we want to break now, it's totally fine by us.

MR. BURESH:  You want to keep going after the break or are we --

THE COURT:  No.  We're done for the day.

(Bench conference concludes.)

THE COURT:  Ladies and gentleman, I asked the lawyers what we should do, and they both said they wanted to go another two hours.

(Laughter.)

Not true.

I suggested that we break for the

afternoon; they thought that was a great idea.  So if you all would be kind enough to be back here at 8:15ish, 8:15, 8:20, we'll get started at 8:30 tomorrow.

Give me one second.

For your planning purposes, as I told you -- I don't think this needs to be on the record. I'll put it on the record if the lawyers want me to after they hear it.

I'm the only district judge in the building, which means I wear more than one hat.  On Wednesday, I have to do sentencings because I also have a criminal docket.  And so we're -- on Wednesday, if you all would get here, for your planning purposes, at 10:00, I'll get started as soon after 10:00 as we can, but I don't want y'all waiting any longer than you have to.

So -- but also, you can't really hurry up sentencings.  So I'm balancing those two things.

So if you all will be here -- plan on being here Wednesday at 10:00, and if tomorrow I forget that, I really mean 10:00.  So if tomorrow I screw up, because I always say be back at 8:30, plan on 10:00 on Wednesday morning.

Please -- please remember my

320

instructions.  Please do not post anything.  Please do not do any research.  And when you get home, please don't discuss -- you obviously can say where you were, but please don't discuss any of the facts that you heard today with anyone outside at all.

Thank you.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

(Off-the-record discussion.)

(Hearing adjourned.)

KRISTIE M. DAVIS, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)

321

UNITED STATES DISTRICT COURT )

WESTERN DISTRICT OF TEXAS      )

I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

Certified to by me this 3rd day of October 2024.

                              /s/ Kristie M. Davis
                              KRISTIE M. DAVIS
                              Official Court Reporter
                              PO Box 20994
                              Waco, Texas 76702
                              (254) 666-0904
                              kmdaviscsr@yahoo.com