322

07:08

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

SVV TECHNOLOGY                    *
  INNOVATIONS, INC.              *
                                *       September 24, 2024
VS.                               *
                                * CIVIL ACTION NO. 6:22-CV-311
ASUSTEK COMPUTER INC.             *

BEFORE THE HONORABLE ALAN D ALBRIGHT
JURY TRIAL PROCEEDINGS
Volume 2 of 4

APPEARANCES:

For the Plaintiff:     Bradley W. Caldwell, Esq.
                       Warren J. McCarty III, Esq.
                       Robert Seth Reich, Jr., Esq.
                       Daniel R. Pearson, Esq.
                       Aisha Mahmood Haley, Esq.
                       Bjorn A. Blomquist, Esq.
                       Caldwell Cassady Curry PC
                       2121 N. Pearl St., Suite 1200
                       Dallas, TX 75201

                       Robert D. Katz, Esq.
                       Katz PLLC
                       6060 N. Central Expressway, Ste 560
                       Dallas, TX 75206

For the Defendant:     Eric A. Buresh, Esq.
                       Michelle L. Marriott, Esq.
                       Chris R. Schmidt, Esq.
                       Nickolas R. Apel, Esq.
                       Erise IP, PA
                       7015 College Boulevard
                       Overland Park, KS 66211

                       Mark Siegmund, Esq.
                       Cherry Johnson Siegmund James, PLLC
                       The Roosevelt Tower
                       400 Austin Avenue, 9th Floor
                       Waco, Texas 76701

Court Reporter:        Kristie M. Davis, CRR, RMR
                       PO Box 20994
                       Waco, Texas 76702
                       (254) 666-0904

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

(Hearing begins.)

THE BAILIFF:  All rise.

THE COURT:  Thank you.  You may be seated.

I'm happy to take up any issues.

MR. SIEGMUND:  Good morning, Your Honor.

The first thing is, is the parties reached a stipulation.  So we just need to read it into the record, if that's all right with the Court.

THE COURT:  Is it something the jury needs to hear?

MR. SIEGMUND:  This one is, which I'll hand to the Court in just a second.  This is also agreed.  And I believe the parties wanted you to read that after Mr. Credelle finishes.

MR. MCCARTY:  I think after the -- we have some depositions.  So just after the depositions, which will come right after Dr. Credelle.

THE COURT:  You just let me know when.

MR. SIEGMUND:  Okay.  So here's the stipulation, Your Honor:  ASUSTeK Computer Incorporated, ASUSTeK hereby stipulates for purpose -- purposes of this case only that ASUSTeK is liable for the sale, offers for sale, and importation of the accused products in the United States by its U.S.

subsidiary ASUS Computer International and to the extent necessary, its subsidiary, ASUSTeK Global Pte. Limited.

ASUSTeK thus waives the ability to challenge vicarious liability in this case including in any subsequent appeal.

ASUSTeK makes this stipulation without waiving its ability to challenge vicarious liability, including but not limited to alter ego theories of liability for any purpose in any other case or context, including without limitation in other legal proceedings, cases, and litigations.

And then if I could approach, I'll hand this to the Court.

THE COURT:  Sure.

What else do we have to take up?

MR. MCCARTY:  We have one little evidentiary issue that my colleague Bjorn Blomquist is going to do, and it's an agreed thing having to do with one of the exhibits or a couple of the exhibits yesterday.

THE COURT:  Okay.

MR. BLOMQUIST:  Good morning, Your Honor. Bjorn Blomquist on behalf of the plaintiff SVV.

First, Your Honor, this is a correction

from yesterday's transcript.  I just want to make it on the record.

At transcript 138:5 to 15 yesterday, there was inadvertently a reference to PTX-130.  It was meant to be PTX-30.  It was eventually admitted as the incorrect exhibit.  So the plaintiffs move to admit PX-30 into the record.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. BLOMQUIST:  Second thing, Your Honor, very briefly is four exhibits that the parties have agreed to admit on the record prior to the depositions reading today.  Those exhibits are PTX-061, PTX-025, PTX-026, and PTX-027.  The plaintiff moves those exhibits into the record.

MR. BURESH:  No objection.

THE COURT:  Admitted.

MR. BLOMQUIST:  Thank you, Your Honor.

THE REPORTER:  Counsel, do you want 130 unadmitted?

MR. BLOMQUIST:  30 admitted.

THE REPORTER:  130.  I'm sorry, 130.

MR. BLOMQUIST:  Yes, please.  Yes.  It's a substitution.  Thank you.

THE COURT:  Anything else to take up?

327

MR. MCCARTY:  Not from the plaintiff, Your Honor.

MR. BURESH:  Nothing, Your Honor.

THE COURT:  Is the witness ready to go?

MR. MCCARTY:  Yes.

THE COURT:  Okay.

(Off-the-record discussion.)

(Recess taken.)

THE BAILIFF:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT:  You may be seated.

Counsel?

MR. REICH:  Your Honor, we'll resume Mr. Credelle.

THE COURT:  Please.

DIRECT EXAMINATION CONTINUED

BY MR. REICH:

Q.   Good morning, Mr. Credelle.

A.   Good morning.

Q.   Did you sleep well?

A.   Yes.

Q.   Now, where we left off yesterday, we showed -- you showed that ASUS' monitors infringe each of the

328

asserted patents.

Can we now talk about ASUS' acts of infringement?

A.    Yes.

Q.    Why do we need to talk about ASUSTeK's acts of infringement if we've already shown that all the monitors that are accused infringe the claims?

A.    In addition to showing that they -- products infringe the claims, ASUS has to perform certain acts of infringement, such as offering for sale, selling, or importing these products into the United States.

Q.    And so what acts of infringement did you find that ASUSTeK is liable for?

A.    Indeed these products are for sale.  They import them into the United States and they are sold.

Q.    What are you showing here on this slide?

A.    This is an example from ASUS' website in the United States.  I think it's ASUS.com.  Excuse me.

Q.    And is this an example of an offer for sale?

A.    Yes.  This is the same monitor that I used in the teardown, the gaming monitor.  It is offered for sale.  On their website it is available generally for $999.

Q.    And there's also descriptions of all of the specifications of this monitor on the website?

A.    Yes.  That's quite detailed about the benefits of this particular monitor to the user.

Q.    Can you turn your -- to your -- PTX-61 in your binder?

A.    Okay.

Q.    What is this exhibit?

A.    This is an excerpt from the -- a figure that shows the sales data for various models of ASUS products in the United States when they sold them, their descriptions, that kind of information.

MR. REICH:  Your Honor, we move to admit PTX-61.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. REICH:

Q.    Are you showing some of the sales data from PTX-61 on the screen?

A.    Yes.  As I said, it's a very large spreadsheet, but this shows just an excerpt.  And for example, it shows the first sale date in the United States, how many were sold, some information on revenue, and then the model name, most importantly.

Q.    And does the actual sales exhibit have rows and rows and columns?

A.    This is a quite large spreadsheet, as you can

imagine.

Q.   Now, are you the one who's going to be talking about all those rows and columns that cover the 4.2 million accused products that were sold?

A.   No.  That's -- Dr. Farber will handle that in his report.

Q.   Now, specifically, what ASUSTeK company does this sales data come from?

A.   I'm sorry.  Could you repeat?

Q.   What ASUS company does this sales spreadsheet that we're looking at come from?

A.   This spreadsheet is for the U.S. subsidiary, which I believe is called ASUSTeK Computer International.

Q.   So just so I'm clear, the International entity is actually the entity in the U.S. and the Inc. entity is the Taiwanese entity; is that right?

A.   Yes.  I suppose, from Taiwan's point of view, we are international so they elected to call this International, but it is the U.S. sales arm.

Q.   And so does this reflect sales and importations in the United States?

A.   It does.

Q.   Can you turn to PTX-47 in your binder?

Are you familiar with this document?

331

A.    Yes.  This is an annual report for ASUSTeK Computer Incorporated from 2021.

MR. REICH:  Your Honor, we move to admit PTX-47.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. REICH:

Q.    Now, what are you showing on this slide with respect to PTX-47?

A.    From this report, it shows the ownership of ASUSTeK Computer International, the U.S. sales arm. And it is indeed a 100-percent-owned entity for ASUSTeK Computer Incorporated.

Q.    Okay.  When the accused products are sold in the U.S., are they labeled as ASUSTeK Computer Inc. products, or are they labeled as ASUSTeK Computer International products?

A.    ASUSTeK Computer Incorporated, the Taiwan entity.

Q.    And is that what you're showing here on the screen from the label on the back of the PG32UQ product?

A.    Exactly.  This is -- this type of label is on the back of every product, and it does identify ASUSTeK Computer Incorporated, from Taiwan, as the

332

manufacturer; and it gives some other data about manufacturing date.

Q.   And what have you indicated in the red box regarding the FCC rules?

A.   Any product that's to be sold into the United States must pass the FCC rules relating to electronic admission -- emission from the product, and this device complies with those rules.  Meaning it is designed to be sold in the United States.

Q.   Okay.  And based on this evidence, can you confirm again to me what your conclusions were with respect to ASUSTeK Computer Incorporated's acts of direct infringement?

A.   I concluded that ASUS does perform acts of infringement by offering for sale, selling, and importing the accused monitors into the United States.

Q.   Now, beyond direct infringement, which we talked about, do you understand there's another type of infringement called indirect infringement?

A.   Yes.  That's my understanding.

Q.   Now, do you need to have any notice or knowledge of the patent for that direct infringement bucket we talked about?

A.   Actually, you do not.

Q.   But for this indirect infringement bucket, do

you understand that ASUS' intent and knowledge are relevant?

A.    Yes.

Q.    Are you the person to opine as to intent and knowledge?

A.    No.  That's for you, the jury, to decide.

Q.    Well, can you help us understand some of the technical issues that are relevant to notice and intent?

A.    The -- I'm sorry.  Can you repeat the question?

Q.    Are you going to be able to help us understand some of the technical issues that are relevant to notice and intent?

A.    Yes.

Q.    Now, I think we saw this before.  Are you familiar with the notice letters in this case?

A.    Yes.

Q.    Taking a look at the notice letter, PTX-16, from your perspective, could a technical person of skill in the art, like yourself, have understood and been on notice of infringement based on the details that SVV provided in this letter to ASUSTeK?

A.    Yes.  I think it's quite straightforward. We've seen this document before.  It lists the patents

that SVV has, and it lists two or three products that are shown or claimed to be infringing.  It would be quite straightforward for an ASUSTeK engineer to look at those products and look at the claims of these patents and see if it infringes.

Q.    Would that be an analysis similar to what you did with these claim boards?

A.    It would work the same way.  They would take apart the monitor.  They actually have access to all the details beyond just taking apart the monitor.  But that would be the most straightforward way to do it.

Q.    Now, as part of your analysis, did you also look at ASUSTeK's written discovery responses in this case?

A.    Yes.  I did.

Q.    Can you turn to Tab PTX-52 in your binder?

A.    Okay.  I'm there.

Q.    Are you familiar with this document?

A.    Yes.

Q.    What is PTX-52?

A.    This is a response to SVV questions, requests for admission, which is basically asking ASUSTeK to confirm or deny certain facts.

MR. REICH:  Your Honor, we move to admit PTX-52.

MR. BURESH:  No objection.

THE COURT:  Admitted.

BY MR. REICH:

Q.    What are you showing with respect to ASUSTeK's response to Request for Admission 6?

A.    This is No. 6, did they receive a copy of the letter we just looked at?

And their answer is:  Yes.  We received that letter.

Q.    And what are you showing on this slide with respect to Request for Admission 8?

A.    This is asking if they are aware of these patents on February 25th, 2021.

And they said:  Yes.  We admit that.

Q.    Now, ultimately, who is responsible for using the evidence like this to determine whether ASUSTeK was aware of and intended to infringe SVV's patents?

A.    Again, that's for the jury to decide.

Q.    Is it time to move to the final topic that you'll be addressing today?

A.    Yes.

Q.    Why are you discussing technical value and damages when you already mentioned that Mr. Farber -- Dr. Farber is coming to explain the sales?

A.    Dr. Farber is not a technical person, and so

he's asked me to comment on the value of these patents to ASUS monitors for use in his analysis.

Q.   What are the technical value and benefits associated with SVV's patents?

A.   SVV's patents, as we heard yesterday, are all about efficient management of light, how light flows from a source to the screen in the most efficient way; and because of that design, the product is improved.

The product is brighter, if you use the same components.  It has better color and whiteness, especially those that use the quantum dots that we discussed.  And it has a better natural viewing angle by the management of the flow of light, again, from these LEDs at the bottom of the screen throughout the whole area, into a comfortable use so you can enjoy the monitor.

Q.   And while these benefits can make the monitor better, as you described, can they -- benefits also manifest in other ways?

A.   Yes.  For example, you might be able to make the brightness 20 percent higher because the efficiency is better, but if you don't need 20 percent brightness higher for your application, you can actually reduce the cost of the monitor by reducing the cost of some of the components.

337

For example, fewer LEDs, fewer optical sheets, a power supply that doesn't have to be as large to supply power to those LEDs.

So this could be manifested as a cost savings for a monitor to achieve basically the same performance, or you can have a premium product with the higher -- higher-quality --

Q.   Now, are you --

A.   -- specs.

Q.   Excuse me.

Are you responsible for quantifying the value of these benefits to ASUSTeK's products?

A.   No.  Again, that's -- that's a job for Dr. Farber.

Q.   Now, before we finish up, I just wanted to go back a little bit to some of the key takeaways from yesterday.

What matters for determining infringement?

A.   The claims, the claims, the claims.

Q.   And did you go through all the claims?

A.   I did.

Q.   Now, are there certain Court constructions that everyone needs to follow when applying the claims?

A.   Yes.  There are.

Q.   Now, otherwise, if there's no construction

that the jury has in their binder, how are the claims supposed to be construed?

A.    The claims are supposed to be construed by their plain and ordinary meaning if there's no Court construction.

Q.    What does this concept of this idea of plain meaning mean?

A.    It means that a person of skill in the art, someone who is familiar with backlighting systems and displays, for example, would understand that a component such as -- for example, quantum dots, there's a plain and ordinary meaning for a quantum dot.

Quantum dots are used widely in industry in millions of products to change blue light into red and green light.  You see these advertised in Best Buy when you go look at TVs these days.

That's the plain and ordinary meaning for quantum dots, even though they can have other applications.  So that's the meaning that I used in my analysis.

Q.    What is the role of the descriptions and the figures in the patents, or patents generally?

A.    Generally they're examples of how the invention works.  I mentioned this is about light management.  Efficient light management from a source

339

to a destination, if you will.  The figures and descriptions are to make that clear to a person of skill in the art so they understand the invention.

Q.   So they're examples?

A.   They're examples.

Q.   And is any given figure a limitation on the claims?

A.   None of them are.

Q.   Are you required to have a figure in your patent for every possible implementation or application?

A.   No.  I think you could imagine that would make patents quite big.  Once the concept of the invention -- in this case, the light management of the optical system -- is disclosed and described, you don't have to have figures for every single application.

Q.   Is the title a limitation on the patent, the claims?

A.   The title is not a limitation on these claims.

Q.   Now, you'll agree that these patents have titles, right, and they're descriptive?

A.   Yes.

Q.   And there are certainly examples, you would agree, in some of these patents related to solar applications.  That's fair; we're not disputing that,

340

right?

A.    Yes.  I don't dispute that.  It's very clear.

Q.    But as an optics guy, where LCD displays are 100 percent in your lane, what is the key understanding that a person of skill in the art with experience in the lighting optics field and industry knows when reading the SVV patents in these examples?

A.    Yeah.  It is a lane I've traveled for almost five decades.  So I have a clear understanding of the optics of these systems.

A person of skill in the art would look at the patents, look at the optical system, how it manages light using the features I described such as lenses and deflecting elements and total internal reflection to achieve a better control of that light going from a source to the end, which in some cases is solar, but in other, equally, it applies to backlight, because light actually can go both ways.

Light is not -- you can have light coming down and in or in and up.  The optics are the same.

Q.    And applying these rules, your understanding, all the work we did, can you give the jury kind of final summary of your conclusions in this case?

A.    Sure.  As I said at the beginning, and I hope now I've shown you that this is indeed the facts, that

341

ASUS infringes Claims 1 and 21 of the '342 patent; ASUS infringes Claims 1 and 7 of the '562 patent; ASUS infringes Claim 19 of the '089 patent; and, finally, ASUS infringes Claim 3 of the '318 patent.

MR. REICH:  Your Honor, SVV marks as demonstratives these claim boards Demonstrative PDX-3 -- 1, 2, 3, 4, and 5, as demonstratives.  And we'll put the stickers on them afterwards.

We'll pass the witness.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. BURESH:

Q.    Good morning, sir.

A.    Good morning.

Q.    How are you?

A.    I'm fine.

Q.    Okay.  Now, let me start here.  You do quite a bit of testifying work as an expert witness, correct?

A.    I don't know what you define as "quite a bit." I have done two or three trials.

Q.    Okay.  And I believe there's a CV in your binder --

A.    Yes.

Q.    -- if you need to review it.

As I reviewed your CV, going back to 2019, so

342

five years, you've been engaged on well more than 20 litigation matters, fair?

A.   I haven't counted them, but I trust your math.

Q.   Okay.  And as you've said, you have testified in multiple trials through that time?

A.   Yes.  When it reaches this stage, I testify. It doesn't usually get all the way to trial.

Q.   When's the last time you testified in trial?

A.   I testified in June of this year.

Q.   So this is kind of old hat for you?

A.   They're always different, but I don't know if I'd say old hat, but they're -- I'm familiar with the process.

Q.   Okay.  And again, looking at your CV if you need to, I couldn't find any nonlitigation consulting that you've done since 2018; is that correct?

A.   In 2018 I moved out of the Bay Area, so the Silicon Valley, if you will, to central Oregon that made it -- excuse me.

Q.   And feel free to take a drink whenever you need to.

A.   It just didn't make it convenient to do business consulting and technical consulting any longer.  And I was entering my semiretirement age's era, so I decided to just focus just on the patent

343

consulting since then.

Q.    Okay.  So since 2018, you've only been doing expert witness consulting?

A.    That's correct.

Q.    Now, for this particular matter, you're being compensated at $500 an hour; is that correct?

A.    That's correct.

Q.    And who's paying that?

A.    The Katz law firm.

Q.    That represents --

A.    That represents SVV.

Q.    Okay.  So I want to be very clear here.  I'm not asking you how much money you make.  That would be impolite.

But I do want to know as a percentage of your income, your wages over the last year, what percentage of your wages is earned through expert witness work?

A.    Essentially all of it in the last year has been consulting on patents, on IPRs, on writing reports, and occasionally testifying.

Q.    Okay.  So this is kind of your main gig?

A.    It's my main retirement gig, if you will.

Q.    And you were hired in this case by the Katz law firm that represents the plaintiff?

A.    Yes.  That's correct.

344

Q.    Is it normal for you to be hired by lawyers?

A.    That's -- yes.  That's, I think, all the -- always the case.  I'm approached by a law firm representing a client looking for advice on patents, and I review the case.  And if it looks interesting, and defendable, I agree to join -- you know, to be an expert for that case.

Q.    Okay.  So having done this work for a while now, I just want to ask you some simple questions about the process that you go through, if that's all right.

A.    Sure.

Q.    Is infringement analysis like the one you were hired to conduct, it's a two-step process, correct?

A.    Yes.  There's multiple steps, but at least there's two steps.  I don't know which ones you're referring to.

Q.    I'm talking high level.

A.    High level.  Okay.

Q.    The first step is to understand the patents and the claims in the patent?

A.    Correct.

Q.    And you're supposed to do that Step 1 without consideration of the accused products that you're being asked to look at?

A.    Actually, that's my normal process, and

345

sometimes I do that before I'm even retained.

Q.   Fair enough.  And I'm trying to ask narrow questions.  So --

A.   Okay.

Q.   -- I know you'd like to add some stuff to it, but your attorneys will get another chance.

MR. REICH:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. BURESH:

Q.   Okay.  So let's get back to the process.

A.   Sure.

Q.   The first step, understand the patent claims?

A.   Check.

Q.   Okay.  And then the second step would be to review the accused products in view of your understanding?

A.   That's fair.

Q.   Okay.  Is it your understanding that in that first step, considering and understanding the patent claims, that that understanding of the terms is found in view of the patent's specification, file history, and the understanding of a person of ordinary skill in the art?

A.   I would say that's accurate.

Q.   Okay.  Is it your understanding that the role

346

of the specification of a patent, the parts before the claims, is to describe and enable the invention?

A.    It -- it needs to enable the invention.  It needs to describe the -- the aspects of the invention.

Q.    So let me ask this again.

The role of the specification in Step 1 is to describe and enable the invention?

A.    Yes.  It does that at least.

Q.    Okay.  In turn, the claims cannot be of a broader scope than the invention that is set forth in the specification.

Is that your understanding in Step 1?

A.    That's my understanding of the patent law.

Q.    Okay.  In fact, care must be taken in Step 1 lest word-by-word application removed from the context of the patent would lead to an overall result that departs significantly from the patented invention?

A.    I'm not sure I followed all of that.

Q.    Okay.

A.    Maybe you can break it down.

Q.    Sure.

I'm going to give you a sentence and ask you if you agree with this sentence.  Okay?

Care must be taken lest word-by-word definition removed from the context of the patent would

lead to an overall result that departs significantly from the patented invention.

Is that your understanding?

A.   I would say at a high level, that's my understanding.

Q.   Okay.  And that's all in Step 1?

A.   Okay.

Q.   Is that correct?

A.   I think you defined the step.  So the first step of reviewing the patents, yes.  It's part of reviewing the patents.

MR. BURESH:  Could I have the ELMO, please?  Thank you.

BY MR. BURESH:

Q.   Do you recognize these as your slides from yesterday and earlier this morning?

A.   Yes.

Q.   Okay.  And these were the topics to be addressed.  I believe you said they were the steps you were going to walk through in your testimony?

A.   Correct.

Q.   And the first step was to describe the patents-in-suit?

A.   Yes.  So understand -- I think I used the word "understand" the patents-in-suit.

348

Q.    Okay.  Understand them.  Fair enough.

And that would correlate to the first step of the infringement analysis that we've been talking about?

A.    Basically, yes.

Q.    Okay.  So as you walked through your first step, the patents-in-suit, you came to this slide?

A.    Yes.  I described that slide.

Q.    Okay.  And I believe the testimony that you were offering was to explain how Figure 26 from the '342 patent would be an example of the claim?

A.    Actually, what -- not quite what I was intending to do.

Q.    Okay.  Do you agree that Figure 26 helped you explain the claim -- Claim 1 of the '342 patent to the jury?

A.    I wasn't explaining the details of the claim at this point.  I was instructing the jury as what components existed and identifying by color the various components, parts of the claim.

Q.    Okay.  And you've in fact done that.  You've linked by color coding the key elements of the claim to the figure?

A.    These are the elements I thought would be instructive to the jury to get them to understand this

349

optical system.

Q.    Okay.  And really I'm just asking, you were trying to help the jury understand the claim language, fair?

A.    Not the entire claim language.

Q.    But some of the key parts?

A.    Some of the key parts of these elements.

Q.    Okay.  And you chose to use this figure for that purpose?

A.    I thought it would be useful to do that.

Q.    And that was Slide 3.17 of your demonstratives?

A.    Yes.

Q.    Okay.  So in this phase, we're still in the patents-in-suit discussion during your testimony.  We go next to 3.18.

You see that?

A.    Yes.

Q.    And you're talking about some patent families here?

A.    Correct.

Q.    And then there wasn't a slide, but right after this, you showed the cover page of the '089 patent.

Do you recall that?

A.    Yes.  I did.  I do, I should say.

350

Q.   And then this was the next slide that you showed?

A.   After I had given a high-level description of the patents, I moved into some comments about the accused monitor products.

Q.   Okay.  So you chose to show the jury in your patent-in-suit discussion, where you were trying to communicate an understanding of the patents, you showed them one figure from one patent?

A.   I thought I showed two, but -- for the '089. I thought there was a figure.

Q.   You did show the cover page of the '089.

A.   Which includes a figure.

Q.   Okay.  Fair enough.

So you showed the cover page of one patent and one figure from another patent, correct?

A.   Yes, as I recall.

Q.   So in the patents-in-suit, the first step of the infringement analysis, there were two patents that you didn't even talk about, correct?

A.   I didn't go into the same level of detail.

Q.   Well, I'm saying -- I'm going a step further.

You didn't even talk about them in terms of their disclosure at all, did you?

A.   No.  That's not correct.

Q.    Just didn't use any -- didn't use any slides?

A.    I did not use any slides, but I talked about those other patents.

Q.    You said what family they were in?

A.    I said what family and how they were related in technology, but they would have different claims.

Q.    Is it fair to say that if it's okay for you to look at figures when you think it's helpful to explain something to the jury, that it's equally okay for me and my client to look at figures when we think it's helpful to the jury?

A.    I think that's fine.

Q.    That's fair?

A.    You can show figures.

Q.    Okay.  And you showed the jury a title page of one of the patents, the '089 --

A.    Yes.

Q.    -- when you were on -- explaining, helping them understand?

A.    Right.

Q.    So is it equally fair that me, Mr. Buresh, who has been repeated multiple times here, and my client, that when we want to look at a title page, that that's equally fair?

A.    As long as you use that title in context.

352

Q.   Because context is really important, isn't it?

A.   Sure.

Q.   Because if we ignore the context, we could get way outside the bounds of the invention, couldn't we?

A.   The invention is in the claims.

Q.   And if we ignore all the context in Step 1, it's possible we could get way outside the bounds of the invention; isn't that fair?

A.   That may happen in rare circumstances.  It did not happen here.

Q.   Now, you did also an explanation of the technological value of the patents, right?

A.   Yes.  This morning I did that.

Q.   And in fact, you showed the jury kind of how a monitor works.  You turned on the big blue light and walked through all the layers, right?

A.   I did that.

Q.   Now, when you were showing how good a monitor works, just so everyone is clear, you were using one of ASUSTeK's monitors?

A.   That's correct.

Q.   Okay.  You weren't actually showing any prototypes of how Dr. Vasylyev and his invention worked, were you?

A.   I was indicating how his invention is

353

incorporated into that monitor as I went through my description.

Q.    And you'd agree with me that that's not a conclusion that anybody's reached yet, right?  The jury gets to decide if the patents are being incorporated in the product, not you?

A.    That's correct.

Q.    Okay.  So you have a little assumption built into your presentation that says I'm going to show how good ASUS' products work, and then I'm going to say that's the value of the patents.

There's a big assumption built in there, right?

A.    That's not how I put it.

Q.    Okay.  So you would agree with me today that showing the jury how an ASUS product works does not tell them the value of the patent?

A.    They can see that the --

THE COURT:  Doctor, you need to answer his question.

A.    Okay.  Please repeat the question.

BY MR. BURESH:

Q.    Showing the jury how well ASUS' products work does not show them the value of the patents, does it?

A.    Not directly.

354

Q.   Okay.  Debating whether I want to try this or not.  Okay.

I don't actually like touching things like this.  It makes me nervous.

A.   There's a phrase, you break it, you buy it.  Does that apply?

Q.   I think this one's probably already broken, so...

Okay.  This is all these sheets and the light guide --

(Clarification by Reporter.)

BY MR. BURESH:

Q.   This is called the backlight panel in an LCD -- in an LCD product, correct?

A.   Not those sheets alone.  Those are part of the backlight panel.

Q.   Okay.  This other part that remains attached to the monitor is the LCD display?

A.   I'm sorry.  The LCD display is not there.  It's on the ground someplace.

Q.   You are correct.

Is this the LCD display?

A.   That is the liquid crystal display.  Yes.

Q.   Okay.  With all the little millions of shutters?

355

A.    Correct.

Q.    And some circuit boards?

A.    Yes.

Q.    That control everything?

A.    That's where the signal comes from.

Q.    Okay.  Now, Dr. Vasylyev's -- let me ask that question a different way.

When you did your infringement analysis, you didn't point to any part of this LCD display or any of the circuits that control it?

A.    I certainly acknowledged that they're there, but they weren't part of the lighting system.

Q.    Okay.  So is it fair to just set this aside?

A.    Yeah.  That's fine.

Q.    I'm going to pull out the light guide.  Okay?

A.    That's actually not the light guide.  That's the optical film stack.  The light guide is probably still in the tray.

Q.    All right. Fair enough.  Light guide's in here.

A.    Okay.

Q.    So set that aside.  These films, were they new and novel to Dr. Vasylyev?

A.    Those kind of films are used in other products.

Q.    And had been well before 2009?

A.    They had been used before 2009.

Q.    Okay.  So these aren't part of the invention?

A.    Only to the extent they affect the light flow from the LEDs to the screen.  They're, individually, just sheets.

Q.    Okay.  Now, this light guide has behind it a reflector that you've talked about some?

A.    Yes.

Q.    The reflector that sits behind the light guide, not new.  People have been doing that well before 2009?

A.    Certainly they were used before 2009.  Yes.

Q.    Okay.  And light guides that received LED light on the edge -- what we're calling edge-lit light guides -- were well known before 2009?

A.    At least in smaller products.

Q.    What about, you know, all the little microdots you were talking about?

A.    Deflecting elements?

Q.    Sure.  Deflecting elements.

I think you said there were millions of those on the bottom of the light guide?

A.    Yeah.  I didn't count them, but I estimate, yes, millions.

357

Q.    Okay.  Having millions of deflection elements, the little dots, on the bottom of a light guide, not new in 2009?

A.    I wouldn't say -- I wouldn't say that.  This style is somewhat different, and I can't recall seeing any backlight systems with these -- this density of microdots of this size on other products.

Q.    Okay.  So you didn't see the exact dots, but the concept of putting micro deformities on the bottom of a light guide was not new?

A.    There's many examples in the past that had versions of that that didn't work the same way for sure, but yes.  They existed.

Q.    While we're talking about the light guide, that's the piece that when the light comes in the edge I guess from the bottom up, the light moves through it until it hits a deflecting element and then comes out?

A.    It comes out either to the screen or to the back reflector.

Q.    Okay.  And if it hits the reflector, then it bounces back up and ultimately comes out?

A.    It gets diffused and then comes out.  Yes.

Q.    Okay.  So if we talk about the general flow of light in this light guide, it's going to be coming up from the bottom on the edge, right?

358

A.   Correct.

Q.   And then it'll hit deflecting elements at different places and the general flow will be out towards the LCD display?

A.   It will be out towards the display, but not necessarily at the right angle.

Q.   Okay.  But it'll be moving in the general direction of the display?

A.   The general direction, but again, the angles are all over the map usually.

Q.   Because the light's very scattered coming out?

A.   The light from the back surface is scattered, the light from the microdots is scattered.

Q.   Okay.  We've been talking about a light guide. Is that a term that's widely used in the industry?

A.   That's pretty common in my industry.

Q.   Okay.  So it'd be fair to say that what a light guide is doing is guiding the light?

A.   That's why it's called that.

Q.   That's why it's called a light guide, right?

A.   Yes.  I think the patent calls it a waveguide, but it's a very similar concept.

Q.   It's still a guide?

A.   Still a guide.

Q.   Not a trap.  It's not called a light trap, is

359

it?

A.    The -- it's not called that, but that's what happens.

Q.    Well, just a second ago we were guiding it, now we're trapping it?

A.    Same thing when you consider TIR.

Q.    Okay.  This is your Demonstrative PDX-3.98 --

A.    Correct.

Q.    -- agreed?

And you're talking here about Claim 1 of the '318 patent?

A.    That's right.

Q.    And this particular claim requires a broad-area light input surface, correct?

A.    Yes.

Q.    Now, we have a edge-lit LED that you've depicted?

A.    Correct.

Q.    And I believe during your testimony yesterday you called this edge here the light input edge?

A.    I referred to it as a light input edge.  Yes. It is a light input edge.

Q.    That's what I asked.  It's a light input edge, yes?

A.    You said "the"; but I said, yes, it's "a."

360

Q.    Okay.  And what you're depicting here is that the light bounces by total internal reflection, which is a big way of saying that all the light reflects?

A.    It's -- that's the meaning, as long as the indexes of refraction, as I described, are proper.

Q.    Okay.  So the light travels, is guided down the light guide, until it -- some of it exits the light guide.  Is that what you're depicting?

A.    Yes.  There's -- these millions of microstructures cause extraction, if you will, of the light both towards the LCD and towards the back reflector about 50/50 ratio.

Q.    Okay.  So this light is going out of the light guide right here?

A.    That's obviously one location.  There's thousands.

Q.    Well, I'm just trying to understand what you depicted.

A.    Yeah.  I -- that's what I've depicted.

Q.    Okay.  So we have light exiting the light guide right here?

A.    Yes.

Q.    After being input into the light guide right here?

A.    Input, and for that angle that I show,

361

that's -- that hits that microstructure, that's what happens.

Q.   Okay.  Now, in your infringement analysis, you took this edge where the light is coming out and you called it the input edge?

A.   Yes.  That's correct, because it is.

Q.   So where the light goes out is where it comes in?

A.   That surface is an input surface for all the reflected light.

Q.   Okay.  So when it exits, it's exiting the input?

A.   Sure.

Q.   Okay.  And just so I don't leave anything out of your opinion, I suppose you're saying that because it reflects off the bottom, that it's coming in here?

A.   All the light reflecting off the bottom is diffusely scattered from all the microdots, not just the one, and that light -- that light flux travels to that input surface that I've identified.

Q.   The input where the light had exited?

A.   It exits at the microdots.  It comes back through the planar sections around the microdots.

Q.   Okay.  I would like to look at a figure in the '318 patent so we can maybe compare what you're saying

362

to the patent.

A.   Sure.

Q.   Do you see Figure 20 on the screen in front of you?

A.   Yes.  I do.

Q.   And this would be one of the example figures from the '318 patent, correct?

A.   Yes.  That's correct.

Q.   Now, this figure that we're seeing here, this is in what I've called a light-trapping patent, right?

A.   I believe that's what you referred to it.

Q.   Because that's the title?

A.   Yes.  I think it is.  I think that's the title.  I forgot.

Q.   Light trapping in the sense that we see a different kind of orientation here, right?  The light's not coming in the edge in this patent.  The light's coming down from above?

A.   Light enters from the bottom, and then by TIR is trapped in the lower structure.

Q.   Light enters from the top, right?

A.   From the top.  Yes.

Q.   Not the bottom?

A.   Correct.

Q.   Okay.  So light comes down from the top, and

363

it comes in.  Let's look at Ray No. 92.  Okay?  It comes into this layer 8 right there, making layer 12 the light input surface?

A.    Yes.  That's correct.

Q.    Okay.  Then down here, the light exits layer 8, making surface 10 the light output surface?

A.    Yes.  For this figure, that's correct.

Q.    Now, this light ray bounces off the bottom and goes back through into layer 8 again, doesn't it?

A.    That's how it's shown.

Q.    And surface 10 is still the output surface?

A.    Surface 10 was the output surface as it was called, I believe, in the spec.

Q.    Okay.  And that happens again with these light rays, right?  You have light coming down and bouncing back up?

A.    Yes.  Not -- not the same quantity of light. But yes.  Some of the light comes back up.  Some of it's absorbed in that, I believe, a photoconductor layer.

Q.    And that bouncing off the bottom doesn't change the understanding of what the input and output layers are, surfaces are, correct?

A.    That's correct.

Q.    Okay.  You see this little number here, 70,

with the dashed line?

A. Yes. I see it.

Q. It's coming down, and the arrow is kind of pointing in this direction here?

A. Right.

Q. What is 70 indicating?

A. You know, I just don't recall.

Q. Okay.

A. It looks like a normal incident angle to that lower surface is probably the way I would interpret it.

Q. I would represent to you that it's indicating the prevailing direction of the light.

A. Okay.

Q. Would you agree or disagree with that?

A. In this figure, that's correct.

Q. Okay. And the prevailing direction of the light is top to bottom?

A. Certainly in this figure, that's what's described.

Q. Making the surface where the light prevailingly comes in, the input, and the surface where the light prevailingly goes out, the output surface?

A. You could say it that way.

Q. That's a fair understanding?

A. That's an interpretation that's fair.

365

Q.   And if we come back to your analysis, the light -- the place where the light prevailingly comes in, the edge, you're not calling that the input surface?

A.   I'm calling the input surface where half the light prevailingly enters the light guide structure, as I've indicated.

Q.   And this surface here, where the light prevailingly goes out, you are calling the input surface?

A.   I'm calling the entire yellow outlined edge the input surface, not just that one location, to be clear.

Q.   And to be clear, the place where the -- the surface where the light is prevailingly going out is where you're calling the input?

A.   I'm -- that is an input surface for the light coming back towards the right in this illustration.

Q.   Now, on the screen in front of you, sir, is your Demonstrative 3.92.

A.   Yes.  I see that.

Q.   Okay.  And this is for the '089 patent?

A.   Correct.

Q.   Now, feel free again to correct me if I'm wrong.  We want a clean record here.

But in every other patent, the surface relief features that you talk about as infringing are the ones on the bottom of the light guide?

A.   I believe that's correct.  Yes.

Q.   Okay.  But here, for this particular patent, the surface relief features that you're pointing to are not in the light guide?

A.   I've identified other surface relief features that relate to the claims of the '089.  Yes.

Q.   The surface relief features that you're pointing to for this particular patent are clear up here in the optical film stack?

A.   That's correct.

Q.   They're not part of the light guide?

A.   That's correct.

Q.   Okay.  Now, in the '089 patent, is there an example of surface relief features anywhere in that patent that's placed somewhere other than the light guide?

A.   The patent describes an optical flow of light and hitting -- hitting deflecting elements.  It only shows an example of what you might call a light guide in that patent.

Q.   Right.  It shows the light guide in this patent, not other layers, right?

367

A.    The claims require that there be reflecting or deflecting elements.  I've identified those in the light flow path.

Q.    No.  I agree.  You've pointed to some deflecting elements that are way up here.  Okay?  So the jury can see what's happening.

The light guide's down here, right?

A.    To be fair and just to make it clear to the jury, this is an expanded scale.  That optical film stack is actually a stack, as you showed.  It's very close to the light guide, but it is distinct from the light guide.  That, I will agree.

Q.    Okay.  This is your demonstrative.  Don't -- I'm -- you made it sound like I'm trying to mislead somebody.  This is your picture?

A.    Well, you said -- you said the term "way up here."  I'm just telling you that it is -- the parts are in this order, but when they're stacked up, they're close to each other.  That's all I wanted to make clear.

Q.    Okay.  So let me -- with that clarification of your depiction, let me ask it again.

The surface relief features that you're pointing to in the '089 are up here?

A.    Correct.

Q.    Okay.  They're not in the light guide anymore for this patent?

A.    For this patent, they are not.

Q.    Okay.  And my question -- going back again, I don't care if you show a picture to the jury out of the patents or some portion of the written description.

Is there any example at all in the patent where the surface deflection features are not in the light guide?

A.    I believe in this -- in the figures, they refer primarily to that light guide near the -- near the bottom of that figure.  That's what they refer to.

Q.    Does that make the answer to my question no, there's no examples?

A.    I believe I answered that.  I may be more succinct.  I don't recall any figures that show any other deflecting elements other than in the light guide.

Q.    Okay.  And again, we want to be careful not to go outside the bounds of the invention, right?

A.    We want to look at the invention and follow the teachings of the light flow.

Q.    Okay.  One more question on this.

There's this concept of the space between the optically transmissive surface and the reflective

surface.

A.   Yes.

Q.   By moving the deflection features that you're looking at away from the light guide and way up here to the optical stack, you've opened that space wide up, right?

A.   I've made that space about 1 millimeter longer than it would have been if it was just the light guide, which is 3 millimeters thick.

Q.   Okay.  But conceptually, you've moved the space?

A.   The space is defined as it's defined from the reflector to the deflecting elements.

Q.   I apologize for the slight delay.  There were a lot of slides.

Here we go.

Okay.  Do you remember this from my opening?

A.   Yes.  I do.

Q.   Okay.  Figure 27, this is coming out of the '342 patent.

A.   Yes.  I see that.

Q.   Okay.  My question for you is -- I want to understand a little bit more about how the patent works.

So you agree this is collimated light coming

370

out that I've highlighted there?

A.    If the focal length of that lens is such that the deflecting element is at the focus, then the light will be collimated.

Q.    Okay.  Break that down.

First, does this indicate collimated light coming out of the light guide through the lenses?

A.    Yes.  It's drawn that way.

Q.    Okay.  And it's collimated because it's parallel?

A.    That's the usual definition of "collimated," roughly parallel.

Q.    And I believe you just answered my second question.  So let me see if I can make sure we understand each other.

If you put this deflecting feature at the focal point of this lens that it's paired with, that will result in collimation?

A.    Essentially, yes.

Q.    Now, I'm not an optics expert at all.  I do know if I put my glasses on this way, I see well.  And if I turn them over, I can't see hardly anything.  Right?

A.    Maybe in your case, yeah.

Q.    The lenses work in one direction?

371

A.    That's not true.

Q.    Okay.  But in terms of their focus, like these lenses are designed to focus on my eye, right?

A.    There's some -- some correction in your lens, but a lens in general works both directions.

Q.    Okay.  When you were a kid, did you ever play with a magnifying glass?

A.    Sure.

Q.    And I have a vivid recollection of sunlight and a magnifying glass lighting some leaves on fire and then getting in trouble because part of my yard burned.

A.    You can do that with focused light.

Q.    Okay.  And that's really if the light were coming down in Figure 27, that's what would be happening, it being -- it would be being focused on one point?

A.    Yeah.  The light would basically follow the reverse path, if you will.  Light would come through that lens.  It would hit that reflector and go back towards the LED.

Q.    Okay.  Now, let me ask you this:  If this deflecting element that I've circled is not at the focal point of this lens that it's paired with, then the light won't be perfectly collimated, right?

A.    That's correct.

372

Q.    And if, for example, I took this deflecting element and moved it, let's say, clear over here in some random location and shot light up this way toward this lens, that light coming out of that lens isn't going to be collimated?

A.    Well, depending on the details, but it will be -- it could still be collimated but going in a different angle, depending on the distance to the focal length.

Q.    Depending on the details?

A.    Depending on the details.

Q.    This is PDX-3.66 from your slides, correct?

A.    Yes.  That's correct.

Q.    Okay.  And this claim limitation, indeed, the part you've highlighted, talks about a predetermined alignment?

A.    That's right.

Q.    And that would be an alignment between the deflecting element and a lens?

A.    It would be the alignment between the array of lenses and the array of microdots.  Yes.

Q.    Okay.  And you've looked at my client's products, the light guides?

A.    Yes.

Q.    Under a microscope?

373

A.   Correct.

Q.   And concluded that the little dots -- the microcavities, as you call them -- are in alignment with the lenses; that's your conclusion?

A.   The microcavities, the array of microcavities, all those dots, are in a predetermined alignment with the lens array.  Yes.

Q.   Now, you said yesterday that all of these little dots -- I'll try to highlight a couple here just so the jury can see, like, what we're talking about.

Those are the dots we're talking about, microcavities?

A.   Yes.

Q.   You said they were randomly placed?

A.   Yes.  They're randomly placed by design.

Q.   In an irregular pattern?

A.   Irregular pattern controlled by the computer software that finds the locations of each dot.

Q.   Okay.  And then you come to the -- the lenses that are running horizontal in this depiction, correct?

A.   Yes.

Q.   And those lenses, they're just, like, in a sheet.  They're just parallel, perfectly linear lenses?

A.   Basically that's correct.  They're a regular array of lenses.

374

Q.    Okay.  So your testimony is that something that is regular and linear is in alignment with a bunch of dots that are random?

A.    Absolutely.

Q.    And in fact, you point out too that -- I took down your testimony.  You said "happen to be at the center"?

A.    That's what I said, I believe.  Yes.  They happen to be at the center.

Q.    Two out of millions in the light guide plate that happen to be at the center?

A.    There's certainly more than two that happen to be, but the point is, as I said, the positional alignment is predetermined.

Q.    Okay.  "Predetermined" means by design, right?

A.    By design.

Q.    So you're saying that somebody -- some optical engineer somewhere in the world has, by design, chosen to put two microcavities in alignment with lenses while not aligning millions of other ones.  That's what you want this jury to understand is your opinion?

A.    No.

Q.    Okay.  But you've pointed to two, right?

A.    I pointed to two as examples.  I could point to any two.  They would be in predetermined alignment.

Q. While most of them are not even arguably in alignment. We can just see that visually, can't we?

A. I disagree.

Q. What about this one that's squarely in the -- in the groove of a lens?

A. The alignment of that dot is in a predetermined alignment with the lens.

Q. What about this one that's in a different one? Different alignment?

A. It's in a predetermined alignment with the lens.

Q. And you think there's some engineer somewhere in the world that has, by design, chosen to make these all different?

A. Basically, yes. Because it's a random pattern of microdots that's required for the uniformity that I described.

Q. Yeah, it's got to be random and you have something linear. Really hard to align linear with random, don't you think?

A. They're predetermined. The alignment is predetermined.

Q. You keep saying that, and you've said there's somebody that, by design, has set this all up. You haven't shown the jury any of these CAD programs you

376

were talking about yesterday, have you?

A.    No.  I have not shown the CAD program, but those are -- those exist, for sure.

Q.    Well, sure.  There's programs all over the place.

But you haven't shown the jury the one you are saying is resulting in whatever alignment you're pointing to?

A.    As I -- may I answer the question with more than yes or no?

Q.    Have you showed the jury any CAD program that you're relying on?

A.    I did not show a CAD program.

Q.    Did you find an engineer somewhere who testified in a deposition that you reviewed that said, I designed it this way because I want two dots to be aligned while millions of other ones aren't, that's how I want to do it?  Did you find some testimony that said that?

A.    No.  Because that's not true, what you said.

Q.    Did you find some testimony somewhere in this case that indicated a design intent, a predetermination to put those two dots in an alignment with the lenses?

A.    In my testimony, I spoke about the alignment, the predetermined alignment of the array of microdots

with the lenses.  I did not say or it isn't required that they be at the center of a lens.

Q.   Okay.  My question is this -- I'm trying to fully respect your testimony, but I'd like to move past that and ask if you have any evidence of a design intent, a predetermination, for that alignment that you're showing on the screen.

A.   I have examined these parts.  I've examined light guides that are from different monitors of the same part number and they are the same.

Q.   Okay.  Let me ask it one more time.  We'll try documents.  We've done depositions.  We didn't see any, right?

A.   Correct.

Q.   We didn't see any CAD program.  Was there a design document that you reviewed from the productions that said, we're going to make two dots align?

A.   I didn't see that because it isn't necessary.

Q.   Okay.

THE COURT:  Doctor, you just need to answer his question.

THE WITNESS:  Okay.

A.   No.

BY MR. BURESH:

Q.   During your testimony yesterday, and it may be

378

what you're trying to say now, you said there are tools to index the microcavities with the lenses?

A.    That is correct.

Q.    And when did you show those tools to the jury?

A.    I did not show those tools to the jury.

Q.    You just said they were there?

A.    Based on my experience and knowledge, yes.

Q.    Okay.  But you didn't show us?

A.    I didn't have access to the -- to that data from Acer -- from ASUS.  Sorry.

Q.    I'm not asking what your issues were; I'm just saying you didn't show this tool for indexing to the jury, did you?

A.    I did not.

Q.    Here, we have Claim 1 from the '562 patent on your Demonstrative 3.77, correct?

A.    Yes.  That's correct.

Q.    Okay.  And this claim limitation says:  The surface relief features...

That's the microcavities, right?

A.    Yes.

Q.    ...formed in the second broad area surface...

A.    Correct.

Q.    ...according to a predetermined two-dimensional pattern.

379

A.    Correct.

Q.    And your testimony yesterday was that the pattern of the million dots in my client's products was random?

A.    I said it was a predetermined random pattern, I think is what I said.

Q.    A predetermined random pattern?

A.    Yes.

Q.    So random, in my mind, means you don't know what's coming?

A.    Maybe in your mind.  Yes.

Q.    If I go to --

MR. BURESH:  Sorry, Judge.  I'm going to take us into a bad place here.

BY MR. BURESH:

Q.    -- the craps table at a casino, okay, and I roll the dice, it's random?

A.    The outcome should be random.

Q.    Meaning no one standing around the table knows what it's going to be?

A.    That's correct.

Q.    And predetermined would mean you'd know it beforehand?

A.    That would be the implication in your casino example.

Q.    Okay.  So predetermined and random seem to be opposites?

A.    Not in my mind.  No.

Q.    During your testimony yesterday, you talked again about a -- some CAD program for this particular patent too?

A.    Yes.  I believe I did.

Q.    Another CAD program that no one here has seen?

A.    I think we're talking about the same CAD program for the location of the dots.  Is that right?

Q.    Sure.

A.    Yeah.  We haven't seen that program.

Q.    You're just telling us about some CAD program?

A.    I am.

MR. BURESH:  Your Honor, I pass the witness.

REDIRECT EXAMINATION

BY MR. REICH:

Q.    Mr. Credelle, earlier it was pointed out that you've been an expert before?

A.    Yes.

Q.    If you didn't believe in a position -- would you join a team to help if you didn't believe in the position?

A.    I wouldn't, and that situation has arose a few

381

times.

Q. How strongly do you believe about the inventions and the infringement in this case?

A. Once I understood from Mr. Katz the patents and the application space, I did my homework and I felt there was certainly strong merit that these patents were in use in these products and I agreed to join this case.

Q. And now that you've done the analysis, completed the analysis, do you feel very strongly about your opinions?

A. I do.

Q. Were you showing ASUS' monitor, when we did the demonstration, to teach the jury about the patents or to show how ASUS was using the patents?

A. It was to show how these layers go together and how the light flows with the optics that are in this structure.

Q. Now, we heard this talk about two steps and an analysis for doing patent infringement.

Do you recall that?

A. Yes.

Q. Did you do both steps?

A. Yes.

Q. As part of Step 1, probably the most important

part, did you apply the Court's claim constructions?

A.   Yes.  I can't remember the -- what -- if the claim construction was done when I first joined this case, but I believe it was.  So I always apply the Court's construction however it exists.

Q.   Is the Court's claim construction a key part of Step 1?

A.   Yes.  Because the terms can be misinterpreted in some cases, and that's why the Court does construe certain terms, to make it clear to experts like myself or any skilled artisan what it means.

Q.   And those are examples where certain preambles were not considered limiting.  Those are Court claim constructions in this case?

A.   Yes.  That is a Court claim construction that the preambles are not limiting on the claims.

Q.   Now, Mr. Buresh used this kind of $2 lawyer word, a written description.

Did you hear that?

A.   Yes.  I believe I heard him say that.

Q.   Do you understand that if ASUS believed at all that these patents were being stretched beyond their disclosure, that's called a written description challenge?

A.   That is.

383

Q.   Are they making a written description challenge in this case?

A.   They're not.

Q.   So was that just a waste of everybody's time?

A.   I would call it that.

Q.   Now, we also heard about certain components being known beforehand.

Do you recall that?

A.   Yes.

Q.   To be clear, was Dr. Vasylyev the first person who came up with the actual inventions that are claimed in these patents?

A.   He is the inventor of these claims that we discussed yesterday.

Q.   And did the PTO review prior art that's listed on the face of these patents?

A.   Yes.  That's the process for the Patent Office.

Q.   And did it issue these patents?

A.   It did issue these patents.  Yes.

Q.   And I think the jury's heard about it on the patent video.  You -- some party could challenge the invalidity if they thought something was known, but is ASUS challenging invalidity in this case?

A.   They are not.

384

Q.   What is your opinion about ASUS' efforts to argue noninfringement by looking at selected figures rather than the language of the claims?

A.   My opinion is that it's not appropriate.

Q.   Why?

A.   Because it's the claims that matter.  Figures and titles are informative.  They're examples.  But it is the claims that matter.

Q.   And do you believe that the Court's instructions will say that the claims matter?

A.   Yes.  For sure.

MR. REICH:  Mr. Diaz, could I have PTX-1, the '318 patent, 7 -- Column 7, 42 through 54?

BY MR. REICH:

Q.   Looking at some of this description, what -- and what are we seeing here in the sentence that begins "For example" at Line 47?

A.   This is referring to, I believe, Figure 1, which is a description of the light guide in this patent.  And it says there are two surfaces, a surface 10 and a surface 12.  Namely, you could think of it as the top surface and the bottom surface.

And what it instructs is that the surface 10 is a light input surface.  But however, the reverse can be true and it could be an output surface.  So these

385

are interchangeable.  And that indicates a fundamental property of optics, is that the light can go both directions through an optical system.  There it's kind of a reversible process.

Q.    And so the next sentence, "when surface 12 is receiving light," does that make it the light receiving or the light input surface?

A.    If the surface 12 is receiving the light, it makes it an input surface.

Q.    Even though it could also be an output surface if it's outputting light?

A.    That's correct.

Q.    And is that what we have here with the bottom side of the light guide plate?

A.    Yes.  That's right.

Q.    If the bottom side of a light guide plate could not receive light, what's the point of the rear reflector?

A.    There would be no need for a rear reflector if the light isn't to come back.  And it is a significant portion of light coming back from that surface into that input.  So it is clearly an input surface.

Q.    We heard a lot about the alignment, the predetermined nature of these patterns.

Just can you remind us again, what is a random

pattern in this field?

A.     A random pattern is basically, as I said yesterday, an irregular pattern.  The locations are designed by a computer so that there aren't hot spots and cold spots from a lighting point of view across the surface and that light is extracted uniformly from the bottom to the top.  That's an irregular pattern, and that's its function.

Q.     Are these things just made willy-nilly, every single one of them different?

A.     No.  They're designed by an optical engineer using a CAD program, a computer program.  Testing is done.  And when it's deemed to be correct, that file is saved in a program which instructs the laser where to put the dots.

Q.     And does that file, the CAD file, have a predetermined set of pattern and alignment with lenses in it?

A.     Yes.  Every file has an associated location for the millions of dots.  And if it's a different light guide for a different product, it may have different requirements.  So it's a different random pattern, but it's also predetermined so it can be fabricated in a factory.

Q.     Can you explain how is it -- I mean, where are

387

these -- this particular product, where is it made? Where are the engineers?

A.    This particular product was made by a company called AU Optronics.  Their factories are in China.  Some of their engineers are in Taiwan.  So I'm not sure who designed this, but it would be either -- engineers in either one of those places.

Q.    Now, even though you don't have the CAD file, what evidence have you actually seen -- and for example, we have two PG32UQ light guides here -- to tell us it's made by a computer and it has a predetermined pattern?

A.    I've examined with a microscope and you can see --

MR. BURESH:  Your Honor.

THE COURT:  Doctor, Doctor.

MR. BURESH:  I object to -- he's doing comparisons between products now that haven't been set forth in his report.

MR. REICH:  Your Honor, this is all set forth in his report.  He explained this in his --

THE COURT:  Here's what I care about at this point:  What is -- what are you asking him that is responsive to what was raised on cross?

MR. REICH:  Evidence about predetermined

388

patterns, Your Honor.

THE COURT:  Okay.  If you'll ask the questions in a context of him responding to what was asked on cross, I don't care whether it's in the report or not, but it's not relevant unless it is responding to what was on cross.

BY MR. REICH:

Q.    Mr. Credelle, what evidence do you have that -- to respond to the point that you need to show a predetermined pattern?

A.    The evidence would be, I believe, it's a ten-digit number that's written into the light guide plate that identifies the file that determines the locations of the dots.

Q.    Can you get out a microscope and show the jury that right now?

A.    Yes.  I can do that.

MR. REICH:  May I approach with a microscope?

THE COURT:  Sure.

MR. REICH:  May you come down and do this?

THE WITNESS:  Okay.

MR. BURESH:  Your Honor, before he does that, can we approach?

THE COURT:  Sure.

(Bench conference.)

MR. BURESH:  He is about to do an infringement analysis that he has not presented in his report.  This comparison that they're getting ready to do, nowhere disclosed.

THE COURT:  If he answers a question -- if counsel frames the question that -- in a way that this expert is responding to something you raised on your cross, he gets to do it.  That's the --

MR. BURESH:  Your Honor, I crossed him on the opinion in his report.

THE COURT:  -- asks him a question that says:  You were asked about this on cross.  You were asked this question.  You want to talk about this.

He now gets to explain it if you raised it on cross.  He gets to raise it.

I told every lawyer at the pretrial conference if you raise something on cross, then on redirect, they are not limited to what is in the report.  They get to explain because the jury gets to hear the entire story.

That's -- but that's the way the question needs to be framed, is you need to tether what you're about to have him say something where he is -- his

390

opinion was challenged on cross for him to put this on.
If you can do that, he can put it in.  If you can't do
that, he doesn't put it in because he's limited to
responding to what was asked on cross.

MR. REICH:  Okay.  Yes, Your Honor.

THE COURT:  Okay.  I'll listen to the
question, and you can object if you want, depending on
the way he frames it.

MR. BURESH:  Understood.  Thank you,
Your Honor.

(Bench conference concludes.)

BY MR. REICH:

Q.    I'll re-ask my question real quick here.

Mr. Credelle, can you show the jury right now
a response to Mr. Buresh's point that you can't prove
the CAD file existed?

A.    Yes.  I believe I can show -- prove that there
is a file --

(Clarification by Reporter.)

A.    Yes.  I can show an identifying mark on the
light guide plate.

BY MR. REICH:

Q.    All right.  May I grab your tablet here?

A.    Yes.

MR. REICH:  May I have the ELMO,

391

Mr. Diaz?

BY MR. REICH:

Q.    All right.  Here's your tablet.

Can you show us -- tell us what you're showing the jury?

A.    I can't see what's on the screen.  Oh, there it is.  Yeah.

Q.    Can you center that number?

A.    Yeah.  I'll try.  I apologize for the lighting in this court, but you can see, I believe, that there's a model number.  It's a mirror image.  So it's a little hard to read.  But that is a unique number that relates to the light guide plate used in the PG32UQ that basically determines where all those dots are located.

Q.    And can you scoot it over just a little bit more?  So we can get that first.

A.    Oh, the first number?

Q.    Yeah.  Is that a backwards P?

A.    Yes.  I think it's -- yeah.  It's hard to read, but the --

Q.    Is it a P32 to start?

A.    I believe that's what it is.  Yes.  You can see it better than me.

Q.    And can you show the same number on this light guide plate to prove, to Mr. Buresh's point, that these

392

have the same number?

And so is that our backwards P32 that we're seeing again --

A.    Yes.

Q.    -- in the same serial number?

A.    Yes.

Q.    So what does this show, to Mr. Buresh's point, that he wanted evidence about a CAD file?

A.    This is evidence to a person of skill in the art, certainly to me, that there is a CAD file -- there's a computer file that indicates the location of each and every one of those dots that I've actually seen that they -- they start to line up if you put them on top of each other.

Q.    So you've also compared the dots, and they line up?

A.    I've compared the dots and I've compared the lenses.  They line up.

Q.    And so in conclusion, how does this support your opinion that the lenses and the pattern are predetermined -- in a predetermined alignment?

A.    They're predetermined, as I mentioned yesterday, by the design of both surfaces.  And the alignment is also predetermined.  The alignment of the lenses is known.  The alignment of the dots is known.

393

They're in an alignment. It doesn't say that every lens is lined up with every dot. That's not what the -- is -- the claim requires, but they are in an alignment for sure.

Q.    All right. You can return to your seat.

MR. REICH: I pass the witness, Your Honor.

MR. BURESH: Very briefly, Your Honor.

THE COURT: Sure.

MR. BURESH: Can you give me the ELMO, please?

Thank you.

RECROSS-EXAMINATION

BY MR. BURESH:

Q.    So now you've shown the jury that the light guide has a model number on it?

A.    It has a part number. I'll call it a part number.

Q.    Okay. I don't see any CAD file name on here. Do you?

A.    It -- it doesn't say CAD -- it's an identifier of the part number which has the associated CAD file that goes with it. This is how the factory works.

Q.    So I use a lot of Word Perfect or document processing. I see a lot of file names with,

394

like, .docx on there.

A.   Oh.   Now, that would be -- that would be in the spec sheet.   That -- there's a -- there's a light guide spec sheet from the manufacturer, a dot pattern has been designed and approved.   It has a part number for that file.   That's what's used in the factory so they know what computer program to load when they're making this 32-inch light guide.

Q.   Okay.   Is it -- let me ask you this:   If you pull the same product out of two different boxes, is it real surprising to you that you're going to find the same model numbers on the same product?

A.   It's not surprising that they would be the same.

Q.   No.   It's not.

So the CAD file that we're looking for, that you now have talked about a product light guide spec sheet that designates the CAD file -- so just to make sure we're clear, we haven't found the CAD file, right?

A.   Correct.

Q.   And the spec sheet you now talked about, you haven't shown the jury the spec sheet?

A.   No.

Q.   Okay.   But you've confirmed that the model numbers are the same thing -- are the same?

395

A.   I confirmed that these two light guide plates have the same dot pattern.

Q.   No.  You've confirmed they had the same model number.

A.   I've shown they have the same model number. I've confirmed that the pattern is exactly the same.

Q.   One is a fact, they have the same model number; the other is your opinion?

A.   It's my opinion based on measurements.  Yes. It's my opinion based on measurements.

Q.   Measurements that you haven't shown the jury either?

A.   That's correct.

Q.   Okay.  Now, you looked at this paragraph during your redirect?

A.   Yes.

Q.   And to orient the jury, this is the '318 patent, Column 7?

A.   Correct.

Q.   And I believe your counsel and you basically looked at this paragraph and said the input and output surface really don't matter.  They can be either/or?

A.   I believe what it says and what I summarized is that either surface can be an input surface, meaning the light can flow either direction.

396

Q.    Okay.  But here in this paragraph, when we look at it, there's a concept in here that's pretty important in terms of how we define those surfaces, isn't there?

If we go up to your "for example" sentence, if we have surface 10 as the light input surface, and surface 12 as the light output surface, the prevailing propagation direction will be from 10 to 12?

A.    That's correct.  It's normal to that -- that plane.

Q.    Okay.  So if we have 10 on top, 12 on the bottom, we know the prevailing direction of light?

A.    It's from 10 to 12.

Q.    Top to bottom?

A.    10 to 12.  Right.  That's what it says.

Q.    Okay.  Now, keep reading.  Because we're not just flipping the surfaces around.  Something else changes too.  When surface 12 is receiving light and surface 10 is opposing light, the prevailing direction of light propagation is now in the opposite direction, right?

A.    To me that's saying it's just going from input to output.

Q.    Okay.  So now we have 10 and 12, but we have light going this way.  So we're looking for the

397

prevailing direction?

A.    Correct.

Q.    Okay.  So that's what we're looking for, the prevailing direction of light?

A.    That's useful information.  Yeah.

MR. BURESH:  Okay.  Nothing further, Your Honor.

MR. REICH:  Nothing further from me.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Who's your next witness?

MR. REICH:  Your Honor, we have depositions to be read next.

(Clarification by Reporter.)

MR. REICH:  Your Honor, next we have depositions to be read.

THE COURT:  How long is the first one?

MR. REICH:  Five minutes, Your Honor.

THE COURT:  How much is the total deposition?

MR. REICH:  Total 20 minutes.

THE COURT:  Say again?

MR. REICH:  20 minutes, Your Honor.

THE COURT:  Ladies and gentleman, would you rather do 20 more minutes before we take our break,

398

or --

So here's what you're about to hear.  In lawsuits, the lawyers are able to ask the other side for a deposition of certain witnesses.  If the plaintiff would like to know what the defendant might say about a matter or vice versa, you can ask for what is called a deposition.

What happens is the lawyers arrange for the person to attend, the person is sworn in.

That's important.  Just like you -- they're sworn in here in court, the person, before they're deposed, is sworn in.  And then the lawyers have the opportunity to ask them whatever questions they want to ask them and get answers.

Obviously, we can't bring everyone who we'd like to have into court.  And so a couple of people are going to be presented to you by deposition.  The most important thing for you to remember, and I'm going to give you an instruction on this at the end, is the reason the seven of you are here are to be the judges and assess the credibility of each witness.

And that's entirely and exclusively up to you.  The fact that a person is testifying by deposition should not impact their credibility.  They have the equal dignity of anyone who appears in person.

399

So listen to the depositions, and then use whatever tools you want -- however you evaluate whether someone is telling the truth or not, you get to do that.

So that being said, if you all would put on the depositions now.  And if you would give just a very brief description of who the person is that's being deposed.

MS. HALEY:  Good morning.  This is Aisha Haley on behalf of SVV.  We will first call by deposition Mr. Jaime Morquecho, who has knowledge about the defendant's activities in the United States.

Are you ready to proceed?

(Deposition of Jaime Morquecho read as follows:

Q.   Good morning, Mr. Morquecho.

A.   Good morning.

Q.   Your role -- well, let me back up a moment.

Who do you work for?

A.   I work for ASUS Computer International.

Q.   And can we just agree to call that ACI for today?

A.   Yes.

Q.   Okay. What is -- what's your actual title at ACI?

A.   I'm the senior manager of service.

Q.   And when you say "service," what kind of

400

service?

A.    Customer service.

Q.    Okay.  How long have you worked at ACI?

A.    About almost 15 years.

Q.    And what ACI office do you work out of now?

A.    I work out of the Fremont location in Fremont, California.

Q.    Were any of the accused products designed or developed in California?

A.    No.

Q.    Was any -- let me start over.

Were any research and development efforts relating to the products done in California?

A.    No.

Q.    Where does the design of the accused products take place?

A.    Overseas.

Q.    Okay.  Is that generally Taiwan?

A.    I couldn't say for certain.  It would be Taiwan or China.  That would be my understanding.

Q.    And what's your understanding of where the manufacture of the accused products takes place?

A.    My understanding would be overseas as well.

(End of deposition.)

MS. HALEY:  And that completes the

—401—

deposition of Mr. Morquecho.

SVV now calls Mr. Jason Wu, who is a ASUS employee that was included on the notice correspondence in this case.

(Deposition of Jason Wu read as follows:

Q.    Mr. Wu, how long ago did you join ASUSTeK?

A.    I joined ASUSTeK in 2021.

Q.    And when you joined ASUSTeK, did you join the legal department?

A.    Yes.

Q.    And you've been in charge of patent litigation matters at ASUSTeK since you joined ASUSTeK; is that correct?

A.    Yes.

Q.    Do you see Exhibit PTX-61?

A.    I see it.

Q.    Did you generate this report?

A.    No.

Q.    Who generated this report?

A.    We have a team.  They would provide or produce the documents per the request by the discovery requirement.

Q.    Okay.  And what's the name of the team just so that we can refer to it?

A.    Legal compliance team.

402

Q.   Do the revenues represent wholesale revenues, retail revenues, or a mix of both?

A.   I do not know because it is the sales data for ACI, not for ASUSTeK.

Q.   So the sales quantity in PTX-61, for those columns that say sales quantity, those are sales in the United States, correct?

A.   Correct.

Q.   The products are manufactured by the ODMs at the behest of ASUSTeK, right?

A.   Correct.

Q.   I'm going to refer to the column headings that refer to COGS AMT.

MS. HALEY:  Can I get the exhibit?

Q.   That's -- and I'll just spell it out, C-O-G-S, A-M-T.

For example, I'm looking at Column -- the column header for Column G.  So does this represent the cost of goods sold amount?

A.   I don't know that COGS represents cost of goods.

Q.   And when it says AMT after that, do you know what the AMT represents?

A.   I do not know.

Q.   What types of costs are considered part of the

403

COGS?

A.    The spreadsheet was produced by ACI.  We do not know what the data represents.

Q.    So you wouldn't be able to tell me what sort of costs go into these particular columns, correct?

A.    Correct.

Q.    With respect to the cost of goods for ASUSTeK, if you wanted to find out what ASUSTeK's cost of goods were, where would you go to look for that information?

A.    I do not know.

Q.    So ASUSTeK pays the ODMs to make the products, correct?

A.    Correct.

Q.    So wouldn't someone at ASUSTeK have to know how much the ODMs got paid for the products?

A.    There should be someone who should have such knowledge.

Q.    And what department would that knowledge -- and what department would have that knowledge within ASUSTeK?

A.    I'm not sure.

Q.    Does ASUSTeK track expenditures for product development involving its monitors?

A.    I do not know.

Q.    Does ASUSTeK project revenues and/or profits

404

going forward?

A.    I do not know.

Q.    Does the letter of Exhibit PTX-16 identify a number of the patents that are asserted in the current litigation?

A.    Yes.

Q.    Okay.  Fair enough.

Does the letter of PTX-16 ask whether ASUS was willing to engage in licensing discussions with SVVTI?

A.    Yes.

Q.    And did ASUSTeK engage in licensing discussions with SVVTI?

A.    We provided the information of vendors and recommended SVVTI to contact with the vendors.

Q.    Okay.  But that really wasn't my question.  My question is simple.  Eight words.

Did ASUSTeK engage in licensing discussions with SVVTI?

A.    We did respond to Mr. Katz.

Q.    Did ASUSTeK attempt to acquire a license from SVVTI?

A.    We did not have enough information for us to assess if we should go ahead to get the license.

Q.    Yeah.  But I didn't ask why you took certain actions.  I'm just asking -- the question is:  Did

ASUSTeK attempt to acquire a license from SVVTI?

A.    SVVTI did not propose any offer before the litigation.

Q.    So you sent me an e-mail in response to the letter, correct?

A.    Yes.

Q.    And Exhibit PX-25 reflects our December 1st, 2021 communication, correct?

A.    Yes.

Q.    Mr. Wu, this was your response, I guess after my December 1st e-mail referring to Exhibit PTX-26; is that correct?

A.    Yes.

Q.    And as part of this communication, you reiterated your request for exemplary -- I'll just highlight it -- exemplary claim charts; is that correct?

A.    Correct.

Q.    Mr. Wu, do you recognize Exhibit PTX-27 being my December 3rd, 2021 e-mail response back to you via e-mail?

A.    Yes.

Q.    That's not -- yeah.  That's not the question.

Claim charts are intended for a patent owner to explain why a particular product infringes a patent,

406

correct?

A.    Yes.

Q.    SVVTI provided exemplary claim charts on December 3rd, 2021 to ASUSTeK, correct?

A.    Yes.

Q.    And SVVTI provided 40 exemplary claim charts, correct, at that time?

A.    I did not count to see if there were 40 or not.

Q.    Did the e-mail say there were 40?

A.    It was written in this way in the e-mail.

Q.    But in response to SVVTI's notice letter, did ASUSTeK change or discontinue selling any products or discontinue targeting them to the U.S. market?

A.    The orders that ASUSTeK placed are targeting at its worldwide market.

Q.    In response to SVVTI's notice letter, did ASUSTeK change anything?

A.    No.

Q.    In response to receiving SVVTI's claim charts, did ASUSTeK change anything?

A.    No.

Q.    Did ASUSTeK ever try to obtain a license to any of the patents-in-suit?

A.    We contacted our vendor and asked them to

407

assist us with determination of if they were using the patented technologies so that we may assess if it would be necessary for us to get the license.

Q.    And did you assess that it was necessary to get the license?

A.    Because the vendor did not give us any substantive response, we were not in the position to conduct the assess.

Q.    How did ASUSTeK try to obtain a license to the patents-in-suit?

A.    ASUSTeK reached out to the vendor, AUO, and asked them to assist to determine if any of the patented product, the technologies were used.  After that ASUS could be able to determine if it will be necessary for them to obtain license of the patents.

Q.    And what did ASUSTeK conclude about the necessity of a license?

A.    Because AUO did not provide any substantive response, ASUSTeK -- so it was not possible for ASUSTeK to conduct the assess.

Q.    And for an inbound license, what is a typical structure?  Is that a lump-sum payment or a running royalty?

A.    Typically we do a lump-sum payment.

Q.    When negotiating a new license agreement, may

ASUSTeK agree to a royalty that is higher or lower than the amount specified in prior agreements?

A.    The lower, the better.

Q.    In this case, did ASUSTeK do anything to mitigate potential infringement?

A.    I would say ASUSTeK did not particularly do anything with regard to this case.

Q.    Did ASUSTeK produce any documents regarding this back-and-forth communication between ASUSTeK and AUO?

A.    For before the litigation, they only provided the information of a contact person whom the plaintiff was able to contact with.

Q.    How important is this case to ASUSTeK?

A.    I do not know.

(End of deposition.)

MS. HALEY:  That concludes the deposition of Mr. Wu.

THE COURT:  Ladies and gentleman of the jury, we'll take our morning recess.  Please remember my instructions not to discuss the case amongst yourselves.  We'll be back in 10 or 15 minutes.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

THE COURT:  You may be seated.

409

Next witness will be your damages expert?

MR. CALDWELL:  Yes, Your Honor.

THE COURT:  And then you'll be done?

Oh, I'm sorry.  You're going to call --

MR. CALDWELL:  Yes, Your Honor.

THE COURT:  I'm sorry.  Okay.  So I'm ballparking.  About how long do you think -- I'm not holding you to it.

MR. PEARSON:  The direct will probably be an hour to hour and 15.

THE COURT:  Let's go off the record just so we can talk.

(Off-the-record discussion.)

THE COURT:  We can go back on the record.

MR. CALDWELL:  So Brad Caldwell for the plaintiff.

Your Honor, there is something that's been kind of bothering me a little bit, and I was trying to put my finger on it.

And so in this case, when we did the jury selection with Judge Manske on Thursday, we kind of had the generic instructions.  It wasn't really specific to a lot of the details of a patent case.

But what's happened is we've started -- kind of this case has started trying a legal question

410

in front of the jury, and it just keeps getting worse and worse and worse.

And I wanted to bring it to the Court's attention because what's happened now and it's sort of an implication at some point and then there are actually examples where it was very explicit, the defendant is literally comparing the accused products to aspects of the preferred embodiment titles, figures, and things like that.

And I have a Q&A. I can read it. Although it's been pretty pervasive. And so there's a lot of problems with that.

One, obviously it's just kind of guiding the --

THE COURT: Why didn't you object?

MR. CALDWELL: Well, the problem is it's actually subject to a motion in limine, and they should have approached first. You're right. We could have objected.

THE COURT: So what do you want me to do now?

MR. CALDWELL: Well, I think the thing to do now is even just a pretty noncontroversial interim instruction that basically the question on infringement is going to be by virtue of comparing the accused

411

products to the claims as construed by the Court, which should be pretty noncontroversial.

At this point we can't even refer back to like a preliminary instruction or something along those lines that we might in some cases. I think they should have approached.

And like I said, I could give you examples where they literally say: Okay. Here's what you're saying about the accused product. Now, let's turn to this figure of the '318 patent and compare. Like they even used that word.

So I had a case once where the same thing sort of happened and unfortunately it happened too late --

THE COURT: I don't know what you're asking me to do.

MR. CALDWELL: Well, I think we want a corrective instruction. A, just what I'm saying, noncontroversial kind of corrective instruction that infringement is analyzed by comparing the accused products to the claims as construed by the Court.

THE COURT: And when would you like me to give that?

MR. CALDWELL: I think when we resume would be ideal. I guess my concern is I don't want to

wait till finals and have it be that we've argued over this for the whole --

THE COURT:  When you resume --

MR. CALDWELL:  When we resume the trial after the break.

THE COURT:  I'm not going to do that.  It has no context now, and that's why I don't understand why you didn't object while he was asking the questions.

MR. CALDWELL:  Yes, sir.  I understand, but I think some things are motions in limine for a reason in the sense that it's a toothpaste-tube situation.

THE COURT:  The motion in limine means if you think he's violating a motion in limine, you say, Your Honor, can we approach the bench, and we take it up then.

I can't -- I can't fix it now -- you know, there -- I'm sure there are things you've said that they're unhappy about that they'd like me to say, you know, remember this.

So I will give instructions at the end of the -- obviously, at the end of the trial.  If you all -- if anyone thinks that there needs to be something added to what I ordinarily give because of

413

what's been done during trial, you can submit it.  I'll decide whether or not to give it.  If I don't, you can object that I don't.

But, you know, I'm -- you know, so far in this case, you all have spent a lot of time worrying about things -- they've spent a lot of time because they have heard this whole case before.

So when y'all say the water's wet, they jump up and say, no.  We -- Judge, you've got to do this prophylactically because they're going to do this.

And you all, having heard what they're doing while they're doing it, don't object and now you want me to -- I don't know what the opposite of prophylactically is -- retroactively give an instruction.

The only way this -- I can do this, after -- I'm finally at the point where I can say a lot of trials is, I don't know what y'all are going to ask.  I don't know how to fix it once it's been asked.

I once had -- I don't think it was this case, but I don't remember -- someone after the -- we'd given the charge and the jury's deliberating, saying, Judge, we have a problem with something they said during closing.  And I'm like, okay.  I can't do anything about it.

414

So I've rambled a long time.  I will -- I understand why you're unhappy.  I don't know what I would have done had it been raised when counsel said that.  If he said that.  I don't remember him saying that the way you said he did.

But I'm just saying, from now on if you have a problem, if anyone thinks the other side's violating a motion in limine, object, and I will -- and I'll -- if you're right, I'll deal with it then; if you're not, I'll deal with it later.

MR. CALDWELL:  Yes, sir.

And my apologies.  I may have misunderstood Your Honor's guidance yesterday about making sure the parties get along, and I --

THE COURT:  No, no, no.

MR. CALDWELL:  -- erroneously inferred --

THE COURT:  Let me make sure.  I have no problem with you objecting to anything that the other side is doing at any time.  What I don't care for is what I consider to be relatively childish conduct between the counsel, with each other, and with me in response to what was going on.

I -- let me make clear.  Let me use a specific example.  No judge likes objections during closing arguments.  That's not very deep.  But if

someone says something like they did in the last trial that needed to be objected to, you need to object and I sustained it.

And in fact, because of what happened in the last trial, which I hate, I'm now going to make you exchange slides before closing arguments, which I had stopped doing, because at the last trial someone put something in -- in front of the jury in closing argument that I had excluded. That didn't work very well, and I couldn't fix it.

So now, though I hate doing it, I hate taking the time to do it. I think closing arguments are more effective. If you -- if the other side doesn't know what you're going to show in your slides, as long as it's within the rules, I think that's better. But that's not the way we're doing it now.

From now on, we're going to exchange closing slides. And if someone says something then, object. If someone says something any time -- you have to protect your client's record.

I'm never unhappy about you -- that's the wrong way. I'm here -- I'm only here to make sure if you think something's inappropriate that you raise it at the time and I will rule on it. And hopefully, I'll get it right.

416

But so I'm sorry if you misunderstood. My concern yesterday was entirely over my perception of the conduct of the lawyers. I don't think it's good in front of -- it's not good in front of me. I don't think it's good in front of the jurors. And so that was why I said that.

But I am never not willing to take up any objection that you all have.

MR. CALDWELL: Yes, sir. We'll keep an eye out for it in their noninfringement expert.

THE COURT: Now, that being said, I remember earlier we postponed an issue that you all had, I think, because we thought we could do it later. Is that something we should take up now?

MR. MCCARTY: We can take it up now, and it's an objection for their technical expert who's coming at the very tail end of the day. We could take it up now or we could take it up -- -

THE COURT: Happy to do it now.

MR. MCCARTY: Okay. And I'll make it brief, Your Honor.

This relates to their technical noninfringement expert. His name is Dr. Goossen. Specifically, Your Honor excluded this witness related to his opinions for two particular terms, and it goes

417

back to this.  They have a -- they had a argument at claim construction on two terms.

And if I could have the ELMO.

The two terms were "light harvesting" and "light converting."  We heard about these two terms throughout the trial.  They're actually not even claim terms, but they are -- they're issues that were construed or subject to claim construction.

Your Honor found it in favor of my client's position at claim construction.  What happened is the expert in his report sort of disobeyed Your Honor's claim construction.  And so Your Honor struck his opinions on these two claim terms.

What's happened now is they're trying to reintroduce -- I guess it'd be a third time -- these opinions that have been subject to claim construction and denied by Your Honor, excluded explicitly at the pretrial conference, and are going to have this expert come in and talk about opinions that were subject to that claim construction and have been excluded.

THE COURT:  Okay.  I was wrong.  This is something dealing with their expert?

MR. MCCARTY:  Yes.

THE COURT:  Okay.  I don't need to take that up now.  Let's get through -- and then.

MR. MCCARTY:  Okay.

THE COURT:  I thought -- for some reason I thought it had to do with your damages expert --

MR. MCCARTY:  Yeah.

THE COURT:  -- and I had to deal with it. We'll take this up before their expert, and that way I'll be able to have it in better context.

MR. MCCARTY:  I think the afternoon break is probably the right time.

THE COURT:  That's just better timing for me.

MR. MCCARTY:  All right.

THE COURT:  Okay.

(Recess taken.)

THE BAILIFF:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury entered the courtroom.)

(Bench conference.)

THE COURT:  You may be seated.  Thanks.

MR. SIEGMUND:  It's just a reminder about the stipulation whenever you can.

THE COURT:  Do you have a copy?

(Bench conference concludes.)

THE COURT:  Ladies and gentleman of the

419

jury, the parties have entered into a stipulation they've asked me to read to you, and when parties enter into a stipulation, you are bound by it.

The parties agree that for the purpose of asserting the issue -- assessing the issue of infringement in this case, you should treat ASUSTeK Computer Inc. and its wholly owned subsidiaries as one actor; that is, an act of infringement by an ASUSTeK wholly owned subsidiary would constitute an act of infringement by defendant ASUSTeK Computer Inc.  SVV still has the burden to prove infringement.

MR. PEARSON:  Daniel Pearson for SVV, Your Honor.  Plaintiff calls as its next witness Dr. Matthew Farber.

(The witness was sworn.)

DIRECT EXAMINATION

BY MR. PEARSON:

Q.   Good morning, Dr. Farber.

Would you please introduce yourself to the jury?

A.   Yes.  My name is Matt Farber.  And I live in Dallas with my wife and three children.

Q.   Are you originally from Dallas?

A.   No.  I grew up in Western New York, but my wife and I have lived in Texas our entire adult lives.

420

I came down from Houston -- came down to Houston at 22, met my wife the next day.  And I look up now, almost two decades later, and have three little kids wearing Cowboy jerseys and eating brisket on Sundays.

Q.    What do you do for a living?

A.    I'm an economist.

Q.    Why are you here today?

A.    I've been asked to provide testimony regarding the appropriate damages for ASUSTeK's infringement of the patents-in-suit.

Q.    Have you prepared anything to assist with your testimony?

A.    Yes.  I have.  I've prepared a set of demonstratives.

Q.    And are these those demonstratives?

A.    Yes.

Q.    Would you please describe your educational and work background for the jury?

A.    I started at the University of Richmond in Virginia.  While I was there, I obtained a B.S.B.A. in economics and a B.A. in Spanish.

After that, as I said, I moved down to Houston, and I taught middle and high school math for four years.

At that point I decided to go back to school,

and I went to the University of Texas.  While there, I obtained a master's of science in economics and a Ph.D. in economics.

Q.   What have you been doing since you earned your Ph.D.?

A.   I've worked in economic consulting since then.

Q.   What's economic consulting?

A.   We get asked to opine on a variety of matters. Since -- I've opined on numerous types of matters such as breach of contract, antitrust, patent infringement. I've worked on trademark infringement, copyright infringement.  Kind of all over the place.

Q.   What type of companies have you had the opportunity to work with?

A.   That's one of the more fun parts of work. When we get hired on a case, we get to learn all about different companies and the marketplace that they work on.  So we just kind of get a wide range of knowledge.

So some examples are toy manufacturers, oil pipeline companies, smartphone manufacturers, restaurants.  Just kind of all over the place.

Q.   When you work as an expert in litigation, have you worked on behalf of both plaintiffs and defendants?

A.   Yes.  I don't keep track.  But it's probably roughly half/half on both sides.

422

Q.   Is your firm being compensated for your time?

A.   They are.

Q.   Does your compensation depend on the outcome of this case?

A.   No.  It does not.

MR. PEARSON:  Your Honor, SVV offers Dr. Matthew Farber as an expert on economics and patent damages.

MS. MARRIOTT:  No objection, Your Honor.

THE COURT:  He'll be admitted as an expert.

BY MR. PEARSON:

Q.   Dr. Farber, what were you asked to do in this case?

A.   I was asked to calculate damages resulting from ASUSTeK's infringement of the patents-in-suit.  As we see, there's two patent families.  And specifically in this matter, I was asked to calculate a reasonable royalty on their infringement of the patented technology.

Q.   Will you preview your ultimate opinion for us?

A.   Yes.  And this is a very high-level summary. And we'll get into all the work.  But my opinion is that the royalty per unit would be $13.96.  ASUS has sold approximately 4.2 million units, and so total

423

damages would be $58,632,139.

Q.   What sort of information did you consider in forming your opinions in this case?

A.   A variety of information.  We looked at the patents.  We looked at legal filings, such as pleadings and the complaint.  We looked at company documents, such as financial data and agreements.

We examined witness testimony in the form of deposition testimony.  We did our own product research.  We examined the academic literature.  I interviewed Dr. Vasylyev, and we reviewed expert reports.

Q.   What sort of work did you do in order to come to your ultimate opinion in this case?

A.   My team and I did a lot of work here.  We issued a detailed report, and that report explains all the reasonings for our opinion.  It also includes a lot of tables and charts showing the quantification of damages.  We produced R scripts for reading the data.  We produced R scripts for product feature scraping and Stata code for data analysis and the regression.

Q.   Now, before you started to determine an appropriate reasonable royalty or to measure it, did you have to analyze any background information?

A.   Yes.  Usually we do some background research into the products at issue, the parties in the matter,

424

and the marketplaces in which those products are sold.

Q.    Who is the plaintiff in this case?

A.    That's SVV.

Q.    And what is your understanding of their business?

A.    As we heard yesterday, Dr. Vasylyev founded SVV in 2000, and they develop technologies relating to all sorts of lighting.  And they do business as Lucent Optics.

Q.    Who's the defendant in this case?

A.    ASUS was founded in 1989.  They're a Taiwanese company, and they sell a variety of hardware, software, and services such as the monitors at issue in this matter.

Q.    Is ASUS a large corporation?

A.    Yes.  They have thousands of employees and sell products all over the world, and they have a number of subsidiaries.

Q.    And what do we see on the screen here?

A.    This is an organizational chart from ASUS' annual reports.  They're publicly produced.  And so at the top here, we can see ASUSTeK Computer Inc., the defendant in this matter.  And I've highlighted the two relevant subsidiaries in blue.

Q.    Okay.  Who is ASGL?

425

A.    That's ASUSTeK Global Pte. Limited.  That's a company based in Singapore.  And ASUSTeK Computer Inc. owns 100 percent of that company.  That's why there's 100 percent above the box.

Q.    And who is ACI, the other entity you've highlighted in blue?

A.    That's ASUS Computer International, and that is ASUSTeK Computer Inc.'s U.S.-based subsidiary.  And once again, ASUSTeK Computer Inc. owns 100 percent of ACI.

Q.    How do you learn about the relationships between various of the ASUS subsidiaries?

A.    We looked at their publicly produced financial statements and their annual reports, and we examined deposition testimony from ASUSTeK's representatives.

Q.    Can you describe for the jury your understanding of how ASUS' products make it to the United States?

A.    Yes.  When ACI needs more monitors, it places an order with ASGL and pays them for those.  ASGL then places an order with ASUSTeK and pays them for those.

ASUSTeK then orders the monitors from the ODMs and directs them to ship them to ACI here in the United States.  And then ACI sells the monitors to consumers like you and me.

426

Q.    What have you learned about the infringing monitors during your investigation into this case?

A.    ASUS has sold 91 infringing models for almost 4.2 million infringing units, and you can see there's a variety of features that go along with those models.

Q.    How do you know that over 4 million infringing monitors were sold?

A.    ASUS produced sales data in this matter.

Q.    If you could, please turn to Tabs 1 through 5 in your binder, which should be PTX-062, PTX-919, PTX-920, PTX-921, and PTX-922.

A.    Yep.  I'm here.

Q.    What are these documents?

A.    These look like printouts of the sales data ASUS produced in this matter.

Q.    Did you rely on this information in forming your opinions in this case?

A.    I did.

MR. PEARSON:  Your Honor, plaintiff moves to admit PTX-062, PTX-919, PTX-920, PTX-921, and PTX-922.

MS. MARRIOTT:  No objection.

THE COURT:  Admitted.

MR. PEARSON:  Mr. Diaz, if we could please see PTX-062 on the screen.

427

BY MR. PEARSON:

Q.   What do we see on the screen here, Dr. Farber?

A.   This is one of the files containing sales data.  So each row is a model, and we have a product description.  And then going over to the right, we have the supplier, a component model number, and then sales quantity, revenue, and I believe there's costs as well.  Though it's cut off on the screen.

Q.   All right.  If you could please turn to Tab 6 in your binder, which should be PTX-684.

A.   I'm there.

Q.   What is this document?

A.   This is my summary of those various sales data.  It's just we combined the files and formatted it to make it an easier read.

Q.   And did you rely on this document you created in forming your opinions in this case?

A.   Yes.  I did.

MR. PEARSON:  Your Honor, plaintiff moves to admit PTX-684.

MS. MARRIOTT:  No objection.

THE COURT:  Admitted.

MR. PEARSON:  Mr. Diaz, if we could please see PTX-684.

BY MR. PEARSON:

428

Q.   What do we see on the screen here, Dr. Farber?

A.   It looks a lot like what we just saw, but it's just our formatted version.  So we have each row is a product.  And then going to the right, we summarize quantity, revenue, and cost of goods sold by year from -- it would be from 2016 all the way through August 2024.

Q.   All right.  If you could please turn to Tab 7 in your binder, which should be PTX-659.

A.   Yes.  I'm there.

Q.   What is this document?

A.   This is a summary of sales data for infringing products only.

Q.   Did you rely on this document in forming your opinions in this case?

A.   Yes.  I did.

MR. PEARSON:  Your Honor, plaintiff moves to admit PTX-659.

MS. MARRIOTT:  No objection.

THE COURT:  Admitted.

MR. PEARSON:  Mr. Diaz, could we please see PTX-659?

BY MR. PEARSON:

Q.   At a high level, could you please sort of describe the differences in what we just saw, PTX-684,

429

and what we see now in PTX-659?

A.    Yes.  This summarizes the data and tells us a little more about each product.  We categorized the products.  We determined when damages would start for each product.  And then we have total unit sales, total revenues, total costs of goods sold.  Then we calculate those on a per-unit basis as well.

Q.    Dr. Farber, how did you make a determination about which models in the far left column to include in the accused product column?

A.    I relied on Mr. Credelle for that.  I also relied on a stipulation agreed to between the parties.

Q.    And what was the difference -- and what difference did this stipulation, which is JTX-5, make to your royalty base?

A.    I believe it added 173,200 units to the royalty base.

Q.    And that's -- and when you relied on that stipulation, that was just to conform your royalty base to that required by the stipulation; is that fair?

A.    Yes.  I just wanted to, you know, be in the -- on the same page as the parties regarding infringement.

MR. PEARSON:  Mr. Diaz, if I could have Slide 12 in the demonstratives.

BY MR. PEARSON:

430

Q. What topics are you going to discuss with the jury today, Dr. Farber?

A. I'll start by discussing the framework of my analysis. I will then discuss a market approach. Although I don't think it's reliable in this matter. I'll cover the benefits of use as described by Mr. Credelle.

I will then get into the income approach and liability. That is the most appropriate approach in this matter. I'll discuss the proper royalty structure, and then I will sum all that up into my opinion as to a reasonable royalty.

Q. Let's start with the first topic, the framework. You mentioned earlier that your main task is to evaluate a reasonable royalty.

What is a reasonable royalty?

A. Yeah. This is laid out by a legal statute. And so it's damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the sale of the invention by the infringer.

Q. Well, how do you determine a reasonable royalty in this case?

A. We -- the courts have laid out what's known as a hypothetical negotiation analysis.

Q. What is a hypothetical negotiation?

431

A.   We go back in time to right before the parties -- or right before the infringer started selling the infringing products.  And we imagine that the two parties sat down at a table and negotiated a monetary compensation for a license to the patents-in-suit.

They -- so I think of it as we lock them in a room and they can't go out until they have a signed agreement.

Q.   Who would have participated in the hypothetical negotiation in this case?

A.   That would be SVV and ASUS.

Q.   And when would this hypothetical negotiation have happened?

A.   January 30th, 2018.

Q.   And how did you come to that date?

A.   That's based on the later of the patent issuance dates and the dates of first sale for each infringing product.

Q.   And then how do you know when ASUS began selling infringing products?

A.   We looked at their sales data.

Q.   Okay.  If you could, please, turn to Tab 8 in your binder, which should be PTX-652.

A.   Yes.  I'm there.

Q.    And what is this document?

A.    This is our summary we use to determine when damages would start for each product and the hypothetical negotiation date.

Q.    Did you rely on this document in forming your opinions in this case?

A.    I did.

MR. PEARSON:  Your Honor, plaintiffs move to admit PTX-652.

MS. MARRIOTT:  No objection, Your Honor.

THE COURT:  Admitted.

MR. PEARSON:  Mr. Diaz, if we could please see PTX-652.

BY MR. PEARSON:

Q.    What do we see here on the screen, Dr. Farber?

A.    Once again, each row is a product, and then we look at the products -- or the patents each product was being accused of infringing, the earliest date of issuance of those patents, and the date of each sale or the date of first sale for each product.

And then damages start on the later of those two dates.  So for each product, we have when damages would start.  And then amongst all those direct damages start dates, the earliest would be the hypothetical negotiation date.

433

Q.    So if the jury were to decide that not all the patents were infringed, would this be a good resource for them to use to determine which products go with which asserted patent?

A.    Yes.  It would.

Q.    And that's seen here in Column A in PTX-652; is that fair?

A.    Yes.

Q.    Are there any legal requirements to the hypothetical negotiation?

MR. PEARSON:  If we could go back to the demonstratives, Mr. Diaz.

A.    Yes.  The parties both have to assume that the patents are valid and infringed by the licensee.  And also importantly, the licensor, in this case SVV, has to be willing to provide a license to the licensee, ASUS.  But ASUS also has to be willing to pay for a license to the patented technology.

BY MR. PEARSON:

Q.    What do the parties talk about at the hypothetical negotiation?

A.    They talk about anything relevant to that negotiation I just discussed, but the courts have laid out what's called -- what are called the Georgia-Pacific factors.  I think we heard about these

yesterday, but there are 15 nonexclusive factors that we are asked to consider as part of our analysis.

Q.    Did you analyze all these factors in coming to your opinions in this case?

A.    I did.

Q.    What are the limitations on information the parties can consider at the hypothetical negotiation?

A.    They have access to all information available. So normally, you think of a negotiation, you may be hiding information from the other party.  But in this case, they get to see the other side's confidential information.

So think of it as playing a card game with your cards face up, like you do with a kid.  You all see all relevant information.  And further, they get to see up -- into the future up until the present.  So while it occurs in January 2018, they would know information that we know today.

Q.    So in considering these 15 factors, are there any primary approaches that damages experts such as yourself generally use to sort of summarize and consider these factors?

A.    Yes.  There's three primary approaches.  I'll describe them.

The market approach is where we look to

435

agreements for -- that are comparable to determine what the price for a license to the patent technology might be.

In the income approach, we look at the incremental profits of the infringer enabled by the use of the patent technology.

And the cost approach, we look at how much it would cost the infringer to design an alternative to the patent technology that provides the same benefits.

Q.   How do you decide among these three approaches which one to use?

A.   You look at the evidence and see where -- what it supports.  You know, sometimes the evidence in one case pushes you toward one approach or another approach.

Q.   Did you analyze all three approaches in this matter?

A.   Yes.  I did.

Q.   Well, let's talk about them starting with the market approach.

Did you find that the market approach was a useful option in this case?

A.   No.  This is where I started my analysis, and ultimately I determined that it was not a reliable approach in this matter.

436

Q.    What Georgia-Pacific factors are generally covered by the market approach?

A.    1, 2, and 4.

Q.    And what do these factors generally relate to?

A.    They relate to licenses entered into by the parties that may or may not be comparable to those -- to -- on an economic and technical basis.

Q.    Did both SVV and ASUS produce patent license agreements in this case?

A.    Yes.  They did.

Q.    Did you have an opportunity to review those?

A.    Yes.

Q.    What did you conclude regarding the usefulness of the agreements produced by SVV and ASUS in this matter?

A.    Ultimately, they're not comparable enough to the agreement that would be discussed at the hypothetical negotiation to use them as a basis for an opinion in this matter.

Q.    Well, how do you decide whether a patent license agreement is a useful fit for use in the market approach at the hypothetical negotiation?

A.    First, the technology in those agreements needs to be comparable to the technology at issue in this case.  I am not a technical expert.  So I rely on

437

others such as Mr. Credelle for that.

But second, the -- those agreements need to have been negotiated under circumstances similar to those that would be present at the hypothetical negotiation.

Q.   And that similarity of circumstances, is that what you call "economic comparability" on the screen?

A.   Yes.  Yep.

Q.   Are both types of comparability necessary for a patent license agreement to be useful for consideration at the hypothetical negotiation?

A.   Yes.  If either one is not met, it's not a good basis for a royalty.

Q.   And again, what is technological comparability?

A.   It's whether the patented technology that's licensed in an agreement we may have is similar to the patented technology at issue in this matter.

So for example, you wouldn't use an agreement relating to pharmaceutical drugs to determine a proper royalty for a concrete patent.  They're just too different.

Q.   Okay.  And then what are -- could you give some examples of what economic comparability might be?

A.   Yeah.  Think of all the factors that go into a

438

negotiation and the outcome of that negotiation and whether those are similar to what we just discussed about the hypothetical negotiation.

Q.   Then what happens if you find that an agreement is noncomparable?

A.   Then it's not a proper basis for a reasonable royalty opinion.

Q.   Did you find SVV's and ASUS' patent license agreements in this matter to be comparable or noncomparable?

A.   Ultimately, they are not comparable.

Q.   Okay.  Let's go through them.  Let's start with SVV's agreement with Samsung.

Did you have an opportunity to review this license?

A.   I did.

Q.   When was this agreement signed?

A.   It was signed on February 8th, 2021.

Q.   And why is that signature date interesting in this case?

A.   Normally, the signature date and the execution date are the same, but in this agreement, the execution date was set to when payment was ultimately received, which I think was 30 days after the signature date.

Q.   What is your understanding of whether the

439

technology covered by the SVV-Samsung agreement is technologically comparable to the agreement that would result from the hypothetical negotiation?

A.    It is technologically comparable.  That agreement includes a license to the patents in this matter.

Q.    Now, what about the economic circumstances? Did you find that SVV-Samsung license agreement was economically comparable?

A.    No.  It is not economically comparable.

Q.    And is that what is reflected by the red Xs on the screen here?

A.    Yep.  All of those rose really to economic comparability.

Q.    Okay.  Well, let's start with the first one. You say "not a settlement agreement."  What does that mean?

A.    At the hypothetical negotiation, the two parties sit down before any litigation occurs.  There's no threat of -- there's no ongoing litigation.  So they are just negotiating, you know, the value of the patented technology.

However, the SVV-Samsung agreement, as we heard yesterday, is a settlement agreement.  And there are differing factors that lead to results in

440

settlement agreements that don't apply to the hypothetical negotiation.

Q.   What about assumptions of validity and infringement?  What does that mean?

A.   As I discussed a few minutes ago, at the hypothetical negotiation, both parties have to assume that the patents are valid and infringed.  However, the SVV-Samsung agreement does not include those assumptions.

Q.   And how does that affect the payment that was made under the license?

A.   Without those assumptions, the enforceability of the patent is more in question, and all else equal, that usually leads to a lower royalty payment.

Q.   What about the next row, licensed products: monitors?  How does the hypothetical negotiation differ from the SVV-Samsung license agreement in this regard?

A.   At stake here, the infringing products here are largely monitors.  However, the Samsung, I believe that there was negotiation over non-monitor products as well in the SVV-Samsung agreement.

Q.   And what about reliable sales data?  What -- why did you find that noncomparable?

A.   To use one of these agreements, you ultimately want to figure out what they paid for use of the

441

patented technology, if you can, on a per-unit basis. To do that, you need to have an idea of the number of units sales they have of products that practice the patented technology. I just didn't have access to that.

Q. And then what about the final factor on here, lack of nonmonetary considerations? What did you mean by that?

A. At the hypothetical negotiation, they're negotiating one thing, and that is a monetary payment. However, the SVV-Samsung agreement includes a standstill provision that would not be present within the agreement resulting from the hypothetical negotiation.

Q. Now, do you recall during opening, when ASUS' counsel argued that because Samsung's overall sales are allegedly 40 times higher than ASUS', damages in this case must somehow be calculated or capped as a proportion against what Samsung paid?

A. I do remember him talking about that.

Q. And what do you think about whether damages in this case can be calculated as a proportion from the Samsung agreement?

A. Ultimately, sometimes if this is the best evidence we have, you can make adjustments for some of

442

these factors.  However, in this case, I just -- there is not reliable sales data on the products specifically that use the patented technology.

You can't just -- they can't be -- it needs to be precise, such adjustments.  You can't use guesswork, and I don't have that information.

Q.   Did you review any other SVV patent license agreements in your investigation in this case?

A.   Yes.  They have an agreement with MSI as well.

Q.   Now that we sort of know how your chart on the screen works, can you walk the jury through your findings on the MSI agreement?

A.   Yeah.  I'll try and be a little faster this time.

It -- similarly to the SVV-Samsung agreement, it includes a license to the patents-in-suit.  However, many of the factors that apply to the SVV-Samsung agreement also apply to the SVV-MSI agreement.

It is a settlement agreement unlike the hypothetical negotiation.

The hypothetical negotiation includes assumptions of validity and infringement, and the SVV-MSI agreement does not.

The licensed products are similar, unlike the SVV-Samsung agreement.  However, once again, I do not

443

have reliable sales data on MSI's sales of licensed products.

Q. Did you have enough information about the economic circumstances in that patent assignment to adjust the MSI payment to make it useful in this case?

A. No. I would need to convert that to a monetary value, and I didn't have that information.

Q. What about ASUS? Did they produce any patent licenses in this matter?

A. Yes. They have an agreement with ADT from 2012.

Q. Did you find that it was a comparable license to that which would have resulted from the hypothetical negotiation?

A. No. I did not.

Q. Why's that?

A. First, I -- I relied on Mr. Credelle, and he told me that the patented technology in that agreement, the licensed technology in that agreement is not comparable to the patented technology that we're here

444

for today.

But there are also economic circumstances that render it incomparable.  So, for example, the hypothetical negotiation does not settle litigation.  This agreement did -- does.

Similarly, as we heard with the other two, the hypothetical negotiation assumes validity and infringement.  This agreement does not.

Lastly, in that agreement, it's my understanding that the patents that were licensed had an expiration date soon after the execution.  However, in this -- at the hypothetical negotiation, they'd be negotiating in 2018 for a license to patents that expire, I believe, between 2026 and 2030.  So far off in the future.

Q.    So what is your ultimate conclusion about whether the market approach is a good fit for this case?

A.    I don't think the evidence supports a reliable market approach in this case.

Q.    Okay.  Let's talk about your understanding of the benefits of the patented technology.

Which Georgia-Pacific factors relate to this?

A.    Factors 9, 10, and 14.

Q.    And what is your understanding of the benefits

445

of the patented technology?

A.    I rely on Mr. Credelle for this.  We heard him earlier today talking about this, but it's overall improved efficiency.  You know, they get improved brightness from the use of the patents.  The monitors have thinner displays, reduced power consumption, improved light distribution, longer LED life, and an improved color gamut.

Q.    And is it your understanding that those benefits apply to the monitor as a whole or to a certain subcomponent of the monitor?

A.    To the monitor as a whole.

Q.    How do those benefits help ASUS' business?

A.    Once again, this is a -- you know, a technical opinion.  So I rely on Mr. Credelle and Dr. Vasylyev for this.  But they have -- they have a lot of options. So I created this figure here to try and illustrate it.

On the vertical axis, we have what's called the "quality increase."  And on the horizontal axis, we have cost savings.

Q.    So tell us about what the quality option is.

How would using the patented technology provide a quality option to ASUS?

A.    Because they can produce monitors more efficiently, they can at the same cost have a

higher-quality monitor. So they could keep the cost the same and increase the quality of the monitors they are selling. When you increase the quality of the monitors that they are selling, they can sell them for more money. So that would result in higher profits.

Q.    What about the efficiency option? What's that?

A.    This is where they can sell the same monitor with the same features but at a lower cost because of those cost savings. So if you sell something at the same cost -- price but have lower cost, they generate profits a different way.

Q.    What are the green dots on each axis supposed to represent?

A.    Those are kind of the extreme options. It's increase quality without cost savings or maximize cost savings while keeping quality the same. So it's kind of holding one constant and -- while moving the other variable.

Q.    Then what's represented by the blue curve?

A.    They have a variety of options. So they can mix and match quality increase, some cost savings, kind of however they want in any monitor. They can -- you know, to any level. So they have a variety of options of how to use the patented technology.

447

Q.   And then how did you determine for each infringing monitor model how ASUS actually implemented the patented technology on the quality versus efficiency scale?

A.   I was actually not able to look at the quality increase.  So I focused on the cost savings point only.  That green dot at the bottom.

Q.   So you did not measure any benefits to quality that ASUS may have received by using SVV's technology?

A.   No.  My analysis assumes that they kept quality the same and maximized cost savings.  However, to the extent that they -- that they did -- that they did increase quality, I do not capture those benefits in my analysis.

Q.   And so what does it mean that you don't capture those benefits in your analysis?

A.   My royalty is based on cost savings only, and if there are additional benefits, I am not able to consider them.  They're left to ASUS.

Q.   Turn to the next topic.

What is the income approach?

A.   This relates to Georgia-Pacific Factors 8, 11, 12, and 13.  And this is where you look at the incremental profits the infringer is able to generate through the use of the patented technology.

448

Q.    And what Georgia-Pacific factors relate to this?

A.    8 and 11 through 13.

Q.    Now, did you look at cost savings when you were analyzing the income approach?

A.    Yes.  I focused on cost savings, as we discussed.

Q.    And how do cost savings relate to profits?

A.    Well, if they can produce the same monitor and sell it at the same price but buy it for less money, those cost savings are incremental profits.  You know, it's one for one.  I lower my cost a dollar, I make more -- a dollar more in profit.

Q.    And how do you measure those cost savings that are enabled by ASUS' use of the patented technology?

A.    I use a regression.  And as you can see here, a regression is a highly studied topic in economics and other fields, you know, textbooks, economic articles, journals and all over.

Q.    Is a regression something that's only associated with the political polling context?

A.    No.  You can use it in a number of contexts. It's a valuable mathematical tool that a lot of people apply in various industries.

Q.    What type of awards have been won for work on

449

developing regression equations?

A.   You know, Bates Clark medals, which are awarded to economists under the age of 40.  As you've heard of, MacArthur genius grants, they've got economists that base their work in regression.  And, you know, Nobel Prizes have gone to economists for their work with regressions as well.

Q.   Why is a regression applicable in this case?

A.   Regression is a widely used tool to try to mathematically quantify a relationship between two variables.  That's what I'm trying to do here, is mathematically quantify the relationship between the use of the patented technology and ASUSTeK's costs.

Oftentimes in a matter like this, we don't get data that allows us to be this precise.  In this instance, we have -- we have purchase data and sales data that includes purchases of over 9 million monitors.  And so I have a lot of data, and I can use a regression here.

Q.   Now, why did you examine ASUS' costs through a regression rather than ASUS' revenue?

A.   I mean, as we heard earlier, you know, through the deposition, we just -- we don't actually know what -- ASUS was unable to tell us what the revenue means from that data.

450

Further, Mr. Credelle pointed me to the cost savings as the -- you know, the primary benefit of the patented technology.  So I focused there.  There are costs, and that data's a lot cleaner than their price -- pricing.

Q.    What do you assume in the course of doing a regression analysis?

A.    We start with the baseline assumption that the two variables are not related.  So in this instance, that these patented technology would not have any cost savings.  That is our baseline assumption.  It's called the "null hypothesis."

However, if we -- only with enough statistical evidence can we reject the hypothesis and accept an alternative hypothesis that there are cost savings or that there is a cost difference.  We will see if it's cost savings, I suppose.

Q.    And then how did you measure the relationship between the use of the patented technology and costs?

A.    We collected data on a lot of different features in the monitors, which you can see here.  And the idea is to isolate the relationship between the various features of the monitors and costs one by one.

And so we're focusing on the use of the patented technology, but a regression is meant to

451

isolate the impact of that on cost from the impact of these other variables you see here.

Q.    How did you construct the dataset that you used to run your regression analysis?

A.    We started with ASUSTeK's purchase data we saw earlier, and it has, you know, purchase data on millions of monitors that are purchased and has the prices they actually paid.

And then we combined that with our own product data, whether it uses the patented technology according to Mr. Credelle.  And we looked at other features and other factors.

So we scraped websites to determine the features of all these monitors and the dataset.  And we then created our own dataset there and merged it with ASUSTeK's purchase data to create a dataset that would allow for a regression such as the one we've described.

Q.    Now, did you produce the R code that you used to construct this dataset?

A.    Yes.

Q.    If you could, please, turn to Tab 9 in your binder, which should be PTX-683.

A.    Yes.  I'm here.

Q.    And what is this document?

A.    This is the R script used to combine the data

and scrape other websites for features and then combine the purchase data and the scraped data into the regression dataset.

MR. PEARSON:  Your Honor, plaintiff moves to admit PTX-683.

MS. MARRIOTT:  No objection.

THE COURT:  Admitted.

MR. PEARSON:  Mr. Diaz, if we could please see PTX-683.

BY MR. PEARSON:

Q.   What do we see here, Dr. Farber?

A.   This is the script that I would probably -- we'd all probably prefer I don't get into the details. So this is the R script we just described.

MR. PEARSON:  All right.  Mr. Diaz, if we could go back to the demonstratives.

BY MR. PEARSON:

Q.   Dr. Farber, once you have the dataset ready, what's the next step in your analysis?

A.   We specify a regression equation.

Q.   What is a regression equation?

A.   So regression is a tool, and it's a, you know, widely used tool.  But you want to make it specific to what you're trying to measure.  So we specify all the variables in the -- in the model that we're running.

453

So here we have the cost for each variable. On the left, that's called the dependent variable. And all the variables to the right are called the independent variables.

Think of each row in the dataset as one monitor purchase and each column as one of the features that we're measuring.

Q.   So the variables are to the right of the equal sign; is that right?

A.   Yeah.  That's all the -- that's all the features in the -- in the variables for which we're trying to measure the impact on cost.

Q.   And could you explain just for one, just for the infringing variable, what the Greek letters and subscripts mean?

A.   Yes.  It's not as scary as it looks.  The X for infringing is a 1 or a 0.  It's 1 if it infringes, and it's 0 if it does not.

And that letter left of the beta tells us what the impact on cost is from the use of the patented technology.  That is the coefficient of interest in this matter, in this model.

Q.   Well, how do you do the actual calculations?

A.   We use what's called -- we use a program called "Stata" that is, you know, highly used for

454

statistical analyses and regression such as this.

Q.   And what sort of information did the results contain?

A.   You can see it on the right here, but for each variable in the model, it shows the coefficient.  And it shows measures of statistical significance of that coefficient.  It also shows measures of statistical significance to the model as a whole and the number of observations in the model.

Q.   Well, and how do you interpret the coefficients of your regression model?

A.   We are quantifying those between these variables in costs.  So here's a couple of examples here.  But if a -- if one of the monitors in the dataset has a camera on it, it costs ASUS on average $35.30 more to purchase, holding all other factors in regression constant.  As -- you know, kind of what we may expect there.

Similarly, that's -- that other variable there is size and inches.  And that means that holding all the other variables constant, in a monitor that is 1 inch larger than another monitor, on average will cost ASUS $16.45 more to purchase.

Q.   And what did you find was the cost savings associated with infringement?

455

A.    Here, we see a negative.  And what a negative means is that it actually -- the cost decreases.  So this means that an infringing monitor on average, holding all else constant, costs ASUS $21.85 less than a noninfringing monitor.

Q.    And who receives these cost savings?

A.    ASUS.

Q.    Did you produce this data code you used to run your regression and its output?

A.    I did.

Q.    If you could please turn to Tabs 10 and 11 in your binder, which should be PTX-686 and 687.

A.    Yes.  I'm there.

Q.    And what are these documents?

A.    One of these is the code itself, and one is the log file showing the results of the code.

Q.    And did you rely on these documents in forming your opinions in this case?

A.    I did.

MR. PEARSON:  Your Honor, plaintiff moves to admit PTX-686 and 687.

MS. MARRIOTT:  No objection.

THE COURT:  Admitted.

MR. PEARSON:  Mr. Diaz, if we could please see those plaintiff's exhibits.

BY MR. PEARSON:

Q.   What do we see on the screen here, Dr. Farber?

A.   This is the log file of the one we ran the regression code.  So it contains all the code and all the output of the code.

MR. PEARSON:  All right.  If we could go back to the demonstratives, Mr. Diaz.

BY MR. PEARSON:

Q.   What sort of tests did you run on your regression analysis to make sure that your cost savings were not the result of random chance or error?

A.   First, we ran a t-test of coefficients of significance on that cost savings due to patent technology.  And you see the value there, and that is 0.016.  That's called a p-value.

And that tells us the probability that we would end up with a coefficient this large if cost savings were truly zero in the population.  So this gives me confidence that the -- the cost savings we're seeing are present, that they're not actually zero and just, you know, a spurious correlation.

Q.   What's the F-test?

A.   That tests the significance of the model as a whole.  And the p-value there is 0.000, and that tells me that the model is pretty well specified.

457

Q.    What is the R-squared test?

A.    That tells us the percentage of variation in the dependent variable, cost, that can be explained by the variation in our independent variables in our model.  And that shows that 74 percent of the variation in costs is explained by our -- by all the features we have in the -- to the right of that equal sign.

Q.    Did you perform any sensitivity analyses on your regression?

A.    Yes.  We typically tweak the model a little bit and try and see if our coefficient changes.  It doesn't.  And as you can see, it doesn't change a lot here for several tweaks.  So that gives me confidence in our model as well.

Q.    Is this the first regression you ran in this case?

A.    No.  It is not.

Q.    Why did you run multiple regressions?

A.    I started my initial report, I ran a regression focusing on the products I believe that the parties would have focused on at the hypothetical negotiation.  However, Mr. Ferioli, ASUS' damages expert, decided that in his opinion, it seemed that he thought they would have focused on a larger set of infringing products.

458

So, you know, I wanted to try and align with him where I could, and I looked at those larger set of infringing products and ended up with this regression.

Q.   I don't think he was introduced during opening statements, but could you please identify for the jury Mr. Ferioli?

A.   Yes.  I met him yesterday.  He's back there in the purple shirt.

Thank you, Mr. Ferioli.

Q.   And you understand that he will have the opportunity to come and testify if he has any complaints about your regression?

A.   I believe that to be the case.

Q.   Did Mr. Ferioli dictate the terms of your amended regression?

A.   No.  We -- we kind of -- you know, it can be a point of disagreement if they look at a smaller set or a larger set of products.  And, you know, that's reasonable.

So we looked at the largest set of products if that's what he felt they would have done at the hypothetical negotiation, but we rejected some other changes he suggested.

Q.   How did the results of your original regression and your updated regression differ?

A.    The original regression showed cost savings of $20.37 per unit, and this regression shows cost savings of $21.85 per unit.  So generally, they're pretty close.

Q.    And which regression did you present to the jury?

A.    The second one.

Q.    Did you just present the amended regression to the jury because it resulted in a higher amount of cost savings?

A.    No.  I did not.  I -- just like at the hypothetical negotiation, the parties have to agree.  I just -- it seems like Mr. Ferioli believes they'd use the wider set of products.  And so I wanted to reduce dispute between the parties here.

Q.    How do these incremental cost savings of $21.85 per infringing unit benefit ASUS?

A.    If they can sell a product with the same features, they will sell it for the same price.  But if they can buy it at a lower cost, those cost savings represent additional profits for ASUS.

Q.    Now, are all the accused infringing products in this case normal, nonportable desktop monitors like we see around the courtroom?

A.    No.  There are two other types of accused

460

products in this case.  The first, which you see here, are portable monitors.

Q.    And how did you calculate the cost savings for the portable monitors?

A.    Well, I figured at the hypothetical negotiation they would focus on the standard monitors, as those make up the vast majority of the accused products.

So you see the cost savings in green.  And on the left there in the proportion, the denominator is the average cost for the accused products.

So using a proportion, I looked -- I saw the portable monitors cost less.  So I scaled those cost savings down to represent the lower cost for portable monitors.  So scaling those down, it looks like portable monitors, the cost savings would be $17.80 per unit.

Q.    And did you follow the same process for the other infringing category of products, Chromebooks?

A.    Yes.  With one additional step.  A Chromebook is kind of like a small laptop.  And as you imagine, there's a keyboard and such.  So I focused on the cost for the display part of the Chromebook, and then I scaled down using a proportion like we see here.

Q.    So what did you do next after doing these

461

scalings?

A.   I concluded a weighted average cost savings across the three types of products.  And so as you can see, most of the accused units in this matter are nonportable monitors.  So that's going to be weighted the most heavily.  So the weighted average cost savings across all products is $21.37 per unit.

Q.   What did you look at next in your reasonable royalty analysis?

A.   I looked at the royalty structure the parties would have agreed to.  And this is Georgia-Pacific Factors 3, 6, and 7.

Q.   What are the two basic options of royalty structures for patent license agreement?

A.   There's a lump-sum royalty structure and a running royalty payment structure.  In a lump sum, there is one dollar amount to be agreed to, and the infringer, ASUSTeK in this matter, would receive a paid-up license through the expiration of the patent-in-suit, but they pay one time at the beginning.

Q.   And what is a running royalty?

A.   In a running royalty, the parties agree to a per-unit rate or a per-dollar rate.  So it could be a number of -- a number of dollars per unit or a percentage of revenues, and they pay up over time, kind

462

of quarterly or annually based on how much of the products have been sold.

Q.   Now, in your opinion, which structure would the parties have agreed to in this case?

A.   They would have agreed to a running royalty. There's two main reasons here.  And the first is that generally in the technology industry, running royalties are more common.

But second, it allows the parties to align their incentive.  So if ASUS makes more use of the invention, SVV would earn more money along with ASUS.

It's pretty hard to predict, you know, at the hypothetical negotiation how many units they would sell through the separation of the patents-in-suit, particularly when they're 12 years out.

And so it's -- it would be easier for them to agree on a per-unit royalty and then have a running royalty going forward.

Q.   And then how did you calculate damages using a running royalty in this matter?

A.   I determined a royalty per unit, as I just talked about in the running royalty.  And then to get total reasonable royalty, multiply that by the number of sold units.

Q.   What's the final topic that you have to

463

discuss with the jury?

A.   My ultimate opinion as to a reasonable royalty.

Q.   And what Georgia-Pacific factors relate to your ultimate opinion?

A.   5, 8, and 15.

Q.   Now, before you told the jury that you calculated ASUS' cost savings as $21.37 per unit as a weighted average.

Do you remember that?

A.   I do.

Q.   Is it your opinion that the royalty -- the reasonable royalty to SVV should be that entire $21.37?

A.   No.   The parties will want to share in those cost savings together.   They would both want a piece of those.

Q.   Well, how would the parties figure out how to split the $21.37?

A.   They would look at their relative contributions toward the generation of those incremental profits of $21.37.

Q.   And what would SVV's and ASUS' respective contributions to the $21.37 in cost savings be?

A.   SV -- or ASUS would offer their commercialization activity, such as selling activities

464

and general administrative activities, and SVV would offer the research and development toward that patent technology.

Q. And how is the research and development a good corollary for receiving technology through a patent license agreement?

A. Research and development is there for new ideas, and this is a new idea that ASUS would be using.

Q. And then how did you quantify these contributions?

A. I looked to ASUSTeK's annual reports in the -- their publicly available financial statements as part of their annual reports to look at how they maximize profits through these activities.

Q. All right. If you could, please, turn to Tab 12 in your binder, which should be PTX-678.

A. I'm there.

Q. What is this document?

A. This is our summary of ASUSTeK's operating expenses over time from 2018 through 2023.

MR. PEARSON: Your Honor, plaintiffs move to admit PTX-678.

MS. MARRIOTT: No objection.

THE COURT: Admitted.

MR. PEARSON: Mr. Diaz, if we could

465

please see PTX-678 on the screen.

BY MR. PEARSON:

Q.    What do we see here, Dr. Farber?

A.    This shows ASUSTeK's investments in selling expenses, general administrative activities, and research and development activities each year from 2018 through 2023 and then in total.  And at the bottom, it shows R&D's share of those expenses each year and in total.

Q.    And it looks like, based on the title of this exhibit, you relied on ASUS' nonconsolidated statements of operating expenses; is that correct?

A.    Yes.  It is.

MR. PEARSON:  Mr. Diaz, if we could go back to the demonstratives.

BY MR. PEARSON:

Q.    What are the two types of financial statements that you looked at from ASUS in forming your opinions in this case?

A.    ASUSTeK Computer produces nonconsolidated financial statements, which is just for that entity, and consolidated financial statements, which it consolidates the numbers for all of their subsidiaries and ASUSTeK Computer together.

Q.    So consolidated is the financial statements

for every entity that you're showing on the screen here?

A.   Yes.   They'd all be included as part of the financial -- the consolidated financial statements.

Q.   And in your opinion, which set of financial statements is more relevant in this case?

A.   I'm trying to focus on the defendant in this matter, ASUSTeK Computer Inc., and so I focused on the nonconsolidated, which just looks at their finances, not the finances of all the companies on the screen here.

Q.   How did you use these nonconsolidated financial reports that we just saw summarized at PTX-678?

A.   I calculated ASUSTeK's share operating expenses that go toward R&D activities, and that's 65.3 percent.

Q.   So after finding the relative percentage spent on R&D as a proportion of its operational expenses, how did you implement your -- this relative contribution apportionment and your opinion?

A.   I applied the 65.3 percent and 100 minus that, 34.7 percent, to the cost savings to split the -- to split it between the parties according to their contributions toward the -- those cost savings.

467

Q.    Is this a fair way to split the benefit of the $21.37 that ASUS receives for infringing SVV's technology?

A.    Yes.  Generally, ASUS spends 65.3 percent of its operating expenses on R&D, and they would not have to do that to generate these cost savings.  So that would be how it would be discussed at the hypothetical negotiation.

Q.    So then how do you use this contribution apportionment in your royalty opinion?

A.    To split the 21.37 amongst the parties.  So of the $21.37, SVV would receive $13.96, and ASUSTeK would receive $7.41.

Q.    So what's your ultimate opinion on an appropriate reasonable royalty per unit that the jury should award for each infringing product in this case?

A.    The parties would agree that ASUSTeK would pay SVV $13.96 for each infringing unit sold.

Q.    Okay.  And then how did you get from your reasonable royalty per unit to your royalty opinion in this matter?

A.    I multiplied the per-unit royalty by the number of units sold and got to my reasonable royalty. So each unit would be $13.96 paid to SVV.

ASUSTeK has sold 4,199,168 units through

468

trial.  When you multiply those, you -- that results in a reasonable royalty of $58,632,139.  And there's some rounding in there that's not in my, you know, math, but if you multiply, it won't be perfectly exact.  It's just rounding.

Q.    So whenever you did the calculations, you used more precise numbers than what are seen on the screen?

A.    Yes.

Q.    Now, the number of sold units, that came from the data that we discussed what seems like a long time ago now; is that right?

A.    Yes.  That data went through August 2024.  So I projected from September 1st through yesterday.

Q.    And how did you do that?

A.    I looked at their units sold in 2024.  I calculated a number of units sold per day and multiplied it by the number of days between the 1st and the 23rd of September.

Q.    Why do you believe the royalties you calculated are reasonable in this matter and the parties would have agreed to them at the hypothetical negotiation?

A.    Well, first, they reflect the actual benefits to ASUS.  I measured the benefit to ASUS, not to anyone else.  I used ASUS' data.

469

Second, they're apportioning the incremental value of the economic contributions of the patented technology.  I'm not capturing benefits outside of the patented technology.

Third, I'm accounting for ASUS' contributions, as we just discussed in -- on the contribution apportionment.

Fourth, ASUS has not identified any acceptable noninfringing alternatives that would allow them to access the benefits of the patented technology.

And fifth, this is consistent with the Georgia-Pacific factors we talked about earlier.

Q.   Now, SVV has also set forth a theory regarding indirect infringement.

Have you calculated alternative damages under that scenario?

A.   I have.

Q.   And what's the difference between the two?

A.   I understand that indirect infringement requires notice, and so damages would start when they received the letter that we saw yesterday on February 25th, 2021.

So the per-unit royalty is the same, but damages start -- they start later, so there are fewer infringing units.  So I multiply the 13.96 by a lower

number, as we see here, a little under 3 million units, and it results in an indirect infringement royalty figure of approximately $41.5 million.

Q.    Is it your opinion that direct infringement damages and indirect infringement are -- damages are additive, that the jury should award both the 58 and the 41?

A.    No.  That should not happen.  I understand that if both are found, the direct infringement number applies.  Indirect infringement is an alternative only if direct infringement is not found.

Q.    All right, Dr. Farber.  For one last time, will you please summarize your opinion on damages in this matter?

A.    Yes.  I measured the benefits to ASUS to the patent technology.  And I split that between the parties resulting in a reasonable royalty of $13.96 per infringing unit sold.  I multiply it by the number of infringing units through trial, resulting in a reasonable royalty of $58,632,139.

MR. PEARSON:  Dr. Farber, thank you for your time.

Your Honor, I pass the witness.

THE COURT:  Ladies and gentleman, we'll take our lunch recess.  If you all would be back by

1:30, we'll get started then.

As I said yesterday, we have a food court right next door. Y'all eat wherever you want, but I'm saying for convenience purposes, there's a food court right next door.

THE BAILIFF: All rise.

(Jury exited the courtroom.)

THE COURT: Is there anything we need to take up?

MR. CALDWELL: Not by the plaintiffs.

THE COURT: I'll see you at 1:30.

(Recess taken.)

THE BAILIFF: All rise.

THE COURT: Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT: Thank you. You may be seated.

Counsel?

MS. MARRIOTT: Thank you.

CROSS-EXAMINATION

BY MS. MARRIOTT:

Q. Good afternoon, Dr. Farber.

A. Good afternoon.

Q. My name is Michelle Marriott. I'm one of the

472

attorneys representing ASUS in this litigation.  It's a pleasure to meet you.

A.    Nice to meet you too.

Q.    Now, I have some questions for you about your testimony that you gave prior to lunch.  At the very beginning of the testimony that you gave you stated, I think, that you were assuming that the patents were infringed; is that correct?

A.    Yes.

Q.    Okay.

MS. MARRIOTT:  And if we could pull up PTX-659, please.  And zoom in on that top -- yeah, there we go.

BY MS. MARRIOTT:

Q.    And this is one of the documents that you showed to the jury; is that correct?

A.    Yes.

Q.    Okay.  Now, I just want to be really clear. This is not an ASUSTeK document, correct?

A.    No.  This is a summary of various -- source of information and my attachments.

Q.    Right.  This is a document you made?

A.    Yes.

Q.    Okay.  So these are your words on the categories at the top?

473

A.   Yes.

Q.   Okay.  And so here, if -- the highlighted category E, Column E, that we're seeing, do you see that?

A.   Yes.

Q.   Where it says:  Infringing unit sales.

Do you see that?

A.   Yes.  I do.

Q.   Okay.  You don't have an opinion that those are infringing; isn't that correct?

A.   No.

Q.   You don't have any opinion whatsoever on infringement in this case; isn't that true?

A.   That's true.

Q.   Okay.  And when you created this document, that's just the title that you put on this column.  Is that a fair characterization?

A.   Yes.

Q.   And you're relying on Dr. Credelle for that, right?

A.   Yes.

Q.   Okay.  Because that's SVV's opinion, right?

A.   Yes.

Q.   It's not a fact?

A.   No.  I believe that's to be tried this week.

474

Q.   And certainly ASUS does not agree that any of its monitors are infringing unit sales, correct?

A.   I would guess not.

Q.   And maybe I missed it in your testimony that you provided to the jury this morning, but if in fact the jury finds the patents are not infringed, you would agree with me that the damages are zero?

A.   Yes.  I would.

Q.   Okay.  Now, sir, in this hypothetical negotiation that you were describing for the jury, that's a pretend negotiation, right?

A.   Yes.

Q.   Never actually happened?

A.   Correct.

Q.   So we're kind of imagining what might have happened in the real world had they actually sat down at the table?

A.   Yes.

Q.   Okay.  And it would be SVV on one side, right?

A.   Yes.

Q.   Okay.  And ASUS on the other?

A.   Yes.

Q.   And I believe your testimony was they have to reach an agreement, right?

A.   Yes.

475

Q.   Okay.  And typically, almost always, maybe always, for parties to reach an agreement, both sides have to be reasonable.  You would agree with me?

A.   Yes.

Q.   Because if you're not reasonable and you're sitting across from someone negotiating, the other side's going to walk away; isn't that true?

A.   Most likely.

Q.   Okay.  And we can't have that in our hypothetical pretend negotiation.  We can't walk away, right?

A.   Correct.

Q.   Okay.  So we have to assume reasonableness?

A.   Yes.

Q.   Okay.  Now, I believe that you testified, and there's a slide to this effect, that there were two settlement agreements that SVV has entered into.

Do you recall that testimony?

A.   I do.

Q.   Okay.  And both of those settlement agreements, those both relate, at least in part, to the four patents that we're talking about here in this trial, correct?

A.   Yes.  I think we talked about that.

Q.   Okay.  One's with Samsung?

476

A.    Yes.

Q.    The other's with MSI?

A.    Yes.

Q.    And for both of those, SVV is the one granting the license, correct?

A.    Correct.

Q.    Okay.  Now, these two agreements did happen in real life, right?

A.    Yes.

Q.    They're not pretend?

A.    They are not pretend.

Q.    And we're not having to imagine them?

A.    No.

Q.    Okay.  And those two companies, Samsung and MSI, are the only two companies ever that have ever taken a license to any of SVV's patents; isn't that correct?

A.    I can't speak to other patents necessarily. For these patents, I believe that to be true.

Q.    Sure.  That's fair.

      For these four patents that we're talking about, it's only Samsung and it's only MSI, correct?

A.    Correct.

Q.    Okay.  And neither of those companies did so voluntarily, did they?

477

A.   They settled litigation, if that's what you're asking.

Q.   Yeah.  They didn't come to SVV and say, I want to use your technology.  Can we do a license, right?

A.   Correct.

Q.   They got sued?

A.   They were sued before the license agreements were executed, yes.

Q.   Okay.  And then they settled the litigation?

A.   Yes.

Q.   And when they settled that lawsuit, they got a license to the patents, right?

A.   They did.

Q.   Okay.  And they got a forever license to the patents; isn't that true?

A.   Yes.  I believe that's true.

Q.   Yeah.  They are covered all the way through the expiration of the patents.  For as long as the patents are alive, they're covered, right?

A.   Yes.

Q.   Okay.  And that was for just one lump sum; isn't that true?

A.   There was additional compensation as part of them, but I guess monetary value --

Q.   Yeah.

A.    -- alone.

Q.    That's a good clarification.  Monetary value.  One lump sum?

A.    Yep, monetary compensation was structured as a lump-sum payment.

Q.    Okay.  So they're not continuing to pay SVV so much a unit like you just testified to the jury ASUS would have done?

A.    Correct.

Q.    Okay.  Now, Samsung and MSI, when they settled those lawsuits, companies do that all the time, right?

A.    Yes.

Q.    Okay.  And they do that because there's a high cost to defending litigation, right?

A.    Yes.

Q.    And there's nothing wrong with defending yourself.  Would you agree with that?

A.    No, nothing wrong at all.

Q.    Okay.  Just like ASUS is doing in this case?

A.    Correct.

Q.    And certainly you wouldn't say that ASUS should be punished for doing that, right?

A.    No.

Q.    And as I understand your testimony from this morning, Dr. Farber, these two settlement agreements

that we've talked about, those are not the basis of your royalty, right?  You didn't rely on those to form your royalty opinions that you presented to the jury?

A.    I did rely on them.

Q.    Okay.  They weren't the basis for your royalty rate?

A.    They weren't the mathematical basis.

Q.    Okay.  You considered them and decided they weren't useful; is that fair?

A.    That's fair.

Q.    Okay.

MS. MARRIOTT:  If we can pull up Plaintiff's Slide 4.21, please.

BY MS. MARRIOTT:

Q.    Now, this is one of the slides that you presented to the jury this morning about why you didn't think those licenses were useful; is that true?

A.    Yes.

Q.    And here on the slide you put an X in the box the second line down for "Not a settlement agreement."

Do you see that?

A.    Yes.

Q.    And as I was listening to your testimony, I believe that you said settlement agreements don't apply to the hypothetical negotiation.

480

Do you recall saying that?

A.    I recall saying that they're different.

Q.    Okay.  Okay.  So it's not that they don't apply?

A.    It's that you would have to adjust for that --

Q.    Okay.

A.    -- among other factors.

Q.    Great.  Because when you -- when I heard "settlement agreements don't apply to the hypothetical negotiation," that kind of left me with the impression that it would always be improper, in your opinion, to use settlement agreements for the basis of calculating damages.  Is that the impression that you would want me to have?

A.    No.  I'm not going to make the claim that they're always improper to use as the basis for a damages opinion.

Q.    Okay.  Because you yourself, Dr. Farber, have actually used settlement agreements in other cases as the basis of your damages calculation; isn't that true?

A.    Most likely.  Yes.

Q.    Okay.  Just last year, March of 2023?

A.    I don't recall exactly what you're talking about, but perhaps.  Yes.

Q.    Sure.  Sure.  I mean, you have a binder in

481

front of you.  There's a tab for one of the cases that you were in from trial testimony that you gave in March of 2023.

A.    Okay.

Q.    Do you recall that?

A.    Yes.  I do.

Q.    Okay.  And in that case, your opinion was based on a settlement agreement.  Take a look at Page 97, if you need to refresh your recollection.

A.    I recall my primary opinion was regarding lost profits in this one, but I had an alternative royalty opinion.

Q.    Okay.  And that alternative royalty opinion was based on a settlement agreement, correct?

A.    I don't remember if it was a settlement agreement or not offhand.

Q.    Okay.  Maybe check -- if you want to refresh your recollection, you can check Pages 97 and 98.

A.    Yep.  Just one second.

Q.    Sure.

A.    Yes.  It looks like the royalty I'm discussing on these pages is a settlement agreement.

Q.    Okay.  And when you did that, you would start with the settlement agreement as a starting point for your royalty rate, correct?

482

A.    Yes.  And then you'd adjust for differences.

Q.    Yeah.  But you do that because it's an actual transaction; isn't that fair?

A.    Yes.

Q.    And that's why you started with the market approach, as you called it, in that case?

A.    Yes.

Q.    Okay.  The market approach tries to ask the question:  How is the license to the patent valued in the market?

So if you look at the actual transaction values derived from the license of similar assets, isn't that the analysis that you did in that case?

A.    I -- most likely.  I don't recall all the details, but generally I'd agree with you in general.

Q.    Yeah.  You don't disagree with that general statement, right?  That's the market approach?

A.    Yep.

Q.    And you do that because you want to get a gauge for how the market would value a license to the patents; isn't that true?

A.    Yes.

Q.    Okay.  And that's the real-life market value, right?

A.    I'm not sure what you're asking with that, the

real-life market value.

Q.   Yeah.   Market value is what happens in the real world, right?

A.   Yes.

Q.   Okay.   Now, on this slide and throughout your testimony, you were mentioning to the jury that there are differences between settlement agreements and the hypothetical pretend negotiation that SVV and ASUS would be having.

Do you recall that discussion?

A.   I do.

Q.   Okay.   And I think you're listing some of them here on the slide; is that fair?

A.   Yes.

Q.   Okay.   Isn't it true, though, Dr. Farber -- well, actually, let me take a step back.   For each of these rows, you have an X next to them.

Do you see that?

A.   Yes.

Q.   So does that indicate that you can never adjust for those, or just that you didn't find the adjustment to be proper in this case?

A.   Neither.   This just lists what is different between the hypothetical negotiation and the SVV-Samsung agreement.

484

Q.   Okay.  So these are just differences?

A.   Yes.

Q.   Okay.  There are always differences between a settlement agreement license and a hypothetical negotiation, correct?

A.   There's always -- there's almost always some difference between economic circumstances present at those negotiations.

Q.   Okay.

A.   Correct.

Q.   And when you have considered settlement agreements in the past, you've also acknowledged that what you do as an economist is you account for those differences, right?

A.   To the extent you can.  Yes.

Q.   Yeah.  And you're being compensated by SVV to be here as an economist, right?

A.   My company is being compensated for my time.

Q.   Okay.  That's fair.

And when you do those adjustments, you have your starting royalty rate that comes from the agreement, right?

A.   If there is one, yes.

Q.   Okay.  And that comes from the language of the agreement, whatever that is, right?

485

A.    And whatever else you know about the negotiations.

Q.    Okay.  And then you adjust that royalty rate based on technical and economic differences as needed, correct?

A.    Yes.

Q.    Okay.

MS. MARRIOTT:  So if we can go one slide back, please.

BY MS. MARRIOTT:

Q.    So here, on this slide, when you were talking with the jury about technical comparability and economic comparability, do you recall that discussion?

A.    Yes.

Q.    These are the things that you adjust for, right?

A.    If possible, yes.

Q.    Yeah.  Now, Dr. Farber, do you ever go to the grocery store?

A.    Yes.

Q.    Okay.  And sometimes we refer to that as "the market"; is that fair?

A.    A supermarket.

Q.    A supermarket.  Yeah.

Things are for sale and you can buy them,

486

right?

A. Yes.

Q. Okay. And so I have three kids. And my kids love apples. And I'm always buying apples constantly. I think every family has their thing.

Do you ever buy apples at the grocery store?

A. All the time.

Q. Okay. Typically apples are sold by the pound, right?

A. In a large bag.

Q. Yeah. But they're often in -- just kind of lined up and you can pick the ones you want and put them in your bag?

A. Yep.

Q. Yeah. And there's a rate by the pound, right, for doing that?

A. Yes.

Q. And that would be the market price?

A. It would be one price in the market.

Q. Yeah. That would be that market's price; is that fair? That particular store?

A. That store's price. Yes.

Q. Yeah. Yes. Now, if you put a lot of big apples into a bag, okay, you load it up to where it's almost bursting, that bag's going to be heavier, right?

487

A.    Yes.

Q.    And it's more full?

A.    Yes.

Q.    And you're going to pay more for that big full bag of apples than you are for maybe a bag of smaller one to two apples, right?

A.    Yes.

Q.    Yeah.  You would never expect to pay more for the bag of little tiny apples than you would for the bag of -- full bag of big apples, right?

A.    If they're the same apples, yes.  I agree with you.

Q.    Okay.  If they were charging you more for that little bag of apples, you would leave and not buy the apples, correct?

A.    Maybe.  Yep.  Seems rational.

Q.    Yeah.  Now, you mentioned the Samsung settlement agreement to the jury, but I didn't see you show it.

So I want to show it to you.  Okay?

A.    Okay.

Q.    So we can talk about it.

MS. MARRIOTT:  Can we pull up PTX-56, please?

BY MS. MARRIOTT:

488

Q.   Actually, sorry, Dr. Farber.  Would you please look in your binder?

Do you see PTX-56?

A.   Got it.

Q.   Okay.  Thanks.

Do you recognize this document?

A.   It looks like the SVV-Samsung agreement.

Q.   Okay.

MS. MARRIOTT:  Move to admit PTX-56.

MR. PEARSON:  No objection.

THE COURT:  Admitted.

MS. MARRIOTT:  Thank you.

BY MS. MARRIOTT:

Q.   Now, this is the settlement agreement between Samsung and SVV; is that correct?

A.   It looks like it.  Yes.

Q.   Okay.  And at this hypothetical pretend negotiation that we're talking about between ASUS and SVV, we would have known about this agreement, right?

A.   Yes.

Q.   Okay.  SVV would have known about it, and ASUS would have known about it, right?

A.   Yes.

MS. MARRIOTT:  And if we can go to Section 3.1.  It's on Page 5, please.

489

BY MS. MARRIOTT:

Q.    Here's the payment clause.  Right?  And they would have known about this too?

A.    Yes.

Q.    Okay.  And they would have known that Samsung ███████████ for -- to settle the litigation and for license to the patents, among other things, correct?

A.    Yes.

Q.    Both sides would have known that, correct?

A.    Yes.

Q.    Now, you know that ASUS views Samsung as a competitor; isn't that true?

A.    I would guess they do.

Q.    And ASUS, it's fair to reason, would not want to make a decision that puts them at a disadvantage against one of their competitors, right?

A.    I would -- yes.  That makes sense.

Q.    Okay.  And if we look at Page 2 of this agreement, there's a clause for licensed patents.

      This particular license covered 14 patents; isn't that true?

A.    Would you like me to count?

Q.    If you'd like, if you don't know.

A.    There are 14 in Clause A there.

Q.    And those 14 patents include the 4 that we're

490

talking about here?

A.   Yes.

Q.   Okay.  So this would have been relevant to both sides.  It would have been on the table, right?

A.   Yes.

Q.   Okay.  Now, we were just talking about how this case involves four patents.  That's like a third of the patents that are involved in this case; isn't that true?

A.   Around there.

Q.   And as an economist, you would agree with me that a party licensing more patents will generally pay more than a party licensing less of the same for both patents?

A.   All else equal, yes.

Q.   All else equal.  Okay.

So here, Samsung has more apples, right, more patents that they're licensing?

A.   They have more patents.

Q.   And ASUS has less, right?

A.   Yes.

Q.   Okay.  Now, let's talk about products.

MS. MARRIOTT:  Can we get up Slide 4.21, please, from Dr. Farber's?

BY MS. MARRIOTT:

491

Q.    Now, here in your licenses discussion, you have an X next to licensed products:  monitors.

Do you see that?

A.    Yes.

Q.    Okay.  What do you mean by that?

A.    At the hypothetical negotiation, they would discuss monitors.  I think 90 of the 91 infringing products are monitors.  And at Samsung there were monitors and a couple odds and ends beyond that.  I don't recall exactly what they were.  I think they were TVs and a tablet maybe.

Q.    Okay.  So that X that's there doesn't mean that Samsung doesn't sell monitors?

A.    Correct.  It would probably have been more precise to write licensed products.  You know, almost monitors are monitors only or -- not monitors only.  But yes.

Q.    Okay.

A.    They sell monitors.

Q.    Okay.  So Samsung has more than monitors?

A.    Yes.

Q.    Okay.  And I think I saw more than monitors in your slides for ASUS too, didn't I?

A.    They have a Chromebook that is infringing or accused in this matter.

492

Q.   Yeah.  They have more than monitors too, right?

A.   Yes.

Q.   And that's a difference we could account for, isn't it?

A.   With the proper evidence, yes.

Q.   Okay.  Now, given the size of Samsung, they sell a whole bunch of monitors; isn't that fair?

A.   I don't think I know exactly how many monitors they sell, but I know Samsung is large.

Q.   Okay.  You didn't look?

A.   At one point I did.  I just don't know the number offhand.

Q.   Okay.  Would you dispute that they sell a bunch of monitors?

A.   No.

Q.   Okay.  Is Samsung a larger company that ASUS?

A.   Generally, yes.

Q.   Okay.  Does it sell more products than ASUS?

A.   Yes.

Q.   And just to hit a point that was suggested by Dr. Vasylyev yesterday, is Samsung still selling LCD monitors?

A.   Yes.

Q.   Okay.  They're still in the market, right?

493

A.    Yes.

Q.    Okay.  So this X that you have next to monitors, it's not that they're not both selling monitors.  It's just maybe they sell different amounts of monitors; is that fair?

A.    There would be a different licensed product mix.

Q.    Okay.  Do you know whether Samsung sells more LCD monitors than ASUS?

A.    I don't offhand.

Q.    Okay.  You don't know?

A.    No.

Q.    Okay.  And obviously ASUS sells monitors. That's why we're here, right?

A.    Yes.

Q.    Okay.  So Samsung's a bigger company, generally they'll have more apples than ASUS; is that fair?

A.    They sell more overall products than ASUS.

Q.    Yeah.  And more licensed products, more licensed types of products, right?

A.    No.

Q.    They didn't license all their products?

A.    That is -- yes.  By the terms of the agreement licensed, they licensed products.

494

Q.   Yeah.  They licensed all their products, right?  All products?

A.   Will you point that out to me?

Q.   Sure.  We can look at the -- we don't have to put it back up on the screen.  You can just take a look at the second page --

A.   Yes.  They license all their products.

Q.   Okay.  Thank you.

And ASUS wouldn't be licensing all their products, right?  Just monitors?

A.   And a Chromebook, but yes.

Q.   And a Chromebook.

But that's less, right?

A.   If a fraction is less than all, yes.  I'll accept that.

Q.   Okay.  And as an economist, a company that is selling more products would expect to pay more for the patents that those products are using than a company that sells less products.  Isn't that a fair statement?

A.   Will you repeat the question, please?

Q.   Sure.  As an economist, a company that's selling more licensed products is going to pay more for that license than a company selling less licensed products?

A.   Not necessarily.

495

Q.   Okay.  A company could be selling less and be required to pay more.  Is that your testimony?

A.   They could be selling less products and be required to pay more.  Yes.

Q.   Okay.  But you didn't use this market evidence that we've been talking about to do your analysis -- to form your royalty rate, correct?

A.   It is part of my analysis.  It's not the mathematical basis for my ultimate opinion, if that's what you're asking.

Q.   Okay.  And instead, you used what you called a regression analysis; is that correct?

A.   Yes.

Q.   Which I think you agreed is the type of analysis that can be used in things like political polls, correct?

A.   I don't know much about political polls.

Q.   So you don't know either way?

A.   No.

Q.   Okay.  And have you concluded, based on this regression analysis that you did, that ASUS would pay ███████ more than Samsung?

A.   Yes.

Q.   For licensing less products?

A.   No.

496

Q.    For licensing less patents?

A.    Yes.

Q.    And for potentially -- I guess you don't know whether they're licensing less products or not.  Is that your testimony?

A.    I want to be a little more precise than that. The -- the value to the licensee is not necessarily an account of licensed products.  Not all products are -- use the patent technology, but often in an agreement we see that they license all their products just to be safe.

Q.    Okay.  That wasn't my question.

Samsung licensed all their products, right?

A.    Yes.

Q.    And that is, by definition, more than licensing just monitors; isn't that fair?

A.    Yes.

Q.    Okay.  So your regression has ASUS paying ██ ██ more for -- than Samsung for licensing less products, correct?

A.    Yes.

Q.    Okay.  Now, let's talk about how you got to that number.  For starters, you're using a running royalty structure, correct?

A.    Yes.

497

Q.    Okay.  And that means for every unit that ASUS is selling, under your model we would be paying almost $14 to SVV, right?

A.    Yes.

Q.    So for every monitor that's sold, $14 to SVV?

A.    Yes.

Q.    And we would kind of keep a running total from now until whenever the patents expire?

A.    Yes.

Q.    Okay.  That's your analysis?

A.    Yes.

Q.    Would you agree with me, sir, that SVV in the real world has never, ever, ever sat down at an actual negotiation and required the other side to do that?

A.    Regarding these patents, I'll agree with you. I don't know if they have agreements outside of that.

Q.    Okay.  So for purposes of our discussion today, just assume that I'm only talking about these patents.  I'm not trying to trick you in that respect. Okay?

A.    Okay.

Q.    You would agree with me that never has SVV sat down at a table and had an actual real-world negotiation where they made someone agree to this running royalty?

498

A.    Yes.

Q.    Okay.  There's no evidence that you presented to the jury in this case that ASUS has ever agreed to it either; isn't that true?

A.    Yes.

Q.    And instead, what we can see in the real-world evidence is that both of SVV's settlement licenses are lump sum, right?

A.    Yes.

Q.    One payment.  I think -- I think, actually, you described it as a paid-up license through the expiration of the patent, but they pay one time at the beginning.  Is that accurate?

A.    Yes.

Q.    And that's what they did with Samsung, right?

A.    Yes.

Q.    And that's what they did with MSI, right?

A.    Monetarily, yes.

Q.    Okay.  And that's the opposite of a running royalty, correct?

A.    It's an alternative.

Q.    They're not the same?

A.    No.

Q.    And it's the -- and a running royalty is something that neither of these parties has ever done

499

based on the evidence in this case; isn't that true?

A.    Yes.

Q.    Okay.  Dr. Farber, how many monitors are accused of infringement in this case, ASUS monitors?

A.    Let me clarify, are you talking units or models?

Q.    Models.

A.    There are 91 products accused of infringement in this case.

Q.    And that comes from Dr. Credelle?

A.    And the stipulation.

Q.    Okay.  And you know that ASUS sells a lot more models than just those 91, right?

A.    I believe it's -- yes.  They sell more than the 91.

Q.    Okay.  In fact, your regression, the analysis that you were doing, one of the key variables is comparing infringing ASUS monitors to noninfringing ASUS monitors; is that fair?

A.    Yes.

Q.    Okay.  And that's how you come up with your cost analysis that you did?

A.    Yes.

Q.    Okay.  And so I think you mentioned that you were provided data on over 9 million units of ASUS

500

monitors; is that correct?

A.   Yes.

Q.   And sitting here today, only 4 million of them are infringing according to SVV?

A.   Yes.

Q.   So more than half are noninfringing?

A.   Yes.

Q.   And the fact that over half of those monitors, ASUS monitors, do not infringe, that comes from Dr. Credelle, correct?

A.   And the sales data.

Q.   Okay.  But whether they're infringing or not, that's going to come from Dr. Credelle, right?

A.   Yes.

Q.   Okay.  And Dr. Credelle's the one who determined that over half of ASUS monitors do not infringe even according to him?

A.   He provided the model numbers.

Q.   That you relied on?

A.   Yes.

Q.   That he thought were infringing and not infringing?

A.   Yes.

Q.   And this fact would also be known if ASUS and SVV were at a hypothetical negotiation.  They would

501

know that fact too, wouldn't they?

A.    Yes.  They would.

Q.    They would know that ASUS has a lot of other monitors that it could sell if SVV was going to demand $58 million for a license, right?

A.    They would -- yes.

Q.    And ASUS could have just said, I don't think that's reasonable.  We just won't use those 4 million monitors and we'll go with the 5 million that don't infringe, right?

A.    Yes.  They'd be giving up their share of the cost savings, but they could do that.

Q.    Yeah.  They could just transition to the ones that everyone in this room agrees are noninfringing, right?

A.    Yes.  They'd be giving up on the 7.41 per model, but they could do that.

Q.    Okay.  And this kind of goes to something else that you were discussing in your report, and that's the idea of bargaining power.  You know what that is?

A.    Yes.

Q.    And you would agree with me that if a company has other choices besides using the allegedly infringing technology that's going to require them to pay $58 million, all else being equal, they would

502

probably use an alternative, right?

A.    I disagree with that characterization there.

Q.    Okay.  You don't agree with that?

A.    No.  They'd be giving up on their share of those cost savings to do so.

Q.    But it would be an option?

A.    If they were desiring to give up profits, yes. I suppose they could.

Q.    We're going to talk about your cost savings.

The point of that, though, is that ASUS certainly would have had some bargaining power at the negotiation, wouldn't they?

A.    Sure.

Q.    Yeah.  They wouldn't have had to have agreed to a license that wasn't reasonable because they have some alternatives?

A.    Yes.  They have alternatives described.

Q.    Okay.

        MS. MARRIOTT:  Can we look at Slide 4.32, please?

BY MS. MARRIOTT:

Q.    Okay.  Now I want to talk to you about your equation on the regression analysis that you did.

        On the far left, you have cost, right?

A.    Yes.

503

Q.   Okay.  And this is just what the entire monitor costs?

A.   Yes.

Q.   Okay.  So the plastic and everything that goes with it, the cord, all of it?

A.   It's the cost that's in the data ASUS produced.

Q.   Okay.  Of the entire monitor, though?

A.   I believe so.

Q.   Okay.  And that's your starting point, fair?

A.   That's the dependant variable.

Q.   Is that your starting point?

A.   I'm not sure I understand the question.

Q.   That's what you're comparing.  That's -- how would you describe it?

A.   The dependent variable in the regression.

Q.   Okay.  And what does that mean?

A.   That's the outcome we're looking at.

Q.   The outcome.  Okay.  Thank you.

So this entire cost of the monitor, that is this outcome, okay, that would include things like the buttons on the screen to adjust things on the monitor?

A.   Yes.

Q.   Okay.  And you would agree that those buttons have nothing to do with the patented technology,

504

wouldn't you?

A.   I rely on Mr. Credelle for his opinion on how the patented technology benefits the monitors.

Q.   Do you know whether those buttons are accused of infringing?

A.   I just know by product what's accused -- what's accused of infringing.

Q.   Are the buttons accused of infringing?

A.   I would guess not, but I'm not the expert here.

Q.   Okay.  You're not sure?

A.   No.

Q.   Okay.  Did you hear Dr. Credelle say the buttons were infringing?

A.   I did not.

Q.   Have you heard the buttons being mentioned at all in this trial?

A.   I don't think so.

Q.   Okay.  How about the base, like the plastic stand that the monitor stands on, that would be included in your cost?

A.   Yes.

Q.   Have you heard any evidence whatsoever that that would be infringing?

A.   No.

505

Q.    Okay.  Or that the plastic stand could be attributed to the patented technology, we haven't heard anything like that, have we?

A.    We did hear that the benefits could extend to the plastic stand, I believe.

Q.    Okay.  So you think the plastic stand is part of the patented technology?

A.    That's not what I said.

Q.    Okay.  How about the circuit boards in the monitor?  Do you know that -- did you know that there were circuit boards in the monitor?

A.    I'll take your word for it.

Q.    Okay.  Did you know whether there were?

A.    I don't think so.

Q.    Okay.

A.    No.

Q.    Did Dr. Credelle ever tell you that the circuit boards in the monitor are infringing?

A.    No.

Q.    Or that they have anything to do with the patented technology?

A.    He explained that the patented technology extends to the entire monitor.

Q.    Okay.

A.    So to that extent, they do have something to

do with the patented technology.

Q.   Okay.  Did Dr. Credelle tell you specifically the circuit boards have anything to do specifically with the patented technology?

A.   I don't recall him discussing circuit boards.

Q.   But you included them in your costs, correct?

A.   Yes.

Q.   Did Dr. Credelle ever tell you that the liquid crystal display -- do you know what I'm talking about?

A.   Yes.

Q.   Okay.  That's --

MS. MARRIOTT:  May I approach?

BY MS. MARRIOTT:

Q.   That's this guy, right?

A.   Yes.

Q.   Did Dr. Credelle ever tell you that this was part of the allegedly infringing technology?

A.   That is a little tougher for me to -- for me to tell.  That's a -- we're getting into the technical aspects that I don't fully grasp because it's not my area of expertise.

Q.   But you included that in the total cost as well, correct?

A.   Yes.  That's in the cost.

Q.   Okay.  And you're not sure if that's part of

507

the patented technology or not?

A.   I don't know.

Q.   You've heard about the backlight module?

A.   Yes.

Q.   Okay.  Is that part of the patented technology?

A.   I believe so.

Q.   Okay.  So that one we know, right?  We know that that's part of the patented allegedly infringing technology, right?

A.   Yes.

Q.   Okay.  But that's not where you started.

A.   Nope.

Q.   You didn't start with the backlight, did you?

A.   I did not.

Q.   You started with the whole thing, right?

A.   Yes.

Q.   And we -- I think you would agree with me, but you can let me know, the cost of the entire monitor is much greater than just the cost component of the sheets and films and LED lights that we looked at, correct?

A.   Yes.

Q.   That would probably be a pretty small part of the cost of the monitor?

A.   It would be part of the cost.  I don't know

what share.  But yes.  It would be part of the cost.

Q.    Yeah.  You don't know how small, but you know it's not the whole thing?

A.    Correct.

Q.    Okay.  So if you start with the higher number, the cost of the monitor, versus starting with the low cost of the backlight panel, all things being equal, by definition, this regression is just going to show a higher cost savings, right?

A.    No.

Q.    If you start with a higher cost, it's not going to basically figure out the cost savings on that higher number?

A.    It will fair up the cost savings on the unit as a whole.

Q.    Yeah.  Not on the backlight module, right?

A.    If there were only savings as part of the backlight module, the regression would be able to show that.

Q.    But you could also have put the backlight module as the cost of the allegedly infringing component, correct?

A.    No.

Q.    Because you didn't know the cost?

A.    No.

509

Q.   Okay.  Then next on your regression equation you have infringing.

Do you see that?

A.   Yes.

Q.   And I believe your testimony was that's a 1 or a 0.  So 1 equals infringing.  0 equals noninfringing.  Is that true?

A.   Correct.

Q.   And I believe when you were testifying on direct, you mentioned that in your first attempt at running this regression, you had classified some of Dr. Credelle's infringing products as noninfringing.

So some of the 1s were 0s in your first try, right?

A.   Yes.  We focused on the product we thought would be most discussed at the hypothetical negotiation.

Q.   Okay.  But not all of the infringing products were in your model.  You left out 30, right?

A.   They were in the model, but if you're asking if they were on -- flags infringing, there were some left out.

Q.   Yeah.  They were in the model misclassified as noninfringing, correct?

A.   They were in the control group.

510

Q.    Zeros?

A.    They were zeros.

Q.    Noninfringing?

A.    Yes.

Q.    Even though Dr. Credelle had told you that he thought they were infringing?

A.    Yes.

Q.    So that was a mistake, right?

A.    No.

Q.    If it should have been a 1 and you put it as a 0, can we agree that that was wrong?

A.    I don't know that it should have been a 1 the way I was thinking about it at the time.

Q.    Okay.  Now, a few more questions about your regression.

You were the one -- you built this model; is that fair?

A.    Yes.  My team and I put it together jointly.

Q.    Sure.  You had some help?

A.    Yes.

Q.    But you were the one -- you and your team -- when I refer to "you," it's the folks supporting you, okay?

You were the one that decided which variables to put in this model, right?

511

A.   Yes.

Q.   Okay.  And that's the features that we're looking at.  That's the third black box here?

A.   Yes.  Everything to the right is the variable we put in the model.

Q.   And there's a bunch of stuff below it that we didn't really talk about, right?

A.   Yeah.  That's boring math stuff.  We can get in it if you want.

Q.   No.  That's okay.

Now, maybe I missed it when you were testifying for the jury, but did I miss you identify what those features were for the jury in your direct testimony?

A.   I don't think we went through them one by one.  No.

Q.   No.  We didn't mention them, did we?

A.   We talked about the features around the slides, but I didn't go through them one by one.  I didn't identify what was in there.

Q.   Yeah.  You didn't show them, right?

A.   I think I did show them.

Q.   Okay.  Now, over time you've tweaked this model.  I think you testified that you tweaked the model in your direct testimony.

512

Do you recall that?

A.   Yes.

Q.   Okay.  And you did that to use different features, right?

A.   That was part of it.

Q.   And you did that -- so you had one set of features in your first analysis, right, that you served to us?

A.   Yes.

Q.   Okay.  And then you made some changes.  You tweaked the model, right?

A.   Yes.

Q.   And you added some variables, right?

A.   We changed two variables.

Q.   Okay.  And you added one that wasn't really there before, right?  The pixel per inch, that wasn't really there?

A.   We changed them as our measure of resolution.

Q.   Okay.  So you tweaked the model, and lo and behold, your number went up, didn't it?

A.   It did.

Q.   Yeah.  Just by tweaking that model?  All things being equal otherwise, correct?

A.   Yes.

Q.   And that's not all of your updates, was it, to

513

this -- to this kind of evolving regression that you're talking about with the jury today.  Just last Friday you changed your data again; isn't that correct?

A.    The royalty base changed for the stipulation on the new data produced by ASUSTeK.

Q.    Okay.  That wasn't my question.

You changed the data inputs, correct?

A.    Into the regression?  Is that what you're asking?

Q.    You changed products from not infringing to infringing.  Zero to one.

A.    No.

Q.    You changed several products, didn't you, sir, that you originally had as 0s the first time you served your model on us, and you changed them to 1s, correct?

A.    I'm sorry.  Were you talking about the regression still?

Q.    I'm talking about your data.

A.    Okay.  To clarify, we did not issue a new regression this past week.  If you're talking about the royalty base, yes, I updated it for the new data in the stipulation the parties agreed to.

Q.    Ah, thank you for the clarification.  Okay.

MS. MARRIOTT:  We can take this regression down.  Thank you.  I don't want it to be

514

confusing.

BY MS. MARRIOTT:

Q.   Okay.  So the data, it changed again last Friday, right?

A.   Yes.

Q.   Okay.  And some of the products that were zeros and had been zeros for the last year, noninfringing, right?

A.   Yes.

Q.   You changed those to ones as infringing?

A.   Yes.

Q.   Did Dr. Credelle tell you to do that?

A.   No.

Q.   He didn't ever look at those products and determine that they were actually infringing; isn't that true?

A.   I don't know.

Q.   Is that important to you whether Dr. Credelle thinks they're infringing?

A.   Yes.  It is.  I also was trying to abide by the agreement between the parties.

Q.   Did Dr. Credelle ever tell you that those products were infringing?

MR. PEARSON:  Your Honor, may we approach?

515

THE COURT: Yes.

(Bench conference.)

MR. PEARSON: She's cross-examining this witness on whether Dr. Credelle gave him specific instructions about the parties' stipulations. Of course he followed the parties' stipulation in constructing his royalty base.

It's not improper, and I think it's an improper line of questioning to suggest that he did something wrong in following the agreement that both parties entered into willingly.

MS. MARRIOTT: So I think, Your Honor, this is the product stipulation motion that we filed over the weekend. Those products were added into the case. Your Honor allowed them to do that but said we can make the record about kind of what they -- you know, we had to siphon off what they were. This is what they were. No one's ever looked at these products.

THE COURT: But this is the parties' stipulation?

MR. PEARSON: Yes, Your Honor.

THE COURT: No. My ruling on saying as long as they were in the same manufacturing number -- there was something.

516

MR. PEARSON:  My understanding was in order for them to make their record, I had to have him say the number of units that were at issue and he did. And that was the end of the ruling and the motion was denied otherwise.

THE COURT:  And so I'm going to sustain the objection.  There's no point in going through this and making him look like he did something wrong.  The point of my ruling was to allow them to be segregated out, and I think that's -- that's what -- I'll sustain the objection.

MR. PEARSON:  Thank you, Your Honor.

MS. MARRIOTT:  Thank you, Your Honor.

(Bench conference concludes.)

BY MS. MARRIOTT:

Q.    All right, Dr. Farber.  I want to talk to you, finally, about your ultimate conclusion.  Okay? $58 million.  That's your ultimate conclusion for damages, correct?

A.    Yes.  Around there.

Q.    Okay.  And maybe I missed it, but I think that's the only damages number that I saw you present to the jury, correct?

A.    We presented damages under indirect infringement as well.

517

Q.   Correct.  Okay.  Let's just talk about the direct infringement number.  It was just $58 million approximately.

A.   Yep.  We can round.

Q.   Okay.  And that number, it's fair to say, assumes that the jury finds all four patents to be infringed; isn't that correct?

A.   Yes.

Q.   Now, the jury may very well find none of the patents infringe, right?

A.   Yes.

Q.   They could just find one of the patents infringe, correct?

A.   Yes.

Q.   Two?

A.   Yes.

Q.   If there was none, there would be no damages, correct?

A.   Correct.

Q.   And, you know, we've been talking throughout this trial --

            MS. MARRIOTT:   Actually, can we pull up PTX-652, please?

BY MS. MARRIOTT:

Q.   Do you recall showing this exhibit to the

518

jury?

A.   I do.

Q.   Okay.  And if I understood your testimony, it was that the jury could look at this particular document and figure out which patents -- how to figure out on a patent -- per-patent basis what damages would be; is that fair?

A.   Yes.

Q.   Okay.  And they would, I guess, do that by looking at the infringed patents column?

A.   Yes.  This tells them which products infringe which patents.

Q.   Okay.  And then there was, I think, another attachment that you showed that had the sales?

A.   Yes.

Q.   And so then they would add up the sales?

A.   Yes.  They could do that.

Q.   And then multiply it by your royalty rate?  Is that how this would work?

A.   Yes.

Q.   Okay.  Now, assume with me just hypothetically that the jury finds just one of the light -- those light-trapping patents -- I know we've talked about categories.  So I don't mean anything other than it's just that -- that set of patents.  Okay?

519

A.    Okay.

Q.    Let's say the '318 to be infringed.  Let's say only the '318 is infringed and no other patents are infringed.  Okay?  Are you with me on that?

A.    Yes.

Q.    If that was the case, you don't think the jury should award $58 million, correct?

A.    Do you mind if I consult my attachments here?

Q.    Sure.

A.    I have the numbers somewhere.

Q.    Yep.

A.    I believe that the number would decrease slightly.

Q.    Okay. Slightly.

Isn't it true that SVV is only accusing four out of the 91 monitors you mentioned of infringing that '318 patent?

A.    Oh, yes.  I'm sorry.  If it's still only four, it would decrease more than slightly.  Yes.

Q.    I'm sorry.  I didn't catch that.

A.    If it's only four products, then damages would decrease more than slightly.

Q.    Okay.  More than slightly.

So there's only four monitors accused of infringing that patent, correct?  The '318?

520

A.    I'm trying to count, but there's a lot of products on the list.  I'll take your word for it, if that's okay.

Q.    So you haven't looked at the issue just specifically, but for purposes of today, you don't have any reason to believe that's untrue?

A.    No.  That sounds about right.

Q.    Okay.  And the total revenues -- I don't expect you to know this answer, but maybe you do.  The total revenues on those four products are like 9.5 million, okay?  That's total revenue for those four products.  Okay?

A.    Okay.

Q.    It would make no sense at all, would it, for ASUS to pay five times the amount of total revenue for products for a license to these patents, correct?

A.    No.  My opinion on that point would not be 58 million.  It would be 13.96 times the number of accused -- of unit sales of those four products.

Q.    Okay.  And this wasn't something that you gave to the jury on direct, right?  This is new information?

A.    We explained how they would do it.

Q.    That would be like $215,000, if I'm doing the math?

A.    I don't know offhand.  Would you like me to

521

calculate it?

Q.   No.  That's okay.

And that's the truth, right?  You would just multiply the units by the rate, correct, to get your rate?  To get your damages for a per-patent basis?

A.   Yes.

Q.   Okay.  Now, let's assume with me that the '319 (sic) and the '018 (sic), so both of the patents in that category, okay?  Assume with me that the jury finds both of those infringed.  If that was the case, the jury shouldn't award $58 million either, correct?

A.   It looks like it's a subset of the accused products that infringe those patents, so you'd want -- you'd follow the same process.

Q.   Yeah.  Just five of them, right?  Five out of 91, correct?

A.   To save the jury and everyone else me counting, I'll take your word for it.

Q.   That would be like $300,000, right, under your methodology?

A.   Sure.

Q.   Okay.  And you didn't tell the jury that either on direct, did you?

A.   No.  I assumed the patents are infringed and valid as part of my analysis.

522

MS. MARRIOTT:  Okay.  I pass the witness.

REDIRECT EXAMINATION

BY MR. PEARSON:

Q.    Dr. Farber, let's sort of go in reverse order a little bit and begin with your -- with her questions about your regression.  Is that okay?

A.    Sure.

Q.    There was a little bit of discussion about -- I think it was characterized as you tweaked the model and it went up.

Do you recall that?

A.    Yes.  I do.

Q.    And you discussed the reasons for that in your direct testimony, didn't you, about why you ran a first regression and a second regression?

A.    I did.

Q.    During cross-examination, did counsel point out that there were any errors in anything that was characterized as a tweak?

A.    I don't think so.

Q.    We saw your regression -- or your regression equation again.

Do you remember that?

A.    Yes.

Q.    And there's some discussion about how you used

523

a lot of variables in doing your regression?

A.   Yes.

Q.   Did you intend anything nefarious in not listing out the many variables you considered by name in your regression equation?

A.   No.   Tried to gloss over the more tedious stuff, but it's in the demonstratives we provided.

Q.   So counsel doesn't think we left anything out, will you please turn to your appropriate Attachment G and let us know what variables you considered in your regression, please?

A.   We included year of production; year since release; monitor category, and that being general use, professional use, commercial use, gaming use; panel type, and that being TN, VA, or IPS; whether the monitor is QLED; whether it has a sync feature that has a camera; whether it has one of a couple of eye care features; one of -- whether it has low blue light; whether it has flicker-free; whether it has extreme low-motion blur; whether it has color accuracy; its size; its refresh rate; its brightness; its response time; pixels per inch; whether it's infringing; and interaction of whether it's infringing and whether it's QLED; and a constant.

Q.   Thank you, Dr. Farber.

524

There was a line of questioning I couldn't quite follow about the stipulation and units in your royalty base.

But did counsel show any evidence that your royalty base does not accurately follow the stipulation, the agreement between the parties, that if the jury finds infringement, if, then these are the models that the jury will find are infringing?

A.   I don't recall any.

Q.   There was some discussion about your regression, about how you began with the entire cost of the monitor and used the entire cost of the monitor when you ran your regression.

Do you recall that?

A.   Yes.

Q.   And there was sort of a laundry list of components within the monitor that I guess counsel was trying to imply you could have used the costs from those components in your regression.

Do you recall that?

A.   Yes.

Q.   And I recall one of them was the backlight unit.

Do you remember that?

A.   Yes.

Q.    And to be clear, did ASUS provide SVV with any information about the cost that it pays for the backlight units in its infringing monitors?

A.    No.  The data we got had their overall cost per monitor, not of the subset of pieces.

Q.    And it seems like ASUS was fair in its nonsharing of information, because I don't believe counsel for ASUS said anything about how much the backlight unit cost.

Do you recall that?

A.    I don't recall any -- any figures.  No.

Q.    And I believe you said you used -- if I recall your direct testimony correctly, that you used the entire cost of the monitor in your regression because it's your understanding that the benefits of the patents extend to the whole monitor; is that fair?

A.    Yes.  I relied on Mr. Credelle for that.

Q.    And that would still -- is that still true even if the mechanical elements of infringing are not necessarily found in every component in the monitor?

A.    Yes.  It's my understanding with Mr. Credelle that though the patented technology may reside on one piece, the benefits extend outside of that to the entire monitor.

Q.    And it sounded like during cross-examination

526

one idea that you had in mind but didn't get to fully explain was the plastic stand that's associated with the monitor.

Could you explain that to the jury?

A.   Yes.  I'm not a technical expert, but the patented technology does not appear to reside in the patent -- in the stand of the monitor.

However, I think we heard from Mr. Credelle that the patented -- the patented technology allows them to use fewer components, thinner components, smaller components, and so if the monitor's thinner and weighs less, you can use a less expensive stand to support that monitor.

Q.   And that is a type of cost savings as a whole that is captured by your regression; is that fair?

A.   Yes.

Q.   Another criticism that I heard, if I recall correctly, is that certain models -- I believe counsel was trying to say in your original regression, but I'm not sure.

Certain models were misclassified or there was a mistake and they were marked as not infringing when they should have been infringing.

Do you recall that?

A.   Yes.  I do.

Q.   And I believe you testified on cross-examination that that was not a mistake; is that fair?

A.   Yes.  That's fair.

Q.   And why is it not a mistake?

A.   I -- with my first regression, I tried to focus on the products I thought the parties would negotiate over, the primary accused products.  And they're not going to negotiate over every last unit.

And I think that's reasonable.  There's just a lot of units here.  So I focused on a set of them, and I -- it's not a mistake.  It's that's what I thought they would focus on as part of the regression.

Q.   And how did you choose the ones that you thought they would focus on as that set?

A.   I based it on the set that Mr. Credelle charted for the most part.

Q.   So the infringement charts like ASUS was asking for before the litigation was filed?

A.   Yes.  I think we saw that in the letters.  I also excluded from that portable monitors and Chromebooks, because those are such a small share of the accused products.  I thought that they'd focus on the ones that are most representative of the total set.

Q.   Well, what would the effect have been on your

528

regression if ASUS' contention was correct and a monitor that should have been flagged as infringing was flagged as noninfringing?

A.   Generally, this goes to something called attenuation bias, and it biases your results down towards zero if you misclassify -- not misclassify -- but put products in the wrong bucket between A and B.

If you mix them up a little bit, that coefficient you saw that was negative 21.85 would decrease towards zero.  That's an economic concept. And it also would have -- no.  That's it.

Q.   I tried to make notes of the criticisms of your regression, and I tried to go through them with you.  If I missed any, I apologize.

Is there anything else that you just feel the burning need to say in defense of your regression?

A.   I don't think so.

Q.   Okay.  The other -- the other sort of, I'd say, major part of the cross-examination had to do with the SVV and Samsung license agreement.

Do you remember that?

A.   I do.

Q.   And there's a lot of discussion about how it would have been considered at the hypothetical negotiation.

529

Do you remember that?

A.    Yes.

Q.    And I believe a few times it was called a pretend negotiation.

Do you remember that?

A.    Yes.

Q.    Did you -- and I know you said this on direct, but could you remind the jury, did you come up with the concept and the requirements of the hypothetical negotiation?

A.    No.  I think that's something only lawyers could have come up with.

Q.    You found it in the case law?

A.    Yes.

Q.    And you're required to follow it?

A.    Yes.

Q.    It sounded to me -- I was doing my best to follow.  There was an extended analogy about apples.

Do you remember that?

A.    Yes.

Q.    As best I could follow it, it sounded like counsel was trying to argue that because Samsung sells a lot of apples or monitors, and they didn't pay $58 million, that ASUS should get some sort of proportional discount because ASUS is selling a smaller

530

bag of apples or something.

Does that sound about right?

A.   Yes.

Q.   Okay.  Did you hear Dr. Vasylyev testify earlier in this case that his investigation found that SVV's inventions were used in far fewer Samsung monitors than ASUS monitors?

A.   Yes.  I think he testified there were seven models maybe.

Q.   So I guess part of the proportion ride is in order to make the argument work, you got to -- you got to make sure the number of Samsung units is really big. We got to prove it's a big bag to make the apple analogy work.

Does that sound about right?

A.   I think I'm following you.

Q.   So there was some discussion with you about whether the Samsung patent license actually licensed all Samsung products or didn't.

Do you remember that?

A.   I do.

Q.   And she -- and counsel showed the license, I believe.  I believe she showed this provision in the definitions and had you agree that all Samsung products are licensed.

531

Do you remember that?

A.      Yes.  They all fall under that definition.

Q.      That's all products?

A.      Yes.  It reads --

Q.      The license doesn't say all monitors?

A.      No.  It says all products.

Q.      Do you know whether Samsung sells washing machines?

A.      I own one.  Yes.

Q.      Do you know whether Samsung sells refrigerators?

A.      Yes.  They do.

Q.      Do you have any reason to believe the patented technology has anything to do with those other types of Samsung products that don't even have a screen?

A.      Some people have screens on their fridges, but for the most part, without a screen, I don't have any reason to believe it would be implicated.

Q.      So when trying to determine the value that Samsung obtained from the Samsung agreement, wouldn't it be fair to try and figure out how many Samsung units, monitors or TVs, other types of products actually used SVV's patents?

A.      Yes.  That's the value that would be negotiated over at the SVV-Samsung negotiations leading

532

to that agreement.

Q.   During your cross-examination, did counsel show you the number of Samsung units that actually use SVV's technology?

A.   No.

Q.   But once we consider washing machines, vacuum cleaners, a lot of other things, we can all agree with common sense that Samsung does sell a lot of products, right?

A.   Yes.  They do.

Q.   It sort of sounded like ASUS was hoping to get the same deal that Samsung got, right?

A.   That was the implication.

Q.   Did you find that curious?

A.   A bit.

Q.   Do you remember when counsel for ASUS said that Samsung didn't even take a license voluntarily?

A.   Yes.

Q.   And do you remember when -- or a few minutes ago, counsel said:  Companies -- this is my notes.  It might not be a direct quote.  Companies settle lawsuits all the time because it's expensive to be sued?

A.   Yes.  I do remember that.

Q.   Isn't it unusual for ASUS to argue on the one hand that the Samsung agreement is irrelevant because

533

it came from litigation and they were just trying to get out of something, and on the other hand to say we're not going to settle, but we sure want the same deal as that guy?

A.    Yeah.  The goal of the market approach is to figure out the market price for -- of -- the market value of a license to the patents.  If the agreement was negotiated and all that monetary compensation was related to the cost of litigation or just to get out of the lawsuit, then it doesn't represent the value of a license to the patents-in-suit.

Q.    But to be fair, we do all agree that in certain circumstances, and you testified to this on your direct examination, that in certain circumstances when sufficiently reliable data exists, it is okay to look at settlement licenses?

A.    Yes.  We go where the evidence points us, where the best evidence is.  So sometimes that's what you have to work with and you adjust as you can.

Q.    Can you please remind the jury, in your expert opinion in this case, is a more reliable basis for damages the SVV-Samsung patent license agreement and doing some sort of proportion or your extreme and sophisticated regression analysis?

A.    I believe the income approach, you know, where

534

I perform my regression analysis, is more accurate.  It measures the benefits to ASUS specifically and does not get into the problems presented within the SVV-Samsung agreement for which I can't adjust.

MR. PEARSON:  Pass the witness, Your Honor.

MS. MARRIOTT:  No further questions, Your Honor.

THE COURT:  You may step down.

You may call your next witness.

MR. CALDWELL:  Your Honor, the plaintiff calls adverse Mr. James Lee, the corporate representative for ASUSTeK.

(Interpreter was sworn.)

(The witness was sworn.)

MR. CALDWELL:  May I proceed, Your Honor?

THE COURT:  Please.

MR. CALDWELL:  Thank you.

DIRECT EXAMINATION

BY MR. CALDWELL:

Q.   Good afternoon.  I'm Brad Caldwell, one of the lawyers for SVV and Dr. Vasylyev.

Now, this is a little bit different than the other witnesses we've seen because although I represent SVV, you are a witness for ASUSTeK, correct?

535

A.    Yes.

Q.    Because it's a little unusual for me to call a witness from the other side, at least compared to the other witnesses we've seen, I would like to give you an opportunity to introduce yourself.

So just to be fair in that respect, will you please take a minute and introduce yourself to the jury?

A.    Okay.  Hi, everyone.  My name is James Lee. I'm living in Taiwan.  And I currently work in ASUS. And I have a wife and a eight-years-old daughter.  So I like to play with my daughter in a weekend.  So sometime I will teaching him to swimming and to ride a bicycle, and he likes to play skittle ball and also like painting.  So normally I will --

(Clarification by Reporter.)

A.    Sorry.  So sometimes I will take my girl to a painting class.

THE COURT:  So we're going to have to do -- we have translators.  We're going to have to -- we need you to speak in Mandarin and have it translated so the court reporter can take it down.  So if you would speak in -- is it Mandarin?  And then allow your translator to translate.

THE INTERPRETER:  Okay.  That's fine.

And that was my introduction.

(Clarification by Reporter.)

THE COURT:  He needs to do it again so we can record it.

A.   Good afternoon, everyone.  I'm happy to be here.  My name is James.  I'm from Taiwan.  And I work at ASUS now.  I have a wife and an eight-year-old child.  She is a little girl, and she likes to draw.  So I sometimes go with her to her art classes.

On the weekends I like to spend time with my child, my daughter, and so sometimes we go to play sports together too.

Thank you, everyone.

BY MR. CALDWELL:

Q.   Welcome to Texas.

A.   No problem.

Q.   When did you get here to Texas?

A.   Last Monday.

Correction.  Last Friday.  It was the middle of last Friday night.

Q.   You are a division chief in the business unit of monitors, correct?

A.   Yes.

Q.   And you are sometimes referred to as a product planner, correct?

537

A.    Yes.

Q.    Okay.  And it was not SVV that picked you as a witness.  It was ASUSTeK that picked you to be here as a witness, correct?

A.    Correct.

Q.    Did you want to come to trial?

A.    Yes.  I did.  I wanted to be able to be here in person and explain my case to the jury.

Q.    Okay.  Now, please understand when I ask you questions, it's kind of like when your lawyers would ask questions of Dr. Vasylyev.  So if I'm asking you cross-examination-type questions, I mean you no disrespect.

Do you understand that?

A.    I understand.

Q.    And let's see if we can agree on a few basic things.  So how many patents are at issue in this trial?

A.    Four.

Q.    And do you know how many claims are at issue in this trial?

A.    I haven't counted them up.

Q.    When we last -- when SVV last spoke with you at your deposition, you had not read the patents, correct?

538

A.    I had looked at them a little bit.

Q.    Okay.  Did you ever read them completely?

A.    No.  Before then, I had not read them completely.

Q.    I'm asking after your deposition, did you ever get around to reading them completely?

A.    I did go to look at them myself after, but because they were quite technical, I discussed them with the engineers.

Q.    And you know that they relate to the backlight unit portion of a monitor, correct?

A.    Yes.  I learned that from speaking with the engineers.

Q.    So in your role in product planning, some of the things that you know about are product specifications, pricing, timing, appearance, and packaging, correct?

A.    Yes.

Q.    And in your role, you kind of know about the parts of a monitor that are -- everything except the actual technical engineering on the inside, right?

A.    Correct.

Q.    Who were the engineers that you talked to about the patents?

A.    ASUS engineers.

Q.   Who were they?

THE INTERPRETER:  The interpreter would like to ask for a clarification.

A.   They were from the displays department and from legal affairs.

BY MR. CALDWELL:

Q.   What were their names?

A.   Jason Wu.

Q.   Anyone else?

A.   Yu, Chia-Lei.  Justin Lee.

(Clarification by Reporter.)

THE INTERPRETER:  Two different names. Last name U -- pinyin spelling is Y-u, first name J-i-a-l-e-i.  The Taiwan spelling may be different.

Justin?

THE WITNESS:  Lee.

THE INTERPRETER:  Lee.  Justin Lee.

BY MR. CALDWELL:

Q.   Are any of those ASUS technical people going to make the trip to the United States to testify in court?

A.   As far as I know, they looked for technical people here in the United States for this purpose.

Q.   My question is, are any of the ASUS technical people that you talked to going to come to court to

540

testify?

A.    As far as I know, no.

Q.    And you, Mr. Lee, do not know what technologies have incorporated into ASUS display panels, correct?

A.    I have a basic understanding only.

Q.    But you would agree, consistent with your prior testimony, that you don't know what exact technologies are incorporated in the display panels, correct?

A.    For the last testimony I gave, I had not done in-depth research or did not have an in-depth understanding of them, but for this occasion, I did prepare more.

Q.    So when we sent you a deposition notice to testify, asking for your testimony on behalf of ASUS about specific issues that are relevant to the case, you didn't bother preparing, but now you've studied up since you're going to come to the United States?

A.    I am not sure which -- what you're referring to by the notice you mentioned.

Q.    Okay.  You understand we took your testimony under oath well into the case, right?

A.    Yes.  I did that last year.

Q.    And last August you didn't know -- did not

541

know what display technologies were incorporated into the panels, correct?

A.   As I just mentioned, I did take a look at them, but I didn't have an in-depth understanding of the technologies.

Q.   And last August you didn't know the types of backlights that were in the monitors, right?

A.   I didn't know what the backlighting had to do with these patents.

Q.   Last August you didn't know if quantum dot technology led to enhanced color accuracy, right?

A.   Well, I am a product -- I work in product planning.  I'm not a technical person.

Q.   You're not a technical person.  I agree.  I'm just asking you a very simple question referring to last August.

You did not know if quantum dot technology led to enhanced color accuracy, correct?

A.   Right.  I did not know that.

Q.   You did not know the details regarding suppliers' utilization of quantum dots, correct?

A.   What models are you referring to?

Q.   Models that use quantum dots, sir.  You did not know the details regarding suppliers' utilization of quantum dots, correct?

542

A.    I did not know the details of that.

Q.    You did not know what features ASUSTeK advertises as important for its quantum dot monitors, correct?

A.    That's not what I said.

Q.    I tell you what.  You have a witness binder in front of you.  If you would, will you turn to the tab with your first deposition and turn to Page 51?

MR. CALDWELL:  And when he finds Page 51, I would like to direct him to Line 19.

THE INTERPRETER:  Counsel, could you tell us what tab that is?

MR. CALDWELL:  It's Tab 1.  Tab 1, Page 51, Line 19.

THE INTERPRETER:  Thank you.

A.    Okay.  I see Page 51.

BY MR. CALDWELL:

Q.    Do you see Line 19?

A.    I see it.

Q.    Are you able to read Line 19 through 22, which have been transcribed in English?  Or if not, I will -- suppose I'll just have to ask them to you and have them translated.

A.    I need a translation.

MR. CALDWELL:  Okay.  Your Honor, given

543

that this is through a translation, may I repeat the question and answer that was in his deposition and ask if I've --

THE COURT:  Of course.

MR. CALDWELL:  -- if it's correct?

BY MR. CALDWELL:

Q.    So I'm going to read Page 51, Line 19.

Mr. Lee, what features does ASUSTeK advertise as important for its quantum dot monitors?

Your answer is:  I cannot know.

Do you believe I read that correctly?

A.    That's correct.

Q.    Similarly, you did not know one way or another if ASUSTeK thinks that quantum dot monitors were commercially successful, correct?

A.    My impression is that I need to ask the attorney for a definition of "success."

Q.    Sir, you testified you don't know if quantum dot monitors were successful, right?

A.    So are you asking about my answers at that time or asking for answers now, here?

Q.    I'm asking how you testified under oath halfway through this case, sir.

A.    I'm sorry.  I don't recall.

Q.    It's true that ASUSTeK does not know what

544

technologies were incorporated into display panels, correct?

A.    That's correct because we are not a manufacturer of display panels.

Q.    Agreed.

And so whether or not to use quantum dot technology is a decision made by the display panel vendors, correct?

A.    Correct.

Q.    Also, you do not know about matters regarding product research and development, correct?

A.    Yes.  Correct.

Q.    But you do understand that research and development costs, that's an important part of SVV's damages model, right?

A.    I saw the explanations of that this morning.

Q.    But ultimately -- and like I say, I mean no disrespect.  The person that ASUSTeK chose to bring here is not a technical person, right?

A.    I think this was a decision made by our company because like I said, they were looking for technical people located here.

Q.    There is no technical ASUS employee who is going to testify in front of this jury, correct?

A.    Well, this technology is about the backlights,

545

but ASUS is not a manufacturer of LCD panels.  And, therefore, ASUS is not responsible for the vendors of those display panels.

Q.    Did you mean to say "correct" in response to my last question, that ASUS is not going to bring any technical employee to talk to this jury?

THE INTERPRETER:  The interpreter would like to ask for clarification.

A.    ASUS did not look for technical people this time.

BY MR. CALDWELL:

Q.    Thank you.

So, sir, perhaps you are on the financial, the money side at ASUSTeK; is that correct?

A.    I know a little bit about it.

Q.    And one of the things you know is that costs can change over time, correct?

CHECK INTERPRETER:  The check interpreter would like to clarify --

(Clarification by Reporter.)

CHECK INTERPRETER:  The check interpreter would like to interpret -- would like to translate.

A.    Yes.  I understand.

BY MR. CALDWELL:

Q.    I don't want the question lost.  I know that

546

everybody's doing the absolute best they can.  I just don't want the question lost.

To clarify, what I'm asking is, you understand that costs can change over time, correct?

A.    Yes.

Q.    And, for example, the pandemic, the COVID pandemic affected your supply chain some and caused fluctuations in costs, correct?

A.    Yes.

Q.    And while you know some stuff about costs, you do not know the costs of backlights for monitors, correct?

A.    I only know a percentage.

Q.    Sir, your testimony, as I understand it, is because you're not a vendor for display panels, you do not know about the price of backlighting; is that correct?

A.    We do not know the exact costs or the details of the costs, but in preparation for this case, we did learn a little bit about it.

Q.    All right.  Sir, I would like to direct you to your deposition.  It's at Tab 1.  And if you would, please flip to Page 39.

A.    I see it.

Q.    Okay.  And now I'd like to direct you starting

547

at Line 19 on that page.

I will read the question and answer, and hopefully you can tell me if I read it correctly.

Does one type of backlighting, for example, lead to a higher priced monitor?

Your answer:  Because we are not a vendor for display panels, we do not know about the -- its price. We do not know about the price of backlighting.

Did I read that correctly?

A.     Correct.  We do not know the details of the costs.

Q.     Now, you were here just a few minutes ago when your lawyer was cross-examining Dr. Farber, correct?

A.     I recall that.  Yes.

Q.     And she was criticizing Dr. Farber for not talking about the price of backlights, correct?

A.     I remember it.

Q.     And as I understand, when we took your deposition under oath, you didn't know about the price of backlighting, but what you want to do today is say, well, now that we're after my deposition, I studied up on it so I can give you some other details in trial? Is that kind of what's going on?

A.     I still do not know much about the details of the costs.  I just know approximate percentages or

proportions.

Q.   Do you know whether quantum dot monitors are more or less profitable?

A.   The profit on each unit is different.

Q.   Is it fair to say, though, that you're not the most knowledgeable person at ASUS when it comes to the cost of parts and profit for the monitors that are at issue in this case?

A.   Well, that's because I could not possibly remember or know the cost and profit information for hundreds of different model types.

Q.   Well, a year ago, you just told us you don't know whether quantum dot monitors are more or less profitable, right?

A.   Well, there are just too many different models.  I could not -- I could not remember them all.

Q.   You know what you said in your deposition about the pricing of quantum dot monitors and the profit, correct?

A.   I don't remember.

Q.   Okay.  Sir, I'll move on.

Do you understand that there are fundamentally two issues that will be presented for the jury to decide at least at a high level?

A.   Could you please explain which two issues?

549

Q.   At a high level, the jury's going to answer a question about infringement and a question about damages, right?

A.   We found technical experts and technical witnesses and damages witnesses for this.

Q.   I'm trying to be respectful of everybody's time here, sir.

Mr. Lee, I want to make sure you understand that the jury will be asked to determine whether there is infringement and whether -- or what the extent of damages is.

Do you understand that?

A.   Yes.  I understand that.

Q.   Okay.  And, sir, the person that ASUS chose to send doesn't know or understand the patents or have the technical testimony and also doesn't understand the backlight costs, correct?

A.   Well, we did look for technical witnesses, and I think their depositions would be more informative.

Q.   Well, you looked for technical witnesses to testify at the trial, technical witnesses you would hire to testify, correct?

A.   I believe so.

Q.   Who are they?

A.   I think they are people who were hired by our

550

attorneys.

Q.    Do you know any of their names?

A.    The witness, the technical witness, is named Keith.  I'm sorry, I don't remember his last name.  And the damages witness is like me, also named James.  And again, I'm sorry.  I don't recall his last name.  It's a little long.

Q.    Last Thursday your lawyers told us they would be calling a witness, Mr. Zane Coleman.

Have you ever met Zane Coleman?

A.    I don't remember.

Q.    Thank you.

Mr. Lee, what was your job in the 2021/2022 time?

A.    I was also serving as the project manager or division -- division director.

Q.    Still in the same monitor space.  In other words, a similar role to what you have now, correct?

A.    Yes.

Q.    And like now, you worked with panel vendors and ODMs, correct?

A.    Correct.

Q.    Okay.  Can you name panel manufacturers that you work with and know how to contact?

A.    Okay.  There are at least five or six of them.

551

AUO, Innolux, BOE, SDC, which is Samsung, LGD, CSOT.

Q.   How many of those were you working with back in 2021?

A.   Almost all of them.

Q.   Which ones were you not working with, if you can identify any?

A.   All of the ones I just mentioned, we worked with them.

Q.   I think you said as far as preparing to come to trial, you talked with Jason Wu.  Am I correct about that?

A.   Yes.

Q.   How long have you known Jason Wu?

A.   I have been in pretty consistent contact with him since 2022 because of the -- because of -- because this case -- because of this case that arose.

Q.   And did you at least meet him in 2021?

A.   I don't recall.

Q.   You've been here for this trial pretty much the whole time, or if not the whole time, correct?

A.   I will be here all week.

Q.   I just want to -- I'm just confirming you have seen everything yesterday and today.  That's all I'm trying to confirm.

A.   Do you mean that I've seen everything

552

happening in the court?

Q.    Yes.

A.    Yes.

Q.    So, Mr. Lee, you will have seen several times now e-mail correspondence that is from Jason Wu to SVV's lawyer, Robert Katz.

Are you familiar with that?

A.    I recall them.  Yes.

Q.    If in 2001 you were -- I'm sorry.  I'll start over.

If in 2021 you were in regular contact with six panel makers, why did Jason Wu tell Mr. Katz he's not sure how to get into contact with panel makers?

A.    If I recall correctly, he did send the contact for AUO and was working on getting information for Innolux.

Q.    He sent one e-mail address for AUO and said he doesn't know the person's name, correct?

THE COURT:  Counsel, about how much time do you have left with him?

MR. CALDWELL:  25 minutes.

THE COURT:  25 minutes?

MR. CALDWELL:  I'm guessing just -- it's a little slower.

THE COURT:  Ladies and gentleman, we're

553

going to take our afternoon recess.  Please remember my instructions not to discuss the case.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

THE COURT:  Thank you.  You may be seated.

You may step down.

To be clear, this gentleman is your corporate representative, correct?

MS. MARRIOTT:  Yes, Your Honor.

THE COURT:  Okay.  Therefore, there's no prohibition against you speaking with him during the break.

MS. MARRIOTT:  Thank you, Your Honor.

THE COURT:  Anything we need to take up?

MR. CALDWELL:  No.

THE COURT:  Okay.

(Recess taken.)

THE BAILIFF:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury entered the courtroom.)

THE COURT:  Thank you.  You may be seated.

MR. CALDWELL:  Thank you, Your Honor.

554

May I proceed?

THE COURT:  Please.

MR. CALDWELL:  Thank you.

BY MR. CALDWELL:

Q.    So before we took the break, I was asking you about the correspondence between SVV's lawyer and Jason Wu at ASUSTeK, correct?

A.    I recall that.

Q.    Okay.

MR. CALDWELL:  Now, Mr. Diaz, can I have Plaintiff's Trial Exhibit 44, and if you'll just go to the page -- I think it's the next one and -- yes. Perfect.

BY MR. CALDWELL:

Q.    So, Mr. Lee, Plaintiff's Trial Exhibit 44 is on the screen, and this is the e-mail you started to reference where Jason Wu had identified a contact person for AUO of Linh Ha at AUO.

Do you see that?

A.    I see that.  Yes.

Q.    Do you know Linh Ha?

A.    I don't know him or her.

Q.    Have you ever heard that name before you saw this e-mail chain?

A.    No.

555

Q.   And were you here during the testimony from Dr. Vasylyev when he said they tried to reach out, but AUO just wanted to start the whole claim chart thing all over again from square one?

A.   Yes.

MR. CALDWELL:   Just keep that up, but we don't need that highlighting.   I'm going to direct you to somewhere else.

I really want to go -- no, same part of that.   I'm sorry, Pete.

I want to go to that third sentence that begins with "Accordingly."

BY MR. CALDWELL:

Q.   So before we took the break, you were answering that Jason Wu had tried to give his contact information for a panel maker, right?

A.   Jason Wu provided the contact person for AUO.

Q.   Right.   Someone you, who actually works with AUO, has never heard of, correct?

A.   I had not heard of that person because our normal contacts at AUO were in business and PMs.

Q.   That's kind of my point.   Earlier in the e-mail what Jason Wu tells us is that we, meaning ASUSTeK, do not have information regarding the panel manufacturers of the monitors and the points of contact

556

for the panel manufacturers.

Do you see that in his e-mail?

A.    It is written that way in the e-mail.  Yes.

Q.    And while Jason Wu was telling us that, you, sir, absolutely had points of contact for the panel manufacturers and talked to them regularly, correct?

A.    Yes.  I had the contact information for the people working in business and the PMs at that company.

Q.    So did you not tell Jason Wu the contact information for the panel makers, or did he not even ask you, the product manager, for the monitors?

A.    As I recall, he did ask me.

Q.    Mr. Wu asked you before or after he told us that ASUSTeK does not have contact information for the panel manufacturers?

A.    Well, as I said earlier, I started to be in closer contact with him beginning in 2022 relating to this case, but I don't know exactly which month in 2022 that was.

Q.    We can at least agree that when Mr. Wu was telling Mr. Katz that ASUSTeK does not have information on panel manufacturers and have points of contact for the panel manufacturers, that is untrue because at the very least, you, the product manager for the monitors, had that exact information, correct?

557

A.    I do recall that he asked for help in 2022 in getting the contacts from business and PMs, and we asked the legal affairs about this.

Q.    Okay.

THE INTERPRETER:  I would like to clarify.

CHECK INTERPRETER:  The check interpreter suggestion, in 2022, they did ask for my help through PM to find the legal liaison.

THE INTERPRETER:  Thank you.

BY MR. CALDWELL:

Q.    Okay.  Sir, we'll move on.

You testified when we took your deposition that you didn't know the patents because you're not an engineer.

Do you remember that?

A.    I remember that.

Q.    Okay.  And now, a technical person was -- we did speak to a technical person also under oath and that was Chia-Lei Yu.

Did you know that we took that deposition?

A.    I know.

Q.    Okay.  And you understand that Chia-Lei -- which for the record, I think, at least the way it's translated in English, is C-h-i-a L-e-i.

558

Just to make sure this is clear, Chia-Lei Yu is ASUS' chief of the R&D department for monitors, right?

A.    Correct.

Q.    Okay.  And you understand that even more than a year into this case, Mr. Yu is not familiar with the content of SVV's patents either?

A.    If that's what he said in his deposition, that is true.

Q.    So if Dr. Vasylyev and SVV would prefer to avoid litigation, what do they have to do to get somebody at ASUSTeK who's technical on monitors to read their patents?

A.    I'm sorry.  I don't know.

Q.    You heard with the last witness, Dr. Farber, both in his direct and cross-examination, he talked about this concept of noninfringing alternatives.

Do you recall that coming up in the testimony?

A.    He did get into the technical details.  I do know that he mentioned this.

Q.    Well --

CHECK INTERPRETER:  May the check interpreter make a suggestion?  He talked about a lot of technical stuff.

BY MR. CALDWELL:

559

Q.   On cross-examination your lawyer suggested or implied that ASUS could just switch to some alternative that was noninfringing.

Do you remember that suggestion in the cross-examination?

A.   Yes.  I remember that.

Q.   Okay.  But one thing she did not do is she didn't actually show any technical example of a noninfringing alternative, correct?

A.   She did not.

Q.   In this case, did SVV ask ASUSTeK if it was aware of or looking into any alternatives it could switch to that would avoid infringement?

A.   We did not make any changes to our designs.

Q.   Right.

THE INTERPRETER:  Interpreter would like to clarify one thing.

A.   We did not make any design changes once this case began.

BY MR. CALDWELL:

Q.   Right.  My question is, though, do you understand that we, SVV, asked ASUSTeK if it was looking into any design changes that would be noninfringing?  It's just yes or no.

Do you understand we asked you that question?

A.    I don't recall.

Q.    Okay.  I'd like to have you take your binder and we'll flip to the very final tab.  That's Tab No. 7 in that binder.

And in Tab 7, if you would, would you please flip to Page 9?

A.    Okay.

Q.    In order to keep the translation efficient, I'm just going to get right to the heart of the issue, okay?

On Page 9 -- sir, right here on Page 9, ASUSTeK told us:  Responding party, ASUSTeK, is not presently aware of and is not investigating any noninfringing alternatives or design-arounds.

Did I read that correctly?

A.    I see it.

Q.    And they were telling us the truth, weren't they?

A.    That's what the document says.

Q.    And right below the sentence I read, ASUSTeK said:  Investigation and discovery are continuing.

Do you see that?

A.    I see that.

Q.    And do you understand that ASUSTeK had the ability and, in fact, the duty to supplement that

561

answer if they had changed their answer?

Do you understand that?

A.   I don't know about that.

Q.   I'd like to have you flip to Page 14 of that same document.

A.   Okay.

Q.   Have you found Page 14, sir?

A.   Yes.

Q.   And sometimes when these interrogatory answers are served, there's a document added to the end called the verification, and that's what this is.

Do you see the document that says it's a verification of the answers?

THE INTERPRETER:  The interpreter would like to ask the check interpreter for a term "interrogatory."

A.   I see the document, Page 14.

BY MR. CALDWELL:

Q.   And who is it that verified these answers on behalf of ASUSTeK?

A.   I see Jason Wu's signature on Page 14.

Q.   Yes.  Jason Wu, the person that's in charge of our case that had been corresponding with Mr. Katz all those years ago, the same person, correct?

A.   Yes.

562

Q.    And as far as you know, the answers that he verified are still true, that ASUS is not making an effort to identify a noninfringing alternative, correct?

A.    I'm not able to answer on behalf of Jason Wu.

Q.    Well, I'm asking you to answer on behalf of ASUSTeK because you are the corporate representative in this trial.  And I want to know, ASUSTeK has not changed its answer, and you stand by that answer today, correct?

A.    That is what it says in the document.

Q.    Yes, sir.  And you're not coming to court today to try to change ASUSTeK's answer, are you?

A.    I do not want to make any changes.

Q.    So in response to the original notice letter from Mr. Katz, ASUSTeK changed nothing about its monitor panels, right?

A.    We did not make any design changes.

Q.    And in response to Mr. Katz sending the 40 claim charts after Jason Wu asked for claim charts, ASUS didn't change anything about its monitors, right?

A.    We did not make any changes.

Q.    And then once the case was on file, we went and talked to the technical corporate representative for ASUSTeK, which was that Mr. Chia-Lei Yu.

You're aware that we took his deposition, right?

A.   Yes.  I know.

Q.   And Mr. Yu was not familiar with the content of the patents and testified that he's not able to answer questions regarding noninfringing alternatives, correct?

A.   If that's how he answered, then that is how he answered.

Q.   Would you like to see it?

A.   We could do that.

Q.   All right.  If you would flip to Tab 4.

A.   I have turned to Page 4.

Q.   Okay.  And it's Page 7.

Have you found Page 7?

A.   I found it.

Q.   Okay.  And I'm going to start at Line 6. There was some translation stuff before that, but I'm going to start at Line 6.

And it says:  In fact, actually, so far I am not familiar with the content of the asserted patents in this case.  So I don't think I am able to answer your question regarding describing the alternative noninfringing alternatives.

Did I read that correctly?

564

A.     May I see that?

Q.     So there's original discussions in the claim charts; that was with Jason Wu and it did not result in change.  And then we talked just now about the testimony of Mr. Yu.  Correct?

A.     Correct.

Q.     And you, Mr. Lee, have indicated that because you're not an engineer, you cannot describe or identify any potential noninfringing alternatives, right?

A.     Correct.

Q.     And said differently from our past discussions, you would not know how to design around any patented technology, correct?

A.     Correct.

Q.     Okay.  And so as you sit here, you don't have a design in mind to switch to to avoid infringing, right?

A.     Right.

Q.     And you are the monitor project -- I'm sorry.  Strike that.

You are the monitor's product planner, correct?

A.     Correct.

Q.     So ASUS' monitor product planner that they brought to this trial has no plans to stop infringing,

565

correct?

A.    No.  We -- we take this very seriously, the matter of intellectual property, and we -- this is why I wanted to come here, to defend ourselves against this claim.

CHECK INTERPRETER:  The check interpreter would want to add one thing he said, that we never thought about infringing or infringement.

THE INTERPRETER:  Thank you.

BY MR. CALDWELL:

Q.    Mr. Lee, after your lawyer got up and suggested with the last witness that you guys could switch to some design that didn't infringe, you as the product planner have no design to switch to in mind as you sit here today and testify, right?

A.    Well, we need to first clarify whether there was any infringement.

Q.    When your lawyer talked about changing the design, you don't have any different design in mind that you would switch to, correct?

A.    There are a lot of factors to take into consideration when making any potential changes, and the attorney is not a technical expert.

THE INTERPRETER:  So the interpreter would like to clarify something here.

566

A.    The attorney is not a engineer, and so they would not know what impact that would have, what impact such changes would have on the products.

BY MR. CALDWELL:

Q.    Agreed.

And also not an engineer is yourself, respectfully.  So you've hired somebody else.  Rather than bring ASUS engineers, you've hired somebody else to talk about noninfringement, correct?

THE INTERPRETER:  May the interpreter ask him to repeat this one sentence?

A.    Well, the important -- the importance of this case is in the backlighting, and ASUS is not a panel manufacturer.  Therefore, we have asked or hired an optical expert to testify here in this case.

MR. CALDWELL:  I'll pass the witness.

Thank you for your time.

THE COURT:  Do you have any questions?

MS. MARRIOTT:  Your Honor, we're going to reserve our questions for our case.

THE COURT:  Could I have counsel up here, please?

(Bench conference.)

THE COURT:  Let's go back on the record.

What was the exhibit?

567

MR. CALDWELL: PTX-44. His colleague reminded me we need to admit that version of --

MR. BURESH: Yes. No objection. I think we've both used it.

THE COURT: So okay.

(Bench conference concludes.)

THE COURT: Who's the plaintiff's next witness?

MR. CALDWELL: Your Honor, with the reservation that we may need to put some stickers on some boards, demonstratives, that sort of thing, the plaintiff rests.

THE COURT: Ladies and gentleman of the jury, we're done for the day. Remember I have sentencings in the morning. If you all want to get here earlier than 10:00, it's a public courtroom. You're welcome to come in and watch what's going on.

What I'm going to be doing starting at 9:00 is public. So you're welcome to come, but you're also welcome to not come until 10:00. And you're welcome when you get here to go directly to the jury room. And so whatever is easiest for you all. Hopefully that will give you a little extra time to sleep in the morning.

And so we will see you tomorrow -- I

568

can't promise we'll be done -- we'll be ready to go at 10:00. But if y'all are here and ready to go when I finish the sentencing, it will start very quickly after I'm done with the sentencing.

And so -- and for your purposes, unless something extraordinary happens, the lawyers and I anticipate that the closing arguments will take place sometime Thursday morning, which means you'll begin deliberating on Thursday. And so we are totally on schedule, and I appreciate your hard work. I appreciate very much the hard work of the lawyers who have made this possible.

We'll see you tomorrow.

THE BAILIFF: All rise.

(Jury exited the courtroom.)

THE COURT: You may be seated.

So let me go ahead and put this on the record. My plan is tomorrow to meet at lunch and do the jury charge. As I think you've all been in front of me maybe more than once, but as you know, if you want to be there, you're welcome. If you don't want to be there, I don't care.

You know, I'm not a judge who feels like you all have to be -- whoever wants to come is welcome. Whoever has other things like putting on witnesses or

569

doing closing arguments is welcome to be working on that, and I take no offense to it.

With regard to the jury charge itself, as you know, most of this -- the default that will win, it will always be that I've given it before with the exception if it was in the -- one of the first two or three cases I had, that's not as good an argument. But if it's in the last five, it's unlikely you will change my mind. And so that's what we'll do there.

Now, does the defendant have a Rule 50 motion they'd like to make?

MR. BURESH: We do, Your Honor, and it will be presented by Chris Schmidt.

THE COURT: Okay.

Yes, sir.

MR. SCHMIDT: Good afternoon, Your Honor. Chris Schmidt on behalf of the defendant. We have six Rule 50 motions.

The first motion is for a finding of noninfringement as a matter of law, that SVV has not shown that any accused product has lenses that are, quote, configured for injecting light into the space between the optically transmissive and reflective surfaces as required by Claim 19 of the '089 patent.

SVV entirely failed to discuss this claim

requirement. A word search of Mr. Credelle's testimony confirms that neither he nor his counsel ever used the word "inject" at all during his testimony and entirely failed to address this requirement.

The relevant testimony on this limitation spanned from Pages 308, Line 17, to Page 309, Line 6 from the Day 1 testimony.

And review of that testimony confirms that Mr. Credelle failed to provide any testimony to explain how the accused lenses inject light into the space between the transmissive and reflective surfaces as required by Claim 19 of the '089 patent.

Further, from the basic structure of the product, it is evident that light is already in the space before the light ever touches a lens such that it is not the lens that injects light into the space at all.

For these reasons, SVV has not shown that the, quote, configured for injecting light limitation of Claim 19 of the '089 patent has been met.

THE COURT: Why don't you just go ahead and do all of them? If I hear something I need a response on, I'll hear it.

MR. SCHMIDT: The second motion is for a finding of noninfringement as a matter of law that SVV

571

has not shown that any accused product has a broad-area light input surface and an opposing broad-area light output surface extending generally parallel to said light input surface as required by Claim 3 of the '318 patent.

Mr. Credelle admitted that light comes into the accused light guides from the edge and exits the light guide from the top and bottom. Mr. Credelle nonetheless opined that the bottom of the light guide is the light input surface which is contrary to the plain meaning of the term "light input surface" as described in Claim 3 of the '318 patent.

SVV has, therefore, not shown that the broad-area light input surface limitation has been met.

The third motion is for a finding of noninfringement as a matter of law as to Claims 1 and 21 of the '342 patent because SVV has not shown that any accused product has a predetermined alignment between light-deflecting elements on the bottom surface of the light guide and the lenses at the top surface of the light guide as required by this limitation.

SVV agrees that the pattern of surface relief features is random while the lenses are in a linear array but nonetheless asserts, without evidence, that the random relief features are in a predetermined

572

alignment with the linear lenses.

Mr. Credelle admitted that "predetermined alignment" means the alignment is, quote, by design. He also admitted that the two surface relief features relied upon happened to be aligned with a corresponding lens which contradicts his own plain and ordinary understanding of predetermined.

Mr. Credelle further suggested that a machine exists that indexes the two elements together but provided no evidence that such a machine exists and admitted he showed no CAD file or any other program, document, or testimony even suggesting that such a machine exists.

For these reasons, SVV has not shown that any accused product has any light-deflecting elements in a predetermined alignment with any lens as required by Claims 1 and 21 of the '342 patent.

The fourth motion is for a finding of noninfringement as a matter of law that SVV has not shown any accused product has a predetermined two-dimensional pattern of surface relief features as required by Claims 1 and 7 of the '562 patent.

Mr. Credelle testified that his photos show the existence of an irregular pattern and then opined without evidence that this pattern is, quote,

predetermined.  Mr. Credelle further testified this pattern is random, and then opined this pattern is both random and predetermined.

He presented no evidence of what happens during manufacturing other than stating, without evidence, that a CAD file or other program exists that creates a predetermined pattern that is somehow still random.  SVV lacks evidence to support a finding of infringement.

For these reasons, SVV has not shown the existence of a predetermined two-dimensional pattern of surface relief features in the accused products as required by Claims 1 and 7 of the '562 patent.

And, Your Honor, we have two additional motions.  Mr. Siegmund will argue those.

MR. SIEGMUND:  Mark Siegmund on behalf of the defendant.

This one relates to willful infringement, Your Honor.

ASUS moves as a matter of law there's not sufficient evidence to support a claim of willful infringement.  Willful conduct, as the Court knows, is malicious, wanton, deliberate and conscious, wrongful, flagrant, or in bad faith, and the Court saw the letter and the responses from ASUS throughout this trial, and

574

they show the exact opposite of flagrant or bad faith.

And there's several factors the Court's aware of that courts use to evaluate this, hopefully given in the jury instructions, whether or not ASUS acted consistently with the standards of behavior for its industry.

It's our view that asking for claim charts responding to these e-mails and even providing information on panel manufacturers is not outside the ordinary industry practice.

The second factor is whether or not ASUS intentionally copied a product of SVV.  There's no evidence of copying in this case.

The third element is whether or not ASUS reasonably believed it did not infringe or that the patent was invalid.  We relied on our engineers and input from the panel manufacturers that it did -- that we did not infringe the patents.

And then, fourth, whether or not ASUS made a good faith effort to avoid infringing the asserted products; for example, whether ASUS has attempted to design around the asserted patents.  It is a fact of this case that there are hundreds of unaccused monitors that do the same thing.

So that is the willful infringement

575

motion, Your Honor.

THE COURT:  Well, how does that not count against you?  I mean, in terms of willfulness?

MR. SIEGMUND:  In terms of what, Your Honor?

THE COURT:  Well, they've told you what they think is infringing, and you've shown that -- your argument is we could have designed around, but you haven't -- I mean, and I get -- look, I get you all don't make the monitors.  I get that.

But I'm saying you have continued -- if it's possible to sell monitors that don't have the infringing -- and I'm not -- that don't have what is accused of infringing.  I don't know if it infringes either.

But you've made -- prior to filing the lawsuit, they gave you all a notice -- I mean, a lot more notice than I see ordinarily -- in their communications, and your client made the decision -- I understand why.  They don't think they infringe.

But I don't see how I would take it away from the jury at this point given the fact this is a Rule 50 motion and there is evidence that would support willfulness, and in my opinion they could easily argue the reverse on the design-around that you just made.

576

So I'm not saying I'm right or wrong. I'm just saying I'm not -- y'all didn't hire me to make the decision. We have seven people who are going to do that. So how would I possibly rule in your favor on that issue?

MR. SIEGMUND: We're making our record, Your Honor. We believe because of the things I just said, I don't expect the Court to agree, that's the --

THE COURT: Again, I'm not taking a position on any of those issues. I'm saying this is -- as a Rule 56 -- Rule 50 motion. I only know two of the rules and those are the two. Well, I know Rule 12 too.

But at any rate, I'm going to deny that one.

MR. SIEGMUND: Understood.

THE COURT: What's next?

MR. SIEGMUND: The last one's damages, Your Honor.

Again, we move as a matter of law for SVV failed to calculate royalties based on the smallest salable patent unit and -- as well as they failed to apportion. Specifically, Dr. Farber's regression model utilizes the cost of the entire display monitor to ascertain any cost savings supposedly attributable to the patented technology.

577

And I think all the -- the experts from both sides have agreed that the patents-in-suit did not invent the entire display module.  What's at issue in this case is the backlight panel.  That's where the accused functionality is directed.

So therefore, any cost savings that can be attributed to the patent technology should only be directed to the cost savings of the backlight panel.

Additionally, Dr. Farber fails to apportion to what the patented technology actually provides to ASUS, as was just stated.  It's undisputed the patents did not invent the backlight, all the components that go in it, let alone the cost of the entire monitor.

In our view, Dr. Farber does not account for this in his analysis; therefore, he failed to apportion down to the patented technology.

And then finally, Dr. Farber, in our view, failed to provide the jury with any evidence of a per-patent royalty, and we believe this is improper.

And those are our motions, Your Honor.

THE COURT:  Okay.  Those are respectfully overruled.

What else do we have to take up?

MR. BURESH:  Nothing for defendant,

578

Your Honor.

MR. MCCARTY:  We do have some remaining objections for their technical expert.  We have to take them up in the morning.  They relate to a couple of slides.

THE COURT:  Let's take that up in the morning.  I think that makes the most sense.

Okay.  If you all -- you all -- again, the courtroom's open.  You're welcome to come in any time.  We'll start at 9:00.  As soon as I'm done with sentencings, we'll bring the jury in and we'll start with defendant's first witness.  I'll see you tomorrow.

(Hearing adjourned.)

579

UNITED STATES DISTRICT COURT )

WESTERN DISTRICT OF TEXAS      )

I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

Certified to by me this 3rd day of October 2024.

*/s/ Kristie M. Davis*
KRISTIE M. DAVIS
Official Court Reporter
PO Box 20994
Waco, Texas 76702
(254) 666-0904
kmdaviscsr@yahoo.com

04:53